**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VICTORINO MARQUEZ, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BRIGHT HEALTH GROUP, INC., G. MIKE MIKAN, CATHERINE R. SMITH, JEFFREY J. SCHERMAN, ROBERT J. SHEEHY, KEDRICK D. ADKINS JR., NAOMI ALLEN, JEFFREY FOLICK, LINDA GOODEN, JEFFERY R. IMMELT, MANUEL KADRE, STEPHEN KRAUS, MOHAMAD MAKHZOUMI, ADAIR NEWHALL, J.P. MORGAN SECURITIES LLC, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL INC., BOFA SECURITIES, INC., CITIGROUP GLOBAL MARKETS INC., PIPER SANDLER & CO., NOMURA SECURITIES INTERNATIONAL, INC., and RBC CAPITAL MARKETS, LLC,<br><br>Defendants. | No. 1:22-cv-00101-AMD-RLM<br><br><u>CLASS ACTION</u><br><br><u>JURY TRIAL DEMANDED</u> |

**AMENDED COMPLAINT FOR VIOLATIONS**
**<u>OF THE FEDERAL SECURITIES LAWS</u>**

# TABLE OF CONTENTS


I. NATURE OF THE ACTION ..... 2

A. Overview of Securities Act Claims ..... 2

B. Overview of Exchange Act Claims ..... 8

II. JURISDICTION AND VENUE ..... 15

III. PARTIES ..... 16

A. Lead Plaintiff ..... 16

B. Defendant Bright Health ..... 17

C. The Individual Defendants ..... 17

D. The Underwriter Defendants ..... 19

IV. BACKGROUND ON RELEVANT GOVERNMENT HEALTH PROGRAMS AND REGULATIONS ..... 22

A. Medicaid and Medicare ..... 22

B. The Affordable Care Act ..... 23

C. Medical Cost Ratio ..... 25

D. Risk Management ..... 25

V. BACKGROUND FACTS FOR ALL CLAIMS ASSERTED ..... 26

A. Overview of Bright Health's Business ..... 26

1. Bright Health's Revenue and Costs ..... 29

2. Bright Health's Pre-IPO Transactions ..... 31

B. Former Bright Health Employees Corroborate the Allegations Herein ..... 33

1. FE-1: Market Executive Director ..... 33

2. FE-2: Former Manager, Care Management ..... 41

3. FE-3: Former Manager, Clinical Market Performance ..... 43

VI. SECURITIES ACT ALLEGATIONS ..... 44

A. The IPO ..... 44

B. The False and Misleading Registration Statement ..... 47

1. The Registration Statement Falsely Describes Certain Risks as Potential when Such Risks had Already Manifested and/or Would Foreseeably Occur Shortly After the IPO ..... 49

2. The Registration Falsely Describes the Strength of Bright Health's Business and Operations by Omitting Then-Existing and Material Operational Challenges and Risks ..... 60

C. Post-IPO Events ..... 74

1. Third Quarter 2021 Results ..... 74

2. Fourth Quarter and Full Year 2021 Results ..... 79

D. Former Bright Health Employees Confirm that Bright Health's Operational Issues Existed Prior to the IPO ..... 85

VII. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ..... 90

COUNT I For Violation of Section 11 of the Securities Act against Defendant Bright Health, the Individual Defendants, and the Underwriter Defendants ..... 90

COUNT II For Violation of Section 12(a)(2) of the Securities Act Against Defendant Bright Health, the Individual Defendants and the Underwriter Defendants ..... 94

COUNT III For Violation of Section 15 of the Securities Act Against the Individual Defendants ..... 96

VIII. EXCHANGE ACT ALLEGATIONS ..... 98

A. Defendants Materially False and Misleading Statements and Omissions ..... 98

(a) The Registration Statement Falsely Describes Certain Risks as Potential when Such Risks had Already Manifested and/or Would Foreseeably Occur Shortly After the IPO ..... 98

(b) The Registration Falsely Describes the Strength of Bright Health's Business and Operations by Omitting Then-Existing and Material Operational Challenges and Risks ..... 110

B. The Truth Begins to Emerge, but Defendants Continue to Mislead the Market ..... 123

1. Second Quarter 2021 Financial Results ..... 123

2. Third Quarter 2021 Results ........ 135

3. Bright Health's Investor Day ........ 145

4. JP Morgan Virtual Healthcare Conference ........ 156

C. The Full Truth is Revealed ........ 160

D. Post Class-Period Events ........ 169

E. Defendants Acted With Scienter When They Made or Caused to be Made Material Misstatements and Omissions in Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder ........ 170

1. The Public Class-Period Statements and Admissions of the Executive Defendants Indicate Knowledge of All Undisclosed Adverse Facts ........ 173

2. Former Bright Health Employees Indicate Defendants Mikan and Smith Were Aware of Operational Challenges Prior to and During the Class Period ........ 175

3. The Executive Defendants Had Access to Adverse Information or Had Been Made Aware of Issues by Senior Company Management ........ 177

4. Executive Departures Following the Disclosure of Adverse Facts Supports an Inference of Scienter ........ 182

5. The Undisclosed Adverse Facts Concerned the Core of Bright Health's Business and Therefore Supports an Inference of Scienter ........ 183

6. The Proximity of the Executive Defendants' Positive Statements Concerning the Company's Financial Health and Prospects and Reversals of Fortune Support an Inference of Scienter ........ 183

F. Loss Causation ........ 185

G. Presumption of Reliance ........ 186

H. Inapplicability of the Statutory Safe Harbor ........ 189

I. Control Person Allegations ........ 190

IX. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........ 192

COUNT IV For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against Defendant Bright Health and the Executive Defendants ........ 192

COUNT V For Violation of Section 20(a) of the Exchange Act Against the Executive Defendants ........ 195

X. CLASS ACTION ALLEGATIONS ........ 196

PRAYER FOR RELIEF ........ 198

JURY DEMAND ........ 199

Lead Plaintiff Winston Van, individually and on behalf of a class of similarly situated persons and entities, by his undersigned counsel, alleges the following against: (i) Bright Health Group, Inc. ("Bright Health" or the "Company"); (ii) G. Mike Mikan and Catherine R. Smith (the "Executive Defendants" and together with Bright Health, the "Bright Health Defendants"); (iii) Jeffrey J. Scherman, Robert J. Sheehy, Kedrick D. Adkins Jr., Naomi Allen, Jeffrey Folick, Linda Gooden, Jeffery R. Immelt, Manuel Kadre, Stephen Kraus, Mohamad Makhzoumi, and Adair Newhall (together with the Executive Defendants, the "Individual Defendants");and (iv) J.P. Morgan Securities LLC, Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc., BofA Securities, Inc., Citigroup Global Markets Inc., Piper Sandler & Co., Nomura Securities International, Inc., and RBC Capital Markets, LLC (the "Underwriter Defendants" and, together with Bright Health, and the Individual Defendants, the "Defendants").[1]

The allegations herein are based on Lead Plaintiff's personal knowledge as to his own acts, and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, Labaton Sucharow LLP, which includes a review of: (i) U.S. Securities and Exchange Commission ("SEC") filings by Bright Health; (ii) securities analysts' reports and advisories about the Company; (iii) press releases and other public statements issued by the Company; (iv) media reports about the Company; (v) interviews with former employees of Bright Health with knowledge of the matters alleged herein;[2] (vi) consultation with relevant experts and consultants; and (vii) other publicly available information. Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within

---

[1] Unless otherwise noted, emphasis had been added and all quotation marks omitted throughout.

[2] Former employees ("FEs") will be identified herein by number (e.g., FE-1, FE-2). All FEs will be described in the masculine to protect their identities.

the custody or control of, the Defendants. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

### A. Overview of Securities Act Claims

1. This action asserts strict liability and negligence claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") relating to Bright Health's initial public offering of 57,512,000 shares of common stock at the offering price of $18.00 per share, including the Underwriter Defendants overallotment 6,162,000 shares, commenced on or about June 24, 2021 (the "IPO" or the "Offering"). These claims do not sound in fraud.

2. The Securities Act claims are brought on behalf of all persons and entities who purchased or otherwise acquired Bright Health common stock pursuant and/or traceable to the Company's false and misleading Registration Statement (defined herein) issued in connection with the IPO, and who were damaged thereby.

3. Congress passed the Securities Act in the hopes of restoring investor confidence after corporate scandals and the stock market crash of 1929. It requires that those who sell securities to the investing public do so on the basis of accurate and fulsome disclosures. The Securities Act creates liability for false, misleading, and incomplete statements made in connection with public securities offerings in order to protect investors and maintain confidence in our public markets.

4. The crux of the Securities Act claims alleged herein, which advance a theory of negligence, center on Bright Health's undisclosed inability and failure to scale with its massive pre-IPO growth, which significantly exacerbated then-existing operation deficiencies. Leading up to the IPO, Bright Health had quickly expanded in exponential proportions. However, this growth

was wide, but not tall, and the Company was unable to manage the deluge of new customers and care partners. In other words, Bright Health's conquest was hollow in that it was unable to sustain its ever-expanding empire. While the skeleton crew that was actual Bright Health management primed the market for the Company's IPO—in no small part by favorably pointing to Bright Health's expansion and increased total revenues year-over-year—behind the curtain, operations had unraveled at an accelerating pace. These issues were manifest at the time of the IPO, and would ultimately lead to an approximately 90% reduction in the Company's value in a single years' time, harming investors.

5. Bright Health claims to be a diversified, consumer-focused healthcare and technology company that provides healthcare products and services for consumers and care providers in local markets throughout the United States. The Company is a self-proclaimed disruptor in the healthcare space, offering purportedly innovative and data-driven proprietary solutions to both consumers and providers. On the cusp of going public in June 2021, Bright Health had enjoyed astronomical growth in 2020, in substantial part due a spree of acquisitions. As a result of the Company's acquisitions, at the time of the IPO its consumer base consisted primarily of new members concentrated in certain geographic regions, including Florida.

6. Bright Health's ability to accurately perform risk adjustments for its populations is integral to the Company's financial wellbeing. As many of Bright Health's programs are subsidized by the U.S. government, accurate risk adjustments directly correlate with the amount of subsidies the Company receives. Should Bright Health overstate the risk of its populations, it would result in an overpayment by the government, later requiring reimbursement by the Company. Conversely, should the Company make a risk adjustment that is too low, it would have negative cost impacts as the Company would not be reimbursed for underpayment. Accordingly,

visibility into the population health of its members is vital to Bright Health's financial health as it directly correlates to its ability to generate revenue.

7. Bright Health's profitability depends not only on its ability to generate total revenues, but its ability to generate net revenues. To this point, Medical Cost Ratio ("MCR"), known interchangeably as Medical Loss Ratio ("MLR"), is a key metric used to evaluate the profitability of healthcare companies. MCR is calculated by dividing total medical expenses paid by an insurer by the total insurance premiums collected, with a ratio of over 100% meaning the company's expenses were greater than any premiums received. A lower ratio indicates higher profitability for the insurer, as it signifies a larger amount of premiums are left over after paying customer insurance claims. As Bright Health had yet to achieve profitability at the time of the IPO, MCR was highly material to investors as it signified in large part when the Company would reach the event horizon of becoming profitable.

8. Finally, the ongoing COVID-19 pandemic set the backdrop of Bright Health's IPO. Having been ongoing in the United States since early 2020, COVID-19 posed unique challenges to healthcare companies, in that it put a strain on healthcare resources and caused people to defer medical treatment. In connection with COVID-19 and in existence at the time of the IPO, President Joe Biden had implemented a special enrollment period for healthcare policies under the Affordable Care Act ("ACA"), allowing for qualifying individuals to sign up for health plans through August 15, 2021, when they would not otherwise have been able to under the general enrollment periods.

9. To the above points, the Registration Statement issued in connection with the IPO warned investors that certain relevant ***potential*** risks ***might*** impact the Company's visibility into its memberships, thereby negatively impacting its financial health and prospects. For example:

(a) "[T]he complexity of our business has increased significantly in a short period of time, and our growth, strategy and profitability ***could*** be negatively impacted if we are unable to effectively manage this complexity."

(b) "Our health plan products are subject to risk adjustment programs, which ***if*** not managed properly ***can*** result in lost revenue, which ***could*** adversely impact our financial results and cash flows. … ***If*** the risk adjustment data we submit is found to incorrectly overstate the health risk of our consumers, we ***may*** be required to refund monies previously received by us."

(c) "***If*** our medical costs exceed our estimates, we will not be able to recover the difference through higher premiums, and our results of operations and financial condition ***could*** be adversely affected."

(d) "Due to the COVID-19 pandemic, we ***may*** not be able to adequately document the health conditions of our consumers and patients, as many of them have avoided in-person medical visits."

10. Warning of such ***potential*** risks that ***could*** adversely impact Bright Health, however, was materially false and misleading at the time such statements were made for one simple reason—all of those risks had already occurred and the adverse impacts of any such risks had and would foreseeably manifest further near-immediately after the IPO. Indeed, as discussed herein and corroborated by Defendant Mikan's and Defendant Smith's post-IPO admissions and the statements of the FEs, the Registration Statement was materially false and misleading in that it omitted to state:

(a) well before the IPO, Bright Health was experiencing a massive backlog of medical claims due to systematic operational deficiencies at the Company;

(b) as a result, Bright Health lacked the sufficient visibility into its populations to perform the risk adjustments required to accurately predict costs and MCR;

(c) parallel to these issues, Bright Health had been struggling to manage COVID-19 related impacts since the start of the pandemic;

(d) the above issues were materially exacerbated by the Company's significant growth, including growth through pre-IPO acquisitions and the ACA SEP, which was ongoing at the time of the IPO, resulting in a heavily skewed, then-existing, and unfavorable percentage of new versus existing members;

(e) thus, at the time of the IPO, the Company was not able to effectively manage its populations, including visibility into risks and costs, which were significantly concentrated in certain states at the time of the IPO;

(f) all the foregoing would have a material negative impact on Bright Health's business and financial condition, including financial impacts associated with overstated risk adjustments, understated MCR, and increased COVID-19 impacts;

(g) accordingly, the Registration Statement misrepresented Bright Health's post-IPO business and financial prospects; and

(h) as a result, the Registration Statement contained materially false and/or misleading statements and failed to state information required to be stated therein.

11. Shortly after the IPO, Bright Health's house of cards toppled due the undisclosed facts outlined above. For example, on November 11, 2021—less than five months following the IPO—Bright Health posted a net loss of nearly $300 million or $0.48 per share for its third quarter 2021, nearly triple the loss analysts were expecting. The miss was attributed to Bright Health's ballooning MCR for the quarter of 103%, up from 90% in the previous year's quarter and the first

nine months of the year. The Company linked the disappointing results to ongoing COVID-19 challenges, as well as the Company's failure to accurately perform risk assessments on its newly added lives.

12. With respect to the non-COVID challenges, Defendant Mikan disclosed visibility issues with a "significant influx of new members with a shorter duration" due to: (i) the per-IPO enrollments "effective on 1/1/21"—or nearly six months prior to the IPO; as well as (ii) the ACA special enrollment period, which also existed at the time of the IPO. Defendant Smith added that the issues stemmed from Bright Health's aberrational percentage of new memberships added "during every month through September." According to Defendant Smith, "[t]he negative impact from risk adjustment scoring, including a true-up for the first half of 2021, … resulted in a cumulative $134 million impact to Q3 revenue," with "$89 million was related to the first half of 2021."

13. Things then went from bad to worse, when, on March 2, 2022, the Company reported a net loss of $813.4 million for the quarter, or $1.30 per share, a loss approximately three times larger than consensus estimates. Bright Health also reported a net loss of approximately $1.2 billion for the full-year 2021. Bright Health further revealed that its MCR had exploded to 134.1% for the quarter, up from 105.4% in the prior year, and that its full year MCR had come in at 101.3%, up from 88.7% in the prior year.

14. Defendant Mikan disclosed that the "large group of new members without risk scores combined with scaling up our organizational capabilities and emerging technologies impacted our results," and as a result, Bright Health's growth—a significant portion of which was pre-IPO—"exacerbated the gaps in performance," which, "were already on [the Company's] list for improvement." Defendant Smith stated that "MCR pressure" was due to "delays in attributing

members, in part due to our rapid growth in 2021, as well as the impact of the unique 2021 special enrollment period." Defendant Mikan also disclosed that the Company was facing operational challenges in timely onboarding newly added members to perform accurate risk adjustments to an unfavorable population mix of 85% new members coupled with the ACA special enrollment period.

15. Defendant Smith stated that the "significant deterioration … was due to specific ***identifiable*** issues," which included "catching up on claims payments, and resolving resubmitted claims," which she described as a "lack of visibility into lagging medical claims on our legacy operational systems, which require manual processing." According to Defendant Smith, Bright Health had again overstated its risk adjustment, resulting in a quarterly revenue decrease of $148 million—with "$111 million relat[ing] to prior quarters." Defendant Smith also revealed that the Company was forced to "recognize[] $139 million in prior period medical costs in Q4." Defendant Smith concluded that full-year 2021 was the "peak of inefficiency" for the Company.

16. As a result of these undisclosed adverse facts, trends, and uncertainties, Bright Health's stock has plummeted, falling from its IPO price of $18.00 per share to $3.08 per share on January 6, 2022, the day this action was commenced.

**B. Overview of Exchange Act Claims**

17. This securities class action separately alleges claims under the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) against Bright Health and the Executive Defendants (defined herein), which unlike the Securities Act claims are based in fraud. These claims are brought on behalf of all persons and entities who or which purchased or otherwise acquired publicly traded Bright Health common stock during the period from June 24, 2021 through March 1, 2022, inclusive (the "Class Period"), and were damaged thereby.

18. The Exchange Act claims alleged herein concern the Bright Health's Defendants' knowing and/or severely reckless cover up of a cascading failure of multiplicatively adverse operational challenges that would, and did, significantly impact the Company's financial health and prospects. Specifically, prior to the start of the Class Period, Bright Health was wholly unable to scale with its growth, resulting in massive undisclosed claims and data processing backlogs. This, in turn, made it virtually impossible for the Company to have visibility into projected costs, resulting in inaccurate risk adjustments and the inability to correctly state MCR. Parallel to these issues, the Company had been unable to address challenges associated with COVID-19, which were also severely exacerbated during the Class Period. In essence, the boat was taking on water, and instead of fixing the leak, Bright Health had just kept making the boat bigger to stay afloat.

19. During the Class Period, the true state of Bright Health's issues began to seep into the market when the Company reported growing net losses and an adverse MCR attributable to these previously undisclosed operational failures. In a desperate effort to conceal the true depth of the issues the Company faced, however, the Bright Health Defendants referred to any such issues as "tailwinds" and continued to tout the Company's rapid expansion and revenue growth as well as its purportedly data-driven approach to managing its memberships and care partner relationships. It was only at the close of the Class Period when the Company released its abysmal fourth quarter and full-year 2021 results that the Bright Health Defendants revealed that 2021 had been the "peak of inefficiency" for the Company. Bright Health shares bottomed out as a result of these disclosures and have made no sign of recovery.

20. Accordingly, the statements made by the Bright Health Defendants alleged in connection with the Exchange Act claims were inaccurate statements of material fact because

they contained untrue statements of material fact and omitted material facts necessary to make the statements contained therein not misleading:

(a) prior to and during the Class Period Bright Health was experiencing a massive backlog of medical claims due to systematic operational deficiencies at the Company;

(b) as a result, Bright Health lacked sufficient visibility into its populations to perform the risk adjustments required to accurately predict costs and MCR;

(c) parallel to these issues, Bright Health had been struggling to manage COVID-19 related impacts since the start of the pandemic;

(d) the above issues were materially exacerbated by the Company's significant growth prior to and during the Class Period, including growth through acquisitions and the ACA SEP, resulting in a heavily skewed, then-existing, and unfavorable percentage of new versus existing members;

(e) thus, prior to and during the Class Period, the Company was entirely unable to effectively manage its populations, including visibility into risks and costs, which were significantly concentrated in certain states;

(f) all the foregoing was reasonably likely to and did have a material negative impact on Bright Health's business and financial condition, including financial impacts associated with backlogged claims, overstated risk adjustments, understated MCR, and increased COVID-19 impacts;

(g) the Bright Health Defendants knowingly and/or recklessly withheld this information from investors in the futile hope to remedy the above-issues before the adverse impacts were too large to conceal;

(h) accordingly, during the Class Period the Bright Health Defendants overstated the Company's business and financial prospects; and

(i) as a result, during the Class Period the Bright Health Defendants made materially false and/or misleading statements and failed to state information required to be stated therein.

21. On August 3, 2021, Bright Health reported the Company's financial results for its second quarter 2021 on SEC Form 8-K, its first earnings release since going public following the IPO. The Company reported that revenues rose more than 275% from the same period a year ago to $1,114 million, up from $297 million in the prior year period. Notwithstanding posting gains in earnings and growth year-over-year, the Company reported a net loss of $43.7 million, or $0.28 per share, which was substantially larger than the consensus estimates which projected a loss of $0.18 per share.

22. The earnings release reported an MCR of 86.8%. Defendant Smith was quoted in the release touting the Company's "remarkable" performance having "quadrupled" revenue "while maintaining a consistent … MCR." On the corresponding investor call the same day, Defendant Mikan touted Bright Health's "consistent performance," and that "[e]ven with [Bright Health's] explosive growth, we have been able to demonstrate in an adjusted medical cost ratio below 80% across our enterprise during the first half of 2021." Defendant Mikan also touted growth from "strong AEP/OEP organic performance, especially in Florida and North Carolina" as well as the ACA special enrollment period, which "growth did not come at the expense of performance."

23. Despite the positive statements outlined above concerning Bright Health's financial health and prospects, the market reacted negatively to the earnings miss. Specifically,

Bright Health's shares declined from the August 2, 2021 closing price of $10.92 per share to close at $8.49 per share on August 3, 2021, representing a decline of approximately 22%.

24. On November 11, 2021, Bright Health posted a surprise net loss of nearly $300 million or $0.48 per share for its third quarter 2021—nearly triple the loss analysts were expecting. The miss was attributed to Bright Health's ballooning MCR for the quarter of 103%, up from 90.1% in the previous year's quarter and the first nine months of the year. The Company attributed the disappointing results to ongoing COVID-19 challenges, as well as the Company's failure to accurately perform risk assessments on its newly added lives.

25. With respect to the non-COVID challenges, Defendant Mikan attributed it to visibility issues with the "significant influx of new members with a shorter duration" due to: (i) the per-IPO enrollments "effective on 1/1/21"—or nearly six months prior to the IPO; as well as (ii) the ACA special enrollment period, which also existed at the time of the IPO. Defendant Smith added that the issues stemmed from Bright Health's aberrational percentage of new memberships added "during every month through September." According to Defendant Smith, "[t]he negative impact from risk adjustment scoring, including a true-up for the first half of 2021, … resulted in a cumulative $134 million impact to Q3 revenue," with "$89 million was related to the first half of 2021."

26. However, in order to bolster investor confidence and keep Bright Health shares artificially inflated, Defendant Smith touted that Bright Health's "year-to-date MCR performance … [is] solid." Likewise, in response to analyst questions regarding MCR volatility, Defendant Mikan described challenges as "tailwinds" and stated he was "pleased with the member composition [and] book of business," that he believed there was a "strong predictability or at least

understanding of our underlying costs," and that had been "pretty consistent throughout the year" with respect to "medical expense."

27. On this news, Bright Health's share price declined from $7.30 at the close of trading on November 10, 2021 to close at $4.94 per share on November 11, 2021. Bright Health shares continued to decline throughout the month of November, closing at $3.33 per share on November 30, 2021.

28. Any negative announcements from the Bright Health Defendants were short lived, as less than a month later they would sling shot back to the narrative that the Company was continuing to effectively manage and enjoy its substantial growth moving into 2022. In preparation for its first ever Investor Day set to occur that same day, on December 7, 2021, Bright Health issued a press release reaffirming its full-year financial outlook for 2021 and providing guidance for 2022. In the release, Bright Health projected full-year revenues of "$6.3 to $6.5 billion, representing over 50% annual growth."

29. On the call, Defendant Mikan stated that Bright Health "now h[ad] data on where [they] [could] drive results and are moving to a more focused and disciplined growth model." When discussing the issues that had impacted Bright Health in the prior quarter, Defendant Mikan affirmed that the purported "tailwinds" were behind the Company, and stated that moving forward the Company would enjoy "more accurate risk coding and, hence, better risk adjustment performance." In sum, Defendant Mikan told investors to expect "less disruption to member engagement and health care utilization related to COVID, also a positive for risk coding accuracy and risk adjustment performance."

30. Defendant Smith, when discussing year-to-date 2021, touted a "revenue increase of 262%" which "reflect[ed] a strong membership growth." With respect to year-to date 2021

MCR (with less than a month left in the year), Defendant Smith stated that it was 90.3%. Speaking on Bright HealthCare specifically, Defendant Smith stated that 2021 "performance to date is strong," and that the Company was expecting an MCR of between 85% and 87%. Defendant Smith touted Bright Health's "good book of business, with underlying medical costs in line with … expectations."

31. The market reacted extremely favorably following Bright Health Investor Day, causing Company shares to rise from the December 6, 2021 closing price of $3.78 per share to close at $4.13 per share on December 7, 2021. Company shares continue to rise closing at $4.35 on December 9, 2021, representing a total increase of 15% as a result of the Company's affirmed 2021 guidance and projected 2022 financial results.

32. The fraud was fully revealed on March 2, 2022. On that day, the Company reported a net loss of $813.4 million for the quarter, or $1.30 per share, a loss approximately three times larger than consensus estimates. Bright Health also reported a net loss of approximately $1.2 billion for the full-year 2021. Bright Health further revealed that its MCR had exploded to 134.1% for the quarter, up from 105.4% in the prior year, and that its full year MCR had come in at 101.3%, up from 88.7% in the prior year.

33. Defendant Mikan revealed that the "large group of new members without risk scores, combined with scaling up our organizational capabilities and emerging technologies, impacted our results," and as a result, Bright Health's growth "exacerbated the gaps in performance," which, "were already on [the Company's] list for improvement." Defendant Smith stated that "MCR pressure" was due to "delays in attributing members in part due to our rapid growth in 2021, as well as the impact of the unique 2021 special enrollment period." Defendant Mikan also revealed the Company was facing operational challenges in timely onboarding newly

added members to perform accurate risk adjustments to an unfavorable population mix of 85% new members coupled with the ACA special enrollment period.

34. Defendant Smith stated that the "significant deterioration … was due to specific ***identifiable*** issues," which included "catching up on claims payments, and resolving resubmitted claims," which she described as a "lack of visibility into lagging medical claims on our legacy operational systems, which require manual processing." According to Defendant Smith, Bright Health had again overstated its risk adjustment, resulting in a quarterly revenue decrease of $148 million—with "$111 million relat[ing] to prior quarters." Defendant Smith also revealed that the Company was forced to "recognize[] $139 million in prior period medical costs in Q4." Defendant Smith concluded that full-year 2021 was the "peak of inefficiency" for the Company.

35. Analysts on the call were shocked at the disappointing news, especially in light of the positive statements made by Defendants Mikan and Smith during the Company's Investor Day, with one asking to "understand a little bit better what happened between the Investor Day in December, our conference in January and today, where [the Company's] risk adjustment accruals came in much different." Defendant Mikan ***admitted*** that when making prior statements "[the Company] didn't have the data or the insights to really understand how [it] [was] capturing the risk codes and what other underlying medical trends [they were] seeing."

36. On this news, the price of Bright Health common stock declined $0.61 per share, or 19.55% from the March 1, 2022 closing price of $3.12 per share to close at $2.51 per share on March 2, 2022. Bright Health shares continued this downward trend, closing as low as $1.79 on March 7, 2022.

## II. JURISDICTION AND VENUE

37. The claims alleged herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, as well as Sections 10(b) and 20(a)

of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

38. This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C.§ 78aa, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

39. Venue is proper pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 17 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged violations of the securities laws or their effects have occurred in this District. Pursuant to the Company's most recent quarterly report filed with the SEC, as of May 3, 2022, there were 629,245,760 shares of the Company's common stock outstanding. Bright Health securities trade on the New York Stock Exchange ("NYSE"). Accordingly, there are presumably hundreds, if not thousands, of investors in Bright Health securities, some of whom undoubtedly reside in this Judicial District.

40. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiff

41. As set forth in the Certification previously filed with the Court (ECF No. 7-3), Lead Plaintiff purchased a significant amount of Bright Health common stock during the Class Period, and suffered substantial losses as a result of the violations of the federal securities laws

alleged in this action. In particular, Lead Plaintiff purchased 200,000 Bright Health shares on the IPO pursuant to the Registration Statement and has been damaged thereby.

**B. Defendant Bright Health**

42. Defendant Bright Health is incorporated under the laws of Delaware with its principal executive offices located in Minneapolis, Minnesota. Bright Health's common stock trades on the NYSE under the symbol "BHG."

**C. The Individual Defendants**

43. Defendant G. Mike Mikan ("Mikan") has served at all relevant times as the Chief Executive Officer ("CEO") and President of Bright Health and is a Director and Vice Chairman on Bright Health's Board of Directors (the "Board"). Defendant Mikan signed the Registration Statement issued in connection with the IPO.

44. Defendant Catherine R. Smith ("Smith") has served at all relevant times as the Chief Financial Officer ("CFO") and Chief Administrative Officer of the Company. Defendant Smith signed the Registration Statement issued in connection with the IPO.

45. Defendants Mikan and Smith may hereafter be referred to at times as the "Executive Defendants," and, together with Bright Health, the "Bright Health Defendants."

46. Defendant Jeffrey J. Scherman ("Scherman") has served at all relevant times as the Chief Accounting Officer at the Company. Defendant Scherman signed the Registration Statement issued in connection with the IPO.

47. Defendant Robert J. Sheehy ("Sheehy") has served at all relevant times as Chairman of the Company's Board. Defendant Sheehy signed the Registration Statement issued in connection with the IPO.

48. Defendant Kedrick D. Adkins Jr. ("Adkins") has served at all relevant times as a Director on the Company's Board. Defendant Adkins signed the Registration Statement issued in connection with the IPO.

49. Defendant Naomi Allen ("Allen") has served at all relevant times as a Director on the Company's Board. Defendant Allen signed the Registration Statement issued in connection with the IPO.

50. Defendant Jeffrey Folick ("Folick") has served at all relevant times as a Director on the Company's Board. Defendant Folick signed the Registration Statement issued in connection with the IPO.

51. Defendant Linda Gooden ("Gooden") has served at all relevant times as a Director on the Company's Board. Defendant Gooden signed the Registration Statement issued in connection with the IPO.

52. Defendant Jeffery R. Immelt ("Immelt") has served at all relevant times as a Director on the Company's Board. Defendant Immelt signed the Registration Statement issued in connection with the IPO.

53. Defendant Manuel Kadre ("Kadre") has served at all relevant times as a Director on the Company's Board. Defendant Kadre signed the Registration Statement issued in connection with the IPO.

54. Defendant Stephen Kraus ("Kraus") has served at all relevant times as a Director on the Company's Board. Defendant Kraus signed the Registration Statement issued in connection with the IPO.

55. Defendant Mohamad Makhzoumi ("Makhzoumi") has served at all relevant times as a Director on the Company's Board. Defendant Makhzoumi signed the Registration Statement issued in connection with the IPO.

56. Defendant Adair Newhall ("Newhall") has served at all relevant times as a Director on the Company's Board. Defendant Newhall signed the Registration Statement issued in connection with the IPO.

57. Defendants Mikan, Smith, Scherman, Sheehy, Adkins, Allen, Folick, Gooden, Immelt, Kadre, Makhzoumi, and Newhall may hereafter be referred to at times as the "Individual Defendants."

**D. The Underwriter Defendants**

58. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase the Bright Health stock issued pursuant thereto. J.P. Morgan is a Delaware limited liability company with principal executive offices located at 383 Madison Avenue, New York, New York. J.P. Morgan was allocated 11,297,000 shares in the IPO to sell to the investing public before the exercise of the overallotment.

59. Defendant Goldman Sachs & Co. LLC ("Goldman") is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase the Bright Health stock issued pursuant thereto. Goldman is a New York limited liability company with principal executive offices located at 200 West Street, New York, New York. Goldman was allocated 11,297,000 shares in the IPO to sell to the investing public before the exercise of the overallotment.

60. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the

Registration Statement and solicit investors to purchase the Bright Health stock issued pursuant thereto. Morgan Stanley is a Delaware limited liability company with principal executive offices located at 1585 Broadway, New York, New York. Morgan Stanley was allocated 9,756,500 shares in the IPO to sell to the investing public before the exercise of the overallotment.

61. Defendant Barclays Capital Inc. ("Barclays") is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase the Bright Health stock issued pursuant thereto. Barclays is a Connecticut corporation with principal executive offices located at 745 7th Avenue, New York, New York. Barclays was allocated 9,756,500 shares in the IPO to sell to the investing public before the exercise of the overallotment.

62. Defendant BofA Securities, Inc. ("BofA") is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase the Bright Health stock issued pursuant thereto. BofA is a Delaware corporation with principal executive offices located at One Bryant Park, New York, New York. BofA was allocated 4,621,500 shares in the IPO to sell to the investing public before the exercise of the overallotment.

63. Defendant Citigroup Global Markets Inc. ("Citigroup") is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase the Bright Health stock issued pursuant thereto. Citigroup is a New York corporation with principal executive offices located at 388 Greenwich Street, New York, New York. Citigroup was allocated 2,054,000 shares in the IPO to sell to the investing public before the exercise of the overallotment.

64. Defendant Piper Sandler & Co. ("Piper Sandler") is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase the Bright Health stock issued pursuant thereto. Piper Sandler is a Delaware corporation with principal executive offices located at 800 Nicollet Mall, Suite 1000, Minneapolis, Minnesota. Piper Sandler was allocated 1,027,000 shares in the IPO to sell to the investing public before the exercise of the overallotment.

65. Defendant Nomura Securities International, Inc. ("Nomura") is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase the Bright Health stock issued pursuant thereto. Nomura is a New York corporation with principal executive offices located at Worldwide Plaza, 309 West 49th Street, New York, New York. Nomura was allocated 770,250 shares in the IPO to sell to the investing public before the exercise of the overallotment.

66. Defendant RBC Capital Markets, LLC ("RBC") is a financial services company that acted as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase the Bright Health stock issued pursuant thereto. RBC is a Minnesota limited liability company with principal executive offices located at Three World Financial Center, 200 Vesey Street, 5th Floor, New York, New York. RBC was allocated 770,250 shares in the IPO to sell to the investing public before the exercise of the overallotment.

67. Defendants J.P. Morgan, Goldman, Morgan Stanley, Barclays, BofA, Citigroup, Piper Sandler, Nomura, and RBC may herein be referred to at times as the "Underwriter Defendants."

68. Defendant Bright Health, the Individual Defendants, and the Underwriter Defendants may herein be referred to at time as the "Defendants."

## IV. BACKGROUND ON RELEVANT GOVERNMENT HEALTH PROGRAMS AND REGULATIONS

### A. Medicaid and Medicare

69. Medicaid provides health coverage to millions of Americans, including eligible low-income adults, children, pregnant women, elderly adults, and people with disabilities. Medicaid is administered by states, according to federal requirements. The program is funded jointly by states and the federal government. Eligible participants may apply for Medicaid at any time of the year. As of February 2022, approximately 80.4 million people were enrolled in Medicaid.

70. Medicare is a health insurance program available to all U.S. adults age 65 or older and younger people who receive disability benefits. Medicare consists of four parts: Part A covers hospital care and related services; Part B covers doctor appointments and outpatient medical care; Part C covers the same benefits of Parts A and B but is offered by private insurers, often referred to as a Medicare Advantage ("MA") plan; and Part D covers prescription drugs. To be eligible for MA, participants must already be enrolled in Part A and Part B.

