UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| VICTORINO MARQUEZ, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BRIGHT HEALTH GROUP, INC., G. MIKE MIKAN, CATHERINE R. SMITH, JEFFREY J. SCHERMAN, ROBERT J. SHEEHY, KEDRICK D. ADKINS JR., NAOMI ALLEN, JEFFREY FOLICK, LINDA GOODEN, JEFFERY R. IMMELT, MANUEL KADRE, STEPHEN KRAUS, MOHAMAD MAKHZOUMI, ADAIR NEWHALL, J.P. MORGAN SECURITIES LLC, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL INC., BOFA SECURITIES, INC., CITIGROUP GLOBAL MARKETS INC., PIPER SANDLER & CO., NOMURA SECURITIES INTERNATIONAL, INC. AND RBC CAPITAL MARKETS, LLC,<br><br>Defendants. | Case No.: 22-cv-00101-LDH-MMH |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
*Attorneys for Bright Health Group, Inc., G. Mike Mikan, Catherine R. Smith, Jeffrey J. Scherman, Robert J. Sheehy, Kedrick D. Adkins Jr., Naomi Allen, Jeffrey Folick, Linda Gooden, Jeffery R. Immelt, Manuel Kadre, Stephen Kraus, Mohamad Makhzoumi, and Adair Newhall*

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Manhattan West
New York, New York
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
*Attorneys for J.P. Morgan Securities LLC, Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc., BofA Securities, Inc., Citigroup Global Markets Inc., Piper Sandler & Co., Nomura Securities International, Inc., and RBC Capital Markets, LLC*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND .................................................................................................... 2

    A.    BHG's IPO ................................................................................................ 2

    B.    Post-IPO Challenges Encountered by BHG ........................................... 5

APPLICABLE LEGAL STANDARDS ..................................................................................... 7

ARGUMENT ............................................................................................................................ 8

I.    Plaintiff's 1933 Act Claims Must be Dismissed Because Plaintiff Fails to Plead Any Material Misstatement or Omission .................................................................................. 8

II.    Plaintiff Fails as a Matter of Law to Plead a Viable Section 10(b) Claim....................... 16

    A.    Plaintiff Fails to Plead a Material Misrepresentation ........................... 16

        1.    Q2 2021 Earnings Call ............................................................ 17
        2.    Q3 2021 Earnings Call ............................................................ 19
        3.    Investor Day Presentation ........................................................ 19
        4.    JPMorgan Conference .............................................................. 20

    B.    Plaintiff Fails to Adequately Allege Scienter ....................................... 20

        1.    Plaintiff Fails to Plead Motive and Opportunity with Particularity .......... 21
        2.    Plaintiff Fails to Plead Circumstantial Evidence Giving Rise to a Strong Inference of Scienter ................................................................. 22

III.    Plaintiff's Control Person Claims Fail as a Matter of Law ............................................. 25

CONCLUSION ......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altayyar v. Etsy, Inc.*,
   242 F. Supp. 3d 161 (E.D.N.Y. 2017),
   *aff'd,* 731 F. App'x 35 (2d Cir. 2018) ............................................................... 13, 22

*Amgen Inc. v. Conn. Ret. Plans*,
   133 S. Ct. 1184 (2013) ...................................................................................... 16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................ 7

*Barilli v. Sky Solar Holdings*,
   389 F. Supp. 3d 232 (S.D.N.Y. 2019) ............................................................. 14

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ............................................................................................ 9

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................ 7

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*,
   No. 07 CIV. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ........................... 15

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
   506 Fed. App'x 32 (2d Cir. 2012) ....................................................................... 9

*Bond Opportunity Fund v. Unilab Corp.*,
   No. 99 CIV. 11074 (JSM), 2003 WL 21058251 (S.D.N.Y. May 9, 2003),
   *aff'd,* 87 F. App'x 772 (2d Cir. 2004) ................................................................ 18

*Campo v. Sears Holdings Corp.*,
   635 F. Supp. 2d 323 (S.D.N.Y. 2009),
   *aff'd,* 371 F. App'x 212 (2d Cir. 2010) .............................................................. 23

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*,
   412 F. Supp. 3d 206 (E.D.N.Y. 2019) ................................................................ 24

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
   129 F. Supp. 3d 48 (S.D.N.Y. 2015) ................................................................... 8

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ............................................................................................ 8

*ECA v. JPMorgan Chase*,
   553 F.3d at 198 ................................................................................................ 21

*Employees' Ret. Sys. v. Blanford*,
   794 F.3d 297 (2d Cir. 2015) ............................................................................. 21

*Geiger v. Solomon–Page Grp., Ltd.*,
   933 F. Supp. 1180 (S.D.N.Y. 1996) .................................................................. 21

*Hall v. Children's Place Retail Stores, Inc.*,
   580 F. Supp. 2d 212 (S.D.N.Y. 2008) ................................................................. 22

*Hutchison v. Deutsche Bank Sec. Inc.*,
   647 F.3d 479 (2d Cir. 2011) ................................................................................ 16

*In re Adient plc Sec. Litig.*,
   No. 18-CV-9116 (RA), 2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ............... 12, 18

*In re Alstom SA Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005) ................................................................. 24

*In re AOL Time Warner Sec. & "ERISA" Litig.*,
   381 F. Supp. 2d 192 (S.D.N.Y. 2004) ................................................................. 25

*In re AT&T/DirecTV Now Sec. Litig.*,
   No. 19-CV-2892 (VEC), 2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020) ............... 8

*In re BHP Billiton Ltd. Sec. Litig.*,
   276 F. Supp. 3d 65 (S.D.N.Y. 2017) ................................................................... 15

*In re Bristol Myers Squibb Co. Sec. Litig.*,
   586 F. Supp. 2d 148 (S.D.N.Y. 2008) ................................................................. 25

*In re Elan Corp. Secs. Litig.*,
   543 F. Supp. 2d 187 (S.D.N.Y. 2008) ................................................................. 23

*In re IBM Secs. Litig.*,
   163 F.3d 102 (2d Cir. 1998) .......................................................................... 14, 17

*In re Lehman Brothers Securities & ERISA Litigation*,
   No. 09 MD 2017 LAK, 2013 WL 3989066 (S.D.N.Y. July 31, 2013) .................. 23

*In re WEBMD Health Corp. Sec. Litig.*,
   No. 11 Civ. 5382(JFK), 2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) ...................... 18

*In re Weight Watchers Int'l, Inc. Sec. Litig.*,
   No. 14-cv-1997 (LAK), 2016 WL 2757760 (S.D.N.Y. May 11, 2016) ................. 12

*In re Yunji Inc., Sec. Litig.*,
   No. 19CV6403LDHSMG, 2021 WL 1439715 (E.D.N.Y. Mar. 31, 2021) ............. 14

*Janbay v. Canadian Solar, Inc.*,
   No. 10 CIV. 4430, 2013 WL 1287326 (S.D.N.Y. Mar. 28, 2013) ....................... 23

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ................................................................................ 22

*Kurtzman v. Compaq Computer Corp.*,
   No. Civ. A. H–99–779, 2002 WL 32442832 (S.D. Tex. Mar. 30, 2002) ............... 24

*Lapin v. Goldman Sachs Group, Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006) ................................................................. 21

*Lighthouse Fin. Grp. v. RBS*,
   902 F. Supp. 2d 329 (S.D.N.Y. 2012),
   *aff'd sub nom. IBEW Loc. Union No. 58 Pension Tr. Fund v. RBS*,
   783 F.3d 383 (2d Cir. 2015) .................................................................................. 8

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010),
  *aff'd*, 430 F. App'x 63 (2d Cir. 2011) .................................................................... 24

