**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VICTORINO MARQUEZ, Individually and On Behalf of All Others Similarly Situated, | No. 1:22-cv-00101-LDH-MMH |
| Plaintiff, | CLASS ACTION |
| v. | |
| BRIGHT HEALTH GROUP, INC., G. MIKE MIKAN, CATHERINE R. SMITH, JEFFREY J. SCHERMAN, ROBERT J. SHEEHY, KEDRICK D. ADKINS JR., NAOMI ALLEN, JEFFREY FOLICK, LINDA GOODEN, JEFFERY R. IMMELT, MANUEL KADRE, STEPHEN KRAUS, MOHAMAD MAKHZOUMI, ADAIR NEWHALL, J.P. MORGAN SECURITIES LLC, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL INC., BOFA SECURITIES, INC., CITIGROUP GLOBAL MARKETS INC., PIPER SANDLER & CO., NOMURA SECURITIES INTERNATIONAL, INC., and RBC CAPITAL MARKETS, LLC, | |
| Defendants. | |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.      INTRODUCTION .................................................................................................. 1

II.     BACKGROUND .................................................................................................... 4

III.    ARGUMENT .......................................................................................................... 8

        A.      Legal Standard ............................................................................................ 8

        B.      The Complaint Alleges Material Misstatements and Omissions ......................... 10

                1.      Registration Statement ......................................................... 11

                2.      Class Period Statements .................................................. 16

        (a)     Q2 Earnings Call .......................................................................... 16

        (b)     Q3 Earnings Call .......................................................................... 17

        (c)     Investor Day & JP Morgan Conference .......................................... 18

        C.      Defendants Acted with Scienter with Respect to the Exchange Act Claims ........ 20

        D.      Control Person Claims ............................................................................. 24

IV.     CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
    965 F.3d 165 (2d Cir. 2020)....................................................................................9

*Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*,
    2020 WL 3318029 (S.D.N.Y. June 18, 2020) ...............................................12, 14

*In re Alstom SA Sec. Litig.*,
    406 F. Supp. 2d 433 (S.D.N.Y.2005)...................................................................13, 23

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
    19 F.4th 145 (2d Cir. 2021) .................................................................................24, 25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................................................8

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)........................................................................................20

*In re Avon Sec. Litig.*,
    2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019).........................................19, 21, 23

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
    851 F. Supp. 2d 746 (S.D.N.Y. 2012)......................................................................25

*In re BHP Billiton Ltd. Sec. Litig.*,
    276 F. Supp. 3d 65 (S.D.N.Y. 2017).......................................................................15

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
    2020 WL 1950783 (E.D.N.Y. Apr. 22, 2020) ........................................4, 5, 12, 16

*Carlton v. Cannon*,
    184 F. Supp. 3d 428 (S.D. Tex. 2016) ....................................................................18

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002)........................................................................................8

*Citiline Holdings, Inc. v. iStar Fin., Inc.*,
    701 F. Supp. 2d 506 (S.D.N.Y. 2010)........................................................4, 17, 21

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012).................................................................20, 21

*City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*,
    814 F. Supp. 2d 395 (S.D.N.Y. 2011)................................................................15

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
    477 F. Supp. 3d 123 (S.D.N.Y. 2020)................................................................15

*Conn. Bar Ass'n v. U.S.*,
    620 F.3d 81 (2d Cir. 2010)....................................................................................8

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
    433 F. Supp. 3d 515 (S.D.N.Y. 2020)................................................................25

*Cortec Indus., Inc. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991)..................................................................................25

*In re CPI Card Grp. Inc. Sec. Litig.*,
    2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017) ..............................................16, 24

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017)..................................................................9

*In re Extreme Networks, Inc. Sec. Litig.*,
    2018 WL 1411129 (N.D. Cal. Mar. 21, 2018)....................................................18

*Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017)..........................................................19, 20

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................................13

*Galestan v. OneMain Hldgs., Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018)..........................................................14, 17

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)................................................................................10

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012)..........................................................23, 24

*In re Gentiva Sec. Litig.*,
    932 F.Supp. 2d 352 (E.D.N.Y. 2013) ................................................................24

*In re HD Supply Holdings, Inc. Sec. Litig.*,
    341 F. Supp. 3d 1342 (N.D. Ga. 2018)..............................................................18

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)..............................................................................................8

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ................................................20, 21, 23

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003) ...............................................................9, 10

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
  251 F. Supp. 3d 596 (S.D.N.Y. 2017) ...................................................................23

*In re ITT Educ. Servs., Sec. Litig.*,
  34 F. Supp. 3d 298 (S.D.N.Y. 2014) ...............................................................22, 24

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
  14 F.4th 141 (2d Cir. 2021) ............................................................................9, 10

*Kurtzman v. Compaq Computer Corp.*,
  2002 WL 32442832 (S.D. Tex. Mar. 30, 2002)......................................................23

*In re LaBranche Sec. Litig.*,
  405 F. Supp. 2d 333 (S.D.N.Y. 2005) ...................................................................25

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*,
  650 F.3d 167 (2d Cir. 2011)..................................................................................25

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011) .............................................................................9, 10

*Lopez v. Ctpartners Exec. Search Inc.*,
  173 F. Supp. 3d 12 (S.D.N.Y. 2016)...............................................................15, 16

*McMahan & Co. v. Wherehouse Ent., Inc.*,
  900 F.2d 576 (2d Cir. 1990).................................................................................10

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014).................................................................................10

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F.Supp. 2d 277 (S.D.N.Y. 2013).............................................................13, 14

*Mississippi Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*,
  523 F.3d 75 (1st Cir. 2008)..................................................................................24

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010).........................................................................8, 9, 10

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012)...................................................................................9

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp. PLC*,
    709 F.3d 109 (2d Cir. 2013)................................................................12

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011)...........................................................23

*In re NIO, Inc. Sec. Litig.*,
    2021 WL 3566300 (E.D.N.Y. Aug. 12, 2021)............................. *passim*

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).............................................................12, 14

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)............................................................................14

*Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt., LLC*,
    595 F.3d 86 (2d Cir. 2010)..................................................................10

*In re OSG Sec. Litig.*,
    12 F. Supp. 3d 622 (S.D.N.Y. 2014)....................................................22

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012).............................................................15, 16

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
    2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020).............................11, 14, 15

*In re Pareteum Sec. Litig.*,
    2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021)...................................22, 24

*Peifa Xu v. Gridsum Holding Inc.*,
    2020 WL 1508748 (S.D.N.Y. Mar. 30, 2020) .........................................9

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..............................................................9, 13

*In re Salix Pharms., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016).......................................15

*In re Scot. Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)..............................................22, 23

*Scott v. Gen. Motors Co.*,
    46 F. Supp. 3d 387 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015) .........................16

*Set Cap. LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021)..................................................................13

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ........................................................18