71. Medicare offers set enrollment periods, which, among other purposes, assist insurance companies in balancing population health risk. The Initial Enrollment Period (the "Medicare IEP") in Medicare spans a seven-month period. It begins three months prior to a person's 65th birthday or based on the 25th month of disability benefits. If a person enrolls in a MA plan during their IEP, they are permitted to change to another MA plan or switch back to Original Medicare within the first 3 months of enrollment in Medicare. The general enrollment period for Part A and B coverage is January 1 through March 31 each year.

72. Individuals who choose not to sign up for a MA plan or stand-alone Medicare prescription drug coverage during their IEP can otherwise enroll in a MA plan during the annual

Fall Medicare Annual Enrollment Period (the "Medicare AEP"), otherwise known as the Open Enrollment Period (the "Medicare OEP"), which runs from October 15 through December 7 every year. During the OEP, one can: (i) enroll in, make changes to or disenroll from a MA plan; and/or (ii) enroll in, make changes to or disenroll from a Medicare prescription drug plan. Plan changes you make during the Medicare OEP go into effect January of the following year.

73. Finally, depending on certain circumstances, individuals may also qualify for a MA Special Enrollment Period (the "MA SEP"). The MA SEP can happen at any time of year following one of the qualifying events: (i) moving to a new area that is outside of the current MA plan's service area; (ii) leaving an employer's coverage; or (iii) Medicare ended the current MA plan's contract.

**B. The Affordable Care Act**

74. The Affordable Care Act ("ACA"), colloquially known as Obamacare, is a U.S. federal statute enacted by the 111th United States Congress and signed into law by President Barack Obama on March 23, 2010. The ACA largely retained the existing structure of Medicare, Medicaid, and the employer market, but individual markets were radically overhauled. Insurers were made to accept all applicants without charging based on preexisting conditions or demographic status (except age).

75. The ACA revised and expanded Medicaid eligibility starting in 2014. All U.S. citizens and legal residents with income up to 133% of the poverty line, including adults without dependent children, would qualify for coverage in any state that participated in the Medicaid program. Under the ACA, Medicare reimbursements were reduced to insurers and drug companies for private MA policies.

76. The ACA implemented multiple approaches to helping mitigate the disruptions to insurers that came with its many changes. One such measure was requiring insurers to make risk

adjustments. Risk adjustment involve transferring funds from plans with lower-risk enrollees to plans with higher-risk enrollees. It was intended to encourage insurers to compete based on value and efficiency rather than by attracting healthier enrollees. Put differently, plans with low actuarial risk compensate plans with high actuarial risk.

77. The ACA mandated that health insurance exchanges be provided for each state. The exchanges are regulated, largely online, marketplaces administered by either federal or state governments, where individuals, families and small businesses can purchase private insurance plans. The federally run exchange is HealthCare.gov, which is used in 33 states as of the 2022 coverage year. The other 17 states and the District of Columbia run their own exchanges.

78. Similar to the Medicare OEP, the open enrollment period for ACA coverage is November 1 through January 15 (the "ACA OEP"), with 60 bonus days allotted for certain qualifying events such as the loss of employment or a divorce resulting in a loss of coverage. The purpose of the ACA OEP is to give individuals and families an opportunity to sign up for health insurance while discouraging adverse selection. Adverse selection is the practice of only signing up for health insurance once you become sick or injured and require care. Adverse selection drives up costs across the health care industry and increases risk among insurers.

79. On January 28, 2021, President Joe Biden entered an executive order reopening enrollment on the federal Affordable Care Act exchanges between February 15, 2021 and May, 2021 15 (the "ACA SEP") for the benefit of roughly 15 million uninsured individuals. State-run insurance marketplaces announced similar special enrollment periods. On March 31, 2021, President Joe Biden announced the extension of the ACA SEP through August 15, 2021. At the time, more than 200,000 people had signed up for 2021 coverage under the ACA SEP.

**C. Medical Cost Ratio**

80. MCR, also commonly known as medical loss ratio or MLR, compares a health insurance company's healthcare-related costs to its revenue premium. The ratio is frequently used to determine the financial strength of an insurance company, as it informs the percentage of revenue that goes towards medical claims.

81. MCR is calculated by dividing total medical expenses paid by an insurer by the total insurance premiums it collected. A lower ratio indicates higher profitability for the insurer, as it signifies a larger amount of premiums are left over after paying customer insurance claims.

82. MCR is also subject to federal regulation, which puts a hard cap on insurance profits for healthcare companies. Under the ACA, insurers must spend at least 80% of their net premiums on health care claims and quality improvements. The other 20% can be spent on overhead, administrative and marketing costs. The minimum required medical loss ratio is 80% for individual and family health plans and small group plans (less than 50 employees). For large group plans (generally 51 or more employees), the minimum required MCR is 85%.

83. The ideal MCR is 80% for small groups and 85% for large groups as it provides the maximum profit for healthcare companies. Should a company drop below minimum MCR, it will be required to reimburse its customers. Conversely, a higher MCR signifies lower-than-ideal profitability, with an MCR of over 100% indicating that the company is operating at a loss—in other words the premiums paid do not cover the cost of claims made.

**D. Risk Management**

84. The management of population health risk is integral to healthcare companies. The Centers for Medicare & Medicaid Service's ("CMS") risk adjustment model for MA and ACA plans uses the Hierarchical Condition Category ("HCC") method to calculate risk scores. HCCs are a grouping of clinically related diagnosis with similar associated cost to the healthcare system.

This method puts related medical diagnoses into groupings based on resource use. Higher category risk scores represent higher anticipated healthcare costs.

85. All risk adjustment models rely on comprehensive healthcare analytics and evidence-based reporting of patient care. CMS requires that a qualified healthcare provider describe all chronic conditions and severe diagnoses for every patient, every year, to establish a health profile. Using HCC risk adjustment coding, this data is then used to predict health costs for the subsequent contract year. Inaccurate or non-specific diagnoses can impact patient care, outcomes and reimbursement payment for ongoing care of that patient.

86. The HCC risk adjustment model assigns a risk score, also called the Risk Adjustment Factor or RAF medical abbreviation "RAF score", to each eligible MA or ACA beneficiary. Higher RAF scores represent patients with a greater than average disease burden. Lower risk scores represent a healthier population view.

87. If a healthcare organization overstates the health risk for its consumer population enrolled in MA and ACA plans, it may be obligated to return funds received to government payors and/or be subject to penalties or sanctions which could result in significant settlements. Conversely, if a healthcare organization understates the health risk of its consumer population, it will not receive funds from government payors that it would otherwise be entitled to receive.

## V. BACKGROUND FACTS FOR ALL CLAIMS ASSERTED

### A. Overview of Bright Health's Business

88. Founded in 2015, Bright Health's self-professed "mission" is "Making Healthcare Right. Together." The Company claims to be a diversified, consumer-focused healthcare and technology company that provides healthcare products and services for consumers and care providers in local markets throughout the United States. Bright Health's health plans include

individual and family plans ("IFPs") and MA plans, which are available in 99 markets across 14 states.

89. Bright Health has two reportable segments: Bright Health Services, Inc. (d/b/a NeueHealth) ("NeueHealth") and Bright Health Management, Inc. (d/b/a Bright HealthCare) ("Bright HealthCare").

90. NeueHealth is Bright Health's healthcare enablement and technology business, which builds, optimizes, delivers, and manages high-performing personalized care networks localized to each market. As of April 2021, NeueHealth had 28 managed and affiliated risk-bearing primary care clinics with 75,000 unique patients, as well as an additional 33 clinics through its Value Services Organization.

91. Bright HealthCare is the Company's diversified healthcare financing and distribution platform that aggregates consumers and delivers healthcare benefits. As of June 2021, Bright HealthCare serves approximately 623,000 consumers, including 515,000 commercial consumers and 108,000 MA consumers, with a presence in 14 states and 99 "core-based statistical areas," which Bright Health defines as markets. Bright HealthCare's customers include: (i) commercial (IFPs, small/large group); (ii) MA enrollees; (iii) Managed Medicaid enrollees; and (iv) employer administrative services only ("ASO") for the self-insured market.

92. Bright Health has developed and utilizes an end-to-end technology platform, Bright Health Intelligent Operating System ("BiOS"), to deliver and finance healthcare. The BiOS platform contains two principal components: Consumer360 and DocSquad.

93. Consumer360 is Bright Health's proprietary intelligent data hub which aggregates not only clinical and administrative data, but also information derived from the consumer experience (i.e., from call center and other consumer interactions), as well as data relating to

social detriments of health (i.e., conditions in which people are born, grow, live, work, and age as shaped by the distribution of money, power and resources at global, national and local levels). According to the Company, this "multi-dimensional, connected data … affords [Bright Health] a differentiated, 360-degree view of the consumer."

94. Bright Health's DocSquad purportedly provides consumer and care provider solutions that creates a personalized experience that connects the consumer with their Personalized Care Team, virtually or in-person and provides real-time alerts for providers and consumers alike ensuring appropriate action is taken to close gaps in care and improve outcomes. According to the Company DocSquad was designed with portability in mind and is therefore tied to the individual consumer, and not the payor or care provider.

95. Bright Health's BiOS platform works as follows:

(a) payor data like claims, provider data like electronic health records, and consumer data like social determinants of health feed into the Company's data hub Consumer360;

(b) Consumer360 aggregates clinical and administrative data, as well as information derived from the consumer experience like call centers and other consumer interactions;

(c) Consumer360 uses artificial intelligence ("AI") and machine learning to analyze the data and render advanced analytics;

(d) Consumer360 data and analytics are shared with DocSquad; finally

(e) DocSquad connects providers with consumers to provide:

(i) personalized care teams curated from the network of Bright Health's physician or provider organizations with which Bright Health partners to support the delivery of personalized healthcare for consumers ("Care Partners");

(ii) an AI-enabled virtual assistant, or healthcare concierge, backed by live support personnel to streamline communication between providers and payors;

(iii) a virtual care platform to connect consumers to their personalized care team via asynchronous conversations, live chat/video visits, or in-person appointment scheduling; and

(iv) care team tools, including real-time alerts for providers and consumers to close gaps in care.

**1. Bright Health's Revenue and Costs**

96. Bright Health primarily generates revenue from premiums, including value-based provider revenue, and fee-for-service provider revenue received from consumers and payors.

97. The Company's Premium revenue is derived primarily from Bright HealthCare IFP products and MA plans sold to consumers as well as NeueHealth value-based provider revenue from serving patients.

98. The sources of Bright HealthCare's commercial premium revenue are primarily IFP products which are comprised of Advance Premium Tax Credit ("APTC") subsidies that are based on consumers income levels and compensated directly by the federal government, as well as billed consumer premiums. IFP products reflect adjustments related to the ACA risk adjustment program, which adjusts premium revenue based on the demographic factors and health status of each consumer as derived from current-year medical diagnoses.

99. Bright HealthCare's MA premium revenues are Medicare Part C premiums related to consumers' medical benefit coverage and Part D premiums related to consumers' prescription

drug benefit coverage. Medicare Part C premiums are comprised of CMS monthly capitation premiums that are risk adjusted based on CMS defined formulas using consumers' demographics and prior-year medical diagnoses.

100. Medicare Part D premiums are comprised of CMS monthly capitation premiums that are risk adjusted, consumer billed premiums and CMS low-income premium subsidies for the Company's insurance risk coverage. Medicare Part D premiums are subject to risk sharing with CMS under the risk corridor provisions based on profitability of the Part D benefit.

101. As a percentage of the Company's total consolidated revenue, premium revenue from CMS were 40%, 13% and 13% for the years ended December 31, 2020, 2019 and 2018, respectively, which are included in our Bright HealthCare segment.

102. NeueHealth premium revenue represents revenue under value-based arrangements entered into by NeueHealth's Value Services Organization and affiliated medical groups in which the responsibility for control of an attributed patient's medical care is transferred, in part or wholly, to such medical groups. Such revenue includes capitation payments, as well as quality incentive payments, and shared savings distributions payable upon achievement of certain financial and quality metrics. Value-based revenue shifts responsibility for control over the medical care delivered to attributed patients to the Company and aligns incentives around the overall well-being of the payor's consumers.

103. Bright Health's medical costs consist of, *inter alia*, reimbursements to providers for medical services, costs of prescription drugs, and supplemental benefits.

104. The Company contracts with hospitals, physicians and other providers of healthcare primarily within its exclusive provider networks under fee-for-service and value-based arrangements. Emergency medical services incurred out-of-network are a covered benefit to

consumers and reimbursed to providers according to the Company's payment policies that are based on applicable regulations. Prescription drug costs are determined based on the contract with our pharmacy benefits manager, which includes pharmacy rebates that are received for certain drug utilization levels or contracted minimums. Dental, vision, and other supplemental medical services are provided to consumers under capitated arrangements.

105. Bright Health's operating costs are comprised of the expenses necessary to execute the Company's business operations. These include employee compensation for salaries and related benefit costs, share-based compensation, outsourced vendor contracted service and technology fees, professional services, technological infrastructure and service fees, facilities costs and other administrative expenses.

106. Operating costs also include payments made by Bright HealthCare to NeueHealth for the provision of Bright Health Network services; selling and marketing expenses from external broker commissions and advertising, primarily related to consumer acquisition; and premium taxes, exchange fees and other regulatory costs, which are primarily based on premium revenue.

### 2. Bright Health's Pre-IPO Transactions

107. Prior to the Company's IPO, Bright Health enjoyed substantial inorganic growth through a series of acquisitions which rapidly expanded the Company's footprint across the United States.

108. Effective December 31, 2019, NeueHealth acquired substantially all of the assets of Associates in Family Practice of Broward, L.L.C. for $41 million in consideration, including $31.8 million in cash. NeueHealth renamed the practice AssociatesMD Medical Group, Inc. ("AMD"). AMD operates medical clinics together with affiliated providers across different specialties serving Florida patients. According to the Company, the AMD Acquisition "was

completed to enhance our clinical capabilities to better serve enrollees as part of our planned Florida market entrance in 2020."

109. Effective April 30, 2020, Bright Health acquired all the outstanding shares of Universal Care, Inc. (d/b/a Brand New Day) for $210.1 million in consideration, including $206.9 in cash, which amount was reduced by a $44 million indemnity escrow adjustments and $32.8 million in cash acquired. Brand New Day ("BND") provides healthcare services in California and serves Medicare eligible senior and special needs populations through a network of primary care providers and specialists.

110. Effective December 31, 2020, Bright Health acquired a 62% controlling interest in Premier Medical Associates of Florida, LLC ("PMA") for $74.2 million in consideration, including $59.6 million in cash less $3.2 million in cash acquired. PMA provides care services to Medicare and Medicaid patients in Florida through a network of primary care providers and population health-focused specialists. According to the Company, "[t]he acquisition of PMA [was] expected to enhance our clinical capabilities to better serve enrollees as part of our Florida market expansion."

111. Effective March 31, 2021, Bright Health acquired True Health New Mexico, Inc. ("THNM") for $3.4 million in total consideration, representing $27.5 million in cash less $24.1 million in cash acquired. THNM is a physician-led health insurance company offering policies available through the commercial market for individual on- and off-exchange and employer-sponsored health coverage.

112. Also effective on March 31, 2021, Bright Health acquired Zipnosis, Inc. ("Zipnosis") for $70.3 million. Zipnosis is a "telehealth platform that offers virtual care to health systems around the U.S."

113. Effective April 1, 2021, Bright Health acquired Health Plan of California, Inc. ("CHP") for $252.6 million, including $276 million in cash less $103.2 million in cash acquired. CHP is an insurance provider of MA services.

## B. Former Bright Health Employees Corroborate the Allegations Herein

### 1. FE-1: Market Executive Director

114. FE-1 was formerly employed at Bright Health from December 2019 through July 2021. His title was Market Executive Director. He explained that, in that role, he was responsible for managing the overall operations for Bright Health's insurance products segment, Bright HealthCare, in Arizona. He elaborated that his duties involved managing relations with Bright Health's care partners; oversight of the Company's brokers and sales teams; managing complaints, issues with the state Department of Insurance and other regulators; and provider and customer issues. From March 2021 through the end of his employment, he reported to Curt Howell, President, West Markets. Howell reported to Amy Knapp, President of Bright HealthCare. Knapp reported to Simeon Schindelman, former CEO for the Bright HealthCare segment. Prior to March 2021, FE-1 advised that he reported directly to Knapp.

115. FE-1 explained that he resigned from Bright Health in July 2021 after the concerns he had raised repeatedly, regarding operational and financial challenges at the Company that continued to be ignored.

116. He explained that the primary operational problem was that Bright Health's medical provider directories were not accurate or up to date. He further explained that this meant that providers with which Bright Health had care contracts were not listed in the directories, while other providers which were not under contract often were listed. As a result, he indicated that legitimate or properly submitted claims from providers under contract were routinely, and improperly denied, based on the faulty directory data. He attributed the failure to maintain and

keep the directories up to date to the company's failure to provide sufficient staffing and resources to the task. He further noted that, due to the improper denial of claims, many providers – both large and small – were owed substantial amounts of money.

117. He indicated that the problem was not limited to Arizona; he provided Tenet Healthcare, a Florida-based provider, as an example which was owed millions of dollars due to overdue claims.

118. FE-1 explained that claims issues were present in Bright Health's already established markets as well as the new markets where Bright Health was expanding. He confirmed that the directory of providers and claims was stored in a "master data warehouse," which housed information on all the company's networks throughout the country.

119. FE-1 further elaborated that he first became aware of the issues with the provider directory in February 2020. He explained that he had become aware that the tax ID numbers for certain providers had not been updated, and so those providers' claims had been denied. FE-1 indicated that the first file he saw with the tax ID problem was dated November 2019, and therefore these problems preceded his starting date of December 2019.

120. FE-1 further noted that, due to the failure to maintain the provider directories, legitimate claims were often 180 days or more behind, or backlogged, in being processed and paid (including correcting the directory and re-adjudicating the improper denial of claims). FE-1 was made aware of these problems from a variety of sources in his role as Director, including from Operations, Customer Relations, and Claims Processing staff. FE-1 recalled receiving an email in approximately May 2021 from a Claims employee in which the backlog of claims was detailed, including the amounts owed to providers and how far behind the company was in

processing those claims. The email indicated a backlog of over 180 days to process claims. FE-1 added that the email was widely distributed, including to all sales managers at Bright Health.

121. FE-1 further confirmed that Bright Health's executive leadership, including CEO Mike Mikan and CFO Cathy Smith, were aware of these issues prior to the IPO in June 2021. He indicated that these problems existed in 2020 and only became worse as the company grew. He indicated that there were several all-hands meetings in which the issues with the directories and claims backlog were acknowledged and discussed by Mikan and Smith, along with assurances that management was working to fix the problems, although no specific steps to fix the problems were detailed at these meetings. He indicated that, beginning in approximately February 2021, there were special all-hands meetings to discuss the claims backlog problem.

122. FE-1 indicated that these issues had all been raised to senior management, meaning vice presidents and higher-level staff. He explained that Bright Health created what it called "war rooms," or executive staff working groups, to address specific issues, and a war room had been created to address the claims backlog problem.

123. FE-1 explained that providers were very upset at the lengthy backlog and delay in getting their claims paid. He indicated that providers were calling high level management at Bright Health with their demands to be paid. As he indicated earlier, Tenet Healthcare was one of the providers demanding to be paid its overdue claims. He recalled learning from Ryan Beckman, the Vice President of Technology and Strategic Implementation at Bright Health, in March or April 2021, that Bright Health issued a "seven figure check" to Tenet to settle the outstanding claims owed. He added that Beckman had been involved in negotiating the payment with Tenet as well as negotiations with other providers.

124. FE-1 further noted that the backlog involved all claims, including those covered under Individual and Family Plans, ACA Exchange plans, and Medicare Advantage. He did not recall the total amount of claims owed but indicated that it was millions of dollars. He advised that the backlog affected multiple national healthcare providers as well as local and smaller providers. He further advised that Bright Health had been audited in Colorado prior to the IPO in 2021 and later fined in 2022 for its failure to pay providers in a timely manner.

125. FE-1 elaborated on what caused the backlog in the claims system. He indicated that many contracted providers were not listed in Bright Health's approved provider directory; as a result, any claims those providers submitted were routinely denied and the providers had to seek re-adjudication, even though they were already under contract and the claims were otherwise covered. He also noted that in some instances, non-contracted providers were in the system, and therefore were being paid as if under contract. Regarding providers under contract, he explained that Bright Health failed to enter new claims contracts in the system in a timely manner. He recalled that it took up to two years for some providers to have their new contract pricing entered into the provider directory.

126. Another problem which he identified as contributing to the claims backlog was Bright Health's failure to provide adequate controls over the vendors it used to process its claims. Most notably, he indicated that these vendors and Bright Health failed to provide enough staff and resources to handle the claims in a timely manner. As a result, he added that disputes about claims in the claims adjudication process went unanswered for months on end. He noted that, in response to these issues, Bright Health eventually moved its Medicare Advantage claims processing to another vendor, Evolent Health. He recalled that the contract with Evolent was signed in 2021 to take effect in January 2022.

127. FE-1 commented that Bright Health claimed that it could not calculate risk scores for chronic patients. He explained that the reason Bright Health could not calculate those risk scores was because it was not processing those patients' claims – the company was just denying them, because it appeared (due to the inaccurate directory) that the providers submitting those claims were not under contract. He further explained that, if the company is denying or not processing the claims, then it could not obtain the information needed to prepare risk scores, as much of the information needed to determine risk for chronic patients is found in the claims. He added that, if the company kept its directory up to date, and processed claims in a timely manner, then it would have had more up to date information and been able to calculate risk scores.

128. FE-1 elaborated that he first observed the company having issues with calculating risk scores by May or June 2020, prior to the IPO. He explained that, during the summer of 2020, he was involved in a program working with providers to try to calculate risk scores for chronic patients; it was his work in that program that alerted him to this problem. He further indicated that the risk score problem was exacerbated by the company's growth.

129. FE-1 recalled that the claims backlog problem was discussed at company-wide "all-hands" meetings in the form of webinars. He recalled that executive management acknowledged the problem, stated that they understood that providers and members were complaining to employees about these problems, and assured employees that they were fixing the operational issues. FE-1 added, however, that management never provided specifics as to what they were doing to actually rectify the problem. He recalled management began making these statements at all-hands meetings in February 2021. He further recalled that the "operational challenges" were addressed specifically by segment CEO Schindelman, Bright Health CFO Cathy Smith, and Bright Health CEO Mike Mikan. He noted that Smith led the all-hands meetings for

the last 8 months of FE-1's employment. He further noted that, during the pandemic, the meetings were initially held weekly, then bi-weekly, then monthly, with some exceptions. He recalled that these meetings were only open to employees.

130. FE-1 further noted that claims complaints and related operations problems were entered by field employees into a tracking system called Jira. He indicated that all members of the operations team had access to Jira, including Schindelman and Patty Rushman, former Vice President, Medicare Advantage Operations. FE-1 indicated that Rushman left Bright Health in 2021. He identified Sam Srivastava, former CEO of NeueHealth and, prior to that, Chief Operating officer at Bright Health, as well as Jeremy Dressen, former Senior Vice President of Enterprise Operations, as having access to Jira as well.

131. FE-1 noted that oversight of Bright HealthCare's operations was transferred to Schindelman in early 2021, and that Schindelman was "laid off" in March 2022. FE-1 further explained that Schindelman was laid off in 2021 partly as a scapegoat for Bright HealthCare's pre-existing operational problems, including the backlog, but he further noted that his management structure and style contributed to the problem and made it worse.

132. Regarding the company's IPO, FE-1 asserted that, since management knew about the backlog and outstanding claims issues prior to the IPO, management also knew that the financials in the public offering materials were not accurate.

133. FE-1 explained that the industry standard is that claims are paid or adjudicated in 30 to 90 days. In some cases, especially with electronically submitted claims, payment can be made in 30 to 45 days. He noted that a backlog of 180 days to process claims is a "huge warning sign." He estimated that, in his experience, a reasonable percentage of denials of claims was 8 – 12%. He indicated that Bright Health acknowledged that it paid or re-adjudicated approximately

60% of its claims for the entire year of 2020 in November and December of that year. In other words, he explained, 60% of all claims submitted that year were not processed until November or December. He reiterated that industry standard turn-around time is 30-90 days. Therefore, he advised, for that volume of claims to be paid in just one quarter signifies a serious problem, and management knew it. FE-1 further confirmed that "management" included Mikan and Smith. He articulated that it was a "known fact" that Mikan and Smith were aware of this issue.

134. FE-1 then explained how the claims backlog affected the company's ability to calculate its medical loss ratio, or MLR. He noted that MLR compares the amount of a claims paid to a standard; approximately 85% of the premiums should be applied to health care costs, such as treatment, medication, etc. He noted that, by processing claims during the standard 30-90 days, insurers know what their expenses and financial exposure are. He added that if an insurer is not processing claims in a timely manner, then that insurer will not know how much it will have to pay; it will not have an accurate picture of its cost information. He advised that failing to process claims in a timely way, therefore, leads to understating costs, and the greater the backlog, the more costs will be understated. He described Bright Health as having understated its costs "massively" as a result.

135. FE-1 went on to note that, by failing to process claims in a timely manner, the company also failed to get accurate information on its members/patients' health information (since that information is derived largely from claims, as noted above). He elaborated that, without accurate information on the patients' health, the company would not have accurate information regarding those patients' healthcare needs, and so would not be able to gauge the risk for those patients or calculate the costs for those needs, nor would the company be able to suggest or approve needed treatments which may improve outcomes and lower risks.

136. He added that factoring in the impact of COVID made the company's costs higher than normal; however, had Bright Health's MLR and claims processes been up to date, then the unexpected costs and volatility triggered by the pandemic would not have been as significant of an issue. He further noted that the company was struggling prior to the pandemic to have visibility into its members' health, and that issue got worse during the pandemic.

137. He noted that, like COVID, the Special Enrollment Periods ("SEPs) also had an impact on the company's cost. he explained that the SEPs were additional enrollment periods opened by the government for patients to enroll in ACA insurance exchanges. He further explained that the additional enrollment of members created by the SEPs did add a greater volume of members; this, in turn exacerbated the already existing backlog of members' claims. He advised that, had the pre-existing backlog problem been addressed, such as with sufficient staffing in place to service the existing volume of claims, then the influx of new members created by the SEPs would have been handled better. In other words, he clarified, because of the pre-existing problems with the claims backlog, the issues created by the impact of COVID and the SEPs were multiplied.

138. He advised that insurers could execute disease management protocols more effectively, reduce treatment expenses, and get CMS funding for chronic conditions more quickly, if the insurer processes claims properly and in a timely manner.

139. FE-1 articulated that he had numerous conversations with his supervisors regarding these problems. He recalled that he first raised the backlog problem in May or June 2020, but the problem kept getting worse. He noted that Bright Health is very "silo'd," so often the only way to resolve a problem is to escalate it up the chain of command, which he did. He indicated that he raised the issue with Schindelman in the summer of 2020 during a Quarterly

Market Review meeting, which was a regular conference call with segment leadership, including Knapp. He recalled that, the day after the conference call, Schindelman emailed him to follow up and acknowledged the problem. FE-1 recalled forwarding the email to Knapp.

140. Despite his complaints, however, FE-1 recalled that the problem only got worse, particularly during the open enrollment period. He explained that open enrollment for Medicare Advantage plans is typically from October through early December; for individual and family plans, the period is roughly from November through mid-December. He added that, when Howell became his supervisor in February or March 2021, he informed him about the problem as well.

**2. FE-2: Former Manager, Care Management**

141. FE-2 was formerly employed by Bright Health from February 2021 through August 2021. His title was Manager, Care Management. He reported to Janet Spellman, currently the Associate Vice President of Clinical Performance at Bright Health.

142. FE-2 explained that, as Manager, Case Management, he oversaw a team of nurses and social workers who performed case management services for Bright Health's members. He elaborated that, in this context, "members" referred to patients, and that he and his team were responsible for making sure that any criteria needed for members to receive treatment or undergo a procedure were met, rather than simply completing necessary paperwork.

143. FE-2 explained that, for example, if a member needed a knee replacement surgery, for that procedure to be approved, the member had to have a BMI of a certain percent. He explained that he and his team was responsible for obtaining that criterion from the providers and communicating that to the members. He added that his team also made sure that the applicable members had the resources needed for their care, such as medical provider coverage, follow up care after treatment, and access to necessary services and equipment for recovery at home, such as home health aides, walkers, or other needs.

144. FE-2 indicated that he and his team were not responsible for treatment coverage or approvals, but often had to work with those groups to get certain treatments for members approved. He described Bright Health's business model as favoring "quantity over quality." He added that there were also times when providers complained that they had not yet received payment for past services, and therefore refused to see new Bright Health members as patients until they were paid. FE-2 also recalled that a large number of complaints came from providers in Florida. He further noted that he observed an increase in the volume of complaints beginning in approximately May or June 2021 through the end of his employment.

145. Regarding how the company coped with COVID-related costs and issues, FE-2 explained that, by the time he joined Bright Health in February 2021, the pandemic was already occurring. He explained that Bright Health did not manage the crisis as well as other insurers, noting that the company did not yet have the infrastructure in place to handle growth.

146. FE-2 provided examples of Bright Health's lack of infrastructure. He detailed how the company was using Dropbox to store files, which he explained was not appropriate for an enterprise solution. He also indicated that the company was not organized well. He explained that he and his team were often assigned tasks or identified tasks on their own that needed to be completed but were not given any training or guidance as to how to complete those tasks. He noted that "everything was thrown together."

147. FE-2 confirmed that he spoke with his supervisor, Spellman, about these issues frequently throughout his employment. FE-2 explained further that Spellman brought up this issue with him as well, in anticipation of the problem. FE-2 recalled that Spellman told him to expect to be given tasks without proper guidance or training, and that they had to "just make it work." FE-2 recalled that Spellman described the situation as "building the plane on the runway"

or "building the plane in the air." FE-2's opinion based on his experience in the healthcare field was that the company's lack of administrative infrastructure affected its ability to properly analyze risks and costs.

### 3. FE-3: Former Manager, Clinical Market Performance

148. FE-3 was formerly employed at Bright Health from April 2021 through September 2021. His title was Manager, Clinical Market Performance. He reported to Peter Fishman, Area Vice President, Clinical Market Performance. Fishman reported to Christine Gilroy, former Associate Chief Medical Officer. Gilroy reported to Tom Valdivia, Chief Health and Equity Officer.

149. FE-3 explained that he functioned as a liaison between Bright Health's members, or individual patients, and Bright Health's care partners, or medical care providers such as doctors and medical practices. He elaborated that, whenever a member or care partner had a complaint, problem, or issue, his department was contacted. He indicated that, as part of his duties, he helped establish new markets in the eastern U.S. He added that he had an oversight function for Clinical Market Performance in North Carolina and South Carolina and was preparing to expand further into Georgia and Virginia when he was laid off in September 2021.

150. FE-3 advised that a major part of his job was addressing improperly rejected claims. He explained that he received many complaints about claims that had not been paid that should have been. He indicated that the company tracked unpaid claims in a spreadsheet put together by the Claims department, which used a payor claim software system called EDI to track claims. He recalled that EDI stood for Electronic Data Interface.

151. FE-3 explained that, whenever he received complaints from care providers about claims that had not been paid, he would email the Claims department and request that they investigate and resolve the complaint. He indicated that the issue of unpaid claims was significant

from the time he started at Bright Health, and the problem only increased throughout his employment. He indicated that Fishman and Gilroy were copied on his communications with the Claims department regarding unpaid claims complaints.

152. FE-3 advised that Bright Health held regular "all hands" conference call meetings, which he described as "pep talks." He further recalled that, shortly after the IPO, Bright Health's stock dropped, and, during the all-hands meeting in August 2021, the CFO was clearly frustrated answering questions from employees and shareholders about the drop.

153. FE-3 further confirmed that Bright Health had difficulties conducting risk assessments. He indicated that he worked with another employee, Isaac Corzine, former Manager, Clinical Market Performance Risk, Stars, and Quality, to put together a risk assessment "game plan." FE-3 further confirmed that many of Bright Health's issues stemmed from inadequate infrastructure to handle its growth. He indicated that the company tried to do too much, too fast, with too few resources, and that it should not have tried to expand before it was set up properly to handle growth. FE-3 stated that these issues existed prior to the IPO.

## VI. SECURITIES ACT ALLEGATIONS

### A. The IPO

154. On or about May 19, 2021, Bright Health filed a registration statement on SEC Form S-1 with the SEC (together with the Prospectus defined herein, the "Registration Statement"). Pursuant to the Registration Statement, the Company registered for sale 57,512,000 shares of common stock, for an offering price of up to $18 per share. Net of underwriting discounts and commissions, the IPO was valued at $887,328,000. Following two amendments dated June 4, 2021, and June 15, 2021, the Registration Statement was declared effective by the SEC on June 23, 2021, and the Company then commenced the IPO. On June 25, 2021, the

Company filed a prospectus with the SEC on Form 424B1 (the "Prospectus"), which is part of the Registration Statement.

155. According to the Registration Statement, the net proceeds of the IPO were expected to be used to repay all outstanding borrowings under a credit agreement dated March 1, 2021 (the "Credit Agreement"), and subsequently borrowed thereunder for the acquisition of CHP, with the remainder of the IPO proceeds left for working capital and other general corporate purposes, including "continued investments in the growth of [Bright Health's] business."

156. Each of the Individual Defendants participated in the preparation of the Registration Statement and in the making of the materially inaccurate, misleading, and incomplete statements alleged herein. The Individual Defendants signed the Registration Statement and/or were a director of Bright Health at the time the filing of the part of the registration with respect to which their liability is being asserted, participated in the IPO, and solicited the purchase of Bright Health's common shares, to serve their financial interest and those of the Company. The Individual Defendants, in their capacity as senior executives and/or directors of Bright Health, reviewed, edited, and approved the Registration Statement.

157. The Underwriter Defendants are investment banking houses which specialize, *inter alia*, in underwriting public offerings of securities. The Underwriter Defendants served as underwriters of the IPO and received in $36,972,000 fees paid to the underwriter syndicate.

158. The Underwriter Defendants determined that in return for their share of proceeds from the IPO, they were willing to merchandise Bright Health common stock in the IPO.

159. The Underwriter Defendants also demanded and obtained an agreement from Bright Health that the Company would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. The Underwriter Defendants also made

certain that Bright Health had purchased millions of dollars in directors' and officers' liability insurance.

160. Representatives of the Underwriter Defendants assisted the Company and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's operations and financial prospects.

161. In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Bright Health's management and top executives (including the Individual Defendants) and assisted in drafting the Registration Statement in advance of its filing. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which the Company's common stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about the Company would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, at a minimum, the Underwriter Defendants were negligent in not knowing of the Company's undisclosed existing problems and plans, and the materially untrue statements and omissions contained in the Registration Statement as detailed herein.

162. The Underwriter Defendants caused the Registration Statement to be filed with the SEC and to be declared effective in connection with offers and sales thereof, including to Lead Plaintiff and the Class.

**B. The False and Misleading Registration Statement**

163. The Registration Statement was negligently prepared, and as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing its preparation. Specifically, the Registration Statement was materially false and misleading in that it omitted to state:

(a) well before the IPO, Bright Health was experiencing a massive backlog of medical claims due to systematic operational deficiencies at the Company;

(b) as a result, Bright Health lacked the sufficient visibility into its populations to perform the risk adjustments required to accurately predict costs and MCR;

(c) parallel to these issues, Bright Health had been struggling to manage COVID-19 related impacts since the start of the pandemic;

(d) the above issues were materially exacerbated by the Company's significant growth, including growth through pre-IPO acquisitions and the ACA SEP, which was ongoing at the time of the IPO, resulting in a heavily skewed, then-existing, and unfavorable percentage of new versus existing members;

(e) thus, at the time of the IPO, the Company was not able to effectively manage its populations, including visibility into risks and costs, which were significantly concentrated in certain states at the time of the IPO;

(f) all the foregoing would have a material negative impact on Bright Health's business and financial condition, including financial impacts associated with overstated risk adjustments, understated MCR, and increased COVID-19 impacts;

(g) accordingly, the Registration Statement misrepresented Bright Health's post-IPO business and financial prospects; and

(h) as a result, the Registration Statement contained materially false and/or misleading statements and failed to state information required to be stated therein.