*Lopez v. Ctpartners Exec. Search Inc.*,
  173 F. Supp. 3d 12 (S.D.N.Y. 2016) ...................................................................... 15

*N.J. Carpenters Health Fund v. RBS*,
  709 F.3d 109 (2d Cir. 2013) ...................................................................................... 9

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .................................................................................... 23

*Pearlstein v. BlackBerry Ltd.*,
  93 F. Supp. 3d 233 (S.D.N.Y. 2015) ...................................................................... 24

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ............................................................................... 8, 17

*Scott v. GM Co.*,
  46 F. Supp. 3d 387 (S.D.N.Y. 2014) ...................................................................... 16

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994) .................................................................................... 18

*South Cherry St., LLC v. Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009) ...................................................................................... 21

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) .................................................................................... 20, 21, 22

*Villare v. Abiomed, Inc.*,
  No. 19 Civ. 7319 (ER), 2021 WL 4311749 (S.D.N.Y. Sep. 21, 2021) .................. 13

*Yoav Gutman v. Lizhi Inc.*,
  No. 21-CV-317 (LDH) (PK), 2022 WL 4646471 (E.D.N.Y. Oct. 1, 2022) ........... 25

**Rules**

Fed. R. Civ. P. 9(b) .......................................................................................................... 8

Fed. R. Civ. P. 12(b)(6) .................................................................................................... 7

## PRELIMINARY STATEMENT

The Complaint spans nearly 200 pages, but volume and repetition are no substitute for properly pled claims.[1]  Plaintiff's Complaint pleads nothing more than classic "fraud by hindsight," which is inactionable as a matter of law.

Plaintiff fails to plead adequately that there was anything false or misleading in BHG's Offering Documents.  He acknowledges, as he must, that the Offering Documents explicitly warned of the risks that eventuated.  Offering only conclusory conjecture, Plaintiff asserts that these detailed risk warnings did not suffice because the risks disclosed were not just risks, but known and existing conditions prior to the IPO.  The Complaint, however, is devoid of any facts to support Plaintiff's assertion.  For example, Plaintiff posits that BHG knew the extent to which COVID-19 would continue to impact the Company, but he alleges no facts supporting that conclusion—nor could he, given the pandemic's now well-known unpredictability.  And he criticizes BHG for supposedly failing to disclose the exacerbating effect of the Company's rapid growth in enrollment and expansion.  But that, too, was unforeseeable:  much of that growth was the product of an unprecedented six-month special enrollment period instituted by the government in response to the pandemic.  An unbroken line of cases establishes that the federal securities laws do not hold companies to the standard of clairvoyance that Plaintiff seeks to impose on Defendants. To be sure, BHG faced challenges following the IPO, but the inability to predict the future does not constitute a securities law violation, particularly where the risks that eventuated were disclosed in painstaking detail in the Offering Documents.

Dismissal is required for the additional reason that Plaintiff fails to plead facts giving rise to a "strong inference" of fraudulent intent necessary to state securities fraud claims.  He pleads

---

[1]     All capitalized terms are as defined in the Appendix attached hereto.

no motives beyond the universal motive to be and appear profitable.  Nor does he plead any other particularized facts suggesting, much less showing, fraudulent intent.  His heavy reliance on confidential witnesses is unavailing because all were low-level employees with no contact with, or insight into the thinking of, the Individual Defendants or anyone else in management.

Plaintiff's control person claims should also be dismissed for failure to plead either a primary violation or culpable participation in any fraud.

In sum, the Complaint fails as a matter of law and should be dismissed with prejudice.

## FACTUAL BACKGROUND[2]

### A.    BHG's IPO

BHG is a healthcare insurance company that was founded in 2015, and expanded rapidly into its IPO on June 24, 2021.  BHG's IPO Offering Documents warned of the risks it faced from such growth:

> Since our inception, we have experienced rapid growth, with total revenue having grown from $130.6 million in 2018 to $1.2 billion in 2020.  Our significant growth to date, attributable to both rapid organic membership growth and acquisitions of other businesses, has placed and we expect will continue to place significant demands on our management team and our operational and financial resources….
>
> ***
>
> ***Continued rapid growth in our business may exacerbate certain of the risks described elsewhere in this section, including our ability to accurately estimate costs, price our products, and charge appropriate premiums, as well as our ability to accurately assess, code and report IFP, MA and Small Group risk adjustment factor ("RAF") scores for our consumer….***

Compl. ¶ 171 (quoting Ex. 1 at 24).[3]

---

[2]    This motion assumes as true the facts pled in the Complaint.  On a motion to dismiss, a court may also consider "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund*, 493 F.3d 87, 98 (2d Cir. 2007); *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

[3]    All emphasis in all quotations was added by Plaintiff in the Complaint, unless otherwise noted.

BHG also highlighted risks inherent in its risk adjustment programs in particular:

*Our health plan products are subject to risk adjustment programs, which if not managed properly can result in lost revenue, which could adversely impact our financial results and cash flows.*

\*\*\*

*If the data on our consumer population overstates the health risk of our consumer population, we may be obligated to return funds we have received to government payors . . .   As a result of the variability of certain factors that go into the development of the risk adjustment we recognize, such as risk scores and other market-level factors where applicable, the actual amount of revenue could be materially more or less than our estimates.  Consequently, our estimate of our health plans' risk scores for any period, and any resulting change in our accrual of revenue related thereto, could have a material adverse effect on our results of operations, financial condition, and cash flows.*

*Id*. ¶ 175 (quoting Ex. 1 at 39).  And BHG specifically explained that issues with performing risk

adjustments could be caused and exacerbated by BHG's recent rapid growth:

In addition, *the historical data on which our assumptions are based may not necessarily be indicative of the actual costs of claims due to our rapid growth in consumer enrollment and our recent expansion into new businesses and markets.*  When we commence operations in a new state, region, or other market, or introduce a new product line, we have limited information from which to estimate our potential medical claims liability.  For a period of time after our entry into a new market, our inception of a new business, or our acquisition of an existing business, we base our estimates on government-provided and third-party historical actuarial data and limited actual incurred and received claims and inpatient acuity information.  *The addition of new categories of eligible individual, as well as new plan design we may offer, may make it difficult for us to estimate our medical claims liability and may result in the actual cost of claims being higher than we anticipate*.

*Id*. ¶ 169 (first emphasis added); Ex. 1 at 23.

BHG also expressly warned of risks from the COVID-19 pandemic, including that:

*The COVID-19 pandemic has adversely affected, and may continue to adversely affect, our business and results of operations.*

\*\*\*

*As a result of the COVID-19 pandemic and the associated protective and preventative measures, we have experienced and may continue to experience disruptions to our business.*  Risks presented by the ongoing effects of COVID-19 include, but may not be limited to, the following:

\*\*\*

3

- *Documentation of Health Conditions.* **Due to the COVID-19 pandemic, we may not be able to adequately document the health conditions of our consumers and patients, as many of them have avoided in-person medical visits . . . . Inaccurate or inadequate documentation could result in an inaccurate RAF score, which could adversely impact our [] revenue for future periods . . . .**

***

> **To the extent the COVID-19 pandemic continues to adversely affect our business and financial results, it may also have the effect of heightening many of the other risks described in this section of the prospectus titled "Risk Factors."**

*Id.* ¶ 173 (quoting Ex. 1 at 25-27). As illustrated above, the Offering Documents specifically explained the relevance of the RAF, the difficulties in conducting RAF assessments for new members as BHG rapidly grows, and the added difficulties of adequately documenting the health conditions of customers in the midst of the COVID-19 pandemic.