*Suez Equity Invs. L.P. v. Toronto–Dominion Bank*,
   250 F.3d 87 (2d Cir.2001) ......................................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................................20

*In re Tufin Software Techs. Ltd. Sec. Litig.*,
   2022 WL 596861 (S.D.N.Y. Feb. 25, 2022) ...........................................11, 12, 13

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ...................................................................................10

*In re Weight Watchers Int'l, Inc. Sec. Litig.*,
   2016 WL 2757760 (S.D.N.Y. May 11, 2016) ........................................................12

*Wilson v. LSB Indus., Inc.*,
   2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) ..........................................................15

**Statutes**

Private Securities Litigation Reform Act of 1995 ..........................................................9

Securities Act of 1933 ...................................................................................... *passim*

Securities Exchange Act of 1934 .................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 8(a)(2) ......................................................................................................9

Fed. R. Civ. P. 9(b) ..........................................................................................................9

Fed. R. Civ. P. 15 ............................................................................................................25

Lead Plaintiff, Winston Van ("Lead Plaintiff"), respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss ("MTD").[1]

## I.   INTRODUCTION

The MTD does not contest that, at the time of the IPO, Bright Health was facing a self-created and knowable operational disaster that rendered the IPO's Registration Statement and subsequent Class Period statements false and misleading. Nor could it. Mere months after the IPO, the BHG Defendants admitted that *full-year 2021* had been the "*peak of inefficiency*," and that the Company's "*significant deterioration … was due to specific identifiable issues*." Further, the BHG Defendants admitted that they "*didn't have the data*" to accurately discuss the Company's business and prospects during the Class Period, despite previously stating they "*have the data … [to] drive results*." In a half-hearted attempt to elude strict liability and negligence claims under the Securities Act, the MTD dances around law and fact. The MTD's primary purpose, it seems, is to do away with the Exchange Act fraud claims only. Such focus is telling—yet even here, the MTD falls short.

Based on the BHG Defendants' admissions and corroborated by the firsthand accounts of FEs, the Complaint alleges that Defendants failed to disclose Bright Health was mired in a

---

[1]   "Defendants" refers to: (i) Bright Health Group, Inc. ("Bright Health" or the "Company") ¶42; (ii) G. Mike Mikan ("Mikan") ¶43 and Catherine R. Smith ("Smith") ¶44 (the "Executive Defendants," and together with the Company, the "BHG Defendants"); (iii) Jeffrey J. Scherman ¶46, Robert J. Sheehy ¶47, Kedrick D. Adkins Jr. ¶48, Naomi Allen ¶49, Jeffrey Folick ¶50, Linda Gooden ¶51, Jeffery R. Immelt ¶52, Manuel Kadre ¶53, Stephen Kraus ¶54, Mohamad Makhzoumi ¶55, Adair Newhall ¶56 (together with the Executive Defendants, the "Individual Defendants"); and (iv) J.P. Morgan Securities LLC ¶58, Goldman Sachs & Co. LLC ¶59, Morgan Stanley & Co. LLC ¶60, Barclays Capital Inc. ¶61, BofA Securities, Inc. ¶62, Citigroup Global Markets Inc. ¶63, Piper Sandler & Co. ¶64, Nomura Securities International, Inc. ¶65, and RBC Capital Markets, LLC ¶66 (the "Underwriter Defendants"). Citations to paragraphs ("¶") refer to the Amended Complaint for Violations of the Federal Securities Laws ("Complaint"). ECF No. 38. Emphasis has been added and internal citations and quotation marks are omitted throughout, and all capitalized and defined terms have the meaning ascribed in the Complaint.

coalescence of operational infirmities prior to the IPO and during the Class Period. While each of these issues were material on their own, the whole was greater than the sum of its parts. For instance, Bright Health had a backlog of claims payable, in part due to a failure to maintain provider directories causing the routine and systemic denial of valid claims, which strained its administrative resources and business relationships. This hampered the Company's already lacking ability to perform accurate risk adjustments. As a result, the Company had zero visibility into its unfavorable membership mix and was unable to accurately project MCR. Further, Bright Health could not scale with its pre-IPO growth, exacerbating the preceding issues. Finally, the Company was ill-positioned to manage financial impacts and ongoing challenges of COVID-19.

Instead of disclosing these issues, the Registration Statement contained numerous generic "risk factors" that could ***potentially*** impact the Company at some point in the future. However, any such "potential" risks were manifest at the time of the IPO and worsening. The Registration Statement also misleadingly touted the Company's growth, prospects, and capabilities, including that the Company "***ha[d] been able to generate consistent MCR performance despite [its] … new market expansion***," and had "***demonstrated the ability to successfully manage medical spend***" when touting MCR. Contrary to these statements, the Company's deficient infrastructure was buckling, leading to zero visibility into risk and the inability to accurately project its inconsistent MCR.

During the Class Period, the true state of Bright Health's issues began to seep into the market following reports of outsized losses and ballooning MCR. The BHG Defendants, however, assured the investing public that Bright Health's operations were on the mend—"tailwinds" behind the Company. The BHG Defendants also continued to tout the Company's rapid expansion and revenue growth as well as its purportedly data-driven approach to managing its memberships

2

and Care Partner relationships. Indeed, up until the end of the Class Period, the BHG Defendants projected favorable results, stating, *inter alia*, that "***medical costs [were] in line with [their] expectations***" and "***continue[d] to exceed … internal expectations***," and generally lauded "***better-than-expected performance***." Such statements were demonstratively false when made.

With respect to the Securities Act claims, the MTD relies on a competing factual narrative divorced from the Complaint's actual allegations that has no bearing on a motion to dismiss. The MTD further obfuscates the BHG Defendants' ***own admissions*** of pre-IPO issues by making the unsupported argument that the Complaint insufficiently alleges the Company's operational issues were in existence at the time of the IPO. Omitting that scienter is not an element of Securities Act claims, the MTD contests that the Complaint inadequately alleges Defendants were aware of the pre-IPO issues. Retreating again, the MTD argues that risk factors warning of potentialities were more than enough to apprise investors of the then-existing catastrophic state of affairs at the Company. These arguments are unavailing and should be rejected out of hand.

The Complaint separately alleges fraud claims under the Exchange Act. Here, the MTD inappropriately cherry picks statements urging the Court to analyze them in a vacuum. Moreover, the MTD sets forth the nonsensical assertion that the BHG Defendants were unaware the Company's business was imploding, despite having spoken in granular detail on the subject at all relevant times. Even then, the BHG Defendants' purported ignorance supports an alternative theory of severe recklessness if they were in fact entirely oblivious and therefore had no basis when making statements. Based on the FE accounts and the BHG Defendants' admissions, the BHG Defendants were aware of or at least recklessly disregarded Bright Health's worsening operations during the Class Period.