164. Sections 11 and 12(a)(2) of the Securities Act create liability against each of the Defendants for each (i) misstatement, (ii) omission in contravention of an affirmative legal disclosure obligation, and (iii) omission of information that is necessary to prevent existing disclosures from being misleading, in the Registration Statement.

165. Pursuant to SEC Regulation C, the Registration Statement was required to disclose material information necessary to ensure that representations in the Registration Statement were not misleading. Specifically, Rule 408, 17 C.F.R. § 230.408(a), states that "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading."

166. Separately, Bright Health, the Individual Defendants, and the Underwriter Defendants were required to comply with Item 303 of Regulation S-K, 17 C.F.R. § 229.303. Specifically, Item 303 and the SEC's related interpretive releases thereto, requires issuers to disclose events and uncertainties, including any known trends that have had or are reasonably likely to cause the issuer's financial information not to be indicative of future operating results.

167. Moreover, Bright Health, the Individual Defendants, and the Underwriter Defendants were also separately required to comply with Item 105 (formerly 503) of Regulation S-K, 17 C.F.R. § 229.105. Specifically, Item 105 required that the Registration Statement furnish, among other things, a discussion of the most significant factors that made the IPO speculative or risky.

168. At the time of the IPO, Bright Health had zero visibility into the influx of newly added lives as a result of its inorganic growth due to operational inefficiencies and financial challenges. These inefficiencies were further impacted by the then-existing ACA SEP reducing visibility into ACA membership cadence, as well as the ongoing COVID-19 pandemic straining available healthcare resources. As a result, the Registration Statement's warnings regarding whether relevant ***potential*** risks ***might*** impact the Company's financial health and prospects were materially false and misleading. Thus, due to the undisclosed true state of affairs at the Company, the Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements contained in the Registration Statement not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

### 1. The Registration Statement Falsely Describes Certain Risks as Potential when Such Risks had Already Manifested and/or Would Foreseeably Occur Shortly After the IPO

169. The Registration Statement inaccurately described as ***potential*** certain risks associated with Bright Health's ability to appropriately set premiums and effectively manage costs, which ***could*** have an adverse effect on its profitability, results of operations, and cash flows, rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

> ***Failure to appropriately set premiums or effectively manage our costs could negatively affect our profitability, results of operations and cash flows***.

The premiums we set for our health plans are a material source of our revenue. We set our premiums using actuarial estimates and our failure to set appropriate premiums, including as a result of inaccuracies in our actuarial estimates, could adversely affect our profitability and cash flows. We use a substantial portion of our health plan revenue to pay the costs of healthcare services delivered to our consumers. ***As such, our profitability depends in large part on our ability to accurately estimate and manage such costs. Relatively small differences between estimated and actual medical costs as a percentage of revenue can result in significant changes in our financial results***.

Our use of actuarial methods to determine premiums and estimate other healthcare costs involves a significant degree of judgment and is subject to a number of inherent uncertainties and assumptions. ***Such actuarial methods are consistently applied, centrally controlled, and are based upon various data points, including our historical submissions and payment data, cost trends, patient and product mix, seasonality, utilization of healthcare services, contracted service rates and other factors for our consumers***. Our ability to accurately estimate such costs depends on various factors, many of which are not within our control, including:

***

• ***our membership mix***;

• ***variances in actual versus estimated levels of cost associated with new products, benefits, lines of business, product changes or benefit level changes***;

• ***changes in the demographic characteristics of an account or market***;

***

• ***catastrophes, including acts of terrorism, pandemics, epidemics or severe weather (e.g., hurricanes, wildfires or earthquakes)***;

***

• ***volatility with respect to the individual market risk pool, including public Health Insurance Marketplaces***; and

• ***potential changes in legislation or other rules and regulations, such as changes in government mandated benefits or consumer eligibility criteria***.

> The impact of many of these items on the ultimate costs for claims is difficult to estimate, and they could have a material impact on our business. In addition, the historical data on which our assumptions are based may not necessarily be indicative of the actual costs of claims due to our rapid growth in consumer enrollment and our recent expansion into new businesses and markets. When we commence operations in a new state, region, or other market, or introduce a new product line, we have limited information from which to estimate our potential medical claims liability. ***For a period of time after our entry into a new market, our inception of a new business, or our acquisition of an existing business, we base our estimates on government-provided and third-party historical actuarial data and limited actual incurred and received claims and inpatient acuity information. The addition of new categories of eligible individuals, as well as new plan designs we may offer, may make it difficult for us to estimate our medical claims liability and may result in the actual cost of claims being higher than we anticipate.***
>
> We set our premiums for twelve-month periods several months prior to the commencement of the premium period and do not change our premiums during such period, consistent with industry practice. Our inability to implement changes in premium rates within a given period is also governed by federal and state regulatory agencies. For example, we are required to submit data on all proposed rate increases to the U.S. Department of Health and Human Services ("HHS") on many of our products, and under the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act ("ACA"), we are prohibited from implementing unreasonable rate increases. ***If our medical costs exceed our estimates, we will not be able to recover the difference through higher premiums, and our results of operations and financial condition could be adversely affected***.

170. The Registration inaccurately described as ***potential***, certain risks associated with Bright Health's risk adjustment programs, which ***could*** have an adverse effect on its financial results and cash flows, rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

> ***Our health plan products are subject to risk adjustment programs, which if not managed properly can result in lost revenue, which could adversely impact our financial results and cash flows.***

> The IFP, MA and Small Group markets we serve employ risk adjustment programs that impact the revenue we recognize for our enrolled membership. These risk adjustment programs are designed to compensate us for the level of risk we take in providing healthcare services to our overall consumer population. In order to be reimbursed by government payors at a level commensurate with our consumer population risk, we must ensure that our Care Partners are identifying and properly inputting data to code all chronic and severe diagnoses to create an accurate health profile for each consumer. ***If our Care Partners do not accurately record this consumer data, including our consumers' "risk scores", we may not be able to accurately estimate our revenue and medical costs. If the data on our consumer population overstates the health risk of our consumer population, we may be obligated to return funds we have received to government payors***. Conversely, if we understate the health risk of our consumer population, we will not receive funds from government payors that we would otherwise be entitled to receive. ***As a result of the variability of certain factors that go into the development of the risk adjustment we recognize, such as risk scores and other market-level factors where applicable, the actual amount of revenue could be materially more or less than our estimates***. ***Consequently, our estimate of our health plans' risk scores for any period, and any resulting change in our accrual of revenue related thereto, could have a material adverse effect on our results of operations, financial condition, and cash flows***. The data provided to CMS to determine risk scores is subject to audit by CMS even several years after the annual settlements occur. ***If the risk adjustment data we submit is found to incorrectly overstate the health risk of our consumers, we may be required to refund monies previously received by us and/or be subject to penalties or sanctions, including potential liability under the federal False Claims Act ("FCA"), which could be significant and would reduce our revenue in the year that repayment or settlement is required***.

171. The Registration Statement inaccurately described as ***potential***, certain risks associated with Bright Health's rapid growth, which the Company "***may*** not be able to manage … effectively," rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

> ***If we continue to grow rapidly, we may not be able to manage our growth effectively***.

> Since our inception, we have experienced rapid growth, with total revenue having grown from $130.6 million in 2018 to $1.2 billion in 2020. Our significant growth to date, attributable to both rapid organic membership growth and acquisitions of other businesses, has placed and we expect will continue to place significant demands on our management team and our operational and financial resources. Sustaining such growth will require additional resources to improve our operational, management, and financial controls, and we expect to continue to increase headcount, including specialized personnel in areas such as software engineering, finance, regulatory, and other mission-critical areas, to support our growth. We may also experience significant personnel changes related to acquisition-related integration efforts. ***Our organizational structure may also become more complex as we add these additional resources, making it more difficult to manage***.
>
> ***
>
> ***Continued rapid growth in our business may exacerbate certain of the risks described elsewhere in this section, including our ability to accurately estimate costs, price our products, and charge appropriate premiums, as well as our ability to accurately assess, code and report IFP, MA and Small Group risk adjustment factor ("RAF") scores for our consumers***. ***If we are not able to manage our growth effectively while maintaining the quality of our services and consumer satisfaction, our business, financial condition and results of operations may be materially adversely affected***.

172. The Registration Statement inaccurately described as ***potential***, certain risks associated with Bright Health's visibility into its business and future prospects, stating the Company's "growth, strategy and profitability ***could*** be negatively impacted if we are unable to effectively manage this complexity," rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

> ***Our limited operating history makes it difficult to evaluate our business and assess our future prospects.***
>
> Our limited operating history makes it difficult to evaluate our business and assess our future prospects. We have encountered and will continue to encounter significant risks and uncertainties frequently experienced by new and growing companies in heavily regulated industries, such as difficulties determining appropriate investments given limited resources, effectively managing growth and efficiently navigating and complying with evolving regulations. We began offering our first health insurance plans in 2017, and our most substantial growth has occurred in the last 18 months. During that time, we have significantly expanded our products and services across both our Bright HealthCare and NeueHealth businesses, including as a result of the Acquisitions. We have also expanded our operations to different lines of business and geographies. ***As such, the complexity of our business has increased significantly in a short period of time, and our growth, strategy and profitability could be negatively impacted if we are unable to effectively manage this complexity***. Any inability to manage our business effectively could result in slowing demand for our services, increased competition or a failure to capitalize on growth opportunities.

173. The Registration Statement inaccurately described as ***potential***, certain risks associated with the ongoing COVID-19 pandemic at the time of the IPO that "***may*** continue to adversely affect, [Bright Health's] business and results of operations," rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

> ***The COVID-19 pandemic has adversely affected, and may continue to adversely affect, our business and results of operations***.
>
> The severity and magnitude of the current COVID-19 pandemic continue to grow, and the duration of the pandemic continues to be uncertain. The pandemic has adversely affected our business and results of operations. The extent to which the COVID-19 pandemic will continue to impact our business, results of operations and financial condition will depend on future developments, which are unknown at this time. Factors that could impact our results include: the ultimate geographic spread, severity and duration of the COVID-19 pandemic; the impact of business closures, travel

restrictions, social distancing and other actions taken to contain the spread of COVID-19; the effectiveness of actions taken to reduce transmission of the virus that causes COVID-19 (including the development and administration of vaccines and the continued research into treatments, the virus, and the disease); the ongoing emergence of new variants of the virus that causes COVID-19; the impact of the pandemic on economic activity; and any impairment in value of our tangible or intangible assets which could be recorded as a result of weaker economic conditions caused by the pandemic. In addition, the long-term impact of the COVID-19 pandemic may not be fully understood or reflected in our results of operations and overall financial condition until future periods.

***As a result of the COVID-19 pandemic and the associated protective and preventative measures, we have experienced and may continue to experience disruptions to our business***. Risks presented by the ongoing effects of COVID-19 include, but may not be limited to, the following:

***

• *Documentation of Health Conditions*. ***Due to the COVID-19 pandemic, we may not be able to adequately document the health conditions of our consumers and patients, as many of them have avoided in-person medical visits. Our third-party clients for our NeueHealth MSO may similarly be unable to adequately document the health conditions of their members. Inaccurate or inadequate documentation could result in an inaccurate RAF score, which could adversely impact our Bright HealthCare revenue for future periods. In addition, inaccurate documentation could impact the ability of our NeueHealth MSOs to manage medical costs and quality metrics on behalf of its clients, putting it at greater financial risk and potentially adversely affecting the profitability of our NeueHealth business***.

***

• *Changes in Regulatory Requirements*. ***As a result of the COVID-19 pandemic, regulatory agencies may require significant temporary changes to benefit coverage requirements, enrollment standards or disenrollment standards, in each case, that could negatively impact our financial performance***. For example, mandatory coverage of COVID-19 testing in the workplace could result in substantial expenses that are not contemplated by our current rates. Furthermore, mandatory termination deferrals due to nonpayment of insurance premiums could result in a situation

> where we incur significant medical expense without the ability to collect any associated premium revenue.
>
> ***
>
> ***To the extent the COVID-19 pandemic continues to adversely affect our business and financial results, it may also have the effect of heightening many of the other risks described in this section of the prospectus titled "Risk Factors."***

174. The Registration Statement inaccurately described as ***potential***, certain risks associated the Company's ability to "***maintain*** the accuracy, integrity or availability of [its] data," rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

> ***We may not be able to maintain the accuracy, integrity or availability of our data.***
>
> ***Our Bright HealthCare and NeueHealth businesses are highly dependent on the accuracy, integrity and availability of the data we generate and use to serve our consumers, Care Partners and other constituents, and to provide patient care. The volume of healthcare data generated, and the uses of data, including for electronic health records, are rapidly expanding. Our ability to implement new and innovative services, adequately price our products and services, provide timely and effective service to our consumers and clients and accurately report our results of operations depends on the accuracy and the integrity of the data in our information systems. If the data we rely upon to run our businesses is found to be inaccurate or unreliable, we could experience adverse effects on our ability to effectively conduct our business, including our ability to***:
>
> • ***accurately estimate revenue and medical costs***;
>
> • ***establish appropriate pricing and accurately code our consumers' RAF scores***;
>
> • prevent, detect and control fraud;
>
> • ***prevent disputes with consumers and network providers***;
>
> • ***prevent errors in medical records***;
>
> • ***manage value-based care contracts***;

• ***prevent regulatory sanctions, scrutiny or penalties***; and

• ***reduce the incurrence of increased operating expenses.***

175. The Registration Statement inaccurately described as ***potential***, certain risks associated with the Company's management of its risk adjustment programs, including the risk of overstating population health risk which "***[could] result in lost revenue***," rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

> ***Our health plan products are subject to risk adjustment programs, which if not managed properly can result in lost revenue, which could adversely impact our financial results and cash flows***.
>
> The IFP, MA and Small Group markets we serve employ risk adjustment programs that impact the revenue we recognize for our enrolled membership. These risk adjustment programs are designed to compensate us for the level of risk we take in providing healthcare services to our overall consumer population. ***In order to be reimbursed by government payors at a level commensurate with our consumer population risk, we must ensure that our Care Partners are identifying and properly inputting data to code all chronic and severe diagnoses to create an accurate health profile for each consumer. If our Care Partners do not accurately record this consumer data, including our consumers' "risk scores", we may not be able to accurately estimate our revenue and medical costs. If the data on our consumer population overstates the health risk of our consumer population, we may be obligated to return funds we have received to government payors***. Conversely, if we understate the health risk of our consumer population, we will not receive funds from government payors that we would otherwise be entitled to receive. ***As a result of the variability of certain factors that go into the development of the risk adjustment we recognize, such as risk scores and other market-level factors where applicable, the actual amount of revenue could be materially more or less than our estimates. Consequently, our estimate of our health plans' risk scores for any period, and any resulting change in our accrual of revenue related thereto, could have a material adverse effect on our results of operations, financial condition, and cash flows***. The data provided to CMS to determine risk scores is subject to audit by CMS even several years after the annual settlements occur. ***If the risk adjustment data we***

> ***submit is found to incorrectly overstate the health risk of our consumers, we may be required to refund monies previously received by us*** and/or be subject to penalties or sanctions, including potential liability under the federal False Claims Act ("FCA"), which could be significant and would reduce our revenue in the year that repayment or settlement is required. We have had in the past to take reserves against our premium revenue because of our difficulty to accurately estimate risk adjustment in our business. Furthermore, if the data we provide to CMS incorrectly understates the health risk of our consumers, we might be underpaid for the care that we must provide to our consumers, which could have a negative impact on our results of operations and financial condition.

176. The Registration Statement inaccurately described as ***potential***, certain risks associated with the modifications to the U.S. health insurance markets, including the then-existing ACA SEP, "***could*** adversely affect [Bright Health's] business and operating results," rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

> ***Modifications or changes to the U.S. health insurance markets, including as a result of legislation, could adversely affect our business and operating results.***
>
> ***Our business operates in the evolving public and private sectors of the U.S. health insurance system, and our future financial performance will depend in part on growth in the market for private health insurance, as well as our ability to adapt to regulatory developments and the development of new state and federal government programs***. Such modifications and changes could reduce demand and adversely affect our business. For example, some elected officials have recently introduced proposals to expand the Medicare program, which range from the creation of a new single-payor national health insurance program for all residents to less overarching proposals, including lowering the age of eligibility for the Medicare program, expanding Medicare to a larger population and creating a new public health insurance option that could compete with private insurers. In addition, in states such as New York and California, legislators have regularly introduced proposals to establish a single-payor or government-run healthcare system at the state level. Federally, the Biden administration and Congress may otherwise propose changes to elements of the ACA. In December 2019, a federal appeals court held that the individual

mandate portion of the ACA was unconstitutional and left open the question of whether the remaining provisions of the ACA would be valid without the individual mandate. On November 10, 2020, the U.S. Supreme Court heard oral arguments in this matter, and is in the process of reviewing this case. A decision is expected later in 2021. ***On January 28, 2021, in response to an Executive Order issued by President Biden, HHS announced a special enrollment period from February 15, 2021 through May 15, 2021, for uninsured and under-insured individuals and families to seek coverage through the Health Insurance Marketplaces. On March 23, 2021, HHS announced the extension of this enrollment period to August 15, 2021***. President Biden's Executive Order also directed federal agencies to examine agency actions to determine whether they are consistent with the Biden administration's commitment to strengthen the ACA, and to relatedly begin rulemaking to suspend, modify or rescind inconsistent actions. Areas of focus include policies or practices that may reduce affordability of coverage, present unnecessary barriers to coverage, or undermine protections for people with preexisting conditions. We continue to evaluate the effect that the ACA and its possible modifications, repeal and replacement has on our business.

***As the regulatory and legislative environments within which we operate are evolving, we may not be able to ensure timely compliance with such changes due to limited resources. Furthermore, we may face challenges prioritizing the allocation of resources between implementing systems responsive to new legislative or regulatory requirements, focusing on growth-related operations and implementing management systems and controls related to becoming a public company***. If our operations are found to be in violation of any of the federal and state regulations that apply to us, we may be subject to penalties that curtail our operations, which could adversely affect our ability to operate our business and our results of operations.

177. The statements referenced above in ¶¶169-76 are inaccurate statements of material fact because while noting only the ***potential*** negative impacts on Bright Health's business, financial condition, and results of operations, the Registration Statement failed to disclose and misrepresented the following significant, ***then-existing*** material events and adverse trends or uncertainties that Bright Health ***had already been*** facing at the time of the IPO:

(a) Beginning as late as 2019 and through the IPO Bright Health's medical provider directories were not accurate or up to date in both its new and existing markets, and, as a result, legitimate or properly submitted claims from providers under contract were routinely, and improperly denied, based on the faulty directory data;

(b) due to the failure to maintain the provider directories, legitimate claims were often 180 days or more behind, or backlogged, in being processed and paid, significantly longer than the industry standard of 30 to 90 days;

(c) in addition, Bright Health and its third-party vendors failed to provide enough staff and resources to handle the claims in a timely manner resulting in claims disputes being unanswered for months on end;

(d) due to this significant backlog of claims, Bright Health owed millions of dollars to healthcare providers for overdue claims;

(e) beginning as late as 2020 and through the IPO, Bright Health was unable accurately perform risk adjustments because of the claims processing and directory issues outlined above;

(f) Bright Health took insufficient measures to remedy issues with its provider directory, claims backlogs, or inability to perform accurate risk adjustments;

(g) by failing to timely process claims, Bright Health massively understated its costs and the health risk of its members, which in turn, caused the Company to similarly overstate its MCR;

(h) parallel to these issues, prior to the IPO Bright Health had been struggling to manage COVID-19 related impacts since the start of the pandemic, which was materially exacerbated by the claims processing issues outlined above;

(i) The above issues were materially exacerbated by the Company's significant pre-IPO growth, including growth through acquisitions and the ACA SEP, resulting in a heavily skewed, then-existing, and unfavorable percentage of new versus existing members;

(j) as a result, Bright Health's financial results would foreseeably be materially impacted in the hundreds of millions of dollars due to inaccurate risk adjustments and prior period medical costs as the Company caught up on claims processing;

(k) further, the Company would foreseeably continue to be impacted adversely by COVID-19;

(l) accordingly, the Registration Statement overstated the Company's business and financial prospects; and

(m) as a result, the Registration Statement made materially false and/or misleading statements and failed to state information required to be stated therein.

**2. The Registration Falsely Describes the Strength of Bright Health's Business and Operations by Omitting Then-Existing and Material Operational Challenges and Risks**

178. The Registration Statement stressed that "[e]nsuring that complete and accurate health conditions of [Bright Health's] consumers are captured within documentation submitted to CMS is critical to recognizing accurate risk adjustment, which is reflected in our revenue year-over-year."

> ***Bright HealthCare's ability to capture complete and accurate risk adjustment data affects revenue***
>
> Portions of premium revenue from our IFP products and MA plans are determined by the applicable CMS risk adjustment models, which compensate insurers based on the underlying health status (acuity) of insured consumers. CMS requires that a consumer's health status be documented annually and accurately submitted to CMS to determine the appropriate risk adjustment. ***Ensuring that complete and accurate health conditions of our consumers are captured within documentation submitted to CMS is critical to***

> ***recognizing accurate risk adjustment, which is reflected in our revenue year-over-year***.

179. The Registration Statement listed "Bright HealthCare Consumers Served" as a "Key Metric" in evaluating the financial health of the Company, stating that patient growth provided Bright Health management visibility into the future needs of the Company:

> ***Bright HealthCare Consumers Served***
>
> Consumers served include Bright HealthCare individual lives served via health insurance policies across multiple lines of business, primarily attributable to IFP products and MA plans in markets across the country. ***We believe growth in the number of consumers is a key indicator of the performance of our Bright HealthCare business. It also informs our management of the operational, clinical, technological, and administrative functional area needs that will require further investment to support expected future consumer growth***.
>
> ***Value-Based Care Patients***
>
> Value-based care patients are patients attributed to providers contracted under varied value-based care delivery models in which the responsibility for control of an attributed patient's medical care is transferred, in part or wholly, to our NeueHealth managed medical groups. ***We believe growth in the number of value-based care patients is a key indicator of the performance of our NeueHealth business. It also informs our management of the operational, clinical, technological and administrative functional area needs that will require further investment to support expected future patient growth***. Over time, we expect our value-based care patients will increase as we convert fee-for-service arrangements into value-based care financial arrangements.

180. The Registration Statement provided historical financial information for Bright Health, including a year-over-year comparison of the Company's financial results for the quarters ending March 31, 2021 and March 31, 2020, attributing a $676.0 million, or 340.4% increase in revenue to "***an increase in Bright HealthCare commercial consumers of 0.3 million, or 217%, from organic growth and inorganic contributions from the Brand New Day acquisition in the Bright HealthCare segment and the PMA acquisition in the NeueHealth segment***."

181. Similarly, the Registration Statement provided historical yearly financial information for the years 2020, 2019, and 2018, attributing the $926.6 million, or 330.2% increase in 2020 revenue to "***an increase in Bright HealthCare consumers of 251% from organic growth and inorganic contributions from the Brand New Day Acquisition, as well as the creation of the NeueHealth segment with the acquisition of AMD***."

182. The Registration Statement stated with respect to Bright Health's risk adjustments, that the Company "refine[d] [its] estimate as new information becomes available."

> **Risk Adjustment**
>
> The risk adjustment programs in the IFP and Medicare Advantage lines of business are designed to mitigate the potential impact of adverse selection and provide stability for health insurers.
>
> Under the Individual and Small Group risk adjustment program, each plan is assigned a risk score based upon demographic and current year medical encounters information that is submitted to CMS for its consumers and calculated based on the CMS risk adjustment methodology. Plans with a plan level risk score that is lower than the State average risk scores will generally pay into the pool, while plans with a plan level risk score higher than State average risk scores will generally receive distributions. ***We refine our estimate as new information becomes available, and we receive the final report from CMS in August of the following year***.
>
> ***In the Medicare Advantage risk adjustment program, each consumer is assigned a risk score based on their demographic and prior year medical encounters information submitted to CMS that reflects the consumer's predicted health costs based on the CMS risk adjustment methodology***. Plans receive higher payments for consumers with higher risk scores than consumers with lower risk scores.

183. The Registration Statement stated that Bright Health's financing strategy involved "seek[ing] to aggregate consumers and design and offer affordable benefits to help effectively manage risk."

> ***Financing of Care*** — The financing of care is more than just insurance. Insurance, in its simplest form, protects against

> catastrophic loss. In contrast, the financing of care focuses not only on protection against loss, but also on the creation of overall consumer value, while enhancing access to healthcare through efficient resource distribution. ***Bright Health seeks to aggregate consumers and design and offer affordable benefits to help effectively manage risk***. We structure value-based arrangements with our Care Partners that are designed to reward the quality of care delivered over the quantity of services rendered, reducing the total cost of care while enhancing clinical outcomes. Our model is designed to address the needs of all consumers, from high-acuity, special needs individuals requiring high-touch care management to lower acuity individuals seeking to protect themselves from catastrophic healthcare events. ***We engage deeply with providers***, while giving consumers the tools and incentives they need to take a proactive role in their personal well-being. We endeavor to put the consumer in the driver seat.

184. Similarly, the Registration Statement stated that the Company had "developed [a] value-based payment structures that enable [it] to take a staged approach to financial alignment with [its] Care Partners. [The Company] first carefully consider each Care Partner's ability and interest to take varying levels of population health risk."

> ***Financial Alignment — We have developed value-based payment structures that enable us to take a staged approach to financial alignment with our Care Partners. We first carefully consider each Care Partner's ability and interest to take varying levels of population health risk***. Whether through shared savings contracts, capitated arrangements, or other contractual incentives, we work collaboratively with our Care Partners to determine and structure the best financial alignment model for each local market and individual organization. Once aligned, we then work with our Care Partners over time to optimize the relationship and prepare them for success under more advanced models of value-based care.

185. The Registration Statement touted how Bright Health had successfully applied its core business principles to a variety of insurance markets throughout the United States, including Florida, to "demonstrate how Bright Health's alignment model can adapt to the nuances of local markets while continuing to deliver MCR improvement as our markets mature." Further, the

Registration Statement touted that Bright Health's business model had allowed the Company to significantly reduce MCR over time.

> Bright Health recognizes that each market is different, and we have been able to apply our three core principles of alignment in a flexible manner to meet the specific needs of the local communities we serve and to drive differentiated experiences and outcomes. As detailed below, we have done so across a variety of markets, each with distinctive organizational constructs.




> ***<u>Market Type 1</u>: Markets Organized Around Risk-Bearing Organizations ("RBOs").***
>
> ***In some markets, local healthcare delivery is organized around significant risk-bearing physician aggregators, such as mature IPAs and MSOs. Working collaboratively with these RBOs, Bright Health applies proprietary analytics to identify and align with high-performing specialists and facility partners to create an IDN that is focused on the management of population health risk.*** Together, we ensure that healthcare is delivered in a seamless manner for consumers across the ecosystem — from primary care physician to specialist, from medical clinic to acute care hospital.
>
> ***In California, we have aligned with leading IPAs with deep experience managing population health risk and strong relationships with leading hospital systems. In select Florida markets, our approach has centered around building and managing a care delivery system anchored around high-performing, risk-bearing physician practice organizations***.
>
> ***<u>Market Type 2</u>: Markets Organized Around Integrated Delivery Network ("IDNs").***

In other markets, we see existing IDNs that have already invested in building and managing a network of clinically aligned physicians and other care delivery providers. Bright Health engages with these established entities to further optimize local market performance and meet the holistic healthcare needs of consumers across both Bright HealthCare — through aligned financing and distribution to aggregate and engage consumers — and NeueHealth — through the technology, data, and experience to drive outcomes.

When entering Colorado, for example, we partnered with an existing IDN that had made significant clinical investment but sought an aligned partner to support financing and distribution. Working closely with this Care Partner, we have been able to collaborate in the development of affordable products tightly aligned with their existing network of affiliated providers. As a result, we have helped this Care Partner drive in-network utilization of 91% in 2020, while maintaining an aggregate commercial MCR through 2020 of 71%.

While markets featuring IDNs are not common nationally, we have the ability to optimize these markets by seamlessly plugging into existing care delivery networks and offering our financing expertise to more closely align with Care Partners, making healthcare simpler and more affordable for consumers.

***Market Type 3: "De Novo" Organized Market.***

***We also serve markets comprised of health system partners that seek to manage population health risk but are looking for greater expertise and support in aligning with high-performing primary and specialty care physicians. Through our proprietary tools, we analyze existing referral relationships and work with local care providers to assemble a set of high-performing Care Partner relationships "de novo".***

In Tennessee, for example, physicians are looking for a partner to support care delivery in a value-based environment, but historically they have had neither the appropriate incentives nor payor support in place to develop the capabilities needed to successfully manage population health risk. In markets such as these, our Bright HealthCare enablement model and NeueHealth tools and capabilities enable our Care Partners to manage low acuity populations while affording them greater opportunity to serve more complex populations over time. Even in a market like Tennessee, which required a tailored "de novo" approach to Care

> Partner development, we have been able to generate an aggregate commercial MCR for IFP products through 2020 of 83%.
>
> ***These examples demonstrate how Bright Health's alignment model can adapt to the nuances of local markets while continuing to deliver MCR improvement as our markets mature***. As shown below, our MCR performance in states with IFP product offerings, as grouped by cohort based upon number of years operating in a given state, demonstrates a declining average MCR from 92.1% in the first year to 66.4% in our most mature markets by the fourth year.

**IFP MCR Evolution Over Time**




**IFP State Entry by Year**

| 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|
| Colorado | Alabama | Arizona | Florida |
| | | Tennessee | Nebraska |
| | | | North Carolina |
| | | | Oklahoma |
| | | | South Carolina |

186. The Registration Statement further touted that Bright Health's proprietary technology provided deep visibility into consumer data and allowed the Company to meaningfully manage patient and care provider relationships:

> Bright Health's aligned and consumer-focused model enables us to transform the way technology can effect meaningful change in healthcare. Historically, key stakeholders with misaligned incentives have generally been unwilling to share critical information, thereby limiting the effectiveness of healthcare technology. In addition, data has been transactional, serving the needs of payors and care providers, but not the individual. ***By aligning stakeholders across the financing and delivery of care and putting consumers in control of their healthcare data, Bright***

***Health can capture a holistic view of the consumer and empower the individual and their care teams to drive better coordination and optimize clinical outcomes***.

Bright Health's product and technology strategy is focused around three key pillars:

• ***Simplifying the Consumer Experience*** — Creating an individual shopping experience for consumers who prioritize price, quality, and convenience.

• ***Enabling High-Value Care Delivery*** — Curating high-performing Personalized Care Teams that help consumers and providers make the right complex care decisions and drive supply-side competition.

• ***Driving Sustainable Affordability*** — Significantly reduces the friction that keeps providers from clinical practice and adds unnecessary cost to the system.

To operationalize our product and technology strategy, Bright Health has developed a differentiated consumer-centric healthcare platform, the Bright Health Intelligent Operating System (BiOS). BiOS is built upon our proprietary intelligent data hub, Consumer360, which integrates with an ecosystem of connected Care Partner data and technology infrastructure to power *DocSquad*, our suite of proprietary consumer and care provider solutions. ***We ensure information is available when and where it is needed, whether through interactions with Bright Health directly or through embedded experiences with our Care Partners***. We allow consumers to see *their* providers on *their* terms, leveraging DocSquad to personalize interactions whether they occur in-person or virtually. BiOS is designed to make healthcare simple, personal, and convenient for consumers.




187. As applied, the Registration Statement detailed that "[w]hen [Bright Health] enter[s] a market, [it] begin[s] with a rigorous assessment and understanding of the unique attributes of that market to determine how to deploy our alignment model and position [the Company] for success." The Registration Statement further emphasized that Bright Health's proprietary set of tools allowed for the Company to fully evaluate all facets of a population upon entry into a new market. According to the Registration Statement, the Company's care partner relationships allowed it to "quickly scale membership as [it] increase[s] [its] service area."

> ***When we enter a market, we begin with a rigorous assessment and understanding of the unique attributes of that market to determine how to deploy our alignment model and position us for success***. We have developed a proprietary set of tools that enable us to assess critical consumer (demand side) attributes as well as care provider (supply side) characteristics in each market. ***These tools have enabled us to develop a measured approach to state and market entry, helping to ensure that the complexity of the population served is commensurate with the level of clinical, financial, and technological integration we initially have with our local Care Partners***. As our local Care Partner relationships evolve over time and we more deeply align, we are better positioned to successfully serve increasingly complex populations, maximizing our total market opportunity.




> We believe our aligned enablement model affords us a tremendous opportunity to serve an untapped (underpenetrated) segment of the population. While legacy managed care organizations have focused on serving low-acuity populations, our model is designed to serve a much broader population, including consumers with complex medical needs, as we progress markets along the "alignment-complexity glidepath". ***Our deep Care Partner relationships allow us to enter new states with an aligned growth partner and quickly scale membership as we increase our service area across the state***.

188. The Registration Statement touted that Bright Health had the "proven ability to grow revenue while reducing our MCR over time."

> ***We have a proven ability to grow revenue while reducing our MCR over time as shown in Colorado, where we have grown our IFP market share in our service areas from 9.3% in 2017 to 33.6% in 2020 while reducing our MCR from 87.3% in 2017 to 66.4% in 2020***. We believe Colorado, like many of our other markets, has further embedded growth potential as we leverage existing infrastructure and Care Partner relationships to address higher acuity consumers, while introducing new Bright HealthCare products to the market.




189. With respect to NeueHealth, the Registration Statement touted that the segment had a "demonstrated … ability to successfully manage medical spend across both commercial and Medicare Advantage value-based contracts," which translated to higher MCR, including in Florida.

> This flexible approach to value-based care delivery improves clinical outcomes, drives reductions in total cost of care, and promotes consumer satisfaction. ***Within our clinics, we have demonstrated the ability to successfully manage medical spend across both commercial and Medicare Advantage value-based contracts. Our South Florida medical group delivered an IFP MCR with its largest payor of 72% in 2019 and 75% in 2020. Similarly, our Central Florida medical group, which primarily serves a Medicare population today, demonstrated a MA MCR across its total cost of care contracts of 66% in both 2019 and 2020***. We have achieved this strong performance while delivering high consumer satisfaction as evidenced by an NPS score of 78 across our clinics.

190. With respect to Bright HealthCare, the Registration Statement touted that the segment "has been able to generate consistent MCR performance despite the accelerating pace of our new market expansion and an increasing share of Medicare Advantage business, which is priced to a higher MCR."

> Bright HealthCare began serving consumers in 2017 through IFP products. Since then, our business has evolved to serve higher acuity populations, adding traditional MAPD in 2018 and expanding further to serve a special needs population in 2019. ***Bright HealthCare has been able to generate consistent MCR performance despite the accelerating pace of our new market expansion and an increasing share of Medicare Advantage business, which is priced to a higher MCR***.

Bright HealthCare At a Glance




| | | | | |
|---|---|---|---|---|
| **States** | 1 | 3 | 6 | 13 |
| **Medical Cost Ratio** | 87.3% | 75.8% | 82.4% | 85.3%(1) |

(1) Reflects COVID-19 adjusted MCR. Bright HealthCare MCR was 89.3% in 2020 on an as-reported basis.

191. Among the Registration Statement's listed "competitive advantages," was Bright Health's "Multi-Pronged Organic and Inorganic Growth Strategy." According the to Registration Statement, the Company had a "proven track record of successfully identifying, executing, and integrating acquisitions into the Bright Health enterprise, which [is] expect[ed] to continue to grow through acquisitions."

> ***We Have a Multi-Pronged Organic and Inorganic Growth Strategy***. Our growth will be driven by a mix of organic and inorganic initiatives. We plan to grow in existing markets as they scale to maturity, and we will leverage our relationships with some of the largest care provider organizations nationally to expand our geographic footprint and diversify into new product and service lines. ***Our team also has a proven track record of successfully identifying, executing, and integrating acquisitions into the Bright Health enterprise, which we expect to continue to grow through acquisitions***.