Finally, BHG disclosed that it relied on third-party vendors for claims processing and other operations, and disclosed the risk that such vendors might be unable to effectively support BHG's business needs, particularly in light of BHG's rapid growth:

> [I]n order to effectively operate our business, **we rely heavily on third-party vendors. Our rapid growth could outpace the capacity of our third-party service providers to effectively support our business needs.** Certain of our third-party service providers have in the past been unable to effectively scale their operations to meet our increased demands resulting from our rapid expansion. In the event that our existing third-party service providers are unable to meet our needs as our business grows, we may need to find alternative service providers. If we are unable to do so in a timely manner or if we are unable to contract with new service providers on terms that are acceptable to us or at all, **our ability to operate our business may be disrupted, which may adversely affect our business, financial condition, results of operations, and cash flow.**

Ex. 1 at 24 (emphasis added).[4]

---

[4]    *See also id.* at 32 ("Our claims management vendors adjudicate and pay claims and generally manage the billing of medical services provided to our customers and to members of Neu-eHealth's third-party payors and other clients. . . . Any disruption or loss of these suppliers could cause considerable strain on our business, result in delays in billings and collections, and negatively impact the experience of our consumers, our network providers, and our third-party payors and other clients.").

**B.      Post-IPO Challenges Encountered by BHG**

Following the IPO, BHG experienced a combination of challenges that it had warned in its Offering Documents could occur.  In Q3 2021, COVID cases surged with the emergence of the Delta variant.  BHG's CEO explained that in Q3 2021, "the Southeast, where we have the largest membership concentration, was hardest hit by the COVID-19 Delta variant," with CDC data "indicat[ing] COVID-related hospitalizations in the region more than tripled compared to the second quarter."  Compl. ¶ 196 (quoting Ex. 2 at 3).  This, he explained, "had a meaningful impact on our medical utilization in the quarter."  *Id.*  And this Q3 2021 COVID spike coincided with a significant influx of new members, spurred by the government-mandated extension of the ACA special enrollment period.  *Id.*  While ACA special enrollment periods are not unusual, this particular special enrollment period was unprecedented because of its extended length and because it not only allowed customers to enroll for the first time, it also allowed customers to *switch* plans.[5]

Together, these developments hampered BHG's ability to accurately estimate the cost to service its customers, as customers put off in-person, non-life threatening medical care and treatment, depriving BHG of critical touchpoints with which to collect health data.  As BHG's CEO explained on the Q3 2021 earnings call:

> ***Due to these factors, we were challenged to engage with members during this period as we typically would consistently throughout the year, which is critical to performance.  This hampered our ability to accurately capture the risk of our members and therefore, our estimated 2021 risk score is lower than we had***

---

[5]      *See, e.g.*, Ex. 9, U.S. Dep't of Health & Human Servs., *2021 Special Enrollment Period Access Extended to August 15 on HealthCare.gov for Marketplace Coverage* (Mar. 23, 2021), https://www.hhs.gov/about/news/2021/03/23/2021-special-enrollment-period-access-extended-to-august-15-on-healthcare-gov-for-marketplace-coverage.html.  *See also* Ex. 10, Centers for Medicare & Medicaid Services, *2021 Special Enrollment Period In Response To The COVID-19 Emergency* (Jan. 28, 2021), https://www.cms.gov/newsroom/fact-sheets/2021-special-enrollment-period-response-covid-19-emergency ("Current enrollees will be able to change to any available plan in their area without restriction to the same level of coverage as their current plan. . . . . ***In addition, consumers won't need to provide any documentation of a qualifying event (e.g., loss of a job or birth of a child), which is typically required for SEP eligibility.***") (emphasis added).

> *originally anticipated.  This resulted in an increase in our risk adjustment payable and a corresponding decrease in our reported premium revenue.*

Compl. ¶ 321 (quoting Ex. 2 at 3).[6]

At its Investor Day presentation a month later, on December 7, 2021, BHG again discussed the challenges that it had faced (and was facing) in the second half of 2021 and explained that the MCR and risk adjustment issues stemmed from disruptions in the ability to engage with members due to the high number of new members, coupled with high COVID-related medical utilization. Compl. ¶¶ 345, 352.[7]  BHG's CEO again explained the confluence of these factors in a presentation at the January 11, 2022 JPMorgan Healthcare Conference.  *See* Ex. 3 at 11.

On March 2, 2022, BHG reported full-year 2021 results that included substantial increases in various revenue metrics year-over-year, but also "a loss of $351.2 million and our adjusted EBITDA was a loss of $790.1 million, with both items impacted by our increased risk adjustment and IBNR estimates, continued COVID costs, and a non-cash $103 million 2022 premium deficiency reserve."  Ex. 4 at 6.  BHG's CEO explained that:

> *The meaningful growth we delivered in 2021, which was a combination of higher anticipated growth to start the year and additional growth from the special enrollment period, outpaced our operational, and system capabilities.*

---

[6]    *See also id.* ¶ 330 (quoting Ex. 2 at 9) ("The big challenge for us this year in terms of medical cost ratio has been the confluence of factors that I talked about impacting risk adjustment, and it's all about consumer engagement and having consumer engagement throughout the year. When you take the strong starting growth that we had on 1/1, when you couple it with in-year growth, which is a unique factor this year in the ACA marketplace with the extended special enrollment period, during a time period when the Delta COVID impact disproportionately hit Florida, so we basically had the care resources constraints, focused on COVID, that limited our ability to engage with our consumers and accurately code and understand the health status of the population. So that's been the biggest variation that we've had.").  This was consistent with disclosures in the Offering documents about the risks of the COVID pandemic for patient engagement and risk adjustment. *See supra* Section A.

[7]    BHG's CEO explained: "And then just as we started to really understand the population we were serving, SEP started to kick in.  We got a churn in the membership, added a bunch of lives, while COVID hit the Southeast literally about the same time period.  And so our ability to not only attribute and get them engaged with their physicians, we just couldn't—we couldn't—we didn't understand the population fast enough."  Compl. ¶ 352 (emphasis omitted).

6

In addition, unique factors in 2021 that we have previously highlighted, including a once in a century pandemic our *large group of new members without risk scores, combined with scaling up organizational capabilities, and emerging technologies, impacted our results into fourth quarter more significantly than anticipated.*

As [BHG's CFO] will discuss in more these factors *impacted our ability to engage with our members in order to accurately capture their underlying health conditions and impacted prior period medical costs we caught up on claims processing….*

Compl. ¶ 368 (quoting Ex. 4 at 5).  BHG's CFO added that:

The significant deterioration in our results since our guidance was due to specific identifiable issues, including COVID costs, *catching up on claims payments, and resolving resubmitted claims*.  This was compounded by our *lack of visibility into lagging medical claims on our legacy operational systems, which require manual processing*.

*Id*. ¶ 370 (quoting Ex. 4 at 6).  BHG reported that these issues "came to fruition through January [2022], as we closed out our books"; its legacy system was managed by an "outside vendor"; and BHG was in the process of transferring to a new claims processing platform. Ex. 4 at 11.

## APPLICABLE LEGAL STANDARDS

Although a court must accept a complaint's well-pleaded factual allegations as true upon a Rule 12(b)(6) motion, it need not accept unsupported factual assertions, bare legal conclusions, unwarranted inferences, or allegations contradicted by documents subject to judicial notice. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).  A complaint must contain "allegations plausibly suggesting (not merely consistent with)" an "entitle[ment] to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Iqbal*, 556 U.S. at 678–80.