As of November 14, 2022, Company shares have fallen below $1.00 per share, an Icarus-like descent from the all-time high IPO price of $18.00. Following the filing of the Complaint, Bright Health has announced plans to excise the lion's share of its business after sustaining hundreds of millions in further losses in the first half of 2022. Bright Health has collapsed following the IPO, and investors should not be left holding the bag for Defendants' misconduct.

## II.   BACKGROUND

The Complaint alleges, based on the BHG Defendants' post-IPO admissions and corroborated by first-hand FE accounts, that the Registration Statement was false and misleading for failing to disclose that Bright Health was facing a conflux of operational issues, *e.g.*, claims backlogs and the inability to accurately perform risk adjustments, which issues were further exacerbated by unmanageable growth, all to the backdrop of COVID-19, resulting in a total drought of visibility into the Company's operations and inability to project MCR. *See Citiline Holdings, Inc. v. iStar Fin., Inc.*, 701 F. Supp. 2d 506, 514-15 (S.D.N.Y. 2010) (failure to disclose full extent of deteriorating financial performance actionable). Instead, the Registration Statement set forth numerous "***potential***" risk factors that "***could***" have an adverse effect on Bright Health's business and operations (¶¶169-77, 268-76). *In re Blue Apron Holdings, Inc. Sec. Litig.*, 2020 WL 1950783, at *10 (E.D.N.Y. Apr. 22, 2020) ("hypothetical" risk factors actionable). For example:

> ***If*** the risk adjustment data we submit is found to incorrectly overstate the health risk of our consumers, we ***may*** be required to refund monies previously received by us and/or be subject to penalties or sanctions …. ¶¶170, 175, 269, 274.

> Continued rapid growth in our business ***may*** exacerbate certain of the risks described elsewhere in this section, including our ability to accurately estimate costs, price our products, and charge appropriate premiums, as well as our ability to accurately assess, code and report IFP, MA and Small Group risk adjustment factor ("RAF") scores for our consumers. ¶¶171, 270.

>*If* the data we rely upon to run our businesses is found to be inaccurate or unreliable, we *could* experience adverse effects on our ability to effectively conduct our business …. ¶¶174, 273.

The Registration Statement also misleadingly touted the strength of Bright Health's business, growth, and scalability (¶¶178-92, 269-283). *Blue Apron*, 2020 WL 1950783, at *10 (scalability and growth statements actionable based on alleged omissions). For example:

>*Bright HealthCare has been able to generate consistent MCR performance despite the accelerating pace of our new market expansion* and an increasing share of Medicare Advantage business, which is priced to a higher MCR. ¶¶190, 289, 429.

In an about face, when reporting 3Q2021 results on November 11, 2021, the Company posted a net loss nearly triple what analysts were expecting due to a ballooning MCR of 103%, up significantly from historical MCR reported in the Registration Statement and the year-to-date MCR disclosed the quarter prior. ¶¶11, 24, 194, 319. Bright Health stated that it had been unable to "accurately capture the risk of … members and therefore, [its] estimated 2021 risk score [was] lower than … originally anticipated." ¶¶196, 321. Further, based on its rapid growth, "population health risk [was] difficult to estimate" which "limited [the Company's] ability to … understand the health status of the population," preventing Bright Health from "captur[ing] underlying risk and impacting [its] risk adjustment scoring."  ¶¶197, 198, 200, 322, 323, 325, 328, 330. Bright Health reported a "[$134 million] negative impact from risk adjustment scoring," with "$89 million … related to the *first half of 2021*." ¶¶25, 199, 324, 396, 430. On this news, Bright Health shares declined 41%, closing at $4.94 per share on November 11, 2021. ¶¶27, 201, 326, 332.

The BHG Defendants continued to assure investors that all was well at the Company during the Class Period. On November 11, 2021, Defendant Mikan described challenges as "tailwinds" and touted "strong predictability or at least understanding of our underlying costs" which were "consistent," and Defendant Smith touted "MCR performance in both … businesses

5

[as] solid." ¶¶327-30. On December 7, 2021, during the Company's Investor Day, the Company affirmed 2021 guidance and Defendant Mikan stated they "ha[d] the data … [to] drive results" and again described issues as "tailwinds," while Defendant Smith stated the Company "continue[d] to exceed internal expectations" and that "performance to date [was] strong." ¶¶338-53. Even after the close of 2021, on January 11, 2022, when discussing 2022 expectations Defendant Mikan cited the Company's "better-than-expected performance." ¶¶358-62.

On March 2, 2022, Bright Health reported its 4Q and FY2021 financial results, revealing net losses three times higher than consensus estimates, a quarterly MCR of 134.1%, up from 105.4% year-over-year, and a full year MCR of 101.3%, up from 88.7%. ¶¶13, 32, 204, 210, 367, 373. Bright Health stated these results were due to "***an inability to capture risk adjustment on newly added lives***, as well as ***prior period medical costs*** recognized in the fourth quarter." ¶¶204, 367. On this news, Bright Health shares declined 20% to close at $2.51 per share on March 2, 2022, and continued to fall to $1.79 on March 7, 2022, a total decline of 43%. ¶¶36, 213, 378.

Defendant Mikan revealed that Bright Health's "***significant deterioration***" in 2021 "***was due to specific identifiable issues***," including "***catching up on claims payments, and resolving resubmitted claims***," due to "***lack of visibility into lagging medical claims on [their] legacy operational systems, which require manual processing***." ¶¶34, 207, 370, 398. When directly questioned by an analyst "what happened between the Investor Day in December, [the] conference in January, and today, where [the Company's] risk adjustment accruals came in much different than expected," Defendant Mikan ***admitted*** that when making prior statements "***[the Company] didn't have the data or the insights to really understand how [it] [was] capturing the risk codes and what other underlying medical trends [they were] seeing***." ¶376.

Regarding MCR, Defendant Smith—referring to 2021 as the "*peak of inefficiency*"—attributed results to "*claims processing issues where … challenges in capturing the risk of the population was in part due to the lack of timely insight into data, which drove the insufficient engagement in care management*." ¶¶15, 19, 34, 208, 209, 371, 372, 380, 398. Bright Health had again overstated its risk adjustment, resulting in a quarterly revenue decrease of $148 million—with "$111 million relat[ing] to *prior* quarters." Defendant Smith elaborated that "MCR pressure" was due to "delays in attributing members in part due to [their] rapid growth in 2021, as well as the impact of the unique 2021 special enrollment period," and that the Company was forced to "recognize[] $139 million in *prior period medical costs* in Q4." ¶¶15, 34, 208, 371, 398.