192. The statements referenced above in ¶¶178-91 are inaccurate statements of material fact because they contained untrue statements of material fact and omitted material facts necessary to make the statements contained therein not misleading:

(a) beginning as late as 2019 and lasting through the IPO, Bright Health's medical provider directories were not accurate or up to date in both its new and existing markets, and, as a result, legitimate or properly submitted claims from providers under contract were routinely, and improperly denied, based on the faulty directory data;

(b) due to the failure to maintain the provider directories, legitimate claims were often 180 days or more behind, or backlogged, in being processed and paid, significantly longer than the industry standard of 30 to 90 days;

(c) in addition, Bright Health and its third-party vendors failed to provide enough staff and resources to handle the claims in a timely manner resulting in claims disputes being unanswered for months on end;

(d) due to this significant backlog of claims, Bright Health owed millions of dollars to healthcare providers for overdue claims;

(e) beginning as late as 2020 and lasting through the IPO, Bright Health was unable accurately perform risk adjustments because of the claims processing and directory issues outlined above;

(f) Bright Health took insufficient measures to remedy issues with its provider directory, claims backlogs, or inability to perform accurate risk adjustments;

(g) by failing to timely process claims, Bright Health massively understated its costs and the health risk of its members, which in turn, caused the Company to similarly overstate its MCR;

(h) parallel to these issues, prior to the IPO Bright Health had been struggling to manage COVID-19 related impacts since the start of the pandemic, which was materially exacerbated by the claims processing issues outlined above;

(i) The above issues were materially exacerbated by the Company's significant pre-IPO growth, including growth through acquisitions and the ACA SEP, resulting in a heavily skewed, then-existing, and unfavorable percentage of new versus existing members;

(j) as a result, Bright Health's financial results would foreseeably be materially impacted in the hundreds of millions of dollars due to inaccurate risk adjustments and prior period medical costs as the Company caught up on claims processing;

(k) further, the Company would foreseeably continue to be impacted adversely by COVID-19;

(l) accordingly, the Registration Statement overstated the Company's business and financial prospects; and

(m) as a result, the Registration Statement made materially false and/or misleading statements and failed to state information required to be stated therein.

## C. Post-IPO Events

### 1. Third Quarter 2021 Results

193. On November 11, 2021, Bright Health reported its third quarter 2021 financial results. Reported revenues rose more than 200% from the same period a year ago to $1,079 million up from $352 million in the prior year period. The Company reported a population of 606,594 commercial members, up from 149,794 in the prior year period, 114,094 MA members, up from 57,751 in the prior year period, and 170,211 NeueHealth members, up from 19,141 in the prior year period.

194. The Company's growth, however, proved unprofitable as the Company posted a net loss of nearly $300 million or $0.48 per share—nearly triple the loss analysts were expecting after reading the Registration Statement. The miss was attributed to Bright Health's ballooning MCR for the quarter of 103%, up from 90% in the previous year's quarter and the first nine months of the year.

195. According to the Company, the sharp increase was attributable to, in part, "540 basis point unfavorable impact from COVID-19 related costs and a 900 basis point unfavorable impact primarily from a cumulative reduction in premium revenue due to an inability to capture risk adjustment on newly added lives."

196. Also on November 11, 2021, the Company hosted a conference call with analysts and investors to discuss Bright Health's third quarter 2021 financial results. On the call, Defendant Mikan attributed the disappointing results to operational challenges, including a "significant influx of new members with a shorter duration" due to: (i) the ***per-IPO*** ACA OEP enrollments "effective on 1/1/21"—or nearly ***six months prior to the IPO***; as well as (ii) ACA SEP enrollments, which also existed at the time of the IPO. Defendant Mikan also attributed challenges to healthcare capacity being "largely prioritized to treat COVID-related needs," with significant concentration in the Company's key market. Making matters worse, these issues caused Bright Health to overstate its risk score, leading to a "risk adjustment payable and a corresponding decrease in our reported premium revenue." Thus, according to Defendant Mikan, these issues "resulted in an increase in our overall medical cost ratio for the third quarter."

> ***First, on top of our significant 2021 ACA open enrollment growth effective on 1/1/21, we grew in year an average of 30 gross new members every month from March to August as a result of the extended 2021 special enrollment period with a heavy concentration in Florida and North Carolina. This resulted in a***

> ***significant influx of new members with a shorter duration during the year***.
>
> Second, the Southeast, where we have the largest membership concentration, was hardest hit by the COVID-19 Delta variant. In the third quarter, Centers for Disease Control and Prevention data indicated COVID-related hospitalizations in the region more than tripled compared to the second quarter. This had a meaningful impact on our medical utilization in the quarter and meant that healthcare capacity was largely prioritized to treat COVID-related needs.
>
> ***Due to these factors, we were challenged to engage with members during this period, as we typically would consistently throughout the year, which is critical to performance. This hampered our ability to accurately capture the risk of our members and therefore, our estimated 2021 risk score is lower than we had originally anticipated. This resulted in an increase in our risk adjustment payable and a corresponding decrease in our reported premium revenue***.
>
> While we experienced a modest reduction in utilization from certain non-COVID-related procedures, the impact of direct COVID utilization and the change in the estimated risk score for our population resulted in an increase in our overall medical cost ratio for the third quarter. Cathy will discuss this in greater detail later on.

197. Defendant Mikan further admitted that Bright Health lacked the visibility to confidently perform accurate risk adjustments for population health risk, blaming the "predominantly new and rapidly growing business."

> We believe matching payment to population health status is needed to align incentives and drive performance in the direct-to-consumer market. ***However, with a predominantly new and rapidly growing business, population health risk is difficult to estimate in the near-term, but improved as our markets and populations mature***. Late September and early fourth quarter indications show COVID-19 greatly subsiding, especially in the Southeast and we have been able to engage more significantly with our members, especially in our owned and managed clinics. This is particularly positive as we build long-term relationships with our consumers.

> Most importantly, despite these challenges, we see strong evidence that when we deploy our fully aligned model, we delivered demonstrably better results.

198. On the call, Defendant Smith elaborated on non-COVID issues which were exacerbated by the increased COVID-capacity constraints, stating that Bright Health had an aberrational percentage of new memberships added "during every month ***through*** September" "due to service area expansion, strong OEP growth on one-one and membership growth," which included "substantial and new IFP [Individual & Family Health Insurance Plans] membership growth." According to Defendant Smith, 85% of Bright Health's total IFP membership were "new to the organization in 2021" based on ACA enrollment periods, including the ACA SEP. Further, in Florida, where over half of Bright Health's IFP memberships are located, "more than 95% of [the Company's] members [were] new adds" in 2021, which was over double the new member mix for other IFP plans in that state. This disproportionate mix of new members—many, if not most of whom were added prior to the IPO—made it "more challenging for Bright Health to capture underlying risk and impacting our risk adjustment scoring."

> Despite the higher incidence of COVID in both states, non-COVID utilization remained slightly below normalized levels in Q3 and in line with our internal forecast. However, the combination of our substantial and new IFP [Individual & Family Health Insurance Plans] membership growth and COVID-driven capacity constraints created challenges in our ability to see patients, capture underlying health status and fully code for risk adjustment, impacting our forecast for risk adjustment payments.
>
> ***Our growth from the 2021 enrollment period and SEP [Special Enrollment Period] meant 85% of our end of September IFP membership across the country was new to the organization in 2021. So the capacity constrained third quarter represented a meaningful time frame relative to the duration of our consumer relationships***.
>
> Looking specifically at Florida, the state represented over half of our IFP membership as of September 30 and more than 95% of our members are new adds this year, due to service area expansion,

> strong OEP [Open Enrollment Period] growth on one-one and membership growth during every month through September.
>
> ***Our mix of new versus returning members is significantly higher than the average for IFP plans in the state***, which have seen approximately 40% of their membership coming from new adds in 2021, ***making it more challenging for Bright Health to capture underlying risk and impacting our risk adjustment scoring***.

199. With respect to MCR for the quarter, Defendant Smith revealed that "[t]he negative impact from risk adjustment scoring, including a ***true-up for the first half of 2021***, … resulted in a cumulative $134 million impact to Q3 revenue," with "$89 million was related to the ***first half of 2021***." Defendant Smith further revealed that there was a "$7 million of negative prior period medical cost development" which contributed to the financial impact that quarter.

> ***The negative impact from risk adjustment scoring, including a true-up for the first half of 2021, was significantly larger than the benefit from lower medical costs associated with non-COVID utilization, resulting in a large net negative impact in the quarter***. The change in our estimated risk adjustment payable accrual for the year resulted in a cumulative $134 million impact to Q3 revenue, representing an MCR headwind of approximately 1,200 basis points. ***Of this $134 million, $89 million was related to the first half of 2021***. And when combined with ***$7 million of negative prior period medical cost development*** represents a total prior period development impact of approximately 900 basis points.

200. Finally, Defendant Mikan also attributed the Company's growth, including under the ACA SEP, as a factor which limited Bright Health's "ability to engage with [its] consumers and accurately code and understand the health status of the population," due to COVID restraints.

> When you take the strong starting growth that we had on one-one, when you couple it with your growth, which is a unique factor this year in the ACA marketplace with the extended special enrollment period, during a time period when the Delta COVID impact disproportionately hit Florida, so we basically had the care resources constrained focused on COVID, that ***limited our ability to engage with our consumers and accurately code and understand the health status of the population***.

201. On this news, Bright Health's share price declined from $7.30 at the close of trading on November 10, 2021 to close at $4.94 per share on November 11, 2021. Bright Health shares continued to decline throughout the month of November, closing at $3.33 per share on November 30, 2021.

### 2. Fourth Quarter and Full Year 2021 Results

202. On March 2, 2022, Bright Health announced its financial results for the fourth quarter and full-year 2021. Reported revenues for the quarter were $962 million up from $360 million in the prior year, and yearly revenues were $4,029 million up from $1,207 million for the prior year. The Company reported a population of 611,078 commercial members, up from 145,459 in the prior year period, 116,621 MA members, up from 61,663 in the prior year period, and 175,587 NeueHealth Members, up from 21,126 in the prior year period.

203. Yet despite its revenue and population growth, the Company reported a net loss of $813.4 million for the quarter, or $1.30 per share, a loss approximately three times larger than consensus estimates. Bright Health also reported a net loss of approximately $1.2 billion for the full-year 2021.

204. Bright Health revealed that its MCR had exploded to 134.1% for the quarter, up from 105.4% in the prior year, and that its full year MCR had come in at 101.3%, up from 88.7% in the prior year. According to the Company:

> Medical Cost Ratio for the three months ended December 31, 2021, include[d] a 860 basis point unfavorable impact from COVID-19 related costs and a ***2,640 basis point unfavorable impact reflecting the combined impact of a cumulative reduction in Premium Revenue due to an inability to capture risk adjustment on newly added lives, as well as prior period medical costs recognized in the fourth quarter***.... Medical Cost Ratio for the twelve months ended December 31, 2021, include[d] a 530 basis point unfavorable impact from COVID-19 costs, and a 90 basis point unfavorable impact from non-COVID PPD. …

205. Also on March 2, 2022, the Company hosted a conference call with analysts and investors to discuss Bright Health's fourth quarter and full year 2021 financial results. On the call, Defendant Mikan admitted that "higher than anticipated growth to start the year and additional growth from the special enrollment period, outpaced our operational and system capabilities," and that when combined with ongoing COVID challenges, this "large group of new members without risk scores combined with scaling up our organizational capabilities and emerging technologies impacted our results into the fourth quarter more significantly than anticipated." Therefore, the Company was unable to "accurately capture their underlying health conditions [which] impacted ***prior*** period medical costs as we caught up on claims processing." As a result, Bright Health's growth—a significant portion of which was pre-IPO—"exacerbated the gaps in performance," which, "***were already on [the Company's] list for improvement***."

> We have always expected some variability in our results. As we executed on our strategy to quickly gain scale in the business and as we closed out 2021, we saw that play out. ***The meaningful growth we delivered in 2021, which was a combination of higher than anticipated growth to start the year and additional growth from the special enrollment period, outpaced our operational and system capabilities***.
>
> In addition, unique factors in 2021 that we have preciously highlighted, including a once in a century pandemic and our ***large group of new members without risk scores combined with scaling up our organizational capabilities and emerging technologies impacted our results into the fourth quarter more significantly than anticipated***.
>
> As Cathy will discuss in more detail, these factors ***impacted our ability to engage with our members in order to accurately capture their underlying health conditions and impacted prior period medical costs as we caught up on claims processing***.
>
> Despite a challenging 2021, our larger base of business along with continued growth in 2022 affords us a tremendous platform to continue executing on our strategy in driving long-term shareholder value.

***

> All of the ***challenges we encountered this past year can be attributed to specific areas that were already on our list for improvement, but the growth we experienced exacerbated the gaps in performance***.

206. Defendant Smith added that they were "swiftly working to improve and provide ***more predictability*** into [the Company's] results."

> However, we did not deliver the financial results we had planned. Let me be clear, we are very disappointed in our financial results and are ***swiftly working to improve and provide more predictability into our results***.

207. Defendant Smith also revealed that Bright Health's "significant deterioration … was due to specific ***identifiable*** issues," which included "catching up on claims payments, and resolving resubmitted claims," which he described as a "lack of visibility into lagging medical claims on our legacy operational systems, which require manual processing."

> The significant deterioration in our results since our guidance was due to specific identifiable issues, including COVID costs, ***catching up on claims payments, and resolving resubmitted claims***. This was compounded by our ***lack of visibility into lagging medical claims on our legacy operational systems, which require manual processing***.

208. With respect to MCR, attributed in part, the staggering results to "claims processing issues where our challenges in capturing the risk of the population was in part due to the lack of timely insight into data, which drove the insufficient engagement in care management." According to Defendant Smith, Bright Health had against overstated its risk adjustment, resulting in a quarterly revenue decrease of $148 million—with "$111 million relat[ing] to ***prior*** quarters." Defendant Smith also revealed that the Company was forced to "recognize[] $139 million in ***prior period medical costs*** in Q4."

> The ***increases in medical costs due to COVID and the top-line headwinds associated with risk adjustments are reflected in our***

> ***medical cost ratio in the quarter***. On a reported basis, our fourth quarter 2021 MCR at the enterprise level was 134.1%, up from 105.4% in the fourth quarter of 2020.
>
> COVID had a negative impact on our MCR in the fourth quarter of 860 basis points, compared to 650 basis points in Q4 of 2020. The fourth quarter 2021 COVID impact to our MCR included $56.5 million of COVID costs related to prior quarters, which contributed 580 basis points of the MCR impact recognized in the quarter.
>
> Our risk adjustment performance in the fourth quarter also reflected the ***claims processing issues where our challenges in capturing the risk of the population was in part due to the lack of timely insight into data, which drove the insufficient engagement in care management***.
>
> ***We increased our risk adjustment payable estimate by $148 million reducing fourth quarter revenue of which $111 million relates to prior quarters. We also recognized $139 million in prior period medical costs in Q4***. The combined impact of the prior period risk adjustment estimate changes and the prior period medical costs was 26.4 percentage points to our medical cost ratio in Q4.
>
> Our expense ratios were also impacted by the non-cash GAAP premium deficiency reserve of $103 million we booked in anticipation of future loss contracts in certain markets in 2022.

209. Defendant Smith stated that "2021 [was] the peak of inefficiency" for the Company as it struggled to "consolidate [its] systems and processes."

> ***We continue to view 2021 as the peak of inefficiency as we consolidate our systems and processes***, and as Mike will discuss, we are taking actions to drive our operating cost ratio meaningfully lower in 2022.

210. When elaborating on the Company's ballooning MCR, Defendant Smith stated that "MCR pressure" was due to "delays in attributing members in part due to our rapid growth in 2021, as well as the impact of the unique 2021 special enrollment period." As such, "Operational inefficiencies contributed 310 basis points to the year-over-year MCR increase through higher than expected medical costs and other medical cost management issues. Medical

costs related to the SEP population and other mixed changes contributed 180 basis points to the increase."

> The 2021 MCR performance in both of our businesses was impacted by the confluence of COVID, unprecedented growth, and the extended 2021 special enrollment period with a 2021 MCR of 101.3%, compared to the 88.7% in 2020. COVID costs in 2021 impacted our MCR by 530 basis points, compared to 400 basis points in 2020.
>
> I want to spend a minute unpacking the 2021 medical cost ratio in a bit more detail given the magnitude of the variance [Technical Difficulty] to our previous guidance. While we are overall pleased with our book of business, we are disappointed in the operating results and can point to specific areas that drove the variant, most of which we believe are one-time in nature and won't reflect the run rate MCR of our business.
>
> I will speak to our forward expectations for these items and the implications for our 2022 adjusted EBITDA in a minute. For 2021, the challenges we had in [risk totaling] [ph] accuracy drove 650 basis points of MCR pressure compared to 2020. ***This was related to our delays in attributing members in part due to our rapid growth in 2021, as well as the impact of the unique 2021 special enrollment period***.
>
> ***Operational inefficiencies contributed 310 basis points to the year-over-year MCR increase through higher than expected medical costs and other medical cost management issues. Medical costs related to the SEP population and other mixed changes contributed 180 basis points to the increase***.

211. During the call, Defendant Mikan stressed the "significant investments" the Company was undertaking to only now address the "structural issues in 2021" and "growth [which] caused [the Company] to out kick [its] coverage," which both prevented the Company from performing accurate risk adjustments in 2021.

> Accurate risk adjustment was a challenge due to several structural issues in 2021 as I have discussed.
>
> ***However, those challenges drove us to make significant investments in our risk adjustment capabilities***. It starts with faster attribution of our members to a larger network of owned and

> affiliate physicians that have better ability to engage with their members earlier in the year.
>
> Equally important are the tech and operational investments we have made in suspecting analytics, outreach and engagement teams, and our end-to-end risk adjustment process to ensure we are accurately capturing the risk of the population we manage. We are also working to help members better manage and navigate their care, which we expect will drive better in network trends.
>
> Four, claims and clinical platform stabilization. ***As I mentioned in 2021, our growth caused us to out kick our coverage***. Not only in the capacity of our fully-aligned provider networks, but on our administrative, operational, and clinical systems as well. This growth was taken place, while we were building or transitioning from numerous vended solutions to Bios, our end-state operating platform.

212. Finally, Defendant Mikan again attributed operation challenges in timely onboarding newly added members to perform accurate risk adjustments to an unfavorable population mix of 85% new members coupled with the ACA SEP.

> When you look at risk adjustment, unfortunately for us, there were many different factors that impacted us in the year. ***It had to do with obviously starting with a new member base, 85% of members being new to us in substantial role, but then SEP kicked in and we got new lives and we were late to attribute them to our own medical centers in our affiliate network***.

213. On this news, the price of Bright Health common stock declined $0.61 per share, or 19.55% from the March 1, 2022 closing price of $3.12 per share to close at $2.51 per share on March 2, 2022. Bright Health shares continued this downward trend, closing as low as $1.79 on March 7, 2022.

214. As of the filing of the initial complaint in this action, on January 6, 2022, Bright Health common stock traded at $3.08, an 83% percent decline than the IPO price of $18.00 per share. Furthermore, Bright Health shares remain depressed, closing at $1.97 per share the date this complaint was filed.

**D. Former Bright Health Employees Confirm that Bright Health's Operational Issues Existed Prior to the IPO**

215. FE-1 was formerly employed at Bright Health from December 2019 through July 2021. FE-1 explained that he resigned from Bright Health in July 2021 after the concerns he had raised repeatedly, regarding operational and financial challenges at the company that continued to be ignored.

216. He explained that the primary operational problem was that Bright Health's medical provider directories were not accurate or up to date. He further explained that this meant that providers with which Bright Health had care contracts were not listed in the directories, while other providers which were not under contract often were listed. As a result, he indicated that legitimate or properly submitted claims from providers under contract were routinely, and improperly denied, based on the faulty directory data. He attributed the failure to maintain and keep the directories up to date to the company's failure to provide sufficient staffing and resources to the task. He further noted that, due to the improper denial of claims, many providers – both large and small – were owed substantial amounts of money.

217. FE-1 explained that claims issues were present in Bright Health's already established markets as well as the new markets where Bright Health was expanding. He confirmed that the directory of providers and claims was stored in a "master data warehouse," which housed information on all the company's networks throughout the country.

218. FE-1 further elaborated that he first became aware of the issues with the provider directory in February 2020. He explained that he had become aware that the tax ID numbers for certain providers had not been updated, and so those providers' claims had been denied. FE-1 indicated that the first file he saw with the tax ID problem was dated November 2019, and therefore these problems preceded his starting date of December 2019.

219. FE-1 further noted that, due to the failure to maintain the provider directories, legitimate claims were often 180 days or more behind, or backlogged, in being processed and paid (including correcting the directory and re-adjudicating the improper denial of claims).

220. FE-1 explained that the industry standard is that claims are paid or adjudicated in 30 to 90 days. In some cases, especially with electronically submitted claims, payment can be made in 30 to 45 days. He noted that a backlog of 180 days to process claims is a "huge warning sign." He estimated that, in his experience, a reasonable percentage of denials of claims was 8 – 12%. He indicated that Bright Health acknowledged that it paid or re-adjudicated approximately 60% of its claims for the entire year of 2020 in November and December of that year.

221. FE-1 indicated that these problems existed in 2020 and only became worse as the company grew. He indicated that, beginning in approximately February 2021, there were special all-hands meetings to discuss the claims backlog problem.

222. FE-1 explained that providers were very upset at the lengthy backlog and delay in getting their claims paid. He indicated that providers were calling high level management at Bright Health with their demands to be paid. Tenet Healthcare was one of the providers demanding to be paid its overdue claims. He recalled learning from Ryan Beckman, the Vice President of Technology and Strategic Implementation at Bright Health, in March or April 2021, that Bright Health issued a "seven figure check" to Tenet to settle the outstanding claims owed.

223. FE-1 further noted that the backlog involved all claims, including those covered under Individual and Family Plans, ACA Exchange plans, and Medicare Advantage. He did not recall the total amount of claims owed but indicated that it was millions of dollars. He advised that the backlog affected multiple national healthcare providers as well as local and smaller

providers. He further advised that Bright Health had been audited in Colorado prior to the IPO in 2021 and later fined in 2022 for its failure to pay providers in a timely manner.

224. FE-1 commented that Bright Health claimed that it could not calculate risk scores for chronic patients. He explained that the reason Bright Health could not calculate those risk scores was because it was not processing those patients' claims—the company was just denying them, because it appeared (due to the inaccurate directory) that the providers submitting those claims were not under contract. He further explained that, if the company is denying or not processing the claims, then it could not obtain the information needed to prepare risk scores, as much of the information needed to determine risk for chronic patients is found in the claims. He added that, if the company kept its directory up to date, and processed claims in a timely manner, then it would have had more up to date information and been able to calculate risk scores.

225. FE-1 elaborated that he first observed the company having issues with calculating risk scores by May or June 2020, prior to the IPO. He explained that, during the summer of 2020, he was involved in a program working with providers to try to calculate risk scores for chronic patients; it was his work in that program that alerted him to this problem. He further indicated that the risk score problem was exacerbated by the company's growth.

226. FE-1 recalled that the claims backlog problem was discussed at company-wide "all-hands" meetings in the form of webinars. He recalled that executive management acknowledged the problem, stated that they understood that providers and members were complaining to employees about these problems, and assured employees that they were fixing the operational issues. FE-1 added, however, that management never provided specifics as to what they were doing to actually rectify the problem. He recalled management began making these statements at all-hands meetings in February 2021.

227. Regarding the company's IPO, FE-1 asserted that, since management knew about the backlog and outstanding claims issues prior to the IPO, management also knew that the financials in the public offering materials were not accurate.

228. FE-1 then explained how the claims backlog affected the company's ability to calculate its medical loss ratio, or MLR. He noted that, by processing claims during the standard 30-90 days, insurers know what their expenses and financial exposure are. He added that if an insurer is not processing claims in a timely manner, then that insurer will not know how much it will have to pay; it will not have an accurate picture of its cost information. He advised that failing to process claims in a timely way, therefore, leads to understating costs, and the greater the backlog, the more costs will be understated. He described Bright Health as having understated its costs "massively" as a result.

229. FE-1 went on to note that, by failing to process claims in a timely manner, the company also failed to get accurate information on its members/patients' health information (since that information is derived largely from claims, as noted above). He elaborated that, without accurate information on the patients' health, the company would not have accurate information regarding those patients' healthcare needs, and so would not be able to gauge the risk for those patients or calculate the costs for those needs, nor would the company be able to suggest or approve needed treatments which may improve outcomes and lower risks.

230. FE-1 added that factoring in the impact of COVID made the company's costs higher than normal; however, had Bright Health's MLR and claims processes been up to date, then the unexpected costs and volatility triggered by the pandemic would not have been as significant of an issue. He further noted that the company was struggling prior to the pandemic to have visibility into its members' health, and that issue got worse during the pandemic.

231. FE-1 noted that, like COVID, the Special Enrollment Periods ("SEPs") also had an impact on the company's cost. He explained that the SEPs were additional enrollment periods opened by the government for patients to enroll in ACA insurance exchanges. He further explained that the additional enrollment of members created by the SEPs did add a greater volume of members; this, in turn exacerbated the already existing backlog of members' claims. He advised that, had the pre-existing backlog problem been addressed, such as with sufficient staffing in place to service the existing volume of claims, then the influx of new members created by the SEPs would have been handled better. In other words, he clarified, because of the pre-existing problems with the claims backlog, the issues created by the impact of COVID and the SEPs were multiplied.

232. FE-1 recalled that he first raised the backlog problem in May or June 2020, but the problem kept getting worse. Despite his complaints, however, FE-1 recalled that the problem only got worse, particularly during the open enrollment period.

233. FE-2 was formerly employed by Bright Health from February 2021 through August 2021. He described Bright Health's business model as favoring "quantity over quality." He added that there were also times when providers complained that they had not yet received payment for past services, and therefore refused to see new Bright Health members as patients until they were paid. FE-2 also recalled that a large number of complaints came from providers in Florida. He further noted that he observed an increase in the volume of complaints beginning in approximately May or June 2021 through the end of his employment.

234. Regarding how the company coped with COVID-related costs and issues, FE-2 explained that, by the time he joined Bright Health in February 2021, the pandemic was already

occurring. He explained that Bright Health did not manage the crisis as well as other insurers, noting that the company did not yet have the infrastructure in place to handle growth.

235. FE-2 provided examples of Bright Health's lack of infrastructure. He detailed how the company was using Dropbox to store files, which he explained was not appropriate for an enterprise solution. He also indicated that the company was not organized well. He explained that he and his team were often assigned tasks or identified tasks on their own that needed to be completed but were not given any training or guidance as to how to complete those tasks. He noted that "everything was thrown together."

236. FE-3 explained that, whenever he received complaints from care providers about claims that had not been paid, he would email the Claims department and request that they investigate and resolve the complaint. He indicated that the issue of unpaid claims was significant from the time he started at Bright Health, and the problem only increased throughout his employment.

237. FE-3 further confirmed that Bright Health had difficulties conducting risk assessments. FE-3 further confirmed that many of Bright Health's issues stemmed from inadequate infrastructure to handle its growth. He indicated that the company tried to do too much, too fast, with too few resources, and that it should not have tried to expand before it was set up properly to handle growth. FE-3 stated that these issues existed prior to the IPO.

## VII. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT I

### For Violation of Section 11 of the Securities Act against Defendant Bright Health, the Individual Defendants, and the Underwriter Defendants

238. Lead Plaintiff repeats and realleges each and every allegation contained above in ¶¶1-16 and ¶¶37-237 as if fully set forth herein, but only to the extent that such allegations do not

allege fraud, scienter, or the intent of the Defendants named in this claim to defraud Lead Plaintiff or members of the Class within the scope of this cause of action.

239. This cause of action is brought by Lead Plaintiff pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of itself and relevant members of the Class within the scope of this cause of action, against Defendant Bright Health, each of the Individual Defendants, and the Underwriter Defendants in connection with the IPO.

240. This cause of action does not sound in fraud. For purposes of this cause of action, Lead Plaintiff does not claim that any of these Defendants committed intentional or reckless misconduct or that any of these Defendants acted with scienter or fraudulent intent. This cause of action is based solely on strict liability as to Bright Health and negligence as to the remaining Defendants. Lead Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

241. The Registration Statement issued in connection with the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted material facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.

242. Bright Health is the registrant and issuer of the common stock offered pursuant to the Registration Statement. As such, Bright Health is strictly liable under Section 11 of the Securities Act to Lead Plaintiff and to relevant members of the Class within the scope of this cause of action for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

243. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

244. The Individual Defendants each signed the Registration Statement and/or was a director of Bright Health at the time of the IPO and are therefore statutorily liable under Section 11 of the Securities Act. The Individual Defendants caused the issuance of the Registration Statement. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of each of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained misstatements of material facts and omissions of material facts. As such, each of the Individual Defendants is liable under Section 11 of the Securities Act to Lead Plaintiff and to the relevant members of the Class within the Scope of this cause of action.

245. The Underwriter Defendants served as the underwriters for the IPO, as alleged herein, and qualifies as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(1). As such, Underwriter Defendants participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Registration Statement. Underwriter Defendants, as underwriters of the securities offered in the IPO pursuant to the Registration Statement, had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. Underwriter Defendants had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of

Underwriter Defendants' failure to exercise reasonable care, the Registration Statement contained misstatements of material facts and omissions of material facts necessary to make the statements therein not misleading. As such, Underwriter Defendants are liable under Section 11 of the Securities Act to Lead Plaintiff and to the relevant members of the Class within the scope of this cause of action.

246. None of the untrue statements or omissions of material fact in the Registration Statement alleged herein was a forward-looking statement. Rather, each such statement concerned existing facts. Moreover, the Registration Statement did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

247. Each of the Defendants named in this cause of action issued, caused to be issued, and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the Registration Statement, which misstated and failed to disclose, *inter alia*, the facts set forth above. By reason of the conduct herein alleged, each Defendant violated Section 11 of the Securities Act.

248. Lead Plaintiff and other members of the Class within the scope of this cause of action acquired Bright Health common stock pursuant to, or traceable to, the defective Registration Statement.

249. Lead Plaintiff and Class members within the scope of this cause of action have sustained damages. The value of Bright Health common stock has declined substantially subsequent to and due to violations by Defendants named in this cause of action.

250. At the time Lead Plaintiff and other members of the Class within the scope of this cause of action purchased Bright Health common stock, they were without knowledge of the facts

concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed between the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based and the time that this action was commenced. Less than three years has elapsed between the time that the securities upon which this cause of action is brought were offered to the public and the time this action was commenced.

**COUNT II**

**For Violation of Section 12(a)(2) of the Securities Act Against Defendant Bright Health, the Individual Defendants and the Underwriter Defendants**

251. Lead Plaintiff repeats and realleges each and every allegation contained above in ¶¶1-16 and ¶¶37-250 as if fully set forth herein, but only to the extent that such allegations do not allege fraud, scienter, or the intent of the Defendants named in this claim to defraud Lead Plaintiff or members of the Class within the scope of this cause of action.

252. This cause of action is brought by Lead Plaintiff pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 771(a)(2), on behalf of himself and relevant members of the Class within the scope of this cause of action, against Defendant Bright Health, each of the Individual Defendants, and the Underwriter Defendants in connection with the IPO.

253. This cause of action does not sound in fraud. For purposes of this cause of action, Lead Plaintiff does not claim that any of these Defendants committed intentional or reckless misconduct or that any of these Defendants acted with scienter or fraudulent intent. This cause of action is based solely on strict liability as to Bright Health and negligence as to the remaining Defendants. Lead Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in

connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made.

254. Each of the Defendants named in this Count were sellers, offerors, and/or solicitors of purchasers of the Company's common stock pursuant to the defective Prospectus. The actions of solicitation by the Defendants named in this Count included participating in the preparation of the false and misleading Prospectus, which are part of the Registration Statement, and marketing the IPO to investors, such as Lead Plaintiff and the other members of the Class within the scope of this cause of action.

255. The Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make statement made therein not misleading, and omitted to state material facts required to be stated therein.

256. Each of the Defendants named in this cause of action owed to Lead Plaintiff and other members of the Class within the scope of this cause of action the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. By virtue of each of these Defendants' failure to exercise reasonable care, the Prospectus contained misstatements of material facts and omissions of material facts necessary to make the statements therein not misleading.

257. Lead Plaintiff and other members of the Class within the scope of this cause of action purchased Bright Health common stock pursuant to and traceable to the defective Prospectus. Lead Plaintiff did not know, nor in the exercise of reasonable diligence could Lead

Plaintiff have known, of the untruths and omissions contained in the Prospectus at the time Lead Plaintiff acquired Bright Health shares.

258. By reason of the conduct alleged herein, the Defendants named in this cause of action violated and/or controlled a person who violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violation, Lead Plaintiff and the other members of the Class within the scope of this cause of action who acquired Bright Health shares pursuant to the Registration Statement sustained substantial damages. Accordingly, Lead Plaintiff and the other members of the Class within the scope of this cause of action who hold the shares issued pursuant to the Registration Statement have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity. Class members within the scope of this cause of action who have sold their Bright Health shares seek damages to the extent permitted by law.

259. This cause of action is brought within one year of when Lead Plaintiff discovered or reasonably could have discovered the untrue statements and omissions in the Prospectus and within three years of their effective dates.

## COUNT III

## For Violation of Section 15 of the Securities Act Against the Individual Defendants

260. Lead Plaintiff repeats and realleges each and every allegation contained in ¶¶1-16 and ¶¶37-259 above as if fully set forth herein, but only to the extent that such allegations do not allege fraud, scienter, or the intent of the Defendants named in this claim to defraud Lead Plaintiff or members of the Class within the scope of this cause of action.

261. This cause of action is brought by Lead Plaintiff pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of itself and relevant members of the Class within the

scope of this cause of action, against each of the Individual Defendants in connection with the IPO.

262. This cause of action does not sound in fraud. For purposes of this cause of action, Lead Plaintiff does not allege that any of these Defendants committed intentional or reckless misconduct or that any of these Defendants acted with scienter or fraudulent intent. This cause of action is based solely on strict liability as to Bright Health and negligence as to the remaining Defendants. Lead Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made.

263. The Individual Defendants were each control persons of Bright Health by virtue of their positions as directors and/or senior officers of Bright Health. The Individual Defendants each had a series of direct or indirect business or personal relationships with other directors or officers or major shareholders of Bright Health.

264. Each of the Individual Defendants participated in the preparation and dissemination of the Registration Statement, and otherwise participated in the process necessary to conduct the IPO. Because of their positions of control and authority as senior officers and/or directors each of the Individual Defendants were able to, and did, control the contents of the Registration Statement, which contained materially untrue information or omitted material information required to be disclosed to prevent the statements made therein from being misleading.

265. Each of the Individual Defendants were culpable participants in the violations of Section 11 and 12(a)(2) of the Securities Act alleged above, based on having signed the

Registration Statement and/or having otherwise participated in the process that allowed the IPO to be completed.

266. As control persons of Bright Health, each of the Individual Defendants are liable jointly and severally with and to the same extent as Bright Health for its violation of Section 11 and 12(a)(2) of the Securities Act.

267. As a result of the foregoing, Lead Plaintiff and other members of the Class within the scope of this cause of action have suffered damages.

## VIII. EXCHANGE ACT ALLEGATIONS

### A. Defendants Materially False and Misleading Statements and Omissions

#### (a) ***The Registration Statement Falsely Describes Certain Risks as Potential when Such Risks had Already Manifested and/or Would Foreseeably Occur Shortly After the IPO***

268. The Registration Statement inaccurately described as ***potential*** certain risks associated with Bright Health's ability to appropriately set premiums and effectively manage costs, which ***could*** have an adverse effect on its profitability, results of operations, and cash flows, rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

> ***Failure to appropriately set premiums or effectively manage our costs could negatively affect our profitability, results of operations and cash flows***.
>
> The premiums we set for our health plans are a material source of our revenue. We set our premiums using actuarial estimates and our failure to set appropriate premiums, including as a result of inaccuracies in our actuarial estimates, could adversely affect our profitability and cash flows. We use a substantial portion of our health plan revenue to pay the costs of healthcare services delivered to our consumers. ***As such, our profitability depends in large part on our ability to accurately estimate and manage such costs. Relatively small differences between estimated and actual medical costs as a percentage of revenue can result in significant changes in our financial results***.