8

Plaintiff's claims are also subject to the heightened pleading requirements of Rule 9(b), as well as the PSLRA's exacting pleading requirements.[8]  Rule 9(b) applies to both of the 1934 Act claims, which directly allege fraud.  A Section 11 or Section 12 claim that sounds in fraud must equally satisfy the heightened pleading requirements of Rule 9(b).  *See Rombach v. Chang*, 355 F.3d 164, 167 (2d Cir. 2004).  Here, Plaintiff notably relies on the same exact allegations for both this Securities Act claims and Exchange Act claims—the latter of which he explicitly admits "are based in fraud."  Compl. ¶ 17; *compare* Compl. ¶¶ 169-191 (1933 Act allegations), *with id*. ¶¶ 268-290 (same allegations in 1934 Act claims).  Plaintiff cannot disclaim his way out of compliance with Rule 9(b), as "a '33 Act claim that is predicated on fraud is subject to the particularity requirement of Rule 9(b), despite any disclaimer a plaintiff makes to the contrary."  *Lighthouse Fin. Grp. v. RBS*, 902 F. Supp. 2d 329, 338 (S.D.N.Y. 2012), *aff'd sub nom. IBEW Loc. Union No. 58 Pension Tr. Fund v. RBS*, 783 F.3d 383 (2d Cir. 2015).  Thus, Rule 9(b) applies to all claims.

## ARGUMENT

### I.   Plaintiff's 1933 Act Claims Must be Dismissed Because Plaintiff Fails to Plead Any Material Misstatement or Omission

To state a claim under Section 11, Plaintiff must plead "materially misleading statements or omissions in registration statements filed with the SEC."  *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 88 (S.D.N.Y. 2015). Similarly, a Section 12(a)(2) claim requires pleading that "securities were sold using a prospectus that contained a material misstatement or omission."  *In re AT&T/DirecTV Now Sec. Litig.*, No. 19-CV-2892 (VEC), 2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020).  Information is material if there is a "substantial likelihood

---

[8]    The PSLRA requires, in particular, that "[s]ecurities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)).

that a complete and truthful disclosure would have been viewed by [a] reasonable investor as having significantly altered the total mix of information made available." *N.J. Carpenters Health Fund v. RBS*, 709 F.3d 109, 126 (2d Cir. 2013) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

Plaintiff advances essentially the same (conclusory) alleged factual predicate to support *every single one* of the alleged misstatements under Sections 11, 12(a), and 10(b). *See, e.g.*, Compl. ¶¶ 177, 192, 276, 291, 311, 331, 354, 363. Plaintiff alleges that BHG's Offering Documents were false and misleading because they failed to disclose that, *at the time of the IPO*: (1) BHG's "medical provider directories were not accurate or up to date in both its new and existing markets" which caused claims to be either "improperly denied" or otherwise "backlogged[] in being processed and paid," *id*. ¶ 177(a)-(b); (2) BHG did not have "enough staff and resources to handle the claims in a timely manner," *id*. ¶ 177(c); (3) due to this purported backlog of claims, BHG "owed millions of dollars to healthcare providers for overdue claims," *id*. ¶ 177(d); (4) due to these alleged claims-processing and directory issues, BHG "was unable accurately perform risk adjustments" and therefore "understated its costs and the health risk of its members, which in turn, caused [BHG] to similarly overstate its MCR," *id*. ¶ 177(e)-(g); and (5) both the (unprecedented) pandemic and BHG's pre-IPO growth exacerbated the above alleged issues, *id*. ¶ 177(h)-(i); *see also Boca Raton Firefighters & Police Pension Fund v. Bahash,* 506 Fed. App'x 32, 37-38 (2d Cir. 2012) (affirming dismissal of a "280-page complaint consist[ing] in large part of large block quotations with italicized text, followed by a passage that reads 'the

statements referenced . . . were each materially false and misleading when made for the reasons set forth in ¶ 256 and the factual detail contained throughout this Complaint.'")

Plaintiff cannot dispute that BHG's Offering Documents included extensive, detailed risk factor disclosures regarding these risks.  They expressly warned investors of the risk of BHG not being able to (i) set appropriate premiums; (ii) manage costs; (iii) manage growth; (iv) evaluate the business and predict future prospects due to limited operating history; (v) manage the ongoing risks posed by the pandemic; (vi) maintain the accuracy, integrity or availability of BHG's data; (vii) hire, retain, motivate or develop personnel; (viii) carry out risk adjustment programs; and (ix) ensure the adequate performance of third-party vendors.[9]  *See id.* ¶¶ 169–177; *see also* Ex. 1 at 20-39.  Plaintiff nevertheless claims these warnings were insufficient because they described *potential* risks, whereas, according to Plaintiff, these risks had already materialized or BHG knew they would predictably materialize.  However, Plaintiff fails to meet his burden to plead any plausible, let alone the required particularized, facts to support his incorrect and conclusory predicate that these risks had already materialized and were known at the time of the IPO.

*First*, Plaintiff provides no plausible facts—much less with the heightened degree of particularity—to support his contentions that, *at the time of the Offering Documents*, BHG's medical provider directories were not accurate; BHG lacked sufficient staff and resources to handle processing of claims; BHG "owed millions of dollars" as a result of unprocessed claims; or that, due to these alleged claims-processing and directory issues, BHG "was unable [to] accurately perform risk adjustments."  As a threshold issue, BHG disclosed in the Offering Documents that

---

[9]      The risk disclosures do not specifically reference "medical provider directories," but the risks allegedly associated with such directories (*e.g.* potential claims backlogs and data issues) were disclosed.  Moreover, as explained below, Plaintiff points to no alleged "corrective disclosure" identifying problems with BHG's medical provider directories.

risks related to each of these matters could materialize.  *See* Ex. 1 at 20-39.  While certain (but not all) of these risks may have come to pass following the IPO, Plaintiff does not plausibly plead facts suggesting that such risks *were already occurring* at the time of the IPO.

Instead, Plaintiff's argument rests on distortions of what BHG and management actually stated.  For example, Plaintiff places heavy reliance on BHG's CFO's statement in the Q4 2021 Earnings Call that "[t]he significant deterioration in [BHG's] results since [its] guidance was due to specific identifiable issues," Compl. ¶¶ 15, 34, 207, 370, 398, repeatedly insinuating that "identifiable" meant "previously known."  But the full context of the statement makes clear that "identifiable" simply meant "currently discernible"—not "previously known."  The other supporting allegations relied on by Plaintiff are merely disclosures of facts understood by BHG *at that point in time*.  *See, e.g.*, ¶¶ 196-206.  For example, Plaintiff alleges that BHG "attributed [its] disappointing results to operational challenges, including a significant influx of new members" that allegedly existed at the time of the IPO.  *Id.* ¶ 196.  But in the Offering Documents, BHG exhaustively warned of the risks it faced from its *current and continuing rapid growth*, including that it would be hampered in its "ability to accurately estimate costs, price [its] products, and charge appropriate premiums."  *See* Ex. 1 at 24-25. That the rapid growth was known and disclosed prior to the IPO does not mean that BHG knew how the newly added members *would perform in the future*—the ultimate complaint advanced by Plaintiff.   In short, BHG warned of this risk and then promptly disclosed when that risk materialized after the IPO.  Plaintiff fails to plead plausible facts suggesting otherwise.  The occurrence of later negative events—*that Plaintiff admits BHG warned could potentially occur*—does not retroactively give rise to a claim for securities fraud.