The accounts of FEs dovetail on the BHG Defendants' admissions. ¶¶114-153. FEs confirmed that by February 2020 Bright Health had a massive backlog of claims, leading to ongoing complaints from the Company's Care Providers, and government investigations in early 2021.[2] ¶¶116-140, 144, 150-51. FEs explained that the backlog of claims was due, in part, to the Company-wide failure to maintain accurate provider directories, which directories were stored in Bright Health's "master data warehouse," resulting in the routine and systemic denial of valid claims. ¶¶116, 118-20, 127. As a result, Bright Health was 180 days or more behind on claims, where the industry standard was 30 to 90 days, or even 30 to 45 days for electronically submitted claims. ¶¶120, 133. As Bright Health was failing to process claims, it could not obtain the information needed to prepare risk scores, which issue became apparent by May 2020. ¶¶127-28. Moreover, FEs explained the claims backlog affected the ability to calculate MCR, causing

---

[2] On April 8, 2022, Colorado regulators announced they were fining Bright Health for failure to pay provider claims and the untimely processing of claims, which pattern of conduct existed since "early 2021." ¶¶388-89. FE-1 stated that Bright Health had been audited by Colorado regulators prior to the IPO and later fined in 2022. ¶223.

understated costs. ¶134. With respect to COVID-19 and growth, FEs stated that had the Company not already been struggling with other issues, then impacts would have been less significant. ¶¶136-37, 145-47.

As of the commencement of this Action, Bright Health common stock closed at $3.08 per share, an **83% decline** from the IPO price of $18.00 per share. ¶¶16, 214. After continuing to perform abysmally and further sustaining hundreds of millions in losses in 2022, on October 11, 2022, Bright Health announced that it was excising the vast majority of its business. Specifically, the Company announced it will no longer offer IFP plans and will only offer MA products in California and Florida in 2023. As of November 14, 2022, Bright Health shares closed at $0.94 per share, a **_decline of 95%_** from the IPO price.

## III.   ARGUMENT

### A.   Legal Standard

To survive a motion to dismiss, a plaintiff must allege sufficient facts to "state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor."[3] *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

The Securities Act imposes a "**_minimal burden_**" on plaintiffs. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Under Section 11, the Complaint need only show "a material misstatement or omission to establish [a] *prima facie* case." *Id.*; *In re Morgan Stanley*

---

[3]   To the extent the MTD fails to challenge every alleged false statement or omission or any other element of the Complaint's claims those arguments are "deemed waived" and may not be "raised for the first time in a reply brief." *See Conn. Bar Ass'n v. U.S.*, 620 F.3d 81, 91 n.13 (2d Cir. 2010). Here, the MTD fails to challenge, *e.g.*, (i) the falsity of numerous statements pled and the alleged omissions, (ii) the materiality of nearly all statements pled, (iii) that Defendants were "statutory sellers" under Section 12(a)(2), (iv) that the Individual Defendants controlled Bright Health for the purposes of Section 15 and 20(a) liability, as well as (v) the elements of reliance and loss causation for the Exchange Act claims. Any such arguments are deemed waived.

*Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (same for Section 12(a)(2)). "Fraud is not an element," the Complaint "need allege no more than negligence," *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004), and thus the Complaint need only plead "a short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2); *see also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011). "Nor do the heightened pleading standards of the [PSLRA] apply to such non-fraud claims."[4] *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 157 (2d Cir. 2012). Upon a showing of a material misstatement or omission, "an issuer's liability ... *is absolute*." *Litwin*, 634 F.3d at 715–16.

Under "Section 10(b) … plaintiffs must allege that the defendants … made a materially false statement or omitted a material fact, with scienter, and that the plaintiffs' reliance on the defendants' action caused injury to the plaintiffs." *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 462 (S.D.N.Y. 2017). Actions under the Exchange Act are subject to the pleading requirements of Fed. R. Civ. P. 9(b) and the PSLRA,[5] which merely requires plaintiffs to explain "why and how" each statement was false and misleading. *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 145 (2d Cir. 2021); *see also In re Initial Pub. Offering Sec. Litig.*, 241

---

[4]    The MTD argues that because the Securities Act and Exchange Act claims rely on the same statements in the Registration Statement, that Fed. R. Civ. P. 9(b) and the PSLRA apply to all claims. MTD at 8. Not so. The Securities Act claims are "analytically distinct" as they are based on "alternative grounds of liability, require[e] different proof" and asserted in a separate portion of the Complaint which disclaims fraud allegations. *In re NIO, Inc. Sec. Litig.*, 2021 WL 3566300, at *5 (E.D.N.Y. Aug. 12, 2021) (did not sound in fraud when pled in "separate … portion of the Amended Complaint"); *Peifa Xu v. Gridsum Holding Inc.*, 2020 WL 1508748, at *7 (S.D.N.Y. Mar. 30, 2020) (same). Lead Plaintiff should be permitted to proceed on alternate legal theories, "even if overlapping conduct forms the basis for both" sets of claims. *NIO*, 2021 WL 3566300, at *5.

[5]    The PSLRA merely requires Exchange Act plaintiffs to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," and "Rule 9(b) requires that 'a complaint ... specify the statements that the plaintiff contends were fraudulent' and 'explain why the statements were fraudulent.'" *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173 (2d Cir. 2020).

F. Supp. 2d 281, 327 (S.D.N.Y. 2003) ("[particularity] means the who, what, when, where, and how: the first paragraph of any newspaper story").

### B.      The Complaint Alleges Material Misstatements and Omissions

"[T]he veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 92 (2d Cir. 2010). "[D]efendants' representations [must be] taken together and in context.," *In re Morgan Stanley*, 592 F.3d at 366, as "literally accurate [statements] can [], through their context and manner of presentation, [become] devices which mislead investors." *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239-40 (2d Cir. 2016) (misleading "half-truths" support claims for securities fraud). Omissions are actionable when there is a duty to disclose the omitted facts. "Once a company speaks on an issue or topic, there is a duty to tell the whole truth," "[e]ven when there is no existing independent duty to disclose [such] information." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).

"Materiality is an 'inherently fact-specific finding' ...." *Litwin*, 634 F.3d at 716-17. An omission is material where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Id.* Because materiality "presents 'a mixed question of law and fact,' it will rarely be dispositive in a motion to dismiss." *Morgan Stanley*, 592 F.3d at 360; *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (dismissal inappropriate unless no reasonable minds could differ as to materiality).

### 1.      Registration Statement

The MTD obfuscates the BHG Defendants' admissions, makes no attempt to challenge every statement pled (or even materiality for that matter), and relies on scant case law, instead proffering a competing factual narrative that cannot be considered on a motion to dismiss.

***First***, the MTD baldly casts the Complaint's allegations that issues existed at the time of the IPO as "conclusory"—a standard the MTD ironically fails to define. MTD at 9-10. It strains sanity, let alone credulity, to think that the BHG Defendants' admissions, *e.g.*, that 2021 was the "peak of inefficiency" due to "identifiable issues," and that Bright Health "did not have the data" to accurately manage risk, resulting in substantial losses attributable to pre-IPO business, is an insufficient basis to allege adverse issues pre-dated the IPO. Moreover, such argument (which solely relies on a competing factual narrative), is oblivious to the concept of cause and effect. Whether or not, for example, adverse effects were felt ***after*** the IPO, does ***nothing*** to alter the analysis if the Complaint pleads the cause of such effects existed ***at the time*** of the IPO. "At bottom, the two sides present competing theories to be developed as the case continues, but at this stage, [Lead Plaintiff] ha[s] met [its] initial pleading burden." *See NIO*, 2021 WL 3566300, at *6; *see also Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *9 (S.D.N.Y. Sept. 27, 2020) (dispute as to when business started to decline precluded grant of motion to dismiss).