Our use of actuarial methods to determine premiums and estimate other healthcare costs involves a significant degree of judgment and is subject to a number of inherent uncertainties and assumptions. ***Such actuarial methods are consistently applied, centrally controlled, and are based upon various data points, including our historical submissions and payment data, cost trends, patient and product mix, seasonality, utilization of healthcare services, contracted service rates and other factors for our consumers***. Our ability to accurately estimate such costs depends on various factors, many of which are not within our control, including:

***

• ***our membership mix***;

• ***variances in actual versus estimated levels of cost associated with new products, benefits, lines of business, product changes or benefit level changes***;

• ***changes in the demographic characteristics of an account or market***;

***

• ***catastrophes, including acts of terrorism, pandemics, epidemics or severe weather (e.g., hurricanes, wildfires or earthquakes)***;

***

• ***volatility with respect to the individual market risk pool, including public Health Insurance Marketplaces***; and

• ***potential changes in legislation or other rules and regulations, such as changes in government mandated benefits or consumer eligibility criteria***.

The impact of many of these items on the ultimate costs for claims is difficult to estimate, and they could have a material impact on our business. In addition, the historical data on which our assumptions are based may not necessarily be indicative of the actual costs of claims due to our rapid growth in consumer enrollment and our recent expansion into new businesses and markets. When we commence operations in a new state, region, or other market, or introduce a new product line, we have limited information from which to estimate our potential medical claims liability. ***For a period of time after our entry into a new market, our inception of a new business, or our acquisition of an existing***

> ***business, we base our estimates on government-provided and third-party historical actuarial data and limited actual incurred and received claims and inpatient acuity information. The addition of new categories of eligible individuals, as well as new plan designs we may offer, may make it difficult for us to estimate our medical claims liability and may result in the actual cost of claims being higher than we anticipate.***
>
> We set our premiums for twelve-month periods several months prior to the commencement of the premium period and do not change our premiums during such period, consistent with industry practice. Our inability to implement changes in premium rates within a given period is also governed by federal and state regulatory agencies. For example, we are required to submit data on all proposed rate increases to the U.S. Department of Health and Human Services ("HHS") on many of our products, and under the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act ("ACA"), we are prohibited from implementing unreasonable rate increases. ***If our medical costs exceed our estimates, we will not be able to recover the difference through higher premiums, and our results of operations and financial condition could be adversely affected***.

269. The Registration inaccurately described as ***potential***, certain risks associated with Bright Health's risk adjustment programs, which ***could*** have an adverse effect on its financial results and cash flows, rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

> ***Our health plan products are subject to risk adjustment programs, which if not managed properly can result in lost revenue, which could adversely impact our financial results and cash flows.***
>
> The IFP, MA and Small Group markets we serve employ risk adjustment programs that impact the revenue we recognize for our enrolled membership. These risk adjustment programs are designed to compensate us for the level of risk we take in providing healthcare services to our overall consumer population. In order to be reimbursed by government payors at a level commensurate with our consumer population risk, we must ensure that our Care Partners are identifying and properly inputting data to code all chronic and severe diagnoses to create an accurate health profile for each consumer. ***If our Care Partners do not accurately record this consumer data, including our consumers' "risk scores", we***

> ***may not be able to accurately estimate our revenue and medical costs. If the data on our consumer population overstates the health risk of our consumer population, we may be obligated to return funds we have received to government payors***. Conversely, if we understate the health risk of our consumer population, we will not receive funds from government payors that we would otherwise be entitled to receive. ***As a result of the variability of certain factors that go into the development of the risk adjustment we recognize, such as risk scores and other market-level factors where applicable, the actual amount of revenue could be materially more or less than our estimates***. ***Consequently, our estimate of our health plans' risk scores for any period, and any resulting change in our accrual of revenue related thereto, could have a material adverse effect on our results of operations, financial condition, and cash flows***. The data provided to CMS to determine risk scores is subject to audit by CMS even several years after the annual settlements occur. ***If the risk adjustment data we submit is found to incorrectly overstate the health risk of our consumers, we may be required to refund monies previously received by us and/or be subject to penalties or sanctions, including potential liability under the federal False Claims Act ("FCA"), which could be significant and would reduce our revenue in the year that repayment or settlement is required***.

270. The Registration Statement inaccurately described as ***potential***, certain risks associated with Bright Health's rapid growth, which the Company "***may*** not be able to manage … effectively," rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

> ***If we continue to grow rapidly, we may not be able to manage our growth effectively***.
>
> Since our inception, we have experienced rapid growth, with total revenue having grown from $130.6 million in 2018 to $1.2 billion in 2020. Our significant growth to date, attributable to both rapid organic membership growth and acquisitions of other businesses, has placed and we expect will continue to place significant demands on our management team and our operational and financial resources. Sustaining such growth will require additional resources to improve our operational, management, and financial controls, and we expect to continue to increase headcount, including specialized personnel in areas such as software engineering, finance, regulatory, and other mission-critical areas, to support our growth. We may also experience significant

> personnel changes related to acquisition-related integration efforts. ***Our organizational structure may also become more complex as we add these additional resources, making it more difficult to manage***.
>
> ***
>
> ***Continued rapid growth in our business may exacerbate certain of the risks described elsewhere in this section, including our ability to accurately estimate costs, price our products, and charge appropriate premiums, as well as our ability to accurately assess, code and report IFP, MA and Small Group risk adjustment factor ("RAF") scores for our consumers***. ***If we are not able to manage our growth effectively while maintaining the quality of our services and consumer satisfaction, our business, financial condition and results of operations may be materially adversely affected***.

271. The Registration Statement inaccurately described as ***potential***, certain risks associated with Bright Health's visibility into its business and future prospects, stating the Company's "growth, strategy and profitability ***could*** be negatively impacted if we are unable to effectively manage this complexity," rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

> ***Our limited operating history makes it difficult to evaluate our business and assess our future prospects.***
>
> Our limited operating history makes it difficult to evaluate our business and assess our future prospects. We have encountered and will continue to encounter significant risks and uncertainties frequently experienced by new and growing companies in heavily regulated industries, such as difficulties determining appropriate investments given limited resources, effectively managing growth and efficiently navigating and complying with evolving regulations. We began offering our first health insurance plans in 2017, and our most substantial growth has occurred in the last 18 months. During that time, we have significantly expanded our products and services across both our Bright HealthCare and NeueHealth businesses, including as a result of the Acquisitions. We have also expanded our operations to different lines of business and geographies. ***As such, the complexity of our business has***

> ***increased significantly in a short period of time, and our growth, strategy and profitability could be negatively impacted if we are unable to effectively manage this complexity***. Any inability to manage our business effectively could result in slowing demand for our services, increased competition or a failure to capitalize on growth opportunities.

272. The Registration Statement inaccurately described as ***potential***, certain risks associated with the ongoing COVID-19 pandemic at the time of the IPO that "***may*** continue to adversely affect, [Bright Health's] business and results of operations," rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

> ***The COVID-19 pandemic has adversely affected, and may continue to adversely affect, our business and results of operations***.
>
> The severity and magnitude of the current COVID-19 pandemic continue to grow, and the duration of the pandemic continues to be uncertain. The pandemic has adversely affected our business and results of operations. The extent to which the COVID-19 pandemic will continue to impact our business, results of operations and financial condition will depend on future developments, which are unknown at this time. Factors that could impact our results include: the ultimate geographic spread, severity and duration of the COVID-19 pandemic; the impact of business closures, travel restrictions, social distancing and other actions taken to contain the spread of COVID-19; the effectiveness of actions taken to reduce transmission of the virus that causes COVID-19 (including the development and administration of vaccines and the continued research into treatments, the virus, and the disease); the ongoing emergence of new variants of the virus that causes COVID-19; the impact of the pandemic on economic activity; and any impairment in value of our tangible or intangible assets which could be recorded as a result of weaker economic conditions caused by the pandemic. In addition, the long-term impact of the COVID-19 pandemic may not be fully understood or reflected in our results of operations and overall financial condition until future periods.
>
> ***As a result of the COVID-19 pandemic and the associated protective and preventative measures, we have experienced and may continue to experience disruptions to our business***. Risks

presented by the ongoing effects of COVID-19 include, but may not be limited to, the following:

***

• *Documentation of Health Conditions*. ***Due to the COVID-19 pandemic, we may not be able to adequately document the health conditions of our consumers and patients, as many of them have avoided in-person medical visits. Our third-party clients for our NeueHealth MSO may similarly be unable to adequately document the health conditions of their members. Inaccurate or inadequate documentation could result in an inaccurate RAF score, which could adversely impact our Bright HealthCare revenue for future periods. In addition, inaccurate documentation could impact the ability of our NeueHealth MSOs to manage medical costs and quality metrics on behalf of its clients, putting it at greater financial risk and potentially adversely affecting the profitability of our NeueHealth business***.

***

• *Changes in Regulatory Requirements*. ***As a result of the COVID-19 pandemic, regulatory agencies may require significant temporary changes to benefit coverage requirements, enrollment standards or disenrollment standards, in each case, that could negatively impact our financial performance***. For example, mandatory coverage of COVID-19 testing in the workplace could result in substantial expenses that are not contemplated by our current rates. Furthermore, mandatory termination deferrals due to nonpayment of insurance premiums could result in a situation where we incur significant medical expense without the ability to collect any associated premium revenue.

***

***To the extent the COVID-19 pandemic continues to adversely affect our business and financial results, it may also have the effect of heightening many of the other risks described in this section of the prospectus titled "Risk Factors."***

273. The Registration Statement inaccurately described as ***potential***, certain risks associated the Company's ability to "***maintain*** the accuracy, integrity or availability of [its] data,"

rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

> ***We may not be able to maintain the accuracy, integrity or availability of our data.***
>
> ***Our Bright HealthCare and NeueHealth businesses are highly dependent on the accuracy, integrity and availability of the data we generate and use to serve our consumers, Care Partners and other constituents, and to provide patient care. The volume of healthcare data generated, and the uses of data, including for electronic health records, are rapidly expanding. Our ability to implement new and innovative services, adequately price our products and services, provide timely and effective service to our consumers and clients and accurately report our results of operations depends on the accuracy and the integrity of the data in our information systems. If the data we rely upon to run our businesses is found to be inaccurate or unreliable, we could experience adverse effects on our ability to effectively conduct our business, including our ability to***:
>
> • ***accurately estimate revenue and medical costs***;
>
> • ***establish appropriate pricing and accurately code our consumers' RAF scores***;
>
> • prevent, detect and control fraud;
>
> • ***prevent disputes with consumers and network providers***;
>
> • ***prevent errors in medical records***;
>
> • ***manage value-based care contracts***;
>
> • ***prevent regulatory sanctions, scrutiny or penalties***; and
>
> • ***reduce the incurrence of increased operating expenses.***

274. The Registration Statement inaccurately described as ***potential***, certain risks associated with the Company's management of its risk adjustment programs, including the risk of overstating population health risk which "***[could] result in lost revenue***," rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

***Our health plan products are subject to risk adjustment programs, which if not managed properly can result in lost revenue, which could adversely impact our financial results and cash flows***.

The IFP, MA and Small Group markets we serve employ risk adjustment programs that impact the revenue we recognize for our enrolled membership. These risk adjustment programs are designed to compensate us for the level of risk we take in providing healthcare services to our overall consumer population. ***In order to be reimbursed by government payors at a level commensurate with our consumer population risk, we must ensure that our Care Partners are identifying and properly inputting data to code all chronic and severe diagnoses to create an accurate health profile for each consumer. If our Care Partners do not accurately record this consumer data, including our consumers' "risk scores", we may not be able to accurately estimate our revenue and medical costs. If the data on our consumer population overstates the health risk of our consumer population, we may be obligated to return funds we have received to government payors***. Conversely, if we understate the health risk of our consumer population, we will not receive funds from government payors that we would otherwise be entitled to receive. ***As a result of the variability of certain factors that go into the development of the risk adjustment we recognize, such as risk scores and other market-level factors where applicable, the actual amount of revenue could be materially more or less than our estimates. Consequently, our estimate of our health plans' risk scores for any period, and any resulting change in our accrual of revenue related thereto, could have a material adverse effect on our results of operations, financial condition, and cash flows***. The data provided to CMS to determine risk scores is subject to audit by CMS even several years after the annual settlements occur. ***If the risk adjustment data we submit is found to incorrectly overstate the health risk of our consumers, we may be required to refund monies previously received by us*** and/or be subject to penalties or sanctions, including potential liability under the federal False Claims Act ("FCA"), which could be significant and would reduce our revenue in the year that repayment or settlement is required. We have had in the past to take reserves against our premium revenue because of our difficulty to accurately estimate risk adjustment in our business. Furthermore, if the data we provide to CMS incorrectly understates the health risk of our consumers, we might be underpaid for the care that we must provide to our consumers, which could have a negative impact on our results of operations and financial condition.

275. The Registration Statement inaccurately described as ***potential***, certain risks associated with the modifications to the U.S. health insurance markets, including the then-existing ACA SEP, "***could*** adversely effect [Bright Health's] business and operating results," rather than disclosing the actual events and trends or uncertainties that had already manifested and affirmatively misrepresented its strength in the market:

> ***Modifications or changes to the U.S. health insurance markets, including as a result of legislation, could adversely affect our business and operating results.***
>
> ***Our business operates in the evolving public and private sectors of the U.S. health insurance system, and our future financial performance will depend in part on growth in the market for private health insurance, as well as our ability to adapt to regulatory developments and the development of new state and federal government programs***. Such modifications and changes could reduce demand and adversely affect our business. For example, some elected officials have recently introduced proposals to expand the Medicare program, which range from the creation of a new single-payor national health insurance program for all residents to less overarching proposals, including lowering the age of eligibility for the Medicare program, expanding Medicare to a larger population and creating a new public health insurance option that could compete with private insurers. In addition, in states such as New York and California, legislators have regularly introduced proposals to establish a single-payor or government-run healthcare system at the state level. Federally, the Biden administration and Congress may otherwise propose changes to elements of the ACA. In December 2019, a federal appeals court held that the individual mandate portion of the ACA was unconstitutional and left open the question of whether the remaining provisions of the ACA would be valid without the individual mandate. On November 10, 2020, the U.S. Supreme Court heard oral arguments in this matter, and is in the process of reviewing this case. A decision is expected later in 2021. ***On January 28, 2021, in response to an Executive Order issued by President Biden, HHS announced a special enrollment period from February 15, 2021 through May 15, 2021, for uninsured and under-insured individuals and families to seek coverage through the Health Insurance Marketplaces. On March 23, 2021, HHS announced the extension of this enrollment period to August 15, 2021***. President Biden's Executive Order also directed federal agencies to examine agency actions to determine whether they are consistent with the Biden administration's

> commitment to strengthen the ACA, and to relatedly begin rulemaking to suspend, modify or rescind inconsistent actions. Areas of focus include policies or practices that may reduce affordability of coverage, present unnecessary barriers to coverage, or undermine protections for people with preexisting conditions. We continue to evaluate the effect that the ACA and its possible modifications, repeal and replacement has on our business.
>
> ***As the regulatory and legislative environments within which we operate are evolving, we may not be able to ensure timely compliance with such changes due to limited resources. Furthermore, we may face challenges prioritizing the allocation of resources between implementing systems responsive to new legislative or regulatory requirements, focusing on growth-related operations and implementing management systems and controls related to becoming a public company***. If our operations are found to be in violation of any of the federal and state regulations that apply to us, we may be subject to penalties that curtail our operations, which could adversely affect our ability to operate our business and our results of operations.

276. The statements referenced above in ¶¶268-75 is an inaccurate statements of material fact because while noting only the ***potential*** negative impacts on Bright Health's business, financial condition, and results of operations, the Registration Statement failed to disclose and misrepresented the following significant, ***then-existing*** material events and adverse trends or uncertainties that Bright Health ***had already been*** facing at the time of the IPO:

(a) beginning as late as 2019 and lasting through the Class Period, Bright Health's medical provider directories were not accurate or up to date in both its new and existing markets, and, as a result, legitimate or properly submitted claims from providers under contract were routinely, and improperly denied, based on the faulty directory data;

(b) due to the failure to maintain the provider directories, legitimate claims were often 180 days or more behind, or backlogged, in being processed and paid, significantly longer than the industry standard of 30 to 90 days;

(c) in addition, Bright Health and its third-party vendors failed to provide enough staff and resources to handle the claims in a timely manner resulting in claims disputes being unanswered for months on end;

(d) due to this significant backlog of claims, Bright Health owed millions of dollars to healthcare providers for overdue claims;

(e) beginning as late as 2020 and lasting through the Class Period, Bright Health was unable accurately perform risk adjustments because of the claims processing and directory issues outlined above;

(f) Bright Health took insufficient measures to remedy issues with its provider directory, claims backlogs, or inability to perform accurate risk adjustments;

(g) by failing to timely process claims, Bright Health massively understated its costs and the health risk of its members, which in turn, caused the Company to similarly overstate its MCR;

(h) parallel to these issues, prior to and during the Class Period Bright Health had been struggling to manage COVID-19 related impacts since the start of the pandemic, which was materially exacerbated by the claims processing issues outlined above;

(i) the above issues were materially exacerbated by the Company's significant growth, including growth through acquisitions and the ACA SEP, resulting in a heavily skewed, then-existing, and unfavorable percentage of new versus existing members;

(j) as a result, Bright Health's financial results would foreseeably be materially impacted in the hundreds of millions of dollars due to inaccurate risk adjustments and prior period medical costs as the Company caught up on claims processing;

(k) further, the Company would foreseeably continue to be impacted adversely by COVID-19;

(l) the Bright Health Defendants knowingly and/or recklessly withheld this information from investors in the futile hope to remedy the above-issues before the adverse impacts were too large to conceal;

(m) accordingly, during the Class Period the Bright Health Defendants overstated the Company's business and financial prospects; and

(n) as a result, during the Class Period the Bright Health Defendants made materially false and/or misleading statements and failed to state information required to be stated therein.

**(b)** ***The Registration Falsely Describes the Strength of Bright Health's Business and Operations by Omitting Then-Existing and Material Operational Challenges and Risks***

277. The Registration Statement stressed that "[e]nsuring that complete and accurate health conditions of [Bright Health's] consumers are captured within documentation submitted to CMS is critical to recognizing accurate risk adjustment, which is reflected in our revenue year-over-year."

> ***Bright HealthCare's ability to capture complete and accurate risk adjustment data affects revenue***
>
> Portions of premium revenue from our IFP products and MA plans are determined by the applicable CMS risk adjustment models, which compensate insurers based on the underlying health status (acuity) of insured consumers. CMS requires that a consumer's health status be documented annually and accurately submitted to CMS to determine the appropriate risk adjustment. ***Ensuring that complete and accurate health conditions of our consumers are captured within documentation submitted to CMS is critical to recognizing accurate risk adjustment, which is reflected in our revenue year-over-year***.

278. The Registration Statement listed "Bright HealthCare Consumers Served" as a "Key Metric" in evaluating the financial health of the Company, stating that patient growth provided Bright Health management visibility into the future needs of the Company:

> ***Bright HealthCare Consumers Served***
>
> Consumers served include Bright HealthCare individual lives served via health insurance policies across multiple lines of business, primarily attributable to IFP products and MA plans in markets across the country. ***We believe growth in the number of consumers is a key indicator of the performance of our Bright HealthCare business. It also informs our management of the operational, clinical, technological, and administrative functional area needs that will require further investment to support expected future consumer growth***.
>
> ***Value-Based Care Patients***
>
> Value-based care patients are patients attributed to providers contracted under varied value-based care delivery models in which the responsibility for control of an attributed patient's medical care is transferred, in part or wholly, to our NeueHealth managed medical groups. ***We believe growth in the number of value-based care patients is a key indicator of the performance of our NeueHealth business. It also informs our management of the operational, clinical, technological and administrative functional area needs that will require further investment to support expected future patient growth***. Over time, we expect our value-based care patients will increase as we convert fee-for-service arrangements into value-based care financial arrangements.

279. The Registration Statement provided historical financial information for Bright Health, including a year-over-year comparison of the Company's financial results for the quarters ending March 31, 2021 and March 31, 2020, attributing a $676.0 million, or 340.4% increase in revenue to "***an increase in Bright HealthCare commercial consumers of 0.3 million, or 217%, from organic growth and inorganic contributions from the Brand New Day acquisition in the Bright HealthCare segment and the PMA acquisition in the NeueHealth segment***."

280. Similarly, the Registration Statement provided historical yearly financial information for the years 2020, 2019, and 2018, attributing the $926.6 million, or 330.2% increase in 2020 revenue to "***an increase in Bright HealthCare consumers of 251% from organic growth and inorganic contributions from the Brand New Day Acquisition, as well as the creation of the NeueHealth segment with the acquisition of AMD***."

281. The Registration Statement stated with respect to Bright Health's risk adjustments, that the Company "refine[d] [its] estimate as new information becomes available."

> **Risk Adjustment**
>
> The risk adjustment programs in the IFP and Medicare Advantage lines of business are designed to mitigate the potential impact of adverse selection and provide stability for health insurers.
>
> Under the Individual and Small Group risk adjustment program, each plan is assigned a risk score based upon demographic and current year medical encounters information that is submitted to CMS for its consumers and calculated based on the CMS risk adjustment methodology. Plans with a plan level risk score that is lower than the State average risk scores will generally pay into the pool, while plans with a plan level risk score higher than State average risk scores will generally receive distributions. ***We refine our estimate as new information becomes available, and we receive the final report from CMS in August of the following year***.
>
> ***In the Medicare Advantage risk adjustment program, each consumer is assigned a risk score based on their demographic and prior year medical encounters information submitted to CMS that reflects the consumer's predicted health costs based on the CMS risk adjustment methodology***. Plans receive higher payments for consumers with higher risk scores than consumers with lower risk scores.

282. The Registration Statement stated that Bright Health's financing strategy involved "seek[ing] to aggregate consumers and design and offer affordable benefits to help effectively manage risk."

> ***Financing of Care*** — The financing of care is more than just insurance. Insurance, in its simplest form, protects against

> catastrophic loss. In contrast, the financing of care focuses not only on protection against loss, but also on the creation of overall consumer value, while enhancing access to healthcare through efficient resource distribution. ***Bright Health seeks to aggregate consumers and design and offer affordable benefits to help effectively manage risk***. We structure value-based arrangements with our Care Partners that are designed to reward the quality of care delivered over the quantity of services rendered, reducing the total cost of care while enhancing clinical outcomes. Our model is designed to address the needs of all consumers, from high-acuity, special needs individuals requiring high-touch care management to lower acuity individuals seeking to protect themselves from catastrophic healthcare events. ***We engage deeply with providers***, while giving consumers the tools and incentives they need to take a proactive role in their personal well-being. We endeavor to put the consumer in the driver seat.

283. Similarly, the Registration Statement stated that the Company had "developed [a] value-based payment structures that enable [it] to take a staged approach to financial alignment with [its] Care Partners. [The Company] first carefully consider each Care Partner's ability and interest to take varying levels of population health risk."

> ***Financial Alignment — We have developed value-based payment structures that enable us to take a staged approach to financial alignment with our Care Partners. We first carefully consider each Care Partner's ability and interest to take varying levels of population health risk***. Whether through shared savings contracts, capitated arrangements, or other contractual incentives, we work collaboratively with our Care Partners to determine and structure the best financial alignment model for each local market and individual organization. Once aligned, we then work with our Care Partners over time to optimize the relationship and prepare them for success under more advanced models of value-based care.

284. The Registration Statement touted how Bright Health had successfully applied its core business principles to a variety of insurance markets throughout the United States, including Florida, to "demonstrate how Bright Health's alignment model can adapt to the nuances of local markets while continuing to deliver MCR improvement as our markets mature." Further, the

Registration Statement touted that Bright Health's business model had allowed the Company to significantly reduce MCR over time.

> Bright Health recognizes that each market is different, and we have been able to apply our three core principles of alignment in a flexible manner to meet the specific needs of the local communities we serve and to drive differentiated experiences and outcomes. As detailed below, we have done so across a variety of markets, each with distinctive organizational constructs.
>
> 
> 
>
> ***<u>Market Type 1</u>: Markets Organized Around Risk-Bearing Organizations ("RBOs").***
>
> ***In some markets, local healthcare delivery is organized around significant risk-bearing physician aggregators, such as mature IPAs and MSOs. Working collaboratively with these RBOs, Bright Health applies proprietary analytics to identify and align with high-performing specialists and facility partners to create an IDN that is focused on the management of population health risk.*** Together, we ensure that healthcare is delivered in a seamless manner for consumers across the ecosystem — from primary care physician to specialist, from medical clinic to acute care hospital.
>
> ***In California, we have aligned with leading IPAs with deep experience managing population health risk and strong relationships with leading hospital systems. In select Florida markets, our approach has centered around building and managing a care delivery system anchored around high-performing, risk-bearing physician practice organizations***.
>
> ***<u>Market Type 2</u>: Markets Organized Around Integrated Delivery Network ("IDNs").***

In other markets, we see existing IDNs that have already invested in building and managing a network of clinically aligned physicians and other care delivery providers. Bright Health engages with these established entities to further optimize local market performance and meet the holistic healthcare needs of consumers across both Bright HealthCare — through aligned financing and distribution to aggregate and engage consumers — and NeueHealth — through the technology, data, and experience to drive outcomes.

When entering Colorado, for example, we partnered with an existing IDN that had made significant clinical investment but sought an aligned partner to support financing and distribution. Working closely with this Care Partner, we have been able to collaborate in the development of affordable products tightly aligned with their existing network of affiliated providers. As a result, we have helped this Care Partner drive in-network utilization of 91% in 2020, while maintaining an aggregate commercial MCR through 2020 of 71%.

While markets featuring IDNs are not common nationally, we have the ability to optimize these markets by seamlessly plugging into existing care delivery networks and offering our financing expertise to more closely align with Care Partners, making healthcare simpler and more affordable for consumers.

***Market Type 3: "De Novo" Organized Market.***

***We also serve markets comprised of health system partners that seek to manage population health risk but are looking for greater expertise and support in aligning with high-performing primary and specialty care physicians. Through our proprietary tools, we analyze existing referral relationships and work with local care providers to assemble a set of high-performing Care Partner relationships "de novo".***

In Tennessee, for example, physicians are looking for a partner to support care delivery in a value-based environment, but historically they have had neither the appropriate incentives nor payor support in place to develop the capabilities needed to successfully manage population health risk. In markets such as these, our Bright HealthCare enablement model and NeueHealth tools and capabilities enable our Care Partners to manage low acuity populations while affording them greater opportunity to serve more complex populations over time. Even in a market like Tennessee, which required a tailored "de novo" approach to Care

> Partner development, we have been able to generate an aggregate commercial MCR for IFP products through 2020 of 83%.
>
> ***These examples demonstrate how Bright Health's alignment model can adapt to the nuances of local markets while continuing to deliver MCR improvement as our markets mature***. As shown below, our MCR performance in states with IFP product offerings, as grouped by cohort based upon number of years operating in a given state, demonstrates a declining average MCR from 92.1% in the first year to 66.4% in our most mature markets by the fourth year.

IFP MCR Evolution Over Time




IFP State Entry by Year

| 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|
| Colorado | Alabama | Arizona<br>Tennessee | Florida<br>Nebraska<br>North Carolina<br>Oklahoma<br>South Carolina |

285. The Registration Statement further touted that Bright Health's proprietary technology provided deep visibility into consumer data and allowed the Company to meaningfully manage patient and care provider relationships:

> Bright Health's aligned and consumer-focused model enables us to transform the way technology can effect meaningful change in healthcare. Historically, key stakeholders with misaligned incentives have generally been unwilling to share critical information, thereby limiting the effectiveness of healthcare technology. In addition, data has been transactional, serving the needs of payors and care providers, but not the individual. ***By aligning stakeholders across the financing and delivery of care and putting consumers in control of their healthcare data, Bright***

***Health can capture a holistic view of the consumer and empower the individual and their care teams to drive better coordination and optimize clinical outcomes***.

Bright Health's product and technology strategy is focused around three key pillars:

• ***Simplifying the Consumer Experience*** — Creating an individual shopping experience for consumers who prioritize price, quality, and convenience.

• ***Enabling High-Value Care Delivery*** — Curating high-performing Personalized Care Teams that help consumers and providers make the right complex care decisions and drive supply-side competition.

• ***Driving Sustainable Affordability*** — Significantly reduces the friction that keeps providers from clinical practice and adds unnecessary cost to the system.

To operationalize our product and technology strategy, Bright Health has developed a differentiated consumer-centric healthcare platform, the Bright Health Intelligent Operating System (BiOS). BiOS is built upon our proprietary intelligent data hub, Consumer360, which integrates with an ecosystem of connected Care Partner data and technology infrastructure to power *DocSquad*, our suite of proprietary consumer and care provider solutions. ***We ensure information is available when and where it is needed, whether through interactions with Bright Health directly or through embedded experiences with our Care Partners***. We allow consumers to see *their* providers on *their* terms, leveraging DocSquad to personalize interactions whether they occur in-person or virtually. BiOS is designed to make healthcare simple, personal, and convenient for consumers.




286. As applied, the Registration Statement detailed that "[w]hen [Bright Health] enter[s] a market, [it] begin[s] with a rigorous assessment and understanding of the unique attributes of that market to determine how to deploy our alignment model and position [the Company] for success." The Registration Statement further emphasized that Bright Health's proprietary set of tools allowed for the Company to fully evaluate all facets of a population upon entry into a new market. According to the Registration Statement, the Company's care partner relationships allowed it to "quickly scale membership as [it] increase[s] [its] service area."

> ***When we enter a market, we begin with a rigorous assessment and understanding of the unique attributes of that market to determine how to deploy our alignment model and position us for success***. We have developed a proprietary set of tools that enable us to assess critical consumer (demand side) attributes as well as care provider (supply side) characteristics in each market. ***These tools have enabled us to develop a measured approach to state and market entry, helping to ensure that the complexity of the population served is commensurate with the level of clinical, financial, and technological integration we initially have with our local Care Partners***. As our local Care Partner relationships evolve over time and we more deeply align, we are better positioned to successfully serve increasingly complex populations, maximizing our total market opportunity.




> We believe our aligned enablement model affords us a tremendous opportunity to serve an untapped (underpenetrated) segment of the population. While legacy managed care organizations have focused on serving low-acuity populations, our model is designed to serve a much broader population, including consumers with complex medical needs, as we progress markets along the "alignment-complexity glidepath". ***Our deep Care Partner relationships allow us to enter new states with an aligned growth partner and quickly scale membership as we increase our service area across the state***.

287. The Registration Statement touted that Bright Health had the "proven ability to grow revenue while reducing our MCR over time."

> ***We have a proven ability to grow revenue while reducing our MCR over time as shown in Colorado, where we have grown our IFP market share in our service areas from 9.3% in 2017 to 33.6% in 2020 while reducing our MCR from 87.3% in 2017 to 66.4% in 2020***. We believe Colorado, like many of our other markets, has further embedded growth potential as we leverage existing infrastructure and Care Partner relationships to address higher acuity consumers, while introducing new Bright HealthCare products to the market.




288. With respect to NeueHealth, the Registration Statement touted that the segment had a "demonstrated … ability to successfully manage medical spend across both commercial and Medicare Advantage value-based contracts," which translated to higher MCR, including in Florida.

> This flexible approach to value-based care delivery improves clinical outcomes, drives reductions in total cost of care, and promotes consumer satisfaction. ***Within our clinics, we have demonstrated the ability to successfully manage medical spend across both commercial and Medicare Advantage value-based contracts. Our South Florida medical group delivered an IFP MCR with its largest payor of 72% in 2019 and 75% in 2020. Similarly, our Central Florida medical group, which primarily serves a Medicare population today, demonstrated a MA MCR across its total cost of care contracts of 66% in both 2019 and 2020***. We have achieved this strong performance while delivering high consumer satisfaction as evidenced by an NPS score of 78 across our clinics.

289. With respect to Bright HealthCare, the Registration Statement touted that the segment "has been able to generate consistent MCR performance despite the accelerating pace of our new market expansion and an increasing share of Medicare Advantage business, which is priced to a higher MCR."

> Bright HealthCare began serving consumers in 2017 through IFP products. Since then, our business has evolved to serve higher acuity populations, adding traditional MAPD in 2018 and expanding further to serve a special needs population in 2019. ***Bright HealthCare has been able to generate consistent MCR performance despite the accelerating pace of our new market expansion and an increasing share of Medicare Advantage business, which is priced to a higher MCR***.

Bright HealthCare At a Glance




| | | | | |
|---|---|---|---|---|
| **States** | 1 | 3 | 6 | 13 |
| **Medical Cost Ratio** | 87.3% | 75.8% | 82.4% | 85.3%(1) |

(1) Reflects COVID-19 adjusted MCR. Bright HealthCare MCR was 89.3% in 2020 on an as-reported basis.

290. Among the Registration Statement's listed "competitive advantages," was Bright Health's "Multi-Pronged Organic and Inorganic Growth Strategy." According the to Registration Statement, the Company had a "proven track record of successfully identifying, executing, and integrating acquisitions into the Bright Health enterprise, which [is] expect[ed] to continue to grow through acquisitions."

> ***We Have a Multi-Pronged Organic and Inorganic Growth Strategy***. Our growth will be driven by a mix of organic and inorganic initiatives. We plan to grow in existing markets as they scale to maturity, and we will leverage our relationships with some of the largest care provider organizations nationally to expand our geographic footprint and diversify into new product and service lines. ***Our team also has a proven track record of successfully identifying, executing, and integrating acquisitions into the Bright Health enterprise, which we expect to continue to grow through acquisitions***.

291. The statements referenced above in ¶¶277-90 are inaccurate statements of material fact because they contained untrue statements of material fact and omitted material facts necessary to make the statements contained therein not misleading:

(a) beginning as late as 2019 and lasting throughout the Class Period, Bright Health's medical provider directories were not accurate or up to date in both its new and existing markets, and, as a result, legitimate or properly submitted claims from providers under contract were routinely, and improperly denied, based on the faulty directory data;

(b) due to the failure to maintain the provider directories, legitimate claims were often 180 days or more behind, or backlogged, in being processed and paid, significantly longer than the industry standard of 30 to 90 days;

(c) in addition, Bright Health and its third-party vendors failed to provide enough staff and resources to handle the claims in a timely manner resulting in claims disputes being unanswered for months on end;

(d) due to this significant backlog of claims, Bright Health owed millions of dollars to healthcare providers for overdue claims;

(e) beginning as late as 2020 and lasting throughout the Class Period, Bright Health was unable accurately perform risk adjustments because of the claims processing and directory issues outlined above;

(f) Bright Health took insufficient measures to remedy issues with its provider directory, claims backlogs, or inability to perform accurate risk adjustments;

(g) by failing to timely process claims, Bright Health massively understated its costs and the health risk of its members, which in turn, caused the Company to similarly overstate its MCR;

(h) parallel to these issues, prior to and during the Class Period Bright Health had been struggling to manage COVID-19 related impacts since the start of the pandemic, which was materially exacerbated by the claims processing issues outlined above;

(i) the above issues were materially exacerbated by the Company's significant growth, including growth through acquisitions and the ACA SEP, resulting in a heavily skewed, then-existing, and unfavorable percentage of new versus existing members;

(j) as a result, Bright Health's financial results would foreseeably be materially impacted in the hundreds of millions of dollars due to inaccurate risk adjustments and prior period medical costs as the Company caught up on claims processing;

(k) further, the Company would foreseeably continue to be impacted adversely by COVID-19;

(l) the Bright Health Defendants knowingly and/or recklessly withheld this information from investors in the futile hope to remedy the above-issues before the adverse impacts were too large to conceal;

(m) accordingly, during the Class Period the Bright Health Defendants overstated the Company's business and financial prospects; and

(n) as a result, during the Class Period the Bright Health Defendants made materially false and/or misleading statements and failed to state information required to be stated therein.