Moreover, the alleged "corrective disclosures" on which Plaintiff relies make clear that risk adjustment and claims processing challenges were precipitated by events that arose *after the*

11

*IPO*, such as the Delta COVID wave and an end-of-year claims processing backlog. *See* Ex. 2 at 3-4, 9-10, 16; Ex. 4 at 5-6, 9. Plaintiff does not and cannot plead any plausible facts suggesting that a claims processing backlog *that would arise at the end of Q4 2021* was somehow known to BHG *at the time of the IPO*. Plaintiff likewise does not and cannot allege that BHG knew that claims that were denied prior to the IPO (for any reason) would be resubmitted (and accepted) months in the future, thereby causing a year-end claims processing backlog. Nor does Plaintiff plausibly allege that, prior to the IPO, BHG was aware that its vendors' manual processing system *would* negatively impact BHG's ability to timely process claims at the end of the year. Of course, BHG was aware at the time of the IPO that risk adjustment and claims processing difficulties *could* arise in the future, which is why BHG made robust disclosures of those and other risks. Ex. 1 at 39.

*Second*, the factual predicate underlying Plaintiff's theory rests on the dubious accounts of anonymous, former employees purportedly acting as CWs. Compl. ¶¶ 114–53. These CWs, however, were uniformly low level and short tenured, offering only limited, anecdotal views of the state of the business. Not one had the high-level insights necessary to speak to the supposed systemic company-wide issues upon which Plaintiff's claims rest:

- Plaintiff relies principally on FE-1. But FE-1 was responsible for just one product area (the insurance product segment) in just one state (Arizona). Compl. ¶ 114. The insurance product segment was only one of BHG's segments, and Arizona was only one (relatively small) state within its 14 states of operation at the time of the IPO. Ex. 5 at 1, 6. Because FE-1 simply was not in a position from which to opine on the overall condition of BHG's overall business, his statements carry no weight. *In re Weight Watchers Int'l, Inc. Sec. Litig.*, No. 14-cv-1997 (LAK), 2016 WL 2757760, at *6 (S.D.N.Y. May 11, 2016). Moreover, there is a mismatch between the statements attributed to FE-1 and Plaintiff's claim. While FE-1 purportedly claims that "the primary operational problem was that BHG's medical provider directories were not accurate or up to date" (Compl. ¶ 116), none of the alleged "corrective disclosures" upon which Plaintiff relies revealed problems related to medical provider directories.

- FE-2 worked for BHG for only six months, with duties limited to overseeing nurses and social workers. Compl. ¶¶ 141-42. Anecdotal experience of low-level employees

lends no support for claims of systemic problems. *See In re Adient plc Sec. Litig.*, No. 18-CV-9116 (RA), 2020 WL 1644018, at *15 (S.D.N.Y. Apr. 2, 2020).

- FE-3 was a low-level employee who worked for BHG for even less time—only five months. Compl. ¶ 148. There is no indication that FE-3's knowledge went beyond his anecdotal experience.

*Third*, Plaintiff's assertions of supposed failure to disclose COVID-related and pre-IPO growth issues, Compl. ¶ 177(h)-(i), are belied by BHG's several disclosures on just that. In just one passage quoted (but selectively bolded) in the Complaint, the Prospectus explained no less than *five times* that the pandemic "has adversely affected" its "business and results of operations," that it "ha[s] experienced and may continue to experience disruptions to [its] business," and that, "[t]o the extent the COVID-19 pandemic continues to adversely affect [its] business and financial results," it may also amplify other risks. Compl. ¶ 173. BHG repeatedly disclosed that the pandemic had and was continuing to have a negative impact on its business, and it "cannot be held liable for failing to disclose something that [it] disclosed." *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 180 (E.D.N.Y. 2017), *aff'd,* 731 F. App'x 35 (2d Cir. 2018). The same is true of BHG's pre-IPO growth.[10]

*Fourth*, many of the specific statements in the Offering Documents that Plaintiff challenges are general statements of corporate optimism that no reasonable investor would rely on in deciding whether to purchase or sell securities. *See Villare v. Abiomed, Inc.*, No. 19 Civ. 7319 (ER), 2021 WL 4311749, at *40 (S.D.N.Y. Sep. 21, 2021) ("A statement of 'puffery'—that is, 'an optimistic

---

[10]     Plaintiff asserts other "omissions" for which there are clear disclosures in the Offering Documents. For example, Plaintiff lifts language from the Offering Documents that he says "inaccurately described as *potential*, certain risks associated with Bright Health's rapid growth" that, in actuality, "had already manifested." Compl. ¶ 171 (bolding omitted). Although Plaintiff tellingly does not bold the language, BHG in fact disclosed that: "Our significant growth to date . . . *has placed* and we expect *will continue to place* significant demands on our management team and our operational and financial resources." Ex. 5 at 24 (emphasis added). Its "rapid growth could outpace the capacity of our third-party service providers to effectively support our business needs," it added, as had been the case "in the past." *Id.* Again, it is elementary that Bright Health "cannot be held liable for failing to disclose something that [it] disclosed." *Altayyar*, 242 F. Supp. 3d at 180.

statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it'—'is not actionable.'" (citation omitted)).   "This includes statements, such as a company's 'generalizations regarding [its] business practices,' that are 'too general to cause a reasonable investor to rely upon them.'"   *In re Yunji Inc., Sec. Litig.*, No. 19CV6403LDHSMG, 2021 WL 1439715, at *8 (E.D.N.Y. Mar. 31, 2021) (quotation omitted).   For example, Plaintiff alleges BHG touted:

- its "demonstrated . . . ability to successfully manage medical spend," Compl. ¶ 288;

- its "proven track record of successfully identifying, executing, and integrating acquisitions," Compl. ¶ 290;

- its "value-based payment structures that enable [it] to take a staged approach to financial alignment with [its] Care Partners," Compl. ¶ 184; and

- its "aligned and consumer-focused model" that "enables [it] to transform the way technology can effect meaningful change in healthcare," Compl. ¶ 186.

These are all quintessential inactionable puffery.  *See, e.g.*, *Barilli v. Sky Solar Holdings,* 389 F. Supp. 3d 232, 252-53 (S.D.N.Y. 2019) (statements about "'proven track record . . . operating under local conditions' and its ability to develop local relationships" were inactionable puffery).

*Fifth*, to the extent Plaintiff challenges statements about BHG's future financial or business prospects, such statements are not actionable because forward-looking statements are protected from liability under the common law "bespeaks caution" doctrine.  *See, e.g.*, *In re IBM Secs. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998).  Statements regarding "uncertain future event[s]" are "expressions of optimism or projections about the future," and are thus inactionable statements of opinion.  *Id.*  This is true of Plaintiff's claims based on statements that BHG "[sought] to aggregate consumers and design and offer affordable benefits to help effectively manage risk," Compl. ¶ 183, and that BHG would "capture a holistic view of the consumer and empower the individual and their care teams to drive better coordination and optimize clinical outcomes."  *Id.* ¶ 186.

14

In short, Plaintiff's entire theory is premised on the notion that the Offering Documents disclosed as potential *risks* things that had purportedly *already materialized*. But the sole factual basis for Plaintiff's theory is the anonymous accounts of former low-level employees coupled with some post-IPO disclosures taken out of context. These do not suffice to conjure material misstatements or omissions in the Offering Documents. Rather, Plaintiff pleads nothing more than fraud by hindsight, as expressly is forbidden. Accordingly, the Court should dismiss the Section 11 and Section 12(a)(2) claims in their entirety.