***Second***, the MTD argues that the Complaint "rests on distortions of what [Defendants] … actually stated" in seeking an improper inference that Defendant Mikan's admission of "identifiable" issues meant "not 'previously known.'" MTD at 11. Setting aside that this still concedes that such issues ***existed at the time of the IPO***, the MTD concocts a defense of ignorance with no basis in law. *Id.* at 10-11. Knowledge is not an element of Securities Act claims, and the MTD's self-serving interpretation of what Defendant Mikan "meant" an inappropriate inference at the pleading stage. *See In re Tufin Software Techs. Ltd. Sec. Litig.*, 2022 WL 596861, at *5

(S.D.N.Y. Feb. 25, 2022) (liability for facts that "were known *or knowable*, at the time of the offering"). As discussed herein, the Complaint adequately pleads scienter for Exchange Act claims, and for Securities Act claims, any factual dispute concerning Defendants' awareness at the time of the IPO "cannot be resolved on a motion to dismiss." *Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*, 2020 WL 3318029, at *3-4 (S.D.N.Y. June 18, 2020).

**Third**, the MTD unsuccessfully attempts to discredit the FEs. MTD at 12-13. The standard for FEs is lenient at the pleading stage and satisfied here.[6] Indeed, the Complaint's FE descriptions include titles, dates of employment (all of which spanned the pre- and post-IPO period), responsibilities, and supervisors.[7] *Tufin Software*, 2022 WL 596861, at *8 (crediting FEs who worked "both before and after the IPO"). The MTD argues that the FEs were "low level" employees who worked with specific customers, products, or within certain regions, and thus cannot be credited. MTD at 12. The Second Circuit has rejected this argument—the allegations of former regional employees are sufficient in supporting falsity where the complaint pleads, as it does here, "company-wide practices." *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp. PLC*, 709 F.3d 109, 123-24 (2d Cir. 2013); *see also, e.g.*, ¶¶117, 129, 226 (FE-1

---

[6]   FEs must be described with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000), which requirement is loosened, where, as here, "independent adequately pled factual allegations corroborate a confidential source's statements," *NIO*, 2021 WL 3566300, at *7, in this case the BHG Defendants' post-IPO admissions.

[7]   *See* ¶¶114, 141, 148 (FE descriptions); *see also NIO*, 2021 WL 3566300, at *7 ("Purchasing Manager whose job duties included selecting factory sites and negotiating with factory suppliers" sufficient description); *Blue Apron*, 2020 WL 1950783, at *7 ("Quality Associate … from January to October 2017, based at Linden, New Jersey fulfillment center" sufficient description). The MTD's cite to *In re Weight Watchers Int'l, Inc. Sec. Litig.*, 2016 WL 2757760, at *6 (S.D.N.Y. May 11, 2016) is misplaced—regarding allegations of lagging growth, the court rejected: (i) a non-employee advertising executive's account that the company's mobile application was not up to date with trends; and (ii) an employee's subjective opinion regarding the company's mobile application compared to competitors with no reference to growth issues. MTD at 12.

stating that claims issues were Company-wide); ¶¶145-47 (FE-2 discussing Company's total lack

of infrastructure). Here, FE accounts, based on first-hand knowledge directly squared with the

Complaint's well-pled allegations and Defendants' admissions, should not be discredited.[8]

     ***Fourth***, the MTD argues that because Bright Health warned it "***may*** continue to

experience disruptions" due to COVID-19, which "***may*** also amplify other risks," that Defendants

are insulated from liability. MTD at 13. This again ignores the Complaint's allegations and the

law. Indeed, "[c]autionary words about future risk cannot insulate from liability the failure to

disclose that the risk has transpired." *See Rombach*, 355 F.3d at 173; *Set Cap. LLC v. Credit*

*Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021) (same). The Complaint alleges that other then-

manifest challenges were impacting the Company, leaving it ill-equipped to deal with and further

exacerbating COVID-19 impacts.[9] *Tufin Software*, 2022 WL 596861, at *7 (risk disclosure that

sales process was "long and unpredictable" failed to counteract allegations of then-existing trend

of languishing sales cycles); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 315

(S.D.N.Y. 2013) (no defense for risk warning that "refer[s] generally to potential unexpected

---

[8]    The MTD avers there is a "mismatch" between FE-1's statements regarding claims backlogs and the "corrective disclosures" regarding risk adjustments and MCR. MTD at 12. ***Wrong***. FE-1 explicitly linked claims backlogs stemming from Bright Health's failure to maintain its Company-wide provider directories resulting in the routine denial of valid claims, to inaccurate risk adjustments and the ability to project MCR (¶¶116-20, 127-28). Further, the BHG Defendants' March 2, 2022, admissions included "catching up on claims payments and resolving resubmitted claims" (¶¶15, 34, 207, 370, 398).

[9]    The MTD devotes a footnote to alleged omissions; specifically, that they were actually disclosed in the Registration Statement. MTD at 13 n.10. However, these so called "disclosures" only pertain to generalized anticipated and potential impacts from current and continued growth—mentioning nothing of the pre-existing operational issues plaguing the Company. *Cf. Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010) ("The purpose of the disclosure requirements is 'to inform, not to challenge the reader's critical wits'"); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 n.11 (S.D.N.Y.2005) ("An investor should not be called upon to piece together buried information from distinct parts of financial statements in order to understand basic aspects of a company's finances.").

events or contingencies"). Indeed, the undisclosed causes of Bright Health's decline would have had disastrous effects with or without COVID-19.

**Fifth**, the MTD argues that certain statements are inactionable puffery and identifies only four such statements. MTD at 13-14. Looking at the statements challenged, this argument fails as the statements conveyed verifiably inaccurate and/or misleading information. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183-84 (2015) ("a determinate, verifiable statement" "is not mere puffery"). For example, statements concerning the "demonstrated … ability to successfully manage medical spend across both commercial and Medicare Advantage value-based contracts," or "value-based payment structures that enable [the Company] to take a staged approach to financial alignment with [its] Care Partners." ¶¶184, 189, 283, 288. As alleged, myriad issues left the Company with no visibility into its patient populations—meaning Bright Health was **unable** to manage its medical spend and was facing a mounting tsunami of backlogged claims with its Care Partners.[10] *Panther Partners*, 2020 WL 5757628, at *10-14 ("bullish statements" actionable based on omissions).