## B. The Truth Begins to Emerge, but the Bright Health Defendants Continue to Mislead the Market

### 1. Second Quarter 2021 Financial Results

292. On August 2, 2021, Bright Health reported the Company's financial results for its second quarter 2021 on SEC Form 8-K, its first earnings release since going public following the

IPO. Reported revenues rose more than 275% from the same period a year ago to $1,114 million, up from $297 million in the prior year period. The Company reported a population of 552,759 commercial members, up from 153,083 in the prior year period, 110,066 MA members, up from 54,141 in the prior year period, and 42,305 NeueHealth members, up from 19,419 in the prior year period.

293. The Company gave the following projections for its full-year 2021 financial results: revenue in the range of $4.0 billion to $4.2 billion, and 86% MCR plus or minus 200 bps.

294. Despite posting significant earnings and growth year-over-year, the Company reported a net loss of $43.7 million, or $0.28 per share, which loss was substantially larger than the consensus estimates which projected a loss of $0.18 per share.

295. The earnings release reported an MCR of 86.8% and 82.0% on an adjusted basis excluding COVID-19 related costs. Defendant Smith was quoted in the release touting the Company's "remarkable" performance having "quadrupled" revenue "while maintaining a consistent … MCR." The release also stated that the Company "continues to leverage operating costs and the business scales."

> Bright Health Group's medical cost ratio ("MCR") for the second quarter of 2021 was 86.8% on a reported basis and 82.0% on an adjusted basis. This is an improvement over last year's second quarter adjusted MCR of 82.7%. "***As we step back and look at year-to-date 2021 compared to the first half of 2020, our growth and ability to demonstrate performance is truly remarkable***. ***Our first half revenue has more than quadrupled since last year, all while maintaining a consistent adjusted MCR below 80%***," said Cathy Smith, Chief Financial and Administrative Officer. In addition, ***the Company continues to leverage operating costs as the business scales with an operating cost ratio of 23.4% for the second quarter***, an improvement of 6.5 percentage points over the same period last year.

296. Also on August 3, 2021, Bright Health hosted its Second Quarter 2021 earnings call with analysts and investors. This was the Company's first investor call to date following the IPO.

297. On the call Defendant Mikan touted that the Company was "well on its way to building the national integrated system of care needed to change healthcare in the United States," and the Bright Health had seen "tremendous growth." Defendant Mikan affirmed that the Company was "forecasting 2021 revenue of greater than $4 billion."

> ***Bright Health Group is well on its way to building the national integrated system of care needed to change healthcare in the United States. Both Bright Health Care and NeueHealth are demonstrating significant growth and diversification. And at a Bright Health Group level, we are forecasting 2021 revenue of greater than $4 billion***.
>
> ***As we enter the second half of 2021, Bright HealthCare has seen tremendous growth*** and currently serves a diverse customer base with nearly 663,000 total consumers across our Commercial and Medicare Advantage lines of business.

298. When discussing the "current state of [the] business," Defendant Mikan lauded the Company's "remarkable" and "unmatched growth"—providing specifics as to the number of members served and added—as well as "continued future growth." Defendant Mikan also praised the Company's data-driven approach driven by its proprietary technology. Finally, Defendant Mikan touted Bright Health's "consistent performance," and that "[e]ven with [Bright Health's] explosive growth, we have been able to demonstrate in an adjusted medical cost ratio below 80% across our enterprise during the first half of 2021."

> As we discuss the current state of our business, I'd like you all to keep five key themes in mind.
>
> ***One***, ***we have demonstrated unmatched growth***. Bright HealthCare ended 2020 with 207,000 members served, approximately 145,000 commercial members and 62,000 Medicare Advantage members. As of the end of the second quarter of 2021,

> Bright HealthCare served nearly 663,000 consumers, an increase of 220%.
>
> ***Two***, ***we have delivered consistent performance. Critical to our model is our ability to price to our underlying capabilities and cost structure in each market. Even with our explosive growth, we have been able to demonstrate in an adjusted medical cost ratio below 80% across our enterprise during the first half of 2021. Critical to this measure is our model's ability to drive in-network utilization within our integrated systems of care***.
>
> ***Three***, we are driving differentiation through NeueHealth. We have been building our NeueHealth business since the beginning of Bright Health. However, we are now starting to see it come to life. Focused on serving all populations, ***NeueHealth builds and operates local, integrated systems of care that clinically, financially and with data and technology, align all stakeholders in a local market***.
>
> Today, NeueHealth directly manages care for approximately 170,000 value based patients through our 44 owned primary care clinics. This represents over 700% growth from the 19,400 patients we managed at the end of Q2 2020.
>
> ***Four***, we are building one technology platform. Core to our model is a single technology platform purpose-built for the aligned model of care. This platform, which leverages our provider and consumer facing tools branded as DocSquad, connects our consumers and patients to their personalized care teams.
>
> We are also moving to a single operating system that spans our care financing and care delivery businesses, which will enable us to continue demonstrating differentiated performance and outcomes.
>
> And finally, ***five***, ***continued future growth. Bright Health Group has significant near and long-term growth prospects as we plan to offer Bright HealthCare products in four new states during the 2022 open enrollment period and expand our NeueHealth integrated care delivery footprint in Texas, North Carolina, and beyond.*** With that, I'll turn to a brief business update to guide everyone on how these teams connect to our day-to-day operations.

299. When discussing Bright Health's "tremendous growth," Defendant Mikan attributed it, in part, to "strong AEP/OEP organic performance, especially in Florida and North Carolina," as well as the ACA SEP, which "growth did not come at the expense of performance."

> ***Across Bright Health Group, we have been able to demonstrate growth across all measures***. Our Bright HealthCare business has seen 220% year-over-year membership growth, while our NeueHealth business continued to add to its capabilities, driving over 775% growth in the number of patients served under value-based contracts. ***This tremendous growth was primarily the result of four drivers***.
>
> ***First***, ***strong AEP/OEP organic performance, especially in Florida and North Carolina, with organic growth contributing 84% of our year-over-year membership growth. Additionally, that organic growth included a 29% organic growth rate in our Medicare Advantage business***.
>
> ***Second***, ***strategic acquisition activity provided additional depth, capabilities, and geographies***.
>
> ***Third***, ***special enrollment period growth in all but one state in which we offer IFP plans, with 47,000 net new consumers since March 1st. And four, both organic and inorganic investment in our NeueHealth business, including strategic acquisitions in key markets. Equally important, this growth did not come at the expense of performance***.

300. Defendant Mikan then stressed that "Critical to the Bright Health model is our ability to price to the underlying capabilities and cost structure in each market and manage membership within our integrated systems of care." He elaborated that the Company's "consistent performance starts with effective pricing that is built on both our unit cost advantage gained through our care partner networks and our integrated systems of care that allow us to effectively manage medical costs by driving improved in-network utilization and accurately capturing membership risk." Defendant Mikan then stated that the Company's "most recent data indicates that even with our growth, our population is consistent with our target and pricing expectations," and that they were "seeing consistent membership demographics between our new 2021 membership and our broader book of business with age and gender mix in line with our mature markets."

> ***Critical to the Bright Health model is our ability to price to the underlying capabilities and cost structure in each market and manage membership within our integrated systems of care.***
>
> ***Our consistent performance starts with effective pricing that is built on both our unit cost advantage gained through our care partner networks and our integrated systems of care that allow us to effectively manage medical costs by driving improved in-network utilization and accurately capturing membership risk.***
>
> ***Our most recent data indicates that even with our growth, our population is consistent with our target and pricing expectations. We are seeing consistent membership demographics between our new 2021 membership and our broader book of business with age and gender mix in line with our mature markets.***
>
> ***Also non-COVID utilization trends are tracking at or below expectations year-to-date across both Commercial and Medicare Advantage. And our IFP metal mix favors silver plans across our markets, consistent with our underlying capabilities and pricing strategy.***

301. When discussing Bright Health's MA business, Defendant Mikan provided granular insight into the Company's members and touted that Bright Health had "developed the infrastructure for future Medicare Advantage growth through key investments to develop capabilities internally and acquire strategic accelerators."

> I'd like to spend a minute discussing our Medicare Advantage business, which we built into a significant contributor with over 110,000 consumers and nearly $1.4 billion in run rate revenue today.
>
> ***Over the past 18 months, we've developed the infrastructure for future Medicare Advantage growth through key investments to develop capabilities internally and acquire strategic accelerators.***

302. Touching on Florida specifically, Defendant Mikan touted the "differentiated integrated care delivery model" the Company had put into place, later referring to it as "successful."

> Through our growth in Florida, we have established a replicable, differentiated integrated care delivery model, which we plan to leverage as we expand into new states.
>
> ***
>
> And finally, we are expanding our NeueHealth integrated care delivery model into Texas and North Carolina. Building upon the successful platform we have put together in Florida. We expect future NeueHealth growth to come from both De Novo builds as well as continued investments in strategic opportunities as we enter new markets. I'd like to thank our team, our care partners and all the frontline workers across the country.

303. Defendant Mikan concluded that the Company was "positioned to continue driving measured growth with a value proposition that resonates with both consumers and care partners."

> As we look to the future***, Bright Health Group is positioned to continue driving measured growth with a value proposition that resonates with both consumers and care partners***. Our 2022 plans in existing states called for robust product diversification across IFP, Medicare Advantage and employer offerings.

304. Defendant Smith stated the company was "pleased with [its] second quarter results and the momentum we are seeing across the business."

> ***We are pleased with our second quarter results and the momentum we are seeing across the business***. At the Bright Health Group level after adjusting for intercompany eliminations, revenue [increased] 275% year-over-year to $1.1 billion in Q2.

305. Defendant Smith then stressed that "[m]anaging medical costs as efficiently and effectively as possible for the members [they] serve is critical."

> ***Managing medical costs as efficiently and effectively as possible for the members we serve is critical. Internally, we look at our underlying operational performance without prior period adjustments and unusual items like the impact of COVID-related expenses.***

306. Defendant Smith discussed Bright Health's MCR in detail, discussing that there had been minor and "minimal" impacts due to COVID and non-COVID prior-period

developments. Defendant Smith concluded that the Company "expect[ed] the impact of MCR adjustments to decline in the future as [its] contribution from existing membership increases as a percentage of our overall book of business."

> For reference, the appendix of our earnings release and investor presentation all concludes a detailed bridge. The 4.4 percentage point difference between our reported and adjusted MCR for the first half of 2021 is comprised of direct COVID cost impact to our MCR of 360 basis points and non-COVID prior-period development, representing an unfavorable impact to MCR of 90 basis points.
>
> With respect to the non-COVID prior-period development, this was impacted largely by onetime items in our Medicare Advantage business, a significant portion of which are from Brand New Day and related to time periods prior to our acquisition. The total net non-COVID prior period gross margin impact to MA was unfavorable by $19.1 million.
>
> Our IFP prior-period impact was minimal as performance was broadly in line with expectations with offsetting favorable and unfavorable developments. The total net non-COVID prior-period gross margin impact to IFP was unfavorable by $2.8 million and was comprised primarily of 2 items.
>
> First, we experienced favorable non COVID IFP medical cost prior-period development of $21.7 million, driven by a population that was slightly healthier than our expectations.
>
> And second, this healthier than expected population resulted in an offsetting unfavorable risk adjustment impact to revenue of $22.3 million. ***We expect the impact of MCR adjustments to decline in the future as our contribution from existing membership increases as a percentage of our overall book of business***.

307. When discussing membership growth, Defendant Smith touted that "the overall composition of [the Company's] new 2021 membership is consistent with [their] broader book of business and is in line with [their] pricing expectations."

> As I look at our membership growth, I want to highlight 5 key themes. One, we continue to operate a diversified business with consistent growth across both our Commercial and Medicare Advantage business.

> Two, over the past year, we saw 63% of our total growth coming from new markets[,] with the remainder coming from existing markets and our 2021 acquisitions. Three, overall, as Mike mentioned earlier, 84% of our total growth came from organic activity, driven by 4 states, Florida, California, North Carolina, and Colorado.
>
> Four, Medicare Advantage grew to 30% of our Bright HealthCare premium revenues in the first half of 2021 and is currently an approximately $1.4 billion revenue business based on the Q2 '21 run rate.
>
> And five, ***while seeing this explosive growth, the overall composition of our new 2021 membership is consistent with our broader book of business and is in line with our pricing expectations***.

308. Defendant Smith concluded by reiterating guidance and stating that "[w]hile there are a variety of items that can impact MCR both positively and negatively, [the Company] ha[d] demonstrated [it] can manage within a reasonable range of outcomes, considering the maturity of [its] business and of [its] membership population."

> I'll wrap up my comments by discussing our outlook for the full year. We expect enterprise revenue to be $4 billion to $4.2 billion, depending on the risk adjustment factors and anticipate an enterprise medical cost ratio of 86%, plus or minus 200 basis points.
>
> ***While there are a variety of items that can impact MCR both positively and negatively*[,] *we have demonstrated we can manage within a reasonable range of outcomes, considering the maturity of our business and of our membership population***.

309. In response to analyst questions, Defendant Mikan stated the Company's "book of business to date" was "about what we expected." Defendant Mikan also stated that COVID impacts were "embedded" in Bright Health's forecasted MCR. Defendant Mikan concluded that they had "good visibility into our pricing on a year-over-year basis" and the unfavorable prior-period developments were "one-time" and behind the Company.

> ***And so when we look across our overall book of business to date, it's about what we expected, maybe slightly healthier than we anticipated going into the year,*** and that's playing out utilization trends. We're seeing that non-COVID trends, if you take out COVID within IFP that it's slightly down from the, call it, the baseline period, normal utilization.
>
> And so as we think about going forward for the remainder of the year with utilization, we do believe that we're going to see continued utilization for COVID, as we saw in the second quarter. Interestingly, over the period, we saw over the first quarter, we saw our senior population impacted by COVID, that's starting to subside. We saw an uptick in the IFP population in the second quarter, albeit in a different way, we're seeing more professional and outpatient services.
>
> We believe that, that's going to continue. ***And that's embedded in our underlying or forecast MLR, as Cathy had mentioned***. So as we go into next year, we're generally assuming going back to the underlying baseline of our cost structure, so normal, call it, utilization. We might see -- continue to see a slight uptick with respect to COVID, but we're really not anticipating that going well into next year.
>
> ***So we think we've got good visibility into our pricing on a year-over-year basis as well as the way we just generally priced to the marketplace and our cost structure as we enter new markets. So we feel we've got good visibility with respect to that***.
>
> ***And then Medicare Advantage with respect to the unfavorable development. The unfavorable development really is related to onetime*** -- [indiscernible] ***unusual items that came from Brand New Day prior to … our acquisition of them, and it's really related to some provider true-ups and things like that***.

310. Defendant Mikan also responded to questions stating with respect to the "risk demographics across [Bright Health's] population," that the "new lives" added to date in 2021 were "very consistent."

> ***As I mentioned, our risk demographics across our population, the new lives that have come to us this year is very consistent with our overall population with respect to age and sex mix, if you will***.

311. The statements discussed above in paragraphs ¶¶292-310 were materially false and misleading for the following reasons:

(a) beginning as late as 2019 and lasting throughout the Class Period, Bright Health's medical provider directories were not accurate or up to date in both its new and existing markets, and, as a result, legitimate or properly submitted claims from providers under contract were routinely, and improperly denied, based on the faulty directory data;

(b) due to the failure to maintain the provider directories, legitimate claims were often 180 days or more behind, or backlogged, in being processed and paid, significantly longer than the industry standard of 30 to 90 days;

(c) in addition, Bright Health and its third-party vendors failed to provide enough staff and resources to handle the claims in a timely manner resulting in claims disputes being unanswered for months on end;

(d) due to this significant backlog of claims, Bright Health owed millions of dollars to healthcare providers for overdue claims;

(e) beginning as late as 2020 and lasting throughout the Class Period, Bright Health was unable accurately perform risk adjustments because of the claims processing and directory issues outlined above;

(f) Bright Health took insufficient measures to remedy issues with its provider directory, claims backlogs, or inability to perform accurate risk adjustments;

(g) by failing to timely process claims, Bright Health massively understated its costs and the health risk of its members, which in turn, caused the Company to similarly overstate its MCR;

(h) parallel to these issues, prior to and during the Class Period Bright Health had been struggling to manage COVID-19 related impacts since the start of the pandemic, which was materially exacerbated by the claims processing issues outlined above;

(i) the above issues were materially exacerbated by the Company's significant growth, including growth through acquisitions and the ACA SEP, resulting in a heavily skewed, then-existing, and unfavorable percentage of new versus existing members;

(j) as a result, Bright Health's financial results would foreseeably be materially impacted in the hundreds of millions of dollars due to inaccurate risk adjustments and prior period medical costs as the Company caught up on claims processing;

(k) further, the Company would foreseeably continue to be impacted adversely by COVID-19;

(l) the Bright Health Defendants knowingly and/or recklessly withheld this information from investors in the futile hope to remedy the above-issues before the adverse impacts were too large to conceal;

(m) accordingly, during the Class Period the Bright Health Defendants overstated the Company's business and financial prospects; and

(n) as a result, during the Class Period the Bright Health Defendants made materially false and/or misleading statements and failed to state information required to be stated therein.

312. Despite the positive statements outlined above concerning Bright Health's financial health and prospects, the market reacted negatively to the earnings miss and higher than expected MCR. Specifically, Bright Health's shares declined approximately 22% from the August 2, 2021 closing price of $10.92 per share to the August 3, 2021 closing price of $8.49 per share.

313. Analysts found solace in the Bright Health Defendants' statements, and reacted favorably to Bright Health's results, and indicated that the sell-off was overblown. For example, RBC Capital Markets stated that "[f]irst quarter out of the gate demonstrates execution on growth strategy" and "[w]e believe weakness through Tuesday's session is overdone, stemming from explainable factors." The analysts noted that "[t]he fact that the risk adjustment headwind is such a small portion of excess MCR suggests to us that management has a very good handle on risk within its growing IFP population," and that the "the unfavorable [prior period developments] in the acquired MA population is a one-time event driven by mispricing or under-reserving on the part of the seller." The analyst also noted they believed that "management has a very good handle on risk with its fast-growing IFP pool."

314. Similarly, BofA Securities stated that "when the company looks at the overall book of business, BHG believes MLR is in-line to slightly better than expected once you exclude COVID costs."

315. Some analysts expressed trepidation with the results. For example, Barclays stated that "MLR Trend Weighs on Sentiment" and that "[i]mpressive membership growth [was] offset by elevated medical costs." As a result, Barclays "adjust[ed] [its] 2021 full year outlook for MLR from 86.0% to 87.0% (above midpoint of company guidance of 86.0% +/- 200 bps).

316. Not all analysts were happy, however, Morgan Stanley lowered Bright Health's price target to $12.00 per share, down from $18.00, stating that "BHG remains a 'show-me' story" and the "[k]ey to turning sentiment around will be execution and delivery on MLR and reduced costs with scale."

**2. Third Quarter 2021 Results**

317. On November 11, 2021, Bright Health reported its third quarter 2021 financial results. Reported revenues rose more than 200% from the same period a year ago to $1,079

million, up from $352 million in the prior year period. The Company reported a population of 606,594 commercial members, up from 149,794 in the prior year period, 114,094 MA members, up from 57,751 in the prior year period, and 170,211 NeueHealth members, up from 19,141 in the prior year period.

318. The Company raised the low end of its full-year 2021 financial results to a range of $4.1 billion to $4.2 billion and projected an MCR of 92.5% plus or minus 50 bps.

319. The Company's growth, however, continued to prove unprofitable as the Company posted a net loss of nearly $300 million or $0.48 per share—nearly triple the loss analysts were expecting. The miss was attributed to Bright Health's ballooning MCR for the quarter of 103%, up from 90% in the previous year's quarter and the first nine months of the year.

320. According to the Company, the sharp increase was attributable to, in part, "540 basis point unfavorable impact from COVID-19 related costs and a 900 basis point unfavorable impact primarily from a cumulative reduction in premium revenue due to an inability to capture risk adjustment on newly added lives."

321. Also on November 11, 2021, the Company hosted a conference call with analysts and investors to discuss Bright Health's third quarter 2021 financial results. On the call, Defendant Mikan attributed the disappointing results to operational challenges, including a "significant influx of new members with a shorter duration" due to: (i) the ***per-IPO*** ACA OEP enrollments "effective on 1/1/21"—or nearly ***six months prior to the IPO***; as well as (ii) ACA SEP enrollments, which also existed at the time of the IPO. Defendant Mikan also attributed challenges to healthcare capacity being "largely prioritized to treat COVID-related needs[,]" with significant concentration in the Company's key market. Making matters worse, these issues caused Bright Health to overstate its risk score, leading to a "risk adjustment payable and a

corresponding decrease in our reported premium revenue." Thus, according to Defendant Mikan, these issues "resulted in an increase in our overall medical cost ratio for the third quarter."

> ***First, on top of our significant 2021 ACA open enrollment growth effective on 1/1/21, we grew in year an average of* [*30*] *gross new members every month from March to August as a result of the extended 2021 special enrollment period with a heavy concentration in Florida and North Carolina*. *This resulted in a significant influx of new members with a shorter duration during the year*.**
>
> Second, the Southeast, where we have the largest membership concentration was hardest hit by the COVID-19 Delta variant. In the third quarter, Centers for Disease Control and Prevention data indicated COVID-related hospitalizations in the region more than tripled compared to the second quarter. This had a meaningful impact on our medical utilization in the quarter and meant that health care capacity was largely prioritized to treat COVID-related needs.
>
> ***Due to these factors, we were challenged to engage with members during this period as we typically would consistently throughout the year, which is critical to performance. This hampered our ability to accurately capture the risk of our members and therefore, our estimated 2021 risk score is lower than we had originally anticipated. This resulted in an increase in our risk adjustment payable and a corresponding decrease in our reported premium revenue***. While we experienced a modest reduction in utilization from certain non-COVID-related procedures, the impact of direct COVID utilization and the change in the estimated risk score for our population resulted in an increase in our overall medical cost ratio for the third quarter. Cathy will discuss this in greater detail later on.

322. Defendant Mikan further admitted that Bright Health lacked the visibility to confidently perform accurate risk adjustments for population health risk, blaming the "predominantly new and rapidly growing business."

> We believe matching payment to population health status is needed to align incentives and drive performance in the direct-to-consumer market. ***However, with a predominantly new and rapidly growing business, population health risk is difficult to estimate in the near term but improved as our markets and populations mature***. Late September and early fourth quarter indications show COVID-19

> greatly subsiding, especially in the Southeast, and we've been able to engage more significantly with our members, especially in our owned and managed clinics. This is particularly positive as we build long-term relationships with our consumers. Most importantly, despite these challenges, we see strong evidence that when we deploy our fully aligned model, we delivered demonstrably better results.

323. On the call, Defendant Smith elaborated on non-COVID issues which were exacerbated by the increased COVID-capacity constraints, stating that Bright Health had an aberrational percentage of new memberships added "during every month ***through*** September" "due to service area expansion, strong OEP growth on 1/1 and membership growth," which included "substantial and new IFP [Individual & Family Health Insurance Plans] membership growth." According to Defendant Smith, 85% of Bright Health's total IFP membership were "new to the organization in 2021" based on ACA enrollment periods, including the ACA SEP. Further, in Florida, where over half of Bright Health's IFP memberships are located, "more than 95% of [the Company's] members [were] new adds" in 2021, which was over double the new member mix for other IFP plans in that state. This disproportionate mix of new members—many, if not most of whom were added prior to the IPO—made it "more challenging for Bright Health to capture underlying risk and impacting our risk adjustment scoring."

> Despite the higher incidence of COVID in both states, non-COVID utilization remained slightly below normalized levels in Q3 and in line with our internal forecast. However, the combination of our substantial and new IFP [Individual & Family Health Insurance Plans] membership growth and COVID-driven capacity constraints created challenges in our ability to see patients, capture underlying health status and fully code for risk adjustment, impacting our forecast for risk adjustment payments. ***Our growth from the 2021 enrollment period and SEP [Special Enrollment Period] meant 85% of our end of September IFP membership across the country was new to the organization in 2021. So the capacity constrained third quarter represented a meaningful time frame relative to the duration of our consumer relationships***.

> Looking specifically at Florida, the state represented over half of our IFP membership as of September 30 and more than 95% of our members are new adds this year due to service area expansion, strong OEP [Open Enrollment Period] growth on 1/1 and membership growth during every month through September. ***Our mix of new versus returning members is significantly higher than the average for IFP plans in the state***, which have seen approximately 40% of their membership coming from new adds in 2021, ***making it more challenging for Bright Health to capture underlying risk and impacting our risk adjustment scoring***.

324. With respect to MCR for the quarter, Defendant Smith revealed that "[t]he negative impact from risk adjustment scoring, including a ***true-up for the first half of 2021***, … resulted in a cumulative $134 million impact to Q3 revenue," with "$89 million was related to the ***first half of 2021***." Defendant Smith further revealed that there was a "$7 million of negative prior period medical cost development" which contributed to the financial impact that quarter.

> ***The negative impact from risk adjustment scoring, including a true-up for the first half of 2021, was significantly larger than the benefit from lower medical costs associated with non-COVID utilization, resulting in a large net negative impact in the quarter***. The change in our estimated risk adjustment payable accrual for the year resulted in a cumulative $134 million impact to Q3 revenue, representing an MCR headwind of approximately 1,200 basis points. ***Of this $134 million, $89 million was related to the first half of 2021***. And when combined with ***$7 million of negative prior period medical cost development*** represents a total prior period development impact of approximately 900 basis points.

325. Finally, Defendant Smith also attributed the Company's growth, including under the ACA SEP, as a factor which limited Bright Health's "ability to engage with [its] consumers and accurately code and understand the health status of the population," due to COVID restraints.

> When you take the strong starting growth that we had on 1/1, when you couple it with your growth, which is a unique factor this year in the ACA marketplace with the extended special enrollment period, during a time period when the Delta COVID impact disproportionately hit Florida. So we basically had the care resources constrained focused on COVID, that ***limited our ability to engage with our consumers and accurately code and understand the health status of the population***.

326. On this news, Bright Health's share price declined from $7.30 at the close of trading on November 10, 2021 to close at $4.94 per share on November 11, 2021. Bright Health's shares continued to decline throughout the month of November, closing at $3.33 per share on November 30, 2021.

327. The Bright Health Defendants were not all doom and gloom during the November 11, 2021 earnings call, however. For instance, Defendant Mikan affirmed the Company's full-year guidance and stated that he "believe[d] [the Company] will deliver more consistent results and shareholder value over time."

> We now expect enterprise revenue between $4.1 billion and $4.2 billion in fiscal year 2021, a meaningful base to continue building our business into the future. ***As we're still building scale, we expect to see some quarterly variations, but we maintain a long-term outlook that we believe will deliver more consistent results and shareholder value over time***.

328. Defendant Mikan also stated that estimations regarding "population health risk," had "improved as [Bright Health's] markets and populations mature[d]," stressed the Company's "exceptional growth with solid operation results," and again affirmed Bright Health's increased full-year 2021 revenue guidance. Defendant Mikan also stated that based on the Company's current data, "COVID-19 [was] greatly subsiding," and despite "challenges" there was "strong evidence" that Bright Health "delivered demonstrably better results."

> We believe matching payment to population health status is needed to align incentives and drive performance in the direct-to-consumer market. However, with a predominantly new and rapidly growing business, population health risk is difficult to estimate in the near term but ***improve[d] as our markets and populations mature***. ***Late September and early fourth quarter indications show COVID-19 greatly subsiding, especially in the Southeast, and we've been able to engage more significantly with our members, especially in our owned and managed clinics. This is particularly positive as we build long-term relationships with our consumers***. ***Most importantly, despite these challenges, we see strong evidence that***

> ***when we deploy our fully aligned model, we delivered demonstrably better results***.
>
> ***Looking at year-to-date performance, our business has driven exceptional growth with solid operating results***. The differentiation we are driving through our fully aligned model gives us additional conviction in our approach and strategy. Over the past 5 years, we have built Bright Health Group into a tremendous platform for growth. We are raising guidance on our end-of-year fiscal year 2021 Bright HealthCare membership from 650,000 to 700,000, an increase of nearly 8%, which gives us confidence in the upper end of our prior revenue range. ***As I mentioned earlier, we now expect fiscal year 2021 revenue of $4.1 billion to $4.2 billion, net of risk adjustment***.

329. Defendant Smith touted that Bright Health's "year-to-date MCR performance [is] solid."

> Smith: ***The year-to-date MCR performance in both of our businesses is solid***, given the challenges this year of COVID, unprecedented growth and the extended 2021 special enrollment period with a year-to-date MCR of 90.3% compared to 81.6% in the prior year period. COVID costs in 2021 impacted our MCR by 420 basis points compared to 290 basis points in 2020. Both business lines within Bright HealthCare were impacted by COVID. The reported year-to-date MCR for our commercial business was 87.1%, while the reported year-to-date MCR for our Medicare Advantage business was 97.5%.

330. In response to analyst questions regarding MCR volatility, Defendant Mikan described challenges as "tailwinds" and stated he was "pleased with the member composition or the book of business," that he believed there was a "strong predictability or at least understanding of our underlying costs," and that had been "pretty consistent throughout the year" with respect to "medical expense."

> **Analyst:** Okay. Great. I guess I appreciate the fact that growing as quickly as you are during a global pandemic that quarter-to-quarter, MLR is going to be choppy. I guess would just love to hear your perspectives about your visibility into where things stand today and in particular, how confident you are in kind of that cost outlook as you price for next year and the ability to kind of make sure that you are going to see that margin improvement in 2022 that you expect?

***

> **Mikan:** Yes. ***So I mean, the medical cost ratio, when you take a look back, given our significant growth throughout the year, the thing that we were -- we've very much been focused on is the book of business that we price for***. As we've always talked about, we price to our underlying capabilities and our underlying cost structure. ***And we target a population, and we're really pleased with the member composition or the book of business that we've had***. ***When you compare the growth, especially take Florida, given the size of it, and compare that book of business to our over more mature book of business, they're very comparable. And so that gives us a lot of conviction that we can price for the population that we seek to serve given our capabilities***. As we've talked about, a key differentiator for us is NeueHealth, our fully aligned model. ***And so when you add that in, we believe we've got a strong predictability or at least understanding of our underlying costs, and we've managed that this year. So, if you look at our medical expense, we've been pretty consistent throughout the year, and we're pleased with that***. The big challenge for us this year in terms of medical cost ratio has been the confluence of factors that I talked about impacting risk adjustment. And it's all about consumer engagement and having consumer engagement throughout the year. When you take the strong starting growth that we had on 1/1, when you couple it with your growth, which is a unique factor this year in the ACA marketplace with the extended special enrollment period, during a time period when the Delta COVID impact disproportionately hit Florida. So we basically had the care resources constrained focused on COVID, that limited our ability to engage with our consumers and accurately code and understand the health status of the population. ***So that's been the biggest variation that we've had. And as Cathy said, we -- in our prepared remarks, we view that as a tailwind going forward into next year because we see some strong signs, encouraging signs from our fully aligned model, especially our own care centers, but also our affiliates, and engaging with consumers. So we think that leads to predictability and consistency and improved performance going into 2022***. With that, Simeon, could you answer the question on pricing?

331. The statements discussed above in paragraph ¶¶318, 319, 328-330 were materially false and misleading for the following reasons:

(a) beginning as late as 2019 and lasting throughout the Class Period, Bright Health's medical provider directories were not accurate or up to date in both its new and existing

markets, and, as a result, legitimate or properly submitted claims from providers under contract were routinely, and improperly denied, based on the faulty directory data;

(b) due to the failure to maintain the provider directories, legitimate claims were often 180 days or more behind, or backlogged, in being processed and paid, significantly longer than the industry standard of 30 to 90 days;

(c) in addition, Bright Health and its third-party vendors failed to provide enough staff and resources to handle the claims in a timely manner resulting in claims disputes being unanswered for months on end;

(d) due to this significant backlog of claims, Bright Health owed millions of dollars to healthcare providers for overdue claims;

(e) beginning as late as 2020 and lasting throughout the Class Period, Bright Health was unable accurately perform risk adjustments because of the claims processing and directory issues outlined above;

(f) Bright Health took insufficient measures to remedy issues with its provider directory, claims backlogs, or inability to perform accurate risk adjustments;

(g) by failing to timely process claims, Bright Health massively understated its costs and the health risk of its members, which in turn, caused the Company to similarly overstate its MCR;

(h) parallel to these issues, prior to and during the Class Period Bright Health had been struggling to manage COVID-19 related impacts since the start of the pandemic, which was materially exacerbated by the claims processing issues outlined above;

(i) the above issues were materially exacerbated by the Company's significant growth, including growth through acquisitions and the ACA SEP, resulting in a heavily skewed, then-existing, and unfavorable percentage of new versus existing members;

(j) as a result, Bright Health's financial results would foreseeably be materially impacted in the hundreds of millions of dollars due to inaccurate risk adjustments and prior period medical costs as the Company caught up on claims processing;

(k) further, the Company would foreseeably continue to be impacted adversely by COVID-19;

(l) the Bright Health Defendants knowingly and/or recklessly withheld this information from investors in the futile hope to remedy the above-issues before the adverse impacts were too large to conceal;

(m) accordingly, during the Class Period the Bright Health Defendants overstated the Company's business and financial prospects; and

(n) as a result, during the Class Period the Bright Health Defendants made materially false and/or misleading statements and failed to state information required to be stated therein.

332. On this news, Bright Health's share price declined approximately 32% from $7.30 at the close of trading on November 10, 2021 to $4.94 per share at closing on November 11, 2021. Bright Health's shares continued to decline throughout the month of November, closing at $3.33 per share on November 30, 2021.

333. Analysts for the most part expressed negative surprise at Bright Health's miss. For example, Wolfe Research announced a price downgrade of $9.96 per share, down from $11.00

per share, citing "MLR reported well above our estimate at 103% vs. our 88.4%." and an "[a]djusted EBITDA loss of ~$246M was 127% / 178% worse than losses projected by WR."

334. J.P. Morgan lowered price targets to $8.00 per share, down from $19.00 per share, stating "Significant Near-Term Uncertainty Keeps Us On the Sidelines," citing, in part "MLR was 103% vs. [JPM's] estimate of 88.2%."

335. RBC Capital Markets significantly downgraded price targets to $9.00 per share, down from $22.00 per share stating "BHG posted a 3Q21 EBITDA deficit well in excess of Street and our expectations primarily reflecting a risk adjustment true-up related to rapid growth in the IFP book, as well as higher COVID costs, which inordinately impacted commercial members." However, RBC Capital Markets further stated that "[d]espite the bumpy MCR profile, development remains on track with a more stable cost structure and margin expansion seen for next year."

336. Piper Sandler lowered price targets from $24.00 per share to $11.00 per share, noting "BHG shares dropped 30%+ today due to the unfavorable MCR trends."

337. Other analysts were again persuaded by the Bright Health Defendants' positive statements and thus took a more positive view. For example, BofA Securities stated "Disappointing quarter, but little has changed as 2022 looks Brighter," adding "Bright Health Group (BHG) characterized the medical loss ratio (MLR) pressures as largely one-time as core medical costs have come in-line, with the misses driven entirely by COVID and risk adjuster headwinds."

### 3. Bright Health's Investor Day

338. Any negative announcements from the Bright Health Defendants were short lived, as less than a month later they would sling shot back to the narrative that the Company was continuing to effectively manage and enjoy its substantial growth into 2022. In preparation for its

first ever Investor Day set to occur that same day, on December 7, 2021, Bright Health issued a press release reaffirming its full-year financial outlook for 2021 and providing guidance for 2022. In the release, Bright Health projected full-year revenues of "$6.3 to $6.5 billion, representing over 50% annual growth."

339. On December 7, 2021, Bright Health hosted its annual Investor Day, which included commentary from Simeon Schindelman ("Schindelman"), CEO of Bright HealthCare, and Sam Srivastava, CEO of NeueHealth.