Finally, Plaintiff's 1933 Act claims likewise fail to the extent they rely on Items 303 and 105 of Regulation S-K.[11] With respect to Item 303, Plaintiff has not sufficiently alleged facts demonstrating that Defendants knew of any alleged trends affecting BHG's business. Such knowledge "is an essential allegation for purposes of a claim based on Item 303." *Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, No. 07 CIV. 10528, 2010 WL 148617, at \*9 (S.D.N.Y. Jan. 14, 2010). The Complaint does not contain factual allegations that suggest there was a "substantial probability" at the time of the IPO that BHG's alleged operational issues would materially affect BHG's performance. *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 88 (S.D.N.Y. 2017). Instead, the Complaint impermissibly relies on BHG's post-IPO financial performance and disclosures to argue that material information was allegedly omitted from the Registration Statement. This is plainly insufficient. *See Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 34 (S.D.N.Y. 2016) (dismissing claims that Item 303 required the defendants to disclose a

---

[11] Item 303 requires that an issuer "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material . . . impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Item 105 requires the issuer to provide "under the caption 'Risk Factors' a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105. Item 105 replaced former Item 503(c) in April 2019. The same analysis applies to claims under Item 105 as for Item 503(c).

potential future scenario because "[e]xcept with the benefit of hindsight, that scenario was speculative and conjectural"); *Scott v. GM Co.*, 46 F. Supp. 3d 387, 394 (S.D.N.Y. 2014) ("A plaintiff may not . . . state viable Section 11 claims by relying solely on hindsight to prove a misstatement.").

With respect to Item 105, the Offering Documents contained a thorough discussion of "Risk Factors" detailing the material factors that made BHG's offering speculative or risky. Ex. 1 at 20-57. Plaintiff's Item 105 allegations are entirely duplicative of his claim under Item 303, and therefore fail for the same reasons. *See Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 n.4 (2d Cir. 2011) (affirming dismissal where "[p]laintiffs advance no arguments unique to Item [105], focusing instead primarily on Defendants' disclosure obligations under Item 303").

## II.   Plaintiff Fails as a Matter of Law to Plead a Viable Section 10(b) Claim

Plaintiff's Section 10(b) claim fails as a matter of law because he cannot plead either a material misrepresentation or scienter.[12]

### A.   Plaintiff Fails to Plead a Material Misrepresentation

For the reasons set forth above, Plaintiff has failed to plead any material misstatement or omission in the Offering Documents. *See* Section I, *supra*. Plaintiff fares no better with his pleadings regarding BHG's post-IPO public statements.

---

[12]   To state a claim under Section 10(b), a plaintiff must allege facts sufficient to show "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen Inc. v. Conn. Ret. Plans*, 133 S. Ct. 1184, 1191–92 (2013).

1.      **Q2 2021 Earnings Call**

Many of the statements challenged by Plaintiff are inactionable puffery.[13]  As explained above in Section I, *supra*, "expressions of puffery and corporate optimism do not give rise to securities violations."  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

Plaintiff's challenges to statements about BHG's financial prospects are inactionable because forward-looking statements are protected from liability under both the PSLRA safe harbor and the "bespeaks caution" doctrine.  *See* Section I, *supra*; *see, e.g.*, *In re IBM Secs. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998).  This is true of Plaintiff's claims based on statements that BHG was "well on its way to building the national integrated system of care needed to change healthcare in the United States" and expecting "continued future growth,"  Compl. ¶¶ 297-98, and that BHG "expect[ed] the impact of MCR adjustments to decline in the future as [its] contribution from existing membership increases as a percentage of our overall book of business,"  *id.* ¶ 306.

As for Plaintiff's challenges to BHG's statements about its "population [being] consistent with [its] target and pricing expectations"; "expect[ing] the impact of MCR adjustments to decline in the future"; seeing "momentum . . . across the business"; and "[m]anaging medical costs as efficiently and effectively as possible," *id.* ¶¶ 300-06, Plaintiff alleges no particularized facts suggesting that any of these statements were false in any way when they were made.  For example, with respect to BHG's statements that it viewed its population in line with internal expectations, or that it expected the future impact of MCR adjustments to decline, the fact that BHG's

---

[13]      These include, for example, Plaintiff's allegations of falsity based on statements in the Q2 2021 Earnings Call. *See* Compl. ¶ 295 (purportedly "touting" BHG's financial strength, "remarkable performance" and ability "to leverage operating costs and the business scales"); *id.* ¶ 300 (describing BHG's "ability to price to the underlying capabilities and cost structure in each market and manage membership within our integrated systems of care"); *id.* ¶ 301 (stating BHG had "developed the infrastructure for future Medicare Advantage growth through key investments to develop capabilities internally and acquire strategic accelerators"); *id.* ¶ 303 (stating that BHG was "positioned to continue driving measured growth with a value proposition that resonates with both consumers and care partners").

expectations ultimately did not come to fruition does not make its statements about its ability to achieve future targets untrue *when originally made*.  *See In re WEBMD Health Corp. Sec. Litig.*, No. 11 Civ. 5382(JFK), 2013 WL 64511, at *5 (S.D.N.Y. Jan. 2, 2013) (holding that, "even if [the company] underestimated the effect on their year-long predictions and guidance, the Second Circuit does not permit pleading 'fraud by hindsight.'"); *see also Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir. 1994) ("[M]isguided optimism is not a cause of action, and does not support an inference of fraud.").  Plaintiff does not plead with particularity "how or why" BHG's statements concerning its internal expectations or future guidance on MCR adjustments were false or misleading at the time they were made.  *See In re Adient plc Sec. Litig.*, No. 18-CV-9116 (RA), 2020 WL 1644018, at *13 (S.D.N.Y. Apr. 2, 2020) (holding that allegations about "certain operational issues," without showing "how or why" defendants' statements about their plan to improve "were false or misleading at the time the statements were made," fail to state a claim).

With regard to BHG's statement about seeing "momentum . . . across the business," Plaintiff ignores BHG's supporting disclosures immediately following this statement, including that BHG's "revenue [increased] 275% year-over-year to $1.1 billion in Q2" and that BHG experienced "growth in [its] gross margin [] with year-over-year growth of 229%, resulting in total gross margin of $209 million."  Ex. 6 at 7.  Finally, BHG's statement that "[m]anaging medical costs as efficiently and effectively as possible for the members [it] serve[s] is critical" is an inactionable statement of opinion.  Plaintiff alleges no facts suggesting that this was a factual misstatement, let alone a material one.  *See Bond Opportunity Fund v. Unilab Corp.*, No. 99 CIV. 11074 (JSM), 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003), *aff'd,* 87 F. App'x 772 (2d Cir. 2004) ("Plaintiffs who charge that a statement of opinion . . . is materially misleading, must allege

'with particularity' 'provable facts' to demonstrate that the statement of opinion is both objectively and subjectively false.").  In sum, Plaintiff fails to plead with the required particularity that any of the challenged statements made on the Q2 2021 earnings call were materially false and misleading when made.

### 2.      Q3 2021 Earnings Call

Regarding the Q3 2021 earnings call, Plaintiff relies on the same types of allegations, which fail as a matter of law for the reasons discussed above.  For example, Plaintiff relies on statements that BHG's estimations of "population health risk" had "improved," and that there was "strong evidence" that BHG "delivered demonstrably better results," "when [] deploy[ing] [its] fully aligned model," Compl. ¶ 328; that BHG's "year-to-date MCR performance in both of [its] businesses [was] solid," *id*. ¶ 329; and that BHG's prior challenges had become "tailwinds," *id.* ¶ 330.

However, Plaintiff fails to plead any facts, much less particularized facts, showing that BHG's statements were false or misleading when made.  For example, BHG's description of prior challenges as "tailwinds" was neither false nor misleading when read in context.  The statement pointed out that the large and rapid increase in membership that had posed challenges in 2021 would become a tailwind in the future as BHG's membership base became more stable and engagement increases.  *See* Ex. 2 at 9-10.  In short, Plaintiff fails to plead with particularity that any of these challenged statements were materially false and misleading when made.