**Sixth**, the MTD argues that two statements concerning "future financial or business prospects," are inactionable. MTD at 14. However, the two statements cited referred to **current** business strategies regarding risk management and patient visibility, and thus decidedly not forward looking. *See Galestan v. OneMain Hldgs., Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018) ("statements are not protected by the safe harbor provision because they were statements of present fact"); *Alpha Cap. Anstalt*, 2020 WL 3318029, at *4 ("as a matter of law" cautionary language cannot warn investors of risks that have already materialized). The Complaint "does not

---

[10]   *See Novak,* 216 F.3d at 315 (not puffery where pled facts showed statements "that the inventory situation was 'in good shape' or 'under control'" were false); *MF Glob.*, 982 F. Supp. 2d at 305 ("[S]tatements are not puffery where they are 'misrepresentations of existing facts.'").

allege that these statements were misleading because they described a future that did not come to pass, but instead because they misrepresented present facts" *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 135 (S.D.N.Y. 2020), and thus "made misleading by material omissions, … particularly in light of historical facts" disclosed in the Registration Statement. *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *10-11 (S.D.N.Y. Apr. 22, 2016); *see also Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017) ("Courts in this circuit have consistently held that neither the PSLRA safe harbor, nor the bespeaks-caution doctrine protects material omissions.").

**Finally**, the MTD argues that the Complaint does not state a Securities Act claim for violations of Item 303 and 105 by failing to plead knowledge (conceding materiality and therefore an Item 105 violation), misstating the law entirely.[11]  MTD at 15-16. The MTD also advances the unavailing argument that the Complaint fails to allege a "substantial probability" that adverse trends and risks existed at the time of the IPO and would materially impact the Company, which argument relies on inapposite case law.[12] MTD at 15. The Complaint's allegations, including FE

---

[11]   Item 303 requires a description of "any known trends or uncertainties" that are material. *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120-21 (2d Cir. 2012). However, plaintiffs must plead that trends were known "consistent with … pleading obligations in … violations of Sections 11, 12, and 15." *Panther Partners*, 2020 WL 5757628, at *10. At maximum, plaintiffs need only plead an **inference** of a "presently known" trend. *Panther Partners*, 681 F.3d at 120-21. Item 105 requires "a discussion of the most significant factors that make the offering speculative or risky," "courts typically analyze the sufficiency of Item [105] disclosures with the familiar materiality standard." *City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011) (discussing Item 105, formerly known as Item 503). Plaintiffs "need not allege Defendants' knowledge … to plead an Item [105] violation." *Panther Partners*, 2020 WL 5757628, at *10.

[12]   *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 89 (S.D.N.Y. 2017) (**Exchange Act** 303 claim finding dam leak did not give rise to substantial probability that the dam would later burst in a result "as catastrophic as was possible."). The cases for the "hindsight" argument fare little better. *See Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 34 (S.D.N.Y. 2016) (**Exchange Act** 303 claim over hostile work environment outside scope of 303 disclosure

accounts that these trends, *e.g.*, claims backlogs and inaccurate risk adjustments, existed and were known throughout the Company and worsening, are sufficient to plead that the "other shoe" would drop after the IPO. *In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597, at \*3 (S.D.N.Y. Oct. 30, 2017) (plausible inference of known trend regarding and that "other shoe" would drop after IPO);  *see also Blue Apron*, 2020 WL 1950783, at \*8 ("Drawing the allegations in the light most favorable to Plaintiffs, … Defendants were aware of the existence of significant delays…."); *Panther Partners*, 681 F.3d at 121-22 (plausible inference of known uncertainty concerning sales issues).

### 2.      Class Period Statements

The MTD cherry picks a handful of carefully trimmed statements to make blanket assertions that ***every*** Class Period statement is inactionable by gesturing to blue chip falsity defenses with zero application. Setting this fatal defect aside, the MTD disregards that statements must be viewed holistically and ignores that the Complaint's claims also rest on what wasn't said.

### (a)      *Q2 Earnings Call*

On August 1, 2021, Bright Health reported its 2Q 2021 financial results, its first-ever post-IPO earnings announcement. Among other results, the Company's earnings release touted that "first half revenue … more than quadrupled since [2020], all while maintaining a consistent adjusted MCR below 80%." ¶295. On the accompanying earnings call, Defendant Mikan echoed this sentiment, stating that "[e]ven with [their] explosive growth, [they] have been able to demonstrate in an adjusted medical cost ratio below 80% across [the] enterprise during the first half of 2021." ¶¶22, 298. Further, Defendant Smith stated that managing medical costs was "critical," explaining that "[i]nternally, we look at our underlying operational performance

---

requirements); *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 394 (S.D.N.Y. 2014) (speculative channel stuffing theory with no admissions).

without prior period adjustments and unusual items like the impact of COVID-related expenses." ¶305.

Despite these statements, the very next quarter when reporting Bright Health's 3Q2021 financial results on November 11, 2021, the BHG Defendants revealed losses three times higher than those estimated by analysts and an unprofitable MCR of 103%, which took into account a $89 million revenue hit attributable to "the first half of 2021." ¶¶12, 25, 199, 319, 324, 396, 430. Defendants blamed the miss, in part, on a lack of visibility into the Company's patient populations, many of which were added well before the IPO. ¶¶321-25. Given the foregoing and based on post-Class Period events and FE accounts, the Complaint alleges that the August 1, 2021 statements were false and misleading for omitting, *e.g.*, Bright Health's mounting claims backlogs, inaccurate risk adjustments, lack of patient visibility, and unmanageable growth. *Citiline*, 701 F. Supp. 2d at 515-16 (statement that portfolio was performing "as expected" actionable where complaint alleged portfolio was sustaining losses); *see also Galestan*, 348 F. Supp.3d at 304 (positive statements regarding current operations actionable).

### (b)    *Q3 Earnings Call*

The poor financial results disclosed by the Company on November 11, 2021, would turn out to be the canary in a coal mine of what was to come. Instead of disclosing the full truth, however, Defendants couched the Company's first post-IPO spill in assurances of strong performance to date while waving away any issues as "tailwinds." For example, Defendant Mikan stated that based on the Company's "year-to-date performance," it had "solid operating results," while Defendant Smith stated "year-to-date-MCR performance in both … businesses [was] solid." ¶¶328-29. Defendant Mikan also touted that Bright Health's MCR was "pretty consistent throughout the year," based on "strong predictability or at least understanding of the underlying costs," and referred to MCR volatility as a "tailwind[]." ¶330.