340. On the call, Defendant Mikan stated that Bright Health was "well positioned for continued success in the future," based on the Company's growth, and that in 2021 the Company "demonstrated the strength of [its] fully aligned model."

> ***We believe Bright Health Group is well positioned for continued success in the future***. Over the past 5 years, we've gone from serving 10,000 members in a single state to serving over 700,000 members across the national footprint today while simultaneously building our differentiated NeueHealth care delivery business. ***In 2021, we demonstrated the strength of our fully aligned model and are actively expanding it by growing the number of risk-bearing affiliated providers and extending our own clinic footprint to 3 states***. In 2022, we're reaching the next phase of our evolution, where we expect to realize the full potential of our fully aligned and integrated care delivery strategy.

341. Defendant Mikan added that Bright "now h[ad] data on where [they] [could] driv[ing] results and are moving to a more focused and disciplined growth model."

> While Bright Health remains a young company, ***we now have data on where we can drive results and are moving to a more focused and disciplined growth model***. The first phase for the company was building the foundation for future growth. We established consumer-driven health plans across the retail marketplaces in IFP and Medicare Advantage, expanding this model from 1 state in 2017 to 13 states in 2020. We first offered Medicare Advantage in 2018 and our first special needs plan in 2019. We worked with care partners during this time to build the foundation for an aligned model of consumer health care.

342. Defendant Mikan stated that the "NeueHealth business is already an emerging leader in taking on global risk for the consumer retail health care market." He added that the Company had "meaningfully expanded [its] fully aligned model and demonstrated the proof point that our model delivers superior performance." Thus, according to Defendant Mikan, the Company was presently "positioned to realize the full potential of the Bright Health Group strategy."

> ***Our NeueHealth business is already an emerging leader in taking on global risk for the consumer retail health care market***. While we were establishing the NeueHealth business, Bright Health Group continued to grow quickly, and exceeded $1 billion in revenue in 2020, with over 200,000 health plan members across commercial and Medicare Advantage.
>
> 2021 has been a year of substantial growth for the company, reaching more than 700,000 health plan members and 170,000 value-based lives supported by our significant market expansion in Florida. ***We have meaningfully expanded our fully aligned model and demonstrated the proof point that our model delivers superior performance***. The Centrum acquisition added materially to our own clinic model, and we grew the business by affiliating Bright HealthCare members to NeueHealth clinics. We expect 2021 revenue of over $4.1 billion.
>
> ***We are now positioned to realize the full potential of the Bright Health Group strategy***. As we enter 2022, our footprint covers the 5 largest IFP states as well as very large Medicare Advantage markets. Going forward, we expect to focus on these states and look to increase market share where we can offer a differentiated model at a competitive price -- at competitive price points supplemented by disciplined geographic expansion within existing states.

343. According to Defendant Mikan, "[g]iven all the progress" by Bright Health, the Company was projecting 2022 revenues exceeding $6.3 billion—over $2 billion more than current projected 2021 revenues, signaling massive revenue growth for the Company year-over-year. Defendant Mikan added that the Company "will continue to progress towards scale of the business."

> ***Given all the progress that I've discussed across our business, we are introducing expectations for 2022 revenue exceeding $6.3 billion. We will continue to progress towards scale of the business, giving us leverage on our operating expenses***. And we expect to achieve breakeven enterprise adjusted EBITDA in 2024.

344. In regard to the Company's forecasted and future financial results, Defendant Mikan stated that the "investments we're making in the business and our disciplined growth plans position us for long-term success. We expect to deliver strong performance in 2022 and to see additional benefits as the business continues to gain scale." As a result of this, Defendant Mikan affirmed full-year 2021 guidance and provide a financial forecast of revenues in the range of $6.3 to $6.5 billion in 2022.

> ***The investments we're making in the business and our disciplined growth plans position us for long-term success***. ***We expect to deliver strong performance in 2022 and to see additional benefits as the business continues to gain scale and we progress towards realizing the company's full potential***. ***Our 2022 Bright Health Group consolidated revenue expectations are for $6.3 billion to $6.5 billion of revenue, representing over 50% growth from our reaffirmed 2021 guidance***.

345. When discussing the issues that had impacted Bright Health in the prior quarter, Defendant Mikan stated that they were behind the Company, referring to them as "tailwinds," and stated that moving forward the Company would enjoy "more accurate risk coding and, hence, better risk adjustment performance." In sum, Defendant Mikan told investors to expect "less disruption to member engagement and health care utilization related to COVID, also a positive for risk coding accuracy and risk adjustment performance."

> ***We have several tailwinds for our business going into 2022***. We expect higher average member duration as the mix of returning members increases and we expect a more limited impact from in-year enrollment. ***This should drive better member engagement, more accurate risk coding and, hence, better risk adjustment performance***. We also expect lower COVID-related medical costs in 2022 but expect ongoing COVID treatment and testing costs as the disease becomes endemic. ***We forecast less disruption to***

> ***member engagement and health care utilization related to COVID, also a positive for risk coding accuracy and risk adjustment performance***.

346. On the Investor Day call Defendant Smith stated the Company "continue[d] to exceed … internal expectations, driven by strong Bright HealthCare membership growth."

> Our next phase of growth will be more capital efficient expansion of our business and will leverage the benefits of our fully aligned model. We are encouraged and humbled by the significant growth our business continues to generate. ***We continue to exceed our internal expectations, driven by strong Bright HealthCare membership growth, as consumers entrust us with their health and well-being***.

347. Defendant Smith, when discussing year-to-date 2021, touted a "revenue increase of 262%" which "reflect[ed] a strong membership growth." With respect to year-to date 2021 MCR (with less than a month left in the year), Defendant Smith stated that it was 90.3%.

> Turning to our year-to-date 2021 results. Compared to the first 9 months of 2020, our revenue increase of 262% reflects a strong membership growth, including the contribution from SEP. Year-to-date, Bright Health Group revenue through the third quarter was over $3 billion. ***Year-to-date MCR of 90.3% compared to 81.6% in the prior year period. And as a reminder, COVID costs impacted the year-to-date 2021 MCR results by 420 basis points versus 290 basis points in 2020***.

348. Defendant Smith touted Bright Health's "good book of business, with underlying medical costs in line with … expectations."

> ***We have a good book of business, with underlying medical costs in line with our expectations***. Our integrated systems of care provide a significant advantage compared to traditional networks and highlights why we are deploying this approach in our largest, fastest-growing markets.

349. Defendant Smith touted that the Company's "deep understanding of the pain points in health care and our model connecting the financing of care and the delivery of care enable Bright Health to access a greater share of each dollar spent in health care."

> ***Our deep understanding of the pain points in health care and our model connecting the financing of care and the delivery of care enable Bright Health to access a greater share of each dollar spent in health care***.
>
> ***Our Bright HealthCare business aggregates consumers and is positioned to receive a greater share of the health care dollar from the government and from other individuals***. This increases our revenue opportunity and enables vertical integration with the delivery of care. Yet this business is subject to regulated margin requirements, and we have long-term targets of mid-single-digit adjusted EBITDA.
>
> ***In contrast, through our NeueHealth care delivery business, we capture care delivery revenue in value-based arrangements with payers, both Bright HealthCare and external payers. This is a mutual relationship where we are rewarded with the financial benefits for the outcomes we drive, we work to deliver high-quality care and avoid unnecessary utilization, and we enable and support providers as they enter value-based contracts***. Long term, we are targeting double-digit adjusted EBITDA margins at NeueHealth, when you blend together Medicare Advantage and IFP risk-bearing care delivery as well as our services contract and our opportunity in direct contracting. ***Importantly, our risk-bearing care delivery provides EBITDA margin expansion***.

350. Speaking on Bright HealthCare specifically, Defendant Smith stated that 2021 "performance to date is strong," and that the Company was expecting an MCR of between 85% and 87%.

> While we are still in the annual and open enrollment periods, Bright HealthCare performance to date is strong, and we expect total enrollment of approximately 900,000 members. We expect a more normal year in 2022, with much lower in-year enrollment and normal IFP attrition rates over the course of the year, partially offset by in-year growth in Medicare Advantage. Given these dynamics, we are forecasting 2022 end of year Bright HealthCare membership between 875,000 and 900,000 members. ***Additionally, we are expecting Bright HealthCare segment medical cost ratio to be between 85% and 87%***.

351. Regarding the future, Defendant Smith stated the Company was "focused on growth and scale within existing states," stating that the Company "will drive predictable and consistent results."

> Looking longer term, our goal is to achieve breakeven adjusted EBITDA in 2024. Key to achieving this goal is twofold. ***At the MCR and gross margin level, we're focused on growth and scale within existing states for Bright HealthCare and increasing contribution from NeueHealth. On a consolidated basis, Bright Health Group will drive predictable and consistent results***. Over the next couple of years, we're also migrating to one operating platform, in-sourcing key functions that have previously been outsourced. ***We're integrating our acquisitions and transitioning our financial and people systems to common platforms. Lastly, we expect to see workflow efficiencies and process improvements, driven by our technology investments***.

352. Defendant Mikan was questioned by an analyst on the call specifically as to how risk adjustment issues were turning into tailwinds. Responding affirmatively, Defendant Mikan ***admitted*** that earlier Class Period risk adjustment issues were because they "didn't understand the population fast enough," including the influx of pre-IPO adds due to the ACA SEP and a "churn in membership." However, Defendant Mikan then assured investors that such issues were behind the Company and performance was expected to improve across the board.

> **Analyst:** I want to ask about risk adjustment for the IFP population. Maybe you could speak to some of the headwinds you experienced in '21 and how they'll turn to tailwinds in '22. And then to try to translate it into the guidance, where you're going to land on kind of gross versus net payments in IFP in '21, and what's forecasted in '22? And also in that, maybe discuss how visibility improves throughout the year and how that's contemplated in your guidance as well for that population.
>
> ***
>
> **Defendant Mikan:** And one of the reasons for that is the -- our model, as you heard us talk about, is really about attributing our members to a primary care physician and engaging them. We engage them through the rewards program. And we engage them through outreach member engagement through our providers. So

getting them attributed, assigned and then communicated with their primary care provider is critical for us. We relate to that this year.

***And then just as we started to really understand the population we were serving, SEP started to kick in. We got a churn in the membership, added a bunch of lives, while COVID hit the Southeast literally about the same time period. And so our ability to not only attribute and get them engaged with their physicians, we just couldn't -- we couldn't -- we didn't understand the population fast enough***.

And so risk adjustment is all about member engagement. It's about proactive care with their provider. And so we got behind. And frankly, when we looked at our practices, the clinics that we own and manage, when we came out of COVID, we were able to ramp up the services significantly between inpatient, at home and virtual visits. Our network of physicians, we obviously don't have the influence over them the way we do with our own and managed practices. And so that was a challenge for us. ***So if you just take that in its totality, the confluence of factors that worked against us, we don't expect that same result going forward***.

Texas, this year, as Simeon said, we built the capacity for the demand of -- for what we expect in the marketplace. So between our owned and managed clinics and our affiliate practices, we're expecting the lives that we're forecasting right now. And so we're going to engage a lot earlier than we did this year. Our processes are better around attributing lives, engaging them. We've ramped up the consumer rewards. And so we expect a much different result. ***And then we won't -- we don't believe we're going to have the confluence of factors highly concentrated between SEP and COVID impact to the Southeast that we had***. So Texas, we expect a different result. It's going to be challenging. Risk adjustment, we are planning for probably a higher payable than we expect the risk of the population, its first year. We expect that in every population, but ***we think it will perform better than it did in Florida***.

So then go back to Florida this year coming in, as Simeon talked about, we have higher retention. We've got a big base of business. We know the members and the patients. And so we're working with them. We can target them early on, so we expect better performance. ***So that's why we expect better. And we're doing that nationally in our other markets as well. So we expect better performance just relative as a result of those things***.

353. When asked about intra-quarter COVID-19 impacts, Defendant Smith reiterated that the Company was confirming its guidance, which "captured … what we've seen."

> **Analyst:** And then if I could just ask one on the quarter. I think on the call, you guys talked about COVID costs subsiding and that you were looking for non-COVID utilization roughly in line with historical trends. Just curious if that's tracked to your expectations so far. And then what you're seeing, either in terms of Omicron, and how you're thinking about the potential impact in the quarter there.
>
> **Defendant Smith:** Yes. I'm happy to take that. So I'm not going to give you an inter-quarter, intra-quarter update. But what I'll tell you is we did say through Q3, that -- and we said ***early indications where we were starting to see a subside after Q3***, which we said in the call. And we've seen $124 million or so of costs through 3 quarters. And we had contemplated a little bit less than what we saw in the first -- individually, for the first 2 quarters and for the remainder of the year. ***So I would just say, I think we feel good, obviously, confirming our guidance today, that we've got that captured with what we've seen***.

354. The statements discussed above in paragraph ¶¶336-53 were materially false and misleading for the following reasons:

(a) beginning as late as 2019 and lasting throughout the Class Period, Bright Health's medical provider directories were not accurate or up to date in both its new and existing markets, and, as a result, legitimate or properly submitted claims from providers under contract were routinely, and improperly denied, based on the faulty directory data;

(b) due to the failure to maintain the provider directories, legitimate claims were often 180 days or more behind, or backlogged, in being processed and paid, significantly longer than the industry standard of 30 to 90 days;

(c) in addition, Bright Health and its third-party vendors failed to provide enough staff and resources to handle the claims in a timely manner resulting in claims disputes being unanswered for months on end;

(d) due to this significant backlog of claims, Bright Health owed millions of dollars to healthcare providers for overdue claims;

(e) beginning as late as 2020 and lasting throughout the Class Period, Bright Health was unable accurately perform risk adjustments because of the claims processing and directory issues outlined above;

(f) Bright Health took insufficient measures to remedy issues with its provider directory, claims backlogs, or inability to perform accurate risk adjustments;

(g) by failing to timely process claims, Bright Health massively understated its costs and the health risk of its members, which in turn, caused the Company to similarly overstate its MCR;

(h) parallel to these issues, prior to and during the Class Period Bright Health had been struggling to manage COVID-19 related impacts since the start of the pandemic, which was materially exacerbated by the claims processing issues outlined above;

(i) the above issues were materially exacerbated by the Company's significant growth, including growth through acquisitions and the ACA SEP, resulting in a heavily skewed, then-existing, and unfavorable percentage of new versus existing members;

(j) as a result, Bright Health's financial results would foreseeably be materially impacted in the hundreds of millions of dollars due to inaccurate risk adjustments and prior period medical costs as the Company caught up on claims processing;

(k) further, the Company would foreseeably continue to be impacted adversely by COVID-19;

(l) the Bright Health Defendants knowingly and/or recklessly withheld this information from investors in the futile hope to remedy the above-issues before the adverse impacts were too large to conceal;

(m) accordingly, during the Class Period the Bright Health Defendants overstated the Company's business and financial prospects; and

(n) as a result, during the Class Period the Bright Health Defendants made materially false and/or misleading statements and failed to state information required to be stated therein.

355. The market reaction was extremely positive following Bright Health Investor Day, causing Company shares to rise from the December 6, 2021 closing price of $3.78 per share to close at $4.13 per share on December 7, 2021. Company shares continue to rise closing at $4.35 on December 9, 2021, representing a total increase of 15% as a result of the Company's affirmed 2021 guidance and projected 2022 financial results.

356. Following Investor Day, analysts reacted exceptionally favorably as well. For example, J.P. Morgan stated "More Attractive Risk/Reward At Current Valuation; Upgrading To Overweight" on the "Solid 2022 guidance, including slightly better than expected BHC membership growth and MCR guidance, and much stronger top-line growth in NeueHealth, have removed key points of uncertainty and de-risked the stock somewhat."

357. RBC Capital Markets stated that Bright Health was "Well capitalized for the next phase of growth." According to RBC Capital Markets, the worst was behind the Company.

> "The argument could be made that the hardest part is largely done – i.e. building initial scale through health plan membership. While third quarter's lofty MLR print demonstrated the woes of a rapidly growing IFP risk pool, exacerbated by COVID and excess in-year volume through SEP, medical costs should begin to normalize on better retention and progress with patient engagement. In fact, we

> were pleasantly surprised by retention rates among 2021 new members north of 80%, which should bode well for the MLR outlook – now seen in the 86-88% range for 2022.

**4. JP Morgan Virtual Healthcare Conference**

358. On January 11, 2022, the Bright Health Defendants presented at the JPMorgan Virtual Healthcare Conference, where they continued to spin the narrative that the worst was behind the Company.

359. At the conference, Defendant Mikan touted that the Company was "achieving scale in our business and expect fundamental execution and productivity gains," and that Bright Health "has the team, capital and strategy to execute on our model." Defendant Mikan affirmed 2022 guidance, citing "better-than expected performance."

> Overall, we're confident in our model and believe our fully aligned, integrated systems of care will deliver differentiated results. ***We're achieving scale in our business and expect fundamental execution and productivity gains to drive us toward our target for breakeven adjusted EBITDA in 2024. Bright Health Group has the team, capital and strategy to execute on our model***.
>
> Taking a step back for people that are new to the Bright Health Group business. ***As I mentioned, we have updated our expectations for annual and open enrollment period members to greater than 1 million for 2022. And we now expect 2022 revenue at the high end of the $6.3 billion to $6.5 billion revenue guidance range we provided. The increased forecast for 2022 enrollment reflects better-than-expected performance, particularly in retention rates, which were in line with better than historical trends in the broader IFP market***. We would also note that the solid performance in member retention comes even as we have taken price increases in key markets and saw expanded 2021 enrollment due to the extended special enrollment period.

360. With respect to NeueHealth, Defendant Mikan stated that the segment was "an emerging leader in taking on global risk for the consumer retail health care market."

> The next phase of our growth was establishing and scaling our NeueHealth care delivery business. We formally launched the NeueHealth brand in 2020, quickly reaching over 20,000 value-

> based patients. We started with NeueHealth clinics in Florida, serving both Bright HealthCare members and consumers from third-party payers. During this time, we also worked on transitioning our financial relationships from fee-for- service models to value-based contracting models where possible. ***Our NeueHealth business is already an emerging leader in taking on global risk for the consumer retail health care market***.

361. Defendant Mikan also indicated that the Company was focused on scaling correctly, including being "even more focused on disciplined growth, fundamental execution and improving productivity," which would improve MCR,

> Looking longer term, our goal is to achieve breakeven adjusted EBITDA in 2024. ***At the MCR and gross margin level, we're focused on growth and scale within existing states for Bright HealthCare and increasing contribution from NeueHealth. As we start to reach scale, we will be even more focused on disciplined growth, fundamental execution and improving productivity with the expectation that we will drive down our operating cost ratio***.

362. Touching on the issues revealed upon release of the Company's third quarter 2021 results, Defendant Mikan stressed that those issues were "tailwinds" and behind the Company. Defendant Mikan went into more detail as to those issues during the call, describing them as past worries moving forward.

> ***We have several tailwinds for business in 2022. We expect higher average member duration as the mix of returning members increases, and we expect a more limited impact from in-year enrollment. We forecast lower COVID-related costs and less disruption related to COVID***. ***Higher member duration and more limited COVID-related disruptions should be positive for 2022 member engagement, risk coding accuracy and risk adjustment performance***. We're continuing to improve to move toward the fully aligned model and expect approximately 40% of Bright HealthCare's IFP members to be fully aligned with NeueHealth providers in 2022.
>
> ***
>
> So it hit us double whammy. Medical costs greater than we thought initially, and then, of course, impacted us with risk coding. And then as we started to really engage with our members with --

> especially with our owned and managed clinics in September and October, rises Omicron. And while it's very different impact, it's much more pervasive as we see it. You see a lot of asymptomatic cases with people not going to work and what have you. And it's -- sure, we're seeing it in hospitalizations, again. It's a lot less in duration and less severe as we see it today. I do believe you're still going to see continued deferred care.
>
> ***
>
> The bottom line is COVID is still here, likely to stay, to some degree. ***We believe it will go down to a relative baseline, and we think we price for that***.

363. The statements discussed above in paragraph ¶¶359-62 were materially false and misleading for the following reasons:

(a) beginning as late as 2019 and throughout the Class Period, Bright Health's medical provider directories were not accurate or up to date in both its new and existing markets, and, as a result, legitimate or properly submitted claims from providers under contract were routinely, and improperly denied, based on the faulty directory data;

(b) due to the failure to maintain the provider directories, legitimate claims were often 180 days or more behind, or backlogged, in being processed and paid, significantly longer than the industry standard of 30 to 90 days;

(c) in addition, Bright Health and its third-party vendors failed to provide enough staff and resources to handle the claims in a timely manner resulting in claims disputes being unanswered for months on end;

(d) due to this significant backlog of claims, Bright Health owed millions of dollars to healthcare providers for overdue claims;

(e) beginning as late as 2020 and lasting throughout the Class Period, Bright Health was unable accurately perform risk adjustments because of the claims processing and directory issues outlined above;

(f) Bright Health took insufficient measures to remedy issues with its provider directory, claims backlogs, or inability to perform accurate risk adjustments;

(g) by failing to timely process claims, Bright Health massively understated its costs and the health risk of its members, which in turn, caused the Company to similarly overstate its MCR;

(h) parallel to these issues, prior to and during the Class Period Bright Health had been struggling to manage COVID-19 related impacts since the start of the pandemic, which was materially exacerbated by the claims processing issues outlined above;

(i) the above issues were materially exacerbated by the Company's significant growth, including growth through acquisitions and the ACA SEP, resulting in a heavily skewed, then-existing, and unfavorable percentage of new versus existing members;

(j) as a result, Bright Health's financial results would foreseeably be materially impacted in the hundreds of millions of dollars due to inaccurate risk adjustments and prior period medical costs as the Company caught up on claims processing;

(k) further, the Company would foreseeably continue to be impacted adversely by COVID-19;

(l) the Bright Health Defendants knowingly and/or recklessly withheld this information from investors in the futile hope to remedy the above-issues before the adverse impacts were too large to conceal;

(m) accordingly, during the Class Period the Bright Health Defendants overstated the Company's business and financial prospects; and

(n) as a result, during the Class Period the Bright Health Defendants made materially false and/or misleading statements and failed to state information required to be stated therein.

364. On February 11, 2022, Bright Health abruptly announced that Schindelman, CEO of Bright HealthCare, was stepping down from his role, effective March 11, 2022. Afterwards, Jay Matushak, CFO of Bright HealthCare, was to serve as the interim CEO of Bright HealthCare while the Company located replacement leadership for its business segment.

**C. The Full Truth is Revealed**

365. Less than three months after its Investor Day, on March 2, 2022, Bright Health announced its financial results for the fourth quarter and full-year 2021. Reported revenues for the quarter were $962 million up from $360 million in the prior year, and yearly revenues were $4,029 million up from $1,207 million for the prior year. The Company reported a population of 611,078 commercial members, up from 145,459 in the prior year period, 116,621 MA members, up from 61,663 in the prior year period, and 175,587 NeueHealth Members, up from 21,126 in the prior year period.

366. Yet despite Bright Health's revenue and population growth, the Company reported a net loss of $813.4 million for the quarter, or $1.30 per share, a loss approximately three times larger than consensus estimates. Bright Health also reported a net loss of approximately $1.2 billion for the full-year 2021.

367. Bright Health revealed that its MCR had exploded to 134.1% for the quarter, up from 105.4% in the prior year, and that its full year MCR had come in at 101.3%, up from 88.7% in the prior year. According to the Company, the increased MCR for the quarter "includes a 860 basis point unfavorable impact from COVID-19 related costs and a 2,640 basis point unfavorable impact reflecting the combined impact of a cumulative reduction in Premium Revenue due to an

inability to capture risk adjustment on newly added lives, as well as prior period medical costs recognized in the fourth quarter. ... Medical Cost Ratio for the twelve months ended December 31, 2021, includes a 530 basis point unfavorable impact from COVID-19 costs, and a 90 basis point unfavorable impact from non-COVID [prior period developments ("PPD")]".

368. On March 2, 2022, the Bright Health Defendants also hosted a conference call with analysts and investors to discuss Bright Health's fourth quarter and full year 2021 financial results. On the call, Defendant Mikan admitted that "higher than anticipated growth to start the year and additional growth from the special enrollment period, outpaced our operational and system capabilities," and that when combined with ongoing COVID challenges, this "large group of new members without risk scores combined with scaling up our organizational capabilities and emerging technologies impacted our results into the fourth quarter more significantly than anticipated." Therefore, the Company was unable to "accurately capture their underlying health conditions [which] impacted ***prior*** period medical costs as we caught up on claims processing." As a result, Bright Health's growth—a significant portion of which was pre-IPO—"exacerbated the gaps in performance," which, "***were already on [the Company's] list for improvement***."

> We have always expected some variability in our results. As we executed on our strategy to quickly gain scale in the business and as we closed out 2021, we saw that play out. ***The meaningful growth we delivered in 2021, which was a combination of higher than anticipated growth to start the year and additional growth from the special enrollment period, outpaced our operational and system capabilities***.
>
> In addition, unique factors in 2021 that we have previously highlighted, including a once in a century pandemic and our ***large group of new members without risk scores combined with scaling up our organizational capabilities and emerging technologies impacted our results into the fourth quarter more significantly than anticipated***.
>
> As Cathy will discuss in more detail, these factors ***impacted our ability to engage with our members in order to accurately capture***

> ***their underlying health conditions and impacted prior period medical costs as we caught up on claims processing***. Despite a challenging 2021, our larger base of business, along with continued growth in 2022, affords us a tremendous platform to continue executing on our strategy in driving long-term shareholder value.
>
> ***
>
> All of the ***challenges we encountered this past year can be attributed to specific areas that were already on our list for improvement. But the growth we experienced exacerbated the gaps in performance***.

369. Defendant Smith added that they were "swiftly working to improve and provide ***more predictability*** into [the Company's] results."

> However, we did not deliver the financial results we had planned. Let me be clear, we are very disappointed in our financial results and are ***swiftly working to improve and provide more predictability into our results***.

370. Defendant Smith also revealed that Bright Health's "significant deterioration … was due to specific ***identifiable*** issues," which included "catching up on claims payments and resolving resubmitted claims," which he described as a "lack of visibility into lagging medical claims on our legacy operational systems which require manual processing."

> The significant deterioration in our results since our guidance was due to specific identifiable issues, including COVID costs, ***catching up on claims payments and resolving resubmitted claims***. This was compounded by our ***lack of visibility into lagging medical claims on our legacy operational systems which require manual processing***.

371. With respect to MCR, the Bright Health Defendants attributed the dreadful results in part to "claims processing issue, where our challenges in capturing the risk of the population was in part due to the lack of timely insight into data which drove the insufficient engagement in care management." According to Defendant Smith, Bright Health had again overstated its risk adjustment, resulting in a quarterly revenue decrease of $148 million—with "$111 million

relat[ing] to ***prior*** quarters." Defendant Smith also revealed that the Company was forced to "recognize[] $139 million in ***prior period medical costs*** in Q4."

> The ***increases in medical costs due to COVID and the top line headwinds associated with risk adjustments are reflected in our medical cost ratio in the quarter***. On a reported basis, our fourth quarter 2021 MCR at the enterprise level was 134.1%, up from 105.4% in the fourth quarter of 2020.
>
> COVID had a negative impact on our MCR in the fourth quarter of 860 basis points, compared to 650 basis points in Q4 of 2020…. The fourth quarter 2021 COVID impact to our MCR included $56.5 million of COVID costs related to prior quarters, which contributed 580 basis points of the MCR impact recognized in the quarter.
>
> Our risk adjustment performance in the fourth quarter also reflected the ***claims processing issue, where our challenges in capturing the risk of the population was in part due to the lack of timely insight into data which drove the insufficient engagement in care management***.
>
> ***We increased our risk adjustment payable estimate by $148 million, reducing fourth quarter revenue, of which, $111 million relates to prior quarters. We also recognized $139 million in prior period medical costs in Q4***. The combined impact of the prior period risk adjustment estimate changes and the prior period medical costs was 26.4 percentage points to our medical cost ratio in Q4.
>
> Our expense ratios were also impacted by the non-cash GAAP premium deficiency reserve of $103 million we booked in anticipation of future loss contracts in certain markets in 2022.

372. Defendant Smith stated that "2021 [was] the peak of inefficiency" for the Company as it struggled to "consolidate [its] systems and processing."

> ***We continue to view 2021 as the peak of inefficiency as we consolidate our systems and processing.*** And as Mike will discuss, we are taking actions to drive our operating cost ratio meaningfully lower in 2022.

373. When elaborating on the Company's ballooning MCR, Defendant Smith stated that "MCR pressure" was due to "delays in attributing members, in part due to our rapid growth

in 2021, as well as the impact of the unique 2021 special enrollment period." As such, "Operational inefficiencies contributed 310 basis points to the year-over-year MCR increase through higher-than-expected medical costs and other medical cost management issues. Medical costs related to the SEP population and other mix changes contributed 180 basis points to the increase."

> The 2021 MCR performance in both of our businesses was impacted by the confluence of COVID, unprecedented growth and the extended 2021 special enrollment period with a 2021 MCR of 101.3%, compared to the 88.7% in 2020. COVID costs in 2021 impacted our MCR by 530 basis points, compared to 400 basis points in 2020.
>
> I want to spend a minute unpacking the 2021 medical cost ratio in a bit more detail given the magnitude of the variance to our previous guidance. While we are overall pleased with our book of business, we are disappointed in the operating results and can point to specific areas that drove the variance, most of which, we believe are onetime in nature and won't reflect the run rate MCR of our business.
>
> I will speak to our forward expectations for these items and the implications for our 2022 adjusted EBITDA in a minute. For 2021, the challenges we had in risk-coding accuracy drove 650 basis points of MCR pressure compared to 2020. ***This was related to our delays in attributing members in part due to our rapid growth in 2021, as well as the impact of the unique 2021 special enrollment period***.
>
> ***Operational inefficiencies contributed 310 basis points to the year-over-year MCR increase through higher-than-expected medical costs and other medical cost management issues. Medical costs related to the SEP population and other mix changes contributed 180 basis points to the increase***.

374. During the call, Defendant Mikan stressed the "significant investments" the Company was undertaking to only now address the "structural issues in 2021" and "growth which caused [the Company] to outkick [its] coverage," which both prevented the Company from performing accurate risk adjustments in 2021.

> Accurate risk adjustment was a challenge due to several structural issues in 2021 as I have discussed.
>
> ***However, those challenges drove us to make significant investments in our risk adjustment capabilities***. It starts with faster attribution of our members to a larger network of owned and affiliate physicians that have better ability to engage with their members earlier in the year.
>
> Equally important are the tech and operational investments we have made in suspecting analytics, outreach and engagement teams and our end-to-end risk adjustment process to ensure we are accurately capturing the risk of the population we manage. We are also working to help members better manage and navigate their care, which we expect will drive better in network trends.
>
> Four, claims and clinical platform stabilization. ***As I mentioned in 2021, our growth caused us to outkick our coverage***. Not only in the capacity of our fully aligned provider networks, but on our administrative, operational and clinical systems as well. This growth was taken place, while we were building or transitioning from numerous vended solutions to BiOS, our end-state operating platform.

375. Finally, Defendant Mikan again attributed operation challenges in timely onboarding newly added members to perform accurate risk adjustments to an unfavorable population mix of 85% new members coupled with the ACA SEP.

> When you look at risk adjustment, unfortunately for us, there were many different factors that impacted us in the year. ***It had to do with, obviously, starting with a new member base, 85% of members being new to us in substantial role, but then SEP kicked in and we got new lives, and we were late to attribute them to our own medical centers in our affiliate network***.

376. Analysts on the call were shocked at the disappointing news, especially in light of the positive statements made by Defendants Mikan and Smith during the Company's Investor Day and the January conference. One analyst asked to "understand a little bit better what happened between the Investor Day in December, our conference in January, and today, where [the Company's] risk adjustment accruals came in much different than expected." Defendant

Mikan ***admitted*** that when making prior statements "[the Company] didn't have the data or the insights to really understand how [it] [was] capturing the risk codes and what other underlying medical trends [they were] seeing."

> **Analyst:** ***I just want to go back to really understand a little bit better what happened between the Investor Day in December, our conference in January, and today, where your risk adjustment accruals came in much different than expected***. So a few things. One, are you making any changes to the accrual process itself? And then secondly, you did raise price, right, when we think about the individual market. What gives you confidence that you are able to price correctly as you think about going into 2023?
>
> **Defendant Mikan:** Lisa, so with respect to what changed between the time periods that you referred to is it's a confluence of factors, as you can imagine. The different areas that we talk about in terms of challenges with compounding effect, but ***it starts with operational limitations***. And we were in the – from the beginning of the year, with all the growth that we had gotten from 2021, we had to build out more network. To coverage from access standpoint, loading our contracts., we made errors in loading. Until early in the year, we had a challenge with processing claims. And so the later part of the year, particularly in the fourth quarter, ***we processed somewhere around 40% to 50% of our underlying claim expense during that time period. Obviously, with that amount of clean processing, we didn't have the data or the insights to really understand how we were capturing the risk codes and what other underlying medical trends were we seeing***. And so, as that came to fruition through January as we closed out our books, obviously, we determined our estimates and – were impacted by an increase in risk of adjustment as well as claim processing.
>
> ***
>
> And so, engaging with them didn't occur until later part in the year, which is too late, which we talked about in Q3, ee talked about that at Investor Day and onward. ***What we didn't really understand was the impact of not having the data from all the claims that we had denied early in the year. And that impacted our understanding of the diagnoses versus the claims that we were paying***.
>
> So there are cases, many cases, where we have now identified that we paid for certain services, but we don't have the original medical diagnosis because it happened prior to our watch and we can't code

> for that effectively. ***So, there are things like that that have been happening – that happened to us in 2021 that we believe we're much better positioned for in 2022. And those are some of the actions that we've talked about. It starts with, we've got to get on a new platform, which we made the decision to do. The good news is all new markets are on a new platform***.

377. Analysts further pressed Defendant Mikan whether the Company's 2022 risk adjustments were in "better shape or more accurate." In response, Defendant Mikan admitted that the pricing they had taken was not based on actuarial data, but instead pure optimism, and only after actual analysis did they arrive at the more disappointing figures.

> **Analyst:** I'm Sorry, I was just going to say, one follow-on on that. Since ACA risk adjustment is a zero-sum game, I mean, do you have data from actuarial firms at this point in '22 that are affirming that how you're accruing that risk adjustment for '22 is in better shape or more accurate? Anything to point to there?
>
> **Defendant Mikan:** Yes. Well we use – obviously we use actuaries to price our business, and we're closing out using our actuarial teams, inside and outside team, and then how we're booking going forward based on what we know, and the data that we capture internally. Obviously, we'll get CMS data later in the spring. But we have the data coming through now. And between what we ended the year at and how we were trending, we take that data, the actuaries look at it, and then we bake in initiatives where we've got proof points to show that we can improve. All that is taken into consideration.
>
> ***And as Cathy mentioned, part of the increase in guidance vis-à-vis the Investor Day conference, we took a more conservative approach from that time period to now based on what we saw closing out Q4. Of course, we want to be optimistic***. We want to improve this, but right now, that's the approach we're taking, and it's actuarial-supported.

378. On this news, the price of Bright Health common stock declined $0.61 per share, or 19.55% from the March 1, 2022 closing price of $3.12 per share to close at $2.51 per share on March 2, 2022. Bright Health shares continued this downward trend, closing as low as $1.79 on March 7, 2022.

379. Analysts were shocked at the chasmic miss. For example, RBC Capital Markets stated lowered price targets to $3.00 per share down from $9.00 per share, stating "We step to the sideline as new members overwhelm operations." According to RBC Capital Markets, "[s]imply put, the outsized IFP growth overwhelmed the platform's ability to process claims and engage patients in time to accurately assess health risk," and "[d]elayed claim processing hampered data collection for risk scoring, resulting in $148MM of incremental risk adjustments, most of which was related to prior quarters because of backlogged claim processing."