### 3.      Investor Day Presentation

Regarding the December 7, 2021 Investor Day, Plaintiff again relies on the same types of allegations that fail as a matter of law for the reasons discussed above.  Plaintiff claims as false statements that despite "remain[ing] a young company[,] [BHG] now ha[d] data on where [it] [could] drive results and [were] moving to a more focused and disciplined growth model," Compl.

19

¶ 341; expected "less disruption to member engagement and health care utilization related to COVID, also a positive for risk coding accuracy and risk adjustment performance," *id.* ¶ 345; maintained a "good book of business, with underlying medical costs in line with [its] expectations," *id.* ¶ 348;[14] and "expected" an MCR within a particular range, *id.* ¶ 350. However, Plaintiff points to nothing indicating that any of this was false or misleading. As noted above, the fact that BHG's expectations ultimately did not come to fruition does not make its statements about its ability to achieve future targets untrue *when made*.

### 4. JPMorgan Conference

Plaintiff similarly claims as false statements made at the January 11, 2022 JPMorgan Virtual Healthcare Conference that BHG was "achieving scale in [its] business and expect[ed] fundamental execution and productivity gains," as well as "has the team, capital and strategy to execute on [its] model," Compl. ¶ 359; that the NeueHealth segment of BHG was "an emerging leader in taking on global risk for the consumer retail health care market," *id.* ¶ 360; and that BHG would "be even more focused on disciplined growth, fundamental execution and improving productivity," *id.* ¶ 361. Again, however, Plaintiff sets forth no facts demonstrating that such statements were misleading or false at the time they were made, and in any event attempts to rely on statements that are inactionable expressions of puffery, opinion, or forward-looking statements.

### B. Plaintiff Fails to Adequately Allege Scienter

Plaintiff's Section 10(b) claim fails for the independent reason that he has not and cannot plead the requisite scienter. Scienter—the "required state of mind" in a securities fraud case—encompasses "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (citation omitted). A plaintiff must state

---

[14]    To the extent Plaintiff relies on statements of inactionable puffery or forward-looking statements, *see, e.g.*, Compl. ¶¶ 340, 343, 348, his allegations fail for the same reasons discussed above.

"facts that give rise to a *strong inference* of intent to deceive, manipulate or defraud." *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 241 (S.D.N.Y. 2006) (emphasis added). A "strong inference" that a defendant acted with the necessary intent requires "more than [being] merely plausible or reasonable—it must be cogent and *at least as compelling as* any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 311. A court must consider "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Id.*

In the Second Circuit, "[t]he requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA v. JPMorgan Chase*, 553 F.3d 187, 198 (2d Cir. 2009). Plaintiff tries to plead both, but succeeds with neither.

### 1.      Plaintiff Fails to Plead Motive and Opportunity with Particularity

Motive may be "shown by pointing to the concrete benefits that could be realized from one or more of the allegedly misleading statements or nondisclosures," whereas "opportunity could be shown by alleging 'the means' used and the likely prospect of achieving concrete benefits by the means alleged." *South Cherry St., LLC v. Hennessee Grp. LLC,* 573 F.3d 98, 108 (2d Cir. 2009) (internal quotations and citations omitted). The paradigmatic example of a motive allegation is insider stock sales. *See Employees' Ret. Sys. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015). Plaintiff, however, alleges no insider sales by any of BHG's directors or officers. And the facts are to the contrary: SEC filings show that the Executive Defendants *increased* their holdings shortly after the Q4 2021 Earnings Call held on March 2, 2022. *See* Ex. 7, 8.

The sole motivation alleged by Plaintiff is the desire to portray BHG in a positive light and keep its stock price high. Courts have rejected stock allegations like these as insufficient to plead scienter time and time again. *See, e.g., Geiger v. Solomon–Page Grp., Ltd.*, 933 F. Supp. 1180,

1189–90 (S.D.N.Y. 1996).  Merely alleging "goals that are 'possessed by virtually all corporate insiders, such as the desire to . . . sustain the appearance of corporate profitability" are insufficient to show motive and opportunity.  *Altayyar*, 242 F. Supp. 3d at 183.

### 2. Plaintiff Fails to Plead Circumstantial Evidence Giving Rise to a Strong Inference of Scienter

Where, as here, there are no coherent allegations of motive and opportunity, a plaintiff must allege particularized facts that provide "circumstantial evidence" of conscious misbehavior or recklessness, "though the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).  To do so, a plaintiff must plead "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Hall v. Children's Place Retail Stores, Inc*., 580 F. Supp. 2d 212, 227 (S.D.N.Y. 2008).  Plaintiff again falls short.  He pleads no facts whatsoever that give rise to *any* inference of fraud, much less the requisite "*strong* inference of intent to deceive, manipulate or defraud."  *Tellabs*, 551 U.S. at 319 (emphasis added).

*First*, Plaintiff cites supposed "admissions" by the Executive Defendants that they knew of BHG's operational issues and other difficulties prior to their public disclosure.  Compl. ¶¶ 395-98.  This argument rests on the same distortions of what was actually stated as described in Section I, *supra*.  The other allegations relied on by Plaintiff are merely disclosures of facts understood by BHG at that point in time.  *See, e.g*., *id.* ¶¶ 396-97.  Nothing about these statements suggests that any of the Defendants were aware at the time of the IPO of facts that would render the statements in the Offering Documents false or misleading in any way.

*Second,* Plaintiff relies on CWs who supposedly "confirmed" that the Executive Defendants were aware of and opted not to disclose operational challenges faced by BHG.  Compl.

¶¶ 399-423.  For a court to credit the statements of CWs, however, the sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).  Courts look, in particular, to whether the CW had any contact with the Executive Defendants, or held a senior position such that they would have had personal knowledge of the Executive Defendants' scienter.  *See Campo v. Sears Holdings Corp*., 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010) (holding that a reasonable person could not infer from statements made by CWs that individuals acted with the requisite intent when none of the CWs had any contact with the individuals); *Janbay v. Canadian Solar, Inc.*, No. 10 CIV. 4430, 2013 WL 1287326, at *7 (S.D.N.Y. Mar. 28, 2013) (holding that plaintiff had not alleged scienter based allegations from CWs who were "out of the loop of management").

Here, the three CWs were all lower-level or single-region managers.  Plaintiff does not allege that any had *any* contact with either of the Executive Defendants.  Nor did any of the CWs report to the Executive Defendants or hold senior positions at BHG such that he or she would have had personal knowledge of the CEO and CFO's mindsets.  In the absence of such allegations, the CWs do not provide a basis from which to infer scienter.  *See In re Lehman Brothers Securities & ERISA Litigation*, No. 09 MD 2017 LAK, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) (finding CW statements "insufficient" because "[t]he confidential witnesses were loan level underwriters, not managers or corporate officers who could have spoken to the company's practices broadly."); *see In re Elan Corp. Secs. Litig*., 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) ("Plaintiffs do not allege any facts indicating that [the CW] was in a position to have knowledge regarding communications with [the company's] senior management or the conclusions reached by . . . management upon receipt of this information.").  Such anecdotal observations of

23

unidentified, low-level employees are of dubious relevance and reliability, particularly where, as here, their accounts are delivered through the filter of plaintiff's counsel. *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460-61 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011).