In seeking to dismiss these statements, the MTD misconstrues the pleading standard and states (not argues) that the Complaint provides inadequate support as to why its alleged statements were false and misleading when made. MTD at 19. This unsupported argument fails. The Complaint alleges that statements regarding the Company's "solid" performance were materially misleading in that they failed to apprise investors as to Bright Health's deteriorating operations. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *12 (S.D.N.Y. Nov. 26, 2018) (qualitative statements touting a company's business as "strong" were actionable based on alleged omissions). Similarly, statements that MCR issues were a "tailwind" falsely implied that the worst was behind the Company. *See In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1358 (N.D. Ga. 2018) ("[v]iewed in the light most favorable to [p]laintiffs" … statement that issues were "behind the [c]ompany" actionable); *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *19-20 (N.D. Cal. Mar. 21, 2018) (same); *Carlton v. Cannon*, 184 F. Supp. 3d 428, 472-73 (S.D. Tex. 2016) ("downplaying the extent and duration of … problems" coupled with assurances to investors gave false impression of "a viable operation that had minor and temporary setbacks, overcame them, and was now ready for the long haul").

### (c)   *Investor Day & JP Morgan Conference*

The MTD also fails to substantively rebut the Complaint's allegations that Defendants' exceedingly positive statements made during the December 2021 Investor Day and January 2022 conference concerning Bright Health's "better-then-expected" performance and financial prospects were false and misleading. MTD at 19-20. Instead, the MTD again provides gerrymandered snippets of exemplar statements to advance the contention that every statement alleged during these investor presentations fails "as a matter of law"—without any explanation as to how or why such statements fail. *Id.*

18

On December 7, 2021, days before the close of 2021, the Company affirmed 2021 guidance and Defendant Mikan stated they "ha[d] the data … [to] drive results" and again described issues as "tailwinds," while Defendant Smith stated the Company "continue[d] to exceed internal expectations" and that "performance to date [was] strong." ¶¶338-53. Defendant Smith also discussed a "[y]ear-to-date MCR of 90.3%." This narrative continued on January 11, 2022. For example, when discussing 2022 expectations Defendant Mikan cited the Company's "better-than-expected performance." ¶¶358-62. As would be shown *mere weeks later* when reporting 4Q and FY2021 results, however, the Company's performance wasn't "strong" at all— it was cataclysmic, including a quarterly MCR of 134.1% and a yearly MCR of 101.3%. Analysts who followed the Company were shocked (not surprising given the miss three times greater than consensus estimates), asking "what happened between the Investor Day in December, [the] conference in January, and today, where [the Company's] risk adjustment accruals came in much different than expected." In response, Defendant Mikan effectively admitted that their prior statements were false, as "[the Company] didn't have the data or the insights to really understand how [it] [was] capturing the risk codes and what other underlying medical trends [they were] seeing." ¶¶35, 376.

Given the foregoing, the MTD cannot plausibly contend that the Complaint fails to allege that statements made during the Class Period were false and misleading when made. *See In re Avon Sec. Litig.*, 2019 WL 6115349, at *19 (S.D.N.Y. Nov. 18, 2019) (class period statement regarding importance of employee training actionable viewed against post-class period admission company had abandoned all training). Yet the MTD ignores the wealth of case law in this Circuit that holds a retraction of a prior statement serves as a basis for falsity, even if it isn't an "admission of wrongdoing." *Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544

(S.D.N.Y. 2017) (restated financial results basis for falsity). Instead, the MTD hides yet again behind baseless accusations and self-serving inferences that cannot be considered on a motion to dismiss.  So too, must these arguments be denied.

### C.   Defendants Acted with Scienter with Respect to the Exchange Act Claims

Unlike the falsity analysis, for scienter the Court must conduct a "comparative assessment of plausible inferences" while "constantly assuming the plaintiff's allegations to be true," to determine whether, based on "*all* of the facts alleged, taken collectively," "a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rights*, *Ltd.*, 551 U.S. 308, 323, 326-27 (2007). Scienter may be inferred from "(1) [facts] showing that [a] defendant[] had both motive and opportunity to commit the fraud[,] *or* (2) [facts that] constitute[e] strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Recklessness can be shown where defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at \*21 (S.D.N.Y. Dec. 2, 2013).

The Complaint alleges a litany of factors that together, readily establish a strong inference that Defendants were aware of the operational issues the Company was facing during the Class Period. ¶¶390-432. Alternatively, had Defendants been entirely unaware of these issues, as argued in the MTD, they were *at the very least* severely reckless by speaking in detail on topics with zero basis. Under either theory the scienter requirement has been satisfied.

*First*, the Executive Defendants' detailed Class Period statements concerning, *inter alia*, growth, patient populations, risk adjustments, and MCR, provides "strong circumstantial

evidence that [they] were receiving some form of specific information."[13] *Lockheed Martin*, 875 F. Supp. 2d at 372. Indeed, "the statements in the Registration Statement and the investor presentation[s] are attributable to" the Executive Defendants, "so they were clearly aware" of the state of the Company at the time of the IPO. *Hi-Crush*, 2013 WL 6233561, at *26; *see also Citiline*, 701 F. Supp. 2d at 516 (inference of scienter where defendants stated they closely monitored loan portfolio and later revealed it was significantly underperforming).

Defendants later recanted their Class Period statements, at minimum supporting a theory of recklessness. *Compare* ¶341 (Defendant Mikan stating they "ha[d] the data … [to] drive results"), *with* ¶376 (Defendant Mikan stating "[they] didn't have the data or the insights"). After the close of the Class Period, the Executive Defendants disclosed that Bright Health's "significant deterioration" in 2021 "was due to specific identifiable issues," including "catching up on claims payments, and resolving resubmitted claims," due to "lack of visibility into lagging medical claims on our legacy operational systems, which require manual processing." ¶¶15, 34, 207, 370, 398. Defendants were ***at the very least*** severely reckless by making statements with no basis to know they were true. *See NIO*, 2021 WL 3566300, at *9-10 (recklessness based on failure to verify facility was under construction when making statements construction was underway); *Avon*, 2019 WL 6115349, at *20 (recklessness where company stated importance of training but later admitted it had abandoned training when couple with corroborating FE accounts).

***Second***, FE accounts support an inference of scienter.[14] ¶¶114-53, 399-405. The FEs corroborate the Complaint's allegations concerning the Company-wide issues, including

---

[13]  As senior Bright Health executives who signed the Registration Statement and spoke to investors on behalf of the Company, the scienter of the Executive Defendants "can be imputed" to Bright Health. *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 369 (S.D.N.Y. 2012) (collecting cases).

[14]  *See supra* Section III.B.1 (FEs described with sufficient particularity).

mounting claims backlogs and inaccurate risk adjustments, which were identifiable in 2020. ¶¶119, 128, 400-04; *see also In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 395 (S.D.N.Y. 2007) (circumstantial evidence supporting scienter where FEs stated "the Company's reporting systems were in such poor condition that it could not properly track unprocessed claims."). FE-1, who discussed claims backlogs directly with Bright HealthCare CEO Schindelman (¶131), advised that beginning in February 2021 there were routine all-hands meetings where Defendants Mikan and Smith, along with Schindelman, discussed claims backlogs. ¶¶129, 401-02; *see also In re ITT Educ. Servs., Sec. Litig.*, 34 F. Supp. 3d 298, 307 (S.D.N.Y. 2014) (circumstantial evidence supporting scienter where FEs "confirm[ed] that Defendants … routinely attended meetings at which [issues] were discussed"). According to FE-1, it was a "known fact" that Defendants Mikan and Smith were aware of the claims backlogs, and because of this, Bright Health management were also aware the financials in the Registration Statement were not accurate. ¶¶132-33, 403-04. FE-3 stated there were similar all-hands meetings during the Class Period where Defendant Smith discussed the Company's poor performance. ¶¶152, 405.