380. Piper Sandler stated the results were "Two Steps Back from More Self-Inflicted Wounds," that these "FY21 self-inflicted wounds were worse than we thought," and that this was the "third disappointing quarter since going public, headlined by a 134% MCR that dropped BHG shares 20%." According to Piper Sandler, "BHG modestly beat on membership, but unsustainable, legacy operating systems, exacerbated by hyper growth, plus COVID limitations, contributed to what mgmt calls the 'peak of inefficiency.'" Critically, Piper Sandler was shocked that the "***poor FY21 MCR result (101%) appeared destined from the start: mgmt. blamed the 26.4% negative prior period medical costs and risk adjustment impact in 4Q21 on legacy claims processing systems and membership hyper growth***."

381. Cowen lowered price targets to $3.00 per share, down from $6.00 per share, stating: "Following the 4Q21 results and guidance, we are again lowering EBITDA estimates and modeling a necessary capital raise during 2022 and lowering our 2022YE price target from $6 to $3," and "materially rais[ing] 2022 MLR and lower 2023 expected enrollment growth from anticipated price action."

382. Barclays downgraded price targets to $4.00 per share, down from $5.50 per share stating "***BHG's 4Q21 was soft as its ACA exchange book of business was mispriced for all of***

***2021 due to adverse selection from high utilization members during last year's SEP***," and that "[o]ther factors were true-up on claims payments, and resolving resubmitted claims. The combined impact of the prior period risk adjustment estimate changes and prior period medical costs was 26.4% to the MLR in 4Q, which contributed to the surprisingly high 134% enterprise MLR in 4Q21."

383. Morgan Stanley stated it was "The Bear Case Playing Out," and that "Bright Health's guidance revision underscores the challenges associated with management's focus on outsized member growth with limited regard to profitability, a strategy that has proved costly in diluting shareholders."

384. J.P. Morgan noted it was "difficult to be confident in the company's view on medical cost trend with 70% of members still on the legacy claims processing system. We think BHG needs to string together several quarters of clean MCR results to determine whether these changes were successful."

385. Cowen stated "BHG reported a shockingly high 134% 4Q21 MLR and EBITDA loss, driven by higher ACA risk-adjustment accruals (2nd qtr in a row), negative PPD and COVID costs," and that the quarterly results "***diverge from recently announced guidance at BHG's December 2021 investor day***."

386. BoFA Securities called it a "[s]urprisingly bad quarter," lowering price targets to $2.50 per share, down from $6.00 per share, also noting "the magnitude of the miss was especially surprising after given an update at its December Investor Day."

**D. Post Class-Period Events**

387. More executive departures followed shortly after the close of the Class Period. On March 15, 2022, Bright Health announced that on March 11, 2022, Keith J. Nelsen, General Counsel and Corporate Secretary of the Company, intended to retire and that he would step down

from his role on March 18, 2022. On May 17, 2022, Bright Health announced that Michael Carson has been hired as the CEO of Bright HealthCare and Jeffrey Cook has been hired as the CEO of NeueHealth. The Company also announced that Srivastava, CEO of NeueHealth, notified the Company that he will be leaving the Company effective May 11, 2022.

388. On April 8, 2022, the Colorado Division of Regulatory Agencies, Division of Insurance ("DOI") announced that as a result of an investigation of Bright Health, it is fining the Company $1 million and is entering into a formal agreement with the company to address its issues with both consumers and health care providers. According to the press release, since 2021, the DOI received over 100 consumer and health care provider complaints about Bright Health that indicated systemic operational problems. These complaints were focused around four areas: (i) failure to pay provider claims according to Colorado law; (ii) failure to communicate with their members; (iii) inability to accurately process consumer payments and accounts; and (iv) untimely processing of claims for physical and behavioral health coverage.

389. The stipulation and agreement entered into by the Company and the DOI dated April 6, 2022, stated that these issues existed since "early 2021." Furthermore, Bright Health's attempt to perform operational improvements in the Colorado market in 2021 were insufficient, according to the DOI.

### E. The Bright Health Defendants Acted With Scienter When They Made or Caused to be Made Material Misstatements and Omissions in Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

390. As alleged herein, Bright Health and the Executive Defendants acted with scienter in that they: (i) knew, or were deliberately reckless in not knowing, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; (ii) knew, or were deliberately reckless in not knowing, that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly (or with

deliberate recklessness) and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

391. As set forth herein in detail, the Executive Defendants, by virtue of their receipt of information reflecting the true facts regarding Bright Health, their control over, receipt, and modification of Bright Health's allegedly materially misleading statements and their associations with the Company that made them privy to material non-public information concerning the Company, participated in the fraudulent scheme alleged herein.

392. The Executive Defendants permitted Bright Health to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's common stock. As set forth herein, the Executive Defendants, by virtue of their receipt of information reflecting the true facts regarding Bright Health, their control over, receipt, and modification of the Company's allegedly materially misleading statements and omissions, and their positions with the Company that made them privy to material non-public information concerning Bright Health, participated in the fraudulent scheme in violation of the Exchange Act as alleged herein.

393. Bright Health and the Executive Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on those who purchased Bright Health common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Bright Health's business, operations, and management and the intrinsic value of the Company's common stock and caused Lead Plaintiff and members of the Class to purchase Bright Health common stock at artificially inflated prices.

394. Numerous additional facts give rise to the strong inference of scienter that, throughout the Class Period, the Executive Defendants knew or were severely reckless in disregarding that:

(a) beginning as late as 2019, Bright Health's medical provider directories were not accurate or up to date in both its new and existing markets, and, as a result, legitimate or properly submitted claims from providers under contract were routinely, and improperly denied, based on the faulty directory data;

(b) due to the failure to maintain the provider directories, legitimate claims were often 180 days or more behind, or backlogged, in being processed and paid, significantly longer than the industry standard of 30 to 90 days;

(c) in addition, Bright Health and its third-party vendors failed to provide enough staff and resources to handle the claims in a timely manner resulting in claims disputes being unanswered for months on end;

(d) due to this significant backlog of claims, Bright Health owed millions of dollars to healthcare providers for overdue claims;

(e) beginning in 2020, Bright Health was unable accurately perform risk adjustments because of the claims processing and directory issues outlined above;

(f) Bright Health took insufficient measures to remedy issues with its provider directory, claims backlogs, or inability to perform accurate risk adjustments;

(g) by failing to timely process claims, Bright Health massively understated its costs and the health risk of its members, which in turn, caused the Company to similarly overstate its MCR;

(h) parallel to these issues, prior to and during the Class Period Bright Health had been struggling to manage COVID-19 related impacts since the start of the pandemic, which was materially exacerbated by the claims processing issues outlined above;

(i) the above issues were materially exacerbated by the Company's significant growth, including growth through acquisitions and the ACA SEP, resulting in a heavily skewed, then-existing, and unfavorable percentage of new versus existing members;

(j) as a result, Bright Health's financial results would foreseeably be materially impacted in the hundreds of millions of dollars due to inaccurate risk adjustments and prior period medical costs as the Company caught up on claims processing;

(k) further, the Company would foreseeably continue to be impacted adversely by COVID-19;

(l) the Bright Health Defendants knowingly and/or recklessly withheld this information from investors in the futile hope to remedy the above-issues before the adverse impacts were too large to conceal;

(m) accordingly, during the Class Period the Bright Health Defendants overstated the Company's business and financial prospects; and

(n) as a result, during the Class Period the Bright Health Defendants made materially false and/or misleading statements and failed to state information required to be stated therein.

**1. The Public Class-Period Statements and Admissions of the Executive Defendants Indicate Knowledge of All Undisclosed Adverse Facts**

395. The public statements by the Bright Health Defendants indicate their knowledge of undisclosed facts. These Defendants spoke to investors and analysts prior to and throughout the Class Period regarding membership growth, COVID-19, and the Company's operational

capabilities, including claims processing and risk adjustment scoring. Moreover, following the close of the Class Period, the Bright Health spoke to the investing public on these issues indicating knowledge of the adverse facts alleged herein throughout the Class Period. The Bright Health Defendants' communications with the public regarding the development and operation of these projects were detail-laden, reflecting that the Executive Defendants were hands-on managers with specific knowledge of (or direct access to) data and facts regarding the Company's business, whether disclosed to the investing public or not.

396. On November 11, 2021, Defendant Mikan revealed visibility issues with a "significant influx of new members with a shorter duration" due to: (i) the per-IPO enrollments "effective on 1/1/21"—or nearly six months prior to the IPO; as well as (ii) the ACA special enrollment period, which also existed at the time of the IPO. Defendant Smith added that the issues stemmed from Bright Health's aberrational percentage of new memberships added "during every month through September." According to Defendant Smith, "[t]he negative impact from risk adjustment scoring, including a true-up for the first half of 2021, … resulted in a cumulative $134 million impact to Q3 revenue," of which "$89 million was related to the first half of 2021."

397. On March 2, 2022, Defendant Mikan revealed that the "large group of new members without risk scores combined with scaling up our organizational capabilities and emerging technologies impacted our results," and as a result, Bright Health's growth—a significant portion of which was pre-IPO—"exacerbated the gaps in performance," which, "were already on [the Company's] list for improvement." Defendant Smith added that "MCR pressure" was due to "delays in attributing members in part due to our rapid growth in 2021, as well as the impact of the unique 2021 special enrollment period." Defendant Mikan also revealed the Company was facing operational challenges in timely onboarding newly added members to

perform accurate risk adjustments to an unfavorable population mix of 85% new members coupled with the ACA special enrollment period.

398. Defendant Smith stated that the "significant deterioration … was due to specific identifiable issues," which included "catching up on claims payments and resolving resubmitted claims," which she described as a "lack of visibility into lagging medical claims on our legacy operational systems which require manual processing." According to Defendant Smith, Bright Health had overstated its risk adjustment, resulting in a quarterly revenue decrease of $148 million—with "$111 million relat[ing] to prior quarters." Defendant Smith also revealed that the Company was forced to "recognize[] $139 million in prior period medical costs in Q4." Defendant Smith concluded that full-year 2021 was the "peak of inefficiency" for the Company.

### 2. Former Bright Health Employees Indicate Defendants Mikan and Smith Were Aware of Operational Challenges Prior to and During the Class Period

399. Former Bright Health employees have confirmed that the Executive Defendants were intimately aware of the operational challenges faced by the Company prior to and throughout the Class Period.

400. FE-1 explained that the primary operational problem was that Bright Health's medical provider directories were not accurate or up to date. FE-1 further noted that, due to the failure to maintain the provider directories, legitimate claims were often 180 days or more behind, or backlogged, in being processed and paid (including correcting the directory and re-adjudicating the improper denial of claims).

401. FE-1 further confirmed that Bright Health's executive leadership, including CEO Mike Mikan and CFO Cathy Smith, were aware of these issues prior to the IPO in June 2021. He indicated that these problems existed in 2020 and only became worse as the company grew. He indicated that there were several all-hands meetings in which the issues with the directories and

claims backlog were acknowledged and discussed by Mikan and Smith, along with assurances that management was working to fix the problems, although no specific steps to fix the problems were detailed at these meetings.

402. FE-1indicated that, beginning in approximately February 2021, there were special all-hands meetings to discuss the claims backlog problem. FE-1 recalled that executive management acknowledged the problem, stated that they understood that providers and members were complaining to employees about these problems, and assured employees that they were fixing the operational issues. He recalled management began making these statements at all-hands meetings in February 2021. He further recalled that the "operational challenges" were addressed specifically by segment CEO Schindelman, Bright Health CFO Cathy Smith, and Bright Health CEO Mike Mikan. He noted that Smith led the all-hands meetings for the last 8 months of FE-1's employment. He further noted that, during the pandemic, the meetings were initially held weekly, then bi-weekly, then monthly, with some exceptions.

403. Regarding the company's IPO, FE-1 asserted that, since management knew about the backlog and outstanding claims issues prior to the IPO, management also knew that the financials in the public offering materials were not accurate.

404. FE-1 explained that the industry standard is that claims are paid or adjudicated in 30 to 90 days. In some cases, especially with electronically submitted claims, payment can be made in 30 to 45 days. He noted that a backlog of 180 days to process claims is a "huge warning sign." He estimated that, in his experience, a reasonable percentage of denials of claims was 8 – 12%. He indicated that Bright Health acknowledged that it paid or re-adjudicated approximately 60% of its claims for the entire year of 2020 in November and December of that year. In other words, he explained, 60% of all claims submitted that year were not processed until November

or December. Therefore, he advised, for that volume of claims to be paid in just one quarter signifies a serious problem, and management knew it. FE-1 further confirmed that "management" included Mikan and Smith. He articulated that it was a "known fact" that Mikan and Smith were aware of this issue.

405. Additionally, FE-3 advised that Bright Health held regular "all hands" conference call meetings, which he described as "pep talks." He further recalled that, shortly after the IPO, Bright Health's stock dropped, and, during the all-hands meeting in August 2021, the CFO was clearly frustrated answering questions from employees and shareholders about the drop.

### 3. The Executive Defendants Had Access to Adverse Information or Had Been Made Aware of Issues by Senior Company Management

406. The Bright Health Defendants had access to adverse information or would have been made aware of such information by senior Company management, supporting an inference of scienter.

407. FE-1 was formerly employed at Bright Health from December 2019 through July 2021. His title was Market Executive Director. From March 2021 through the end of his employment, FE-1 reported to Curt Howell, President, West Markets. Howell reported to Amy Knapp, President of Bright HealthCare. Knapp reported to Simeon Schindelman, former CEO for the Bright HealthCare segment. Prior to March 2021, FE-1 advised that he reported directly to Knapp. FE-1 explained that he resigned from Bright Health in July 2021 after the concerns he had raised repeatedly, regarding operational and financial challenges at the company that continued to be ignored.

408. According to FE-1, the claims issues at Bright Health were occurring company-wide, and not just in his territory of Arizona. He explained that claims issues were present in Bright Health's already established markets as well as the new markets where Bright Health was

expanding. He confirmed that the directory of providers and claims was stored in a "master data warehouse," which housed information on all the company's networks throughout the country.

409. In regards to claims backlogs, FE-1 indicated that these issues had all been raised to senior management, meaning vice presidents and higher-level staff. He explained that Bright Health created what it called "war rooms," or executive staff working groups, to address specific issues, and a war room had been created to address the claims backlog problem.

410. FE-1 explained that providers were very upset at the lengthy backlog and delay in getting their claims paid. He indicated that providers were calling high level management at Bright Health with their demands to be paid. Tenet Healthcare was one of the providers demanding to be paid its overdue claims. He recalled learning from Ryan Beckman, the Vice President of Technology and Strategic Implementation at Bright Health, in March or April 2021, that Bright Health issued a "seven figure check" to Tenet to settle the outstanding claims owed. He added that Beckman had been involved in negotiating the payment with Tenet as well as negotiations with other providers.

411. FE-1 advised that Bright Health had been audited in Colorado prior to the IPO in 2021 and later fined in 2022 for its failure to pay providers in a timely manner. To this point, on April 8, 2022, the Colorado Division of Regulatory Agencies, Division of Insurance announced that as a result of an investigation of Bright Health, it was fining the Company $1 million and entering into a formal agreement with the company to address its issues with both consumers and health care providers. According to the press release, since 2021, the DOI received over 100 consumer and health care provider complaints about Bright Health that indicated systemic operational problems. These complaints were focused around four areas: (i) failure to pay provider claims according to Colorado law; (ii) failure to communicate with their members; (iii)

inability to accurately process consumer payments and accounts; and (iv) untimely processing of claims for physical and behavioral health coverage.

412. Another problem which he identified as contributing to the claims backlog was Bright Health's failure to provide adequate controls over the vendors it used to process its claims. Most notably, he indicated that these vendors and Bright Health failed to provide enough staff and resources to handle the claims in a timely manner. As a result, he added that disputes about claims in the claims adjudication process went unanswered for months on end. He noted that, in response to these issues, Bright Health eventually moved its Medicare Advantage claims processing to another vendor, Evolent Health. He recalled that the contract with Evolent was signed in 2021 to take effect in January 2022.

413. FE-1 further noted that claims complaints and related operations problems were entered by field employees into a tracking system called Jira. He indicated that all members of the operations team had access to Jira, including Schindelman and Patty Rushman, former Vice President, Medicare Advantage Operations. FE-1 indicated that Rushman left Bright Health in 2021. He identified Sam Srivastava, former CEO of NeueHealth and, prior to that, Chief Operating officer at Bright Health, as well as Jeremy Dressen, former Senior Vice President of Enterprise Operations, as having access to Jira as well.

414. With regards to the issues alleged herein related to MCR, the ACA SEP, and COVID-19, FE-1 stated that he had numerous conversations with his supervisors regarding these problems. He recalled that he first raised the backlog problem in May or June 2020, but the problem kept getting worse. He noted that Bright Health is very "silo'd," so often the only way to resolve a problem is to escalate it up the chain of command, which he did. He indicated that he raised the issue with Schindelman in the summer of 2020 during a Quarterly Market Review

meeting, which was a regular conference call with segment leadership, including Knapp. He recalled that, the day after the conference call, Schindelman emailed him to follow up and acknowledged the problem. FE-1 recalled forwarding the email to Knapp. He added that, when Howell became his supervisor in February or March 2021, he informed him about the problem as well.

415. FE-2 was formerly employed by Bright Health from February 2021 through August 2021. His title was Manager, Care Management. He reported to Janet Spellman, currently the Associate Vice President of Clinical Performance at Bright Health.

416. FE-2 described Bright Health's business model as favoring "quantity over quality." He added that there were also times when providers complained that they had not yet received payment for past services, and therefore refused to see new Bright Health members as patients until they were paid. FE-2 also recalled that a large number of complaints came from providers in Florida. He further noted that he observed an increase in the volume of complaints beginning in approximately May or June 2021 through the end of his employment.

417. Regarding how the company coped with COVID-related costs and issues, FE-2 explained that, by the time he joined Bright Health in February 2021, the pandemic was already occurring. He explained that Bright Health did not manage the crisis as well as other insurers, noting that the company did not yet have the infrastructure in place to handle growth.

418. FE-2 provided examples of Bright Health's lack of infrastructure. He detailed how the company was using Dropbox to store files, which he explained was not appropriate for an enterprise solution. He also indicated that the company was not organized well. He explained that he and his team were often assigned tasks or identified tasks on their own that needed to be

completed but were not given any training or guidance as to how to complete those tasks. He noted that "everything was thrown together."

419. FE-2 confirmed that he spoke with his supervisor, Spellman, about these issues frequently throughout his employment. FE-2 explained further that Spellman brought up this issue with him as well, in anticipation of the problem. FE-2 recalled that Spellman told him to expect to be given tasks without proper guidance or training, and that they had to "just make it work." FE-2 recalled that Spellman described the situation as "building the plane on the runway" or "building the plane in the air."

420. FE-3 was formerly employed at Bright Health from April 2021 through September 2021. His title was Manager, Clinical Market Performance. He reported to Peter Fishman, Area Vice President, Clinical Market Performance. Fishman reported to Christine Gilroy, former Associate Chief Medical Officer. Gilroy reported to Tom Valdivia, Chief Health and Equity Officer.

421. FE-3 advised that a major part of his job was addressing improperly rejected claims. He explained that he received many complaints about claims that had not been paid that should have been. He indicated that the Company tracked unpaid claims in a spreadsheet put together by the Claims department, which used a payor claim software system called EDI to track claims. He recalled that EDI stood for Electronic Data Interface.

422. FE-3 explained that, whenever he received complaints from care providers about claims that had not been paid, he would email the Claims department and request that they investigate and resolve the complaint. He indicated that the issue of unpaid claims was significant from the time he started at Bright Health, and the problem only increased throughout his

employment. He indicated that Fishman and Gilroy were copied on his communications with the Claims department regarding unpaid claims complaints.

423. FE-3 further confirmed that Bright Health had difficulties conducting risk assessments. He indicated that he worked with another employee, Isaac Corzine, former Manager, Clinical Market Performance Risk, Stars, and Quality, to put together a risk assessment "game plan."

**4. Executive Departures Following the Disclosure of Adverse Facts Supports an Inference of Scienter**

424. Sudden and abrupt executive departures in close proximity to the revelation of adverse facts can lead to an inference of scienter.

425. On February 11, 2022, Bright Health abruptly announced that Schindelman, CEO of Bright HealthCare, was stepping down from his role, effective March 11, 2022. On March 18, 2022, Bright Health announced that on March 11, 2022, Keith J. Nelsen, General Counsel and Corporate Secretary of the Company, intended to retire and that he would step down from his role on March 18, 2022. On May 17, 2022, Bright Health announced that Sam Srivastava, CEO of NeueHealth, notified the Company that he will be leaving the Company effective May 11, 2022.

426. The sudden departures of both Schindelman and Srivastava are especially notable here as they served as respective CEOs of Bright Health's two business segments, Bright HealthCare and NeueHealth, both of which were discussed in granular detail during the Class Period and touted as the foundation of the Company's competitive advantage and instrumental in the Company's growth and future financial prospects. Moreover, Schindelman and Srivastava spoke to investors on their respective business segments just weeks before their terminations during Bright Health's Investor Day on December 7, 2021.

### 5. The Undisclosed Adverse Facts Concerned the Core of Bright Health's Business and Therefore Supports an Inference of Scienter

427. Given the multitude of statements concerning the Company's tremendous growth, both from a revenue and membership standpoint, and the Executive Defendants' frequent monitoring the Company's operations, Care Partner relationships, MCR, risk adjustments, the ACA SEP, and COVID-19 impacts, it is reasonable to infer that the Executive Defendants would be aware of the mounting problems with the Company's inability to scale at a reasonable pace leading to a known lack of visibility into the data and risk profiles of its members as well as a significantly heightened vulnerability to COVID-19 volatility as these facts are critical to Bright Health's core operations. Given the critical importance of the Bright Health's operational ability to manage and have visibility into its explosive membership growth on the Company's overall business and projected growth, including MCR and risk adjustments, the problems detailed herein could not have occurred without the Executive Defendants' knowledge and approval.

### 6. The Proximity of the Executive Defendants' Positive Statements Concerning the Company's Financial Health and Prospects and Reversals of Fortune Support an Inference of Scienter

428. Because truly unforeseen developments often take time to unfold, a close temporal proximity between management statements and either later contradictory statements or incongruous results may support an inference of scienter.

429. For example, the Registration Statement stated that "Bright HealthCare has been able to generate consistent MCR performance despite the accelerating pace of our new market expansion and an increasing share of Medicare Advantage business, which is priced to a higher MCR." Similarly, despite missing earnings estimates, on August 2, 2021, Defendant Smith touted Company's "remarkable" performance having "quadrupled" revenue "while maintaining a consistent … MCR" and that "growth did not come at the expense of performance."

430. Shortly thereafter and less than six months after the IPO, however, on November 11, 2021, Defendant Mikan revealed visibility issues with a "significant influx of new members with a shorter duration" due to: (i) the per-IPO enrollments "effective on 1/1/21"—or nearly six months prior to the IPO; as well as (ii) the ACA special enrollment period, which also existed at the time of the IPO. Defendant Smith added that the issues stemmed from Bright Health's aberrational percentage of new memberships added "during every month through September." According to Defendant Smith, "[t]he negative impact from risk adjustment scoring, including a true-up for the first half of 2021 … resulted in a cumulative $134 million impact to Q3 revenue," of which "$89 million was related to the first half of 2021."

431. Then, on December 7, 2021 Defendant Mikan stated that Bright "now h[ad] data on where [they] [could] driv[e] results and are moving toward a more focused and disciplined growth model." When discussing the issues that had impacted Bright Health in the prior quarter, Defendant Mikan stated that they were behind the Company, referring to them as "tailwinds," and stated that moving forward the Company would enjoy "more accurate risk coding and, hence, better risk adjustment performance." In sum, Defendant Mikan told investors to expect "less disruption to member engagement and health care utilization related to COVID, also a positive for risk coding accuracy and risk adjustment performance."

432. Yet on March 2, 2022, Defendant Mikan revealed that the "large group of new members without risk scores, combined with scaling up our organizational capabilities and emerging technologies, impacted our results," and as a result, Bright Health's growth—a significant portion of which was pre-IPO—"exacerbated the gaps in performance," which, "were already on [the Company's] list for improvement." Defendant Mikan stated that "MCR pressure" was due to "delays in attributing members in part due to our rapid growth in 2021, as well as the

impact of the unique 2021 special enrollment period." Defendant Mikan also revealed the Company was facing operational challenges in timely onboarding newly added members to perform accurate risk adjustments to an unfavorable population mix of 85% new members coupled with the ACA special enrollment period.

**F. Loss Causation**

433. During the Class Period, as detailed herein, the Bright Health Defendants engaged in a course of conduct that artificially inflated the price of Bright Health common stock. Their conduct operated as a fraud or deceit on Class Period purchasers of Bright Health common stock by failing to disclose and misrepresenting the adverse facts relating to the Company's business and growth prospects that are detailed herein. By presenting a misleading picture of Bright Health's business and prospects, the Bright Health Defendants' false and misleading statements had the intended effect of causing Bright Health common stock to trade at artificially inflated levels throughout the Class Period.

434. As alleged herein, the artificial inflation in the price of Bright Health common stock gradually dissipated on August 3, 2021, November 11, 2021, and March 2, 2022, as the Bright Health Defendants' false and misleading statements and omissions became apparent to the market, and the price of Bright Health common stock fell. As a result of their acquisitions of Bright Health common stock at artificially inflated prices during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss.

435. The declines in the price of Bright Health stock pled herein were a direct and proximate result of the nature, extent and impact of the Bright Health Defendants' prior false and misleading statements and omissions being revealed to investors. The timing and magnitude of the price decline of Bright Health common stock negates any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions,

macroeconomic or industry factors, or Company-specific factors unrelated to the Bright Health Defendants' wrongful conduct.

436. The economic loss suffered by Lead Plaintiff and other members of the Class was a direct and proximate result of the Bright Health Defendants' wrongful conduct, which artificially inflated the prices of Bright Health common stock and resulted in the subsequent decline in the value of Bright Health common stock when the Bright Health Defendants' prior false and misleading statements and omissions were revealed.

437. It was entirely foreseeable to the Bright Health Defendants that their materially false and misleading statements and omissions would artificially inflate and/or maintain the price of Bright Health common stock. It was also foreseeable to the Bright Health Defendants that the revelation of the truth alleged herein would cause the price of Bright Health common stock to fall as the artificial inflation caused by the Bright Health Defendants' misstatements and omissions was removed from the stock price. Thus, the stock price declines described above were directly and proximately caused by the Bright Health Defendants' materially false and misleading statements and omissions.

**G. Presumption of Reliance**

438. Lead Plaintiff alleges that throughout the Class Period, the Bright Health Defendants omitted material information of which the Bright Health Defendants were aware or reckless in not knowing. Such statements artificially inflated or artificially maintained the price of Bright Health publicly traded common stock and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired that common stock during the Class Period. Because the Bright Health Defendants chose to speak on the issues described herein, it was important that Defendants not mislead investors or withhold material information.

439. Lead Plaintiff is entitled to a presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) the Bright Health Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e) Lead Plaintiff and other members of the Class purchased Bright Health stock between the time the Bright Health Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

440. At all relevant times, the market for Bright Health stock was efficient for the following reasons, among others:

(a) Bright Health stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) According to the Company's annual report on SEC Form 10-K for the year 2021, Bright Health had 628,751,245 shares of common stock outstanding as of March 7, 2022, demonstrating a very active and broad market for Bright Health common stock at all relevant times;

(c) as a regulated issuer, Bright Health filed periodic public reports with the SEC;

(d) Bright Health regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(e) Bright Health was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(f) Unexpected material news about Bright Health was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

441. As a result of the foregoing, the market for Bright Health securities promptly digested current information regarding Bright Health from all publicly available sources and reflected such information in Bright Health's stock price. Under these circumstances, all purchasers of Bright Health common stock during the Class Period suffered similar injury through their purchase of Bright Health common stock at artificially inflated or artificially maintained prices and the presumption of reliance applies.

442. In the alternative, to the extent that the Bright Health Defendants concealed or improperly failed to disclose material facts with respect to Bright Health's business and financial prospects, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128153 (1972).

### H. Inapplicability of the Statutory Safe Harbor

443. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged herein.

444. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

445. To the extent certain of the statements alleged to be false or misleading may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

446. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, the Bright Health Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the statement was authorized or approved by an executive officer of Bright Health who knew that the statement was false when made, and/or the statement omitted material adverse information whose disclosure was necessary to render the statement not misleading.

447. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any

projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Bright Health Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

**I. Control Person Allegations**

448. The Executive Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels. The Executive Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

449. Defendant Mikan has served at all relevant times as the Chief Executive Officer ("CEO") and President of Bright Health and is a Director and Vice Chairman on the Board.

450. Defendant Catherine R. Smith ("Smith") has served at all relevant times as the Chief Financial Officer ("CFO") and Chief Administrative Officer of the Company.

451. During the Class Period, Defendants' statements were materially false and misleading when made in that Defendants failed to disclose:

(a) Prior to and during the Class Period Bright Health was experiencing a massive backlog of medical claims due to systematic operational deficiencies at the Company;

(b) as a result, Bright Health lacked the sufficient visibility into its populations to perform the risk adjustments required to accurately predict costs and MCR;

(c) parallel to these issues, Bright Health had been struggling to manage COVID-19 related impacts since the start of the pandemic;

(d) the above issues were materially exacerbated by the Company's significant growth prior to and during the Class Period, including growth through acquisitions and the ACA SEP, resulting in a heavily skewed percentage of new versus existing members;

(e) thus, prior to and during the Class Period, the Company was entirely unable to effectively manage its populations, including visibility into risks and costs, which were significantly concentrated in certain states;

(f) all the foregoing was reasonably likely to and did have a material negative impact on Bright Health's business and financial condition, including financial impacts associated with overstated risk adjustments, understated MCR, and increased COVID-19 impacts;

(g) the Bright Health Defendants knowingly and/or recklessly withheld this information from investors in the futile hope to remedy the above-issues before the adverse impacts were too large to conceal;

(h) accordingly, during the Class Period the Bright Health Defendants overstated the Company's business and financial prospects; and

(i) as a result, during the Class Period the Bright Health Defendants made materially false and/or misleading statements and failed to state information required to be stated therein.

452. The Executive Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Executive Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Executive Defendants are

responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

453. The Executive Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about Bright Health's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board meetings and committees thereof, and reports and other information provided to them in connection therewith.

454. As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time period, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Executive Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Executive Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

## IX. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT IV

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against Defendant Bright Health and the Executive Defendants**

455. Lead Plaintiff repeats and realleges each and every allegation contained above in ¶¶17-153 and ¶¶268-454 as if fully set forth herein.

456. This Count is asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiffs and the Class, against Defendant Bright Health and the Executive Defendants.

457. During the Class Period, Defendant Bright Health and the Executive Defendants disseminated or approved the materially false or misleading statements alleged herein, among others, which they knew or recklessly disregarded were misleading in that they misrepresented and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

458. Defendant Bright Health and the Executive Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and a course of conduct that operated as a fraud and deceit upon purchasers of Bright Health common stock during the Class Period. Defendant Bright Health and the Executive Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

459. During the Class Period, Defendant Bright Health and the Executive Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made materially false statements and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a reckless disregard for the truth; and employed devices and

artifices to defraud in connection with the purchase or sale of Bright Health common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the other Class members; (b) artificially inflate and maintain the market price of Bright Health common stock; and (c) caused Lead Plaintiffs and other members of the Class to purchase Bright Health common stock at artificially inflated prices and to suffer losses when the true facts became known.

460. Defendant Bright Health is liable for all materially false or misleading statements made during the Class Period, as alleged above.

461. The Executive Defendants are liable for the false or misleading statements they made and for which they were responsible, as alleged above.

462. As alleged above, the Executive Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with reckless disregard for the truth. The material misrepresentations and omissions of material facts alleged herein, which presented a danger of misleading buyers and sellers of Bright Health common stock, were either known to the Defendant or were so obvious that the Defendants should have been aware of them.

463. The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at Bright Health, establish a strong inference that the Executive Defendants acted with scienter in making the materially false or misleading statements alleged above during the Class Period.

464. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Bright Health common stock and were harmed when the truth about Bright Health negatively impacted the price of those securities. Lead Plaintiff and the

Class would not have purchased Bright Health common stock at the prices they paid, or at all, had they been aware of the truth about Bright Health.

465. As a direct and proximate result of Defendant Bright Health and the Executive Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered harm in connection with their respective purchases of the Company's common stock during the Class Period.

## COUNT V

### For Violation of Section 20(a) of the Exchange Act Against the Executive Defendants

466. Lead Plaintiff repeats and realleges each and every allegation contained above in ¶¶17-153 and ¶¶268-454 as if fully set forth herein.

467. This Count is asserted pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiff and the Class, against each of the Executive Defendants.

468. As set forth above, each of the Executive Defendants were each controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. The Executive Defendants acted as controlling persons of Bright Health within the meaning of Section 20(a) of the Exchange Act by virtue of their executive positions and their culpable participation, as alleged above, the Executive Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends were false and misleading. The Executive Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

469. In particular, the Executive Defendants had direct involvement in and responsibility over the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and had the power and ability to control public statements about Bright Health and the actions of Bright Health and its employees. Moreover, the Executive Defendants were each directly involved in providing false information and certifying and/or approving the materially false or misleading statements disseminated by Bright Health during the Class Period. As a result of the foregoing, the Executive Defendants each were controlling persons of Bright Health within the meaning of Section 20(a) of the Exchange Act.

470. As alleged above, Bright Health violated Section 10(b) of the Exchange Act by its material misrepresentations and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of Bright Health and as a result of their own aforementioned conduct, the Executive Defendants are each liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act of Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Bright Health common stock. Moreover, as alleged above, during the respective times that the Executive Defendants served as officers and/or directors of Bright Health, each of the Individual Defendants culpably participated in the material misstatements and omissions made by Bright Health, as set forth above.

471. As a direct and proximate result of the Executive Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases or acquisitions of Bright Health common stock during the Class Period.

## X. CLASS ACTION ALLEGATIONS

472. Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of: (i) all person or entities who

purchased or otherwise acquired Bright Health common stock between February June 24, 2021 through March 1, 2022, inclusive (the "Class Period"); and/or (ii) purchased or otherwise acquired Bright Health common stock pursuant and/or traceable to the Company's IPO, and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants (as defined herein); (ii) present or former executive officers and directors of any Defendant, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing entities' and individuals' legal representatives, heirs, successors or assigns; and (iv) any entity in which Defendants have or had a controlling interest, or any affiliate of any Defendant. For avoidance of doubt, "affiliates" are persons or entities that directly, or indirectly through one or more intermediaries, control, are controlled by or are under common control with one of the Defendants, and include any employee benefit plan organized for the benefit of Bright Health employees.

473. The members of the Class are so numerous that joinder of all members is impracticable. Commencing on the IPO and throughout the Class Period, Bright Health's common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Bright Health or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

474. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether the Exchange Act was violated by the Defendants;

(b) Whether the Securities Act was violated by Defendants;

(c) Whether Defendants omitted and/or misrepresented material facts;

(d) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(f) whether Defendants' conduct caused the members of the Class to sustain harm; and

(g) the extent of harm sustained by Class members and the appropriate measure of harm.

475. Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

476. Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in securities class action litigation. Lead Plaintiff has no interests that conflict with those of the Class.

477. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as a class representative, and appointing Labaton Sucharow LLP as class counsel pursuant to Rule 23(g);

B. Awarding Lead Plaintiff and the Class compensatory damages and equitable relief, including all damages and relief provided for under the Exchange Act and the Securities Act, against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by Lead Plaintiff's consulting and testifying expert witnesses; and

D. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lead Plaintiff hereby demands a trial by jury of all issues so triable.

DATED: January 24, 2022

Respectfully submitted,

*<u>/s/ Alfred L. Fatale III</u>*

**LABATON SUCHAROW LLP**
Alfred L. Fatale III
David J. Schwartz
Charles Wood
Marco A. Dueñas
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
afatale@labaton.com
dschwartz@labaton.com
cwood@labaton.com
mduenas@labaton.com

*Counsel for Lead Plaintiff and Lead Counsel for the Proposed Class*