*Third*, Plaintiff next relies on ordinary-course executive departures. However, the Complaint provides nothing suggesting this handful of departures was out of the ordinary—not their timing, not their circumstances, nor anything else. *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 505 (S.D.N.Y. 2005) (noting that, "absent any alleged facts linking the two resignations and the alleged fraud, the resignations of [company executives] do not support an inference of conscious misbehavior or recklessness") (citing *Kurtzman v. Compaq Computer Corp.*, No. Civ. A. H–99–779, 2002 WL 32442832, at *10 (S.D. Tex. Mar. 30, 2002) ("[T]here are many reasons not related to fraud why people resign and more is needed before one *reasonably* could infer, no less before a *strong* inference arises, that the resignations were motivated by anything besides 'a sense of inadequacy for the job in the face of [the company's] troubles.'")). These departures do not move the needle on scienter at all.

*Fourth*, Plaintiff attempts to conjure scienter from the conclusory allegation that the alleged misstatements relate to "core operational concerns." It is well established, however, that a plaintiff may not "rely only on the 'core operations' doctrine to meet the PSLRA's demanding scienter pleading requirement." *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 228 (E.D.N.Y. 2019).

*Fifth*, Plaintiff claims a close temporal proximity between management's initial statements and its later corrective disclosures shows scienter. Compl. ¶¶ 428–32. The proximity of any optimistic, pre-IPO statements to the supposed corrective disclosures does not raise any inference

24

of scienter in this case. *See, e.g.*, *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 247 (S.D.N.Y. 2015) (explaining that "temporal proximity alone does not raise a circumstantial inference of fraud," but rather plaintiffs must "specifically allege defendants' knowledge of facts or access to information contradicting their public statements").

In sum, Plaintiff fails to allege with particularity any facts showing a strong inference of fraudulent intent.

## III.   Plaintiff's Control Person Claims Fail as a Matter of Law

Plaintiff's control person claims under Section 15 and Section 20(a) must be dismissed because they fail to plead a primary violation. *See* Points I and II, *supra*.[15]

Both claims also fail as a matter of law for the additional and independent reason that Plaintiff fails to plead culpable participation by the Individual Defendants or Executive Defendants.  Plaintiff does not allege, for example, that the putative control person defendants actively concealed fraudulent transactions, or otherwise structured transactions so as to mislead investors as to BHG's financial strength. *See, e.g.*, *In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 226-27, 229-30, 235 (S.D.N.Y. 2004).

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice in its entirety.

---

[15]      "To plead a Section 15 violation, Plaintiff must allege (i) an underlying primary violation of the Securities Act, (ii) control by the defendant, and (iii) 'particularized facts as to the controlling person's culpable participation in the fraud perpetrated by the controlled person.'" *Yoav Gutman v. Lizhi Inc.*, No. 21-CV-317 (LDH)(PK), 2022 WL 4646471, at *7 (E.D.N.Y. Oct. 1, 2022) (Hall, J.).  To state a claim under Section 20(a), a plaintiff must plead (1) a primary violation by a controlled person; (2) actual control by the defendant; and (3) the controlling person's culpable participation in the primary violation. *In re Bristol Myers Squibb Co. Sec. Litig.,* 586 F. Supp. 2d 148, 170 (S.D.N.Y. 2008).

Dated:  October 12, 2022

SIMPSON THACHER & BARTLETT LLP

By:  _____/s/ Joseph M. McLaughlin _____
Joseph M. McLaughlin (jmclaughlin@stblaw.com)
George S. Wang (gwang@stblaw.com)
Anthony C. Piccirillo (anthony.piccirillo@stblaw.com)
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

*Attorneys for Bright Health Group, Inc., G. Mike
Mikan, Catherine R. Smith, Jeffrey J. Scherman,
Robert J. Sheehy, Kedrick D. Adkins Jr., Naomi Allen,
Jeffrey Folick, Linda Gooden, Jeffery R. Immelt,
Manuel Kadre, Stephen Kraus, Mohamad Makhzoumi,
and Adair Newhall*

SKADDEN, ARPS, SLATE, MEAGHER & FLOM
LLP

By:  _____/s/ Susan L. Saltzstein_____
Susan L. Saltzstein (susan.saltzstein@skadden.com)
Jeffrey S. Geier (jeffrey.geier@skadden.com)
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

*Attorneys for J.P. Morgan Securities LLC, Goldman
Sachs & Co. LLC, Morgan Stanley & Co. LLC,
Barclays Capital Inc., BofA Securities, Inc., Citigroup
Global Markets Inc., Piper Sandler & Co., Nomura
Securities International, Inc., and RBC Capital
Markets, LLC*

26

**Appendix of Defined Terms**

| TERM | DEFINITION |
|---|---|
| **1933 Act** | Securities Act of 1933 |
| **1934 Act** | Securities Exchange Act of 1934 |
| **ACA** | Affordable Care Act |
| **BHG** | Bright Health Group, Inc. |
| **CEO** | G. Mike Mikan, Chief Executive Officer and President of Bright Health |
| **CFO** | Catherine R. Smith, Chief Financial Officer and Chief Administrative Officer of Bright Health |
| **Class Period** | June 24, 2021 through March 1, 2022 |
| **Complaint** | Plaintiffs' June 24, 2022 Amended Complaint for violations of the federal securities laws |
| **COVID or COVID-19** | Disease caused by a virus named SARS-CoV-2 |
| **CWs** | Confidential witnesses |
| **Defendants** | Defendant Bright Health, the Individual Defendants, and the Underwriter Defendants |
| **Ex.** | Exhibit # [exhibit range] in the Declaration of George S. Wang, dated October 12, 2022 |
| **Executive Defendants** | G. Mike Mikan and Catherine R. Smith |
| **FEs** | Former employees one, two, and three, as referenced in Plaintiff's Complaint |
| **Individual Defendants** | Jeffrey J. Scherman, Robert J. Sheehy, Kedrick D. Adkins Jr., Naomi Allen, Jeffrey Folick, Linda Gooden, Jeffery R. Immelt, Manuel Kadre, Stephen Kraus, Mohamad Makhzoumi, Adair Newhall, G. Mike Mikan, and Catherine R. Smith |
| **IFP** | Individual and family plan |
| **Investor Day** | December 7, 2021 Bright Health Group, Inc. analyst/investor day |

A-1

| | |
|---|---|
| **IPO** | June 24, 2021 Bright Health Group, Inc. initial public offering |
| **MA** | Medicare Advantage |
| **MCR** | Medical cost ratio |
| **NeueHealth** | Bright Health's healthcare enablement and technology business |
| **Offering Documents** | The Registration Statement and Prospectus, as defined in Plaintiff's Complaint, together |
| **Plaintiff** | Lead Plaintiff Winston Van, individually and on behalf of a class of similarly situated persons and entities |
| **PSLRA** | Private Securities Litigation Reform Act of 1995 |
| **Prospectus** | June 25, 2021 Prospectus for Bright Health Group, Inc. |
| **Q3 2021** | Third tax quarter of 2021, July 1, 2021 through September 30, 2021 |
| **Q3 2021 Earnings Call** | November 11, 2021 Bright Health Group, Inc. Q3 2021 Earnings Call |
| **Registration Statement** | June 15, 2021 Bright Health Group Amended Registration Statement filed on SEC form S-1 |
| **RAF** | Risk adjustment factor |
| **Section 10(b)** | Section 10(b) of the Securities Exchange Act of 1934 |
| **Section 11** | Section 11 of the Securities Act of 1933 |
| **Section 12(a)(2)** | Section 12(a)(2) of the Securities Act of 1933 |
| **Section 15** | Section 15 of the Securities Act of 1933 |
| **Section 20(a)** | Section 20(a) of the Securities Exchange Act of 1934 |
| **SEP** | Special enrollment period |
| **Underwriter Defendants** | J.P. Morgan Securities LLC, Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc., BofA Securities, Inc., Citigroup Global Markets Inc., Piper Sandler & Co., Nomura Securities International, Inc., RBC Capital Markets, LLC |