*Third*, high-level departures can contribute to an inference of scienter. *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *16-17 (S.D.N.Y. Aug. 11, 2021) (finding high-level executive departures "contribute[d] to a strong inference of scienter"). Schindelman, CEO of Bright HealthCare, and Srivastava, CEO of NeueHealth, abruptly left after the close of the Class Period. ¶¶339, 364, 387, 425-26. *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014) (collecting cases and noting departures "[can] suggest[] a higher level of wrongdoing approaching recklessness or even conscious malfeasance."). FE-1, who directly communicated with Schindelman prior to the Class Period regarding the claims backlog problems, stated that Schindelman had been "laid off" in March 2022 partly as a scapegoat for Bright HealthCare's

22

pre-existing operational problems. ¶¶131, 139; *see also Scot.*, 524 F. Supp. 2d at 394 n.176 (noting that "highly unusual or suspicious" resignations "add to the overall pleading of circumstantial evidence of fraud."). As such, these are not "ordinary course departures," but instead the jettisoning of two senior executives to quell investor outrage following Bright Health's disastrous post-IPO performance, and thus contribute to an inference of scienter.[15] MTD at 24.

*Fourth*, the Executive Defendants, as the Company's senior-most executives, "were intimately involved in the day-to-day operations of [Bright Health], and they can be presumed to have knowledge of the [C]ompany's core operations."[16] *Hi-Crush*, 2013 WL 6233561, at *26 (core operations where contract represented 18% of revenue). Because the Complaint's allegations go to the "core operations" of Bright Health's business, *i.e.*, Bright HealthCare and NeueHealth which accounted for all the Company's revenue, this "permits an inference" of scienter, *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 623-24 (S.D.N.Y. 2017), or at minimum, may provide supplemental support for establishing scienter. *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011) ("allegations of a company's core operations … and removal of its executives can provide supplemental support for allegations of scienter"); *see also Avon*, 2019 WL 6115349, at *20 (core operations where segment accounted for 21% of revenue). Indeed, "it would be absurd" to suggest that the Executive Defendants lacked

---

[15]   The MTD's cited cases are inapposite. *See Alstom*, 406 F. Supp. 2d at 505-06 (departures **supported** inference of scienter based on allegations); *Kurtzman v. Compaq Computer Corp.*, 2002 WL 32442832, at *10 (S.D. Tex. Mar. 30, 2002) (out-of-circuit case where plaintiff failed to link resignations to fraud, unlike here).

[16]   Here, one not even need infer based on Defendant Smith's statement that they closely monitored the Company's performance and medical costs by "[i]nternally … look[ing] at [their] underlying operational performance without prior period adjustments and unusual items like the impact of COVID-related expenses." ¶305.

knowledge regarding issues impacting the entirety of Bright Health's business. *See In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012).

**Fifth**, close temporal proximity between positive statements and sudden reversals of fortune can provide strong circumstantial evidence of scienter. *See Pareteum*, 2021 WL 3540779, at *16 ("The proximity and size of the restatements, just seven months after [defendants'] firm and rosy representations of revenue, backlog, and realization add further strength to the strong circumstantial evidence of scienter."). Here, the November 2021 corrective disclosure came mere months after the IPO and the Company's 2Q2021 earnings, and the March 2022 disclosure came on the heels of the December 2021 Investor Day and the January 2022 conference, supporting an inference of scienter. *See Mississippi Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 91 (1st Cir. 2008) (close temporal proximity providing "strong evidence" of scienter); *see also CPI Card.*, 2017 WL 4941597, at *4 ("The fact that [company] admitted its awareness of the [issues] so soon after the IPO … supports a claim of pre-IPO knowledge").

**Finally**, pending investigations can serve as evidence of scienter. *See ITT*, 34 F. Supp. 3d at 309 ("The Court will consider the pending investigations as evidence of scienter."); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) (same). Here, on April 8, 2022, Colorado regulators announced they were fining Bright Health for failure to pay provider claims and the untimely processing of claims beginning in "early 2021" (¶388) and FE-1 stated that Bright Health had been audited by Colorado prior to the IPO (¶¶223, 411).

## D.   Control Person Claims

The MTD does not dispute that the Individual Defendants were control persons. Instead, it incorrectly advances a "culpable participation" standard.[17] MTD at 25. To state a "*prima facie*

---

[17]   The MTD also argues that the control claims must be dismissed because the Complaint fails to allege primary violations, which is not the case here, mooting any such argument.

case of [control person] liability," a plaintiff need only show "a primary violation by a controlled person." *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 152 (2d Cir. 2021); *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011) (same). For Section 15, the Complaint alleges "that the Individual Defendants had control over [Bright Health] because all of them signed [the] Registration Statement" (¶¶43-56), and otherwise "participated in the preparation and dissemination of the Registration Statement, and otherwise participated in the process necessary to conduct the IPO" (¶¶260-67). Nothing more need be shown even *if* some "culpable participation" requirement applied to Section 15. *NIO*, 2021 WL 3566300, at *11-12 (signing registration statement sufficient); *see also In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 773 (S.D.N.Y. 2012) (collecting cases and holding no culpable participation needed for Section 15). For Section 20(a), a plaintiff need only plead that the defendant was involved in the day-to-day management of the company and had responsibility over its statements to the public. *See In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 363–64 (S.D.N.Y. 2005) (relying on *Suez Equity Invs. L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 101 (2d Cir.2001)). This is *precisely* what the Complaint has alleged, among other allegations of control. ¶¶468-69. Regardless, such "culpable participation" inquiry is of little importance where Plaintiff has shown scienter for control persons. *See Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 551 (S.D.N.Y. 2020).

IV.    **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in full.[18]

---

[18]    If the Court dismisses any or all of the Complaint, Lead Plaintiff respectfully requests leave to amend pursuant to Rule 15 of the Federal Rules of Civil Procedure as this is the first complaint considered. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("usual practice upon granting a motion to dismiss to allow leave to replead").

DATED: November 14, 2022        Respectfully submitted,

*/s/ Alfred L. Fatale III*
**LABATON SUCHAROW LLP**
Alfred L. Fatale III
David J. Schwartz
Charles Wood
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
afatale@labaton.com
dschwartz@labaton.com
cwood@labaton.com

*Counsel for Lead Plaintiff and Lead*
*Counsel for the Proposed Class*

26