UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

VICTORINO MARQUEZ,

                Plaintiff,

       -against-

BRIGHT HEALTH GROUP, INC., G. MIKE MIKAN,
CATHERINE R. SMITH, JEFFREY J. SCHERMAN,
ROBERT J. SHEEHY, KEDRICK D. ADKINS JR.,
NAOMI ALLEN, JEFFREY FOLICK, LINDA
GOODEN, JEFFERY R. IMMELT, MANUEL
KADRE, STEPHEN KRAUS, MOHAMAD
MAKHZOUMI, ADAIR NEWHALL, J.P. MORGAN
SECURITIES LLC, GOLDMAN SACHS & CO. LLC,
MORGAN STANLEY & CO. LLC, BARCLAYS
CAPITAL INC., BOFA SECURITIES, INC.,
CITIGROUP GLOBAL MARKETS INC., PIPER
SANDLER & CO., NOMURA SECURITIES
INTERNATIONAL, INC. and RBC CAPITAL
MARKETS, LLC,

              Defendants.

**MEMORANDUM AND ORDER**
22-cv-101 (LDH) (MMH)

---

Victorino Marquez ("Plaintiff") individually and on behalf of all other similarly situated

individuals ("Plaintiffs"), brings this putative class action against Bright Health Group, Inc.

("BHG"), BHG executives G. Mike Mikan and Catherine R. Smith ("Executive Defendants"),

BHG Chief Accounting Officer Jeffery J. Sherman, and several members of BHG's Board of

Directors and financial services companies (collectively, "Defendants"), asserting claims for

violations of sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act")

and violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the

"Exchange Act"), and a violation of Securities Exchange Commission ("SEC") Rule 10b-5,

codified at 17 C.F.R. § 240.10b-5. Defendants move pursuant to Federal Rule of Civil Procedure

12(b)(6) to dismiss the Amended Complaint in its entirety.

## BACKGROUND[1]

BHG is a healthcare insurance company that was founded in 2015 and expanded rapidly into its initial public offering ("IPO") on June 24, 2021.  (Am. Compl. ¶¶ 88, 107, ECF No. 38.) BHG's health plans include individual and family plans ("IFPs") and MA plans,[2] which are available in 99 markets across 14 states.  (*Id.* ¶ 88.)  BHG has two segments: Bright Health Services, Inc. (d/b/a NeueHealth) ("NeueHealth") and Bright Health Management, Inc.  (*Id.* ¶ 89.)  As of June 2021, BHG served approximately 623,000 consumers, including 515,000 commercial consumers and 108,000 MA consumers.  (*Id.* ¶ 91.)

Plaintiff purchased BHG's common stock between the June 24, 2021 IPO and March 1, 2022 (the "Class Period").  (*Id.* ¶¶ 17, 41.)  In the offering documents BHG filed in connection with its IPO, it provided a disclosure warning of the risks it faced from its rapid growth:

> Since our inception, we have experienced rapid growth, with total revenue having grown from $130.6 million in 2018 to $1.2 billion in 2020. Our significant growth to date, attributable to both rapid organic membership growth and acquisitions of other businesses, has placed and we expect will continue to place significant demands on our management team and our operational and financial resources. . . .
>
> Continued rapid growth in our business may exacerbate certain of the risks described elsewhere in this section, including our ability to accurately estimate costs, price our products, and charge appropriate premiums, as well as our ability to accurately assess, code and report IFP, MA and Small Group risk adjustment factor ("RAF") scores for our consumers. . . .

---

[1] The following facts are taken from the Amended Complaint and are assumed to be true for the purpose of this memorandum and order, unless otherwise indicated.

[2] The Court takes judicial notice that "MA plans" refers to a Medicare Advantage Plan.  *Understanding Medicare Advantage Plans*, Medicare.gov, https://www.medicare.gov/publications/12026-Understanding-Medicare-Advantage-Plans.pdf (last visited Oct. 31, 2024).

(Am. Compl. ¶ 171 (quoting Defs.' Ex. 1 ("Registration Statement") at 24, ECF No. 48-5).[3]

BHG also highlighted risks inherent in its risk adjustment programs in particular:

> Our health plan products are subject to risk adjustment programs, which if not managed properly can result in lost revenue, which could adversely impact our financial results and cash flows. . . .
>
> If the data on our consumer population overstates the health risk of our consumer population, we may be obligated to return funds we have received to government payors. . . . As a result of the variability of certain factors that go into the development of the risk adjustment we recognize, such as risk scores and other market-level factors where applicable, the actual amount of revenue could be materially more or less than our estimates. Consequently, our estimate of our health plans' risk scores for any period, and any resulting change in our accrual of revenue related thereto, could have a material adverse effect on our results of operations, financial condition, and cash flows.

(*Id.* ¶ 175 (quoting Registration Statement at 39).) BHG explained that issues with performing risk adjustments could be caused and exacerbated by BHG's recent rapid growth:

> In addition, the historical data on which our assumptions are based may not necessarily be indicative of the actual costs of claims due to our rapid growth in consumer enrollment and our recent expansion into new businesses and markets. When we commence operations in a new state, region, or other market, or introduce a new product line, we have limited information from which to estimate our potential medical claims liability. For a period of time after our entry into a new market, our inception of a new business, or our acquisition of an existing business, we base our estimates on government-provided and third-party historical actuarial data and limited actual incurred and received claims and inpatient acuity information. The addition of new categories of eligible individual, as well as new plan designs we may offer, may make it difficult for us to estimate our medical claims liability and may result in the actual cost of claims being higher than we anticipate.

(*Id.* ¶ 169; Registration Statement at 23.) BHG also warned of risks from the COVID-19 pandemic, including that:

---

[3] The Court may consider "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted).

The COVID-19 pandemic has adversely affected, and may continue to adversely affect, our business and results of operations. . . .

As a result of the COVID-19 pandemic and the associated protective and preventative measures, we have experienced and may continue to experience disruptions to our business. Risks presented by the ongoing effects of COVID-19 include, but may not be limited to, the following:

Documentation of Health Conditions. Due to the COVID-19 pandemic, we may not be able to adequately document the health conditions of our consumers and patients, as many of them have avoided in-person medical visits. . . . Inaccurate or inadequate documentation could result in an inaccurate RAF score, which could adversely impact our [] revenue for future periods. . . .

To the extent the COVID-19 pandemic continues to adversely affect our business and financial results, it may also have the effect of heightening many of the other risks described in this section of the prospectus titled "Risk Factors."

(Am. Compl. ¶ 173 (quoting Registration Statement at 25–27).) BHG disclosed that it relied on third-party vendors for claims processing and other operations, and disclosed the risk that such vendors might be unable to effectively support BHG's business needs, particularly in light of BHG's rapid growth:

[I]n order to effectively operate our business, we rely heavily on third-party vendors. Our rapid growth could outpace the capacity of our third-party service providers to effectively support our business needs. Certain of our third-party service providers have in the past been unable to effectively scale their operations to meet our increased demands resulting from our rapid expansion. In the event that our existing third-party service providers are unable to meet our needs as our business grows, we may need to find alternative service providers. If we are unable to do so in a timely manner or if we are unable to contract with new service providers on terms that are acceptable to us or at all, our ability to operate our business may be disrupted, which may adversely affect our business, financial condition, results of operations, and cash flow.

(Registration Statement at 24.)

Following the IPO, BHG experienced challenges, which it first reported on a November 11, 2021 conference call with analysts and investors. (Am. Compl. ¶ 196.) Mike Mikan, BHG's President and CEO, reported that BHG posted a net loss nearly triple what analysts were

4

expecting due to a rapidly rising medical cost ratio ("MCR")[4] of 103%, up significantly from historical MCR reported in the Registration Statement and the year-to-date MCR disclosed the quarter prior. (*Id.* ¶¶ 11, 24, 194, 319.) Mikan explained that BHG had been unable to "accurately capture the risk of [its] members and therefore, [its] estimated 2021 risk score [was] lower than [it] had originally anticipated" due to unexpected impact of the Affordable Care Act's ("ACA") extended open enrollment[5] growth and the COVID-19 Delta variant. (Am. Compl. ¶¶ 196, 321.)

Further, based on its rapid growth, "population health risk [was] difficult to estimate" which "limited [BHG's] ability to . . . understand the health status of the population," preventing BHG from "captur[ing] underlying risk and impacting [its] risk adjustment scoring." (*Id.* ¶¶ 197, 198, 200, 322.) BHG reported a "[$134 million] negative impact from risk adjustment scoring," with "$89 million . . . related to the first half of 2021." (*Id.* ¶¶ 25, 199, 324, 396, 430.)

Thereafter, BHG's shares declined 41%, closing at $4.94 per share on November 11, 2021. (*Id.* ¶ 201.) During an earnings call held the same day, Mikan described challenges as "tailwinds" and touted "strong predictability or at least understanding of our underlying costs" which were "consistent," and Catherine Smith, BHG's CFO, stated that "MCR performance in

---

[4] MCR "compares a health insurance company's healthcare-related costs to its revenue premium. The ratio is frequently used to determine the financial strength of an insurance company, as it informs the percentage of revenue that goes towards medical claims." (Am. Compl. ¶ 80.) "The ideal MCR is 80% for small groups and 85% for large groups. . . . [A]n MCR of over 100% indicat[es] that the company is operating at a loss—in other words the premiums paid do not cover the cost of claims made." (*Id.* ¶ 83.)

[5] The ACA allows individuals to enroll in a health insurance marketplace between November 1 and January 15 of a given fiscal year. *See Open Enrollment Period*, HealthCare.gov, https://www.healthcare.gov/glossary/open-enrollment-period/. A special enrollment period is "[a] time outside of the yearly Open Enrollment Period" when individuals can sign up for health insurance. *See Special Enrollment Period*, HealthCare.gov, https://www.healthcare.gov/glossary/special-enrollment-period/. On March 23, 2021, the Centers for Medicare & Medicaid Services extended access to the special enrollment period as part of the federal government's response to the COVID-19 pandemic. Chelsea Cirruzzo, *Biden Extends Health Insurance Marketplace Through Summer*, U.S. News & World Report (Mar. 23, 2021), https://www.usnews.com/news/health-news/articles/2021-03-23/biden-extends-health-insurance-marketplace-through-summer.

both . . . businesses [was] solid." (*Id.* ¶¶ 327–30.) On December 7, 2021, during BHG's Investor Day, Mikan affirmed his 2021 guidance and stated BHG "ha[d] the data . . . [to] drive results" and again described issues as "tailwinds," while Smith stated the Company "continue[d] to exceed internal expectations" and that "performance to date [was] strong." (*Id.* ¶¶ 338–53.) On January 11, 2022, Mikan stated that BHG's anticipated increase in revenue reflected its "better-than-expected" performance in 2021. (*Id.* ¶¶ 359.)

On February 11, 2022, BHG "abruptly announced" the departure of Simeon Schindelman, CEO of the Bright HealthCare segment. (*Id.* ¶ 425.) On a March 2, 2022 conference call, BHG reported its fourth quarter and fiscal year 2021 financial results, revealing net losses three times higher than consensus estimates, a quarterly MCR of 134.1%, up from 105.4% year-over-year, and a full year MCR of 101.3%, up from 88.7%. (*Id.* ¶¶ 13, 32, 204, 210.) BHG stated these results were due to "an inability to capture risk adjustment on newly added lives, as well as prior period medical costs recognized in the fourth quarter." (*Id.* ¶¶ 204, 367.)

During the March 2022 call, Mikan stated that the "significant deterioration" in BHG's 2021 results "was due to specific identifiable issues, including COVID costs, catching up on claims payments, and resolving resubmitted claims" which "was compounded by [a] lack of visibility into lagging medical claims on [BHG's] legacy operational systems, which require manual processing." (*Id.* ¶¶ 34, 207, 370, 398.) Mikan explained that BHG "didn't have the data or the insights to really understand how [it] [was] capturing the risk codes and what other underlying medical trends [they were] seeing." (*Id.* ¶ 376.) Smith attributed BHG's poor 2021 MCR to COVID-19 and "claims processing issues where [BHG's] challenges in capturing the risk of the population was in part due to the lack of timely insight into data, which drove the

insufficient engagement in care management." (*Id.* ¶ 208.) BHG had overstated its risk adjustment, resulting in a quarterly revenue decrease of $148 million, with "$111 million relat[ing] to prior quarters." (*Id.* ¶ 371, 379.) Smith elaborated that "MCR pressure" was due to "delays in attributing members in part due to [their] rapid growth in 2021, as well as the impact of the unique 2021 special enrollment period," and that the Company was forced to "recognize[] $139 million in prior period medical costs in Q4." (*Id.* ¶¶ 15, 34, 208, 371, 398.)

Thereafter, BHG shares declined 20% to close at $2.51 per share on March 2, 2022, and continued to fall to $1.79 on March 7, 2022. (*Id.* ¶¶ 36, 213, 378.) On April 8, 2022, the Colorado Division of Regulatory Agencies, Division of Insurance announced that it would issue a $1,000,000 fine to BHG as a result of an investigation into BHG's claims processing and payment errors. (*Id.* ¶ 388.) And, in May 2022, BHG announced a series of executive departures, including Sam Srivastava, CEO of the NeueHealth section of BHG. (*Id.* ¶ 425.)

A former employee of BHG, FE-1, who had worked for BHG in Arizona from December 2019 through July 2021, confirmed that by February 2020 Bright Health had a massive backlog of claims. (*Id.* ¶¶ 114, 129.) FE-1 explained that the backlog of claims was due, in part, to a company-wide failure to maintain accurate provider directories, which were stored in BHG's "master data warehouse," resulting in the systemic denial of valid claims. (*Id.* ¶¶ 116, 118-20, 127.) As a result, BHG was 180 days or more behind on claims, where the industry standard was 30 to 90 days, or 30 to 45 days for electronically submitted claims. (*Id.* ¶¶ 120, 133.) As BHG struggled to process claims, it could not obtain the information needed to prepare risk scores, an issue that became apparent by May 2020. (*Id.* ¶¶ 127–28.) Moreover, FE-1 explained the claims backlog affected the BHG's ability to calculate MCR, causing it to understate costs. (*Id.* ¶ 134.) Two other former employees, FE-2 and FE-3, worked at BHG for six and five months,

respectively.  (*Id.* ¶¶ 141, 148.)  FE-2 stated that the COVID-19 pandemic exacerbated BHG's preexisting operational issues.  (*Id.* ¶¶ 145–47.)  FE-3 explained that BHG's operational problems led to complaints from the BHG's providers about unpaid claims.  (*Id.* ¶ 151.)

## STANDARD OF REVIEW

To withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of defendants' liability for the alleged misconduct.  *Id.*  While this standard requires more than a "sheer possibility" of defendants' liability, "[i]t is not the [c]ourt's function to weigh the evidence that might be presented at trial" on a motion to dismiss.  *Id.*; *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999).  Instead, "the [c]ourt must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the court must accept the factual allegations of the complaint as true."  *Morris*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999) (citations omitted).

With respect to claims alleging fraud, however, Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  In addition to the requirements of Rule 9(b), a plaintiff seeking to avoid dismissal of a securities complaint must also satisfy the pleading requirements included in the Private Securities Litigation Reform Act ("PSLRA").  *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110 (2d Cir. 2009).  Congress enacted the PSLRA in 1995 in part "[a]s a check against abusive litigation by private parties."  *Id.* at 111.  The PSLRA requires complaints alleging securities fraud to "state with

particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2).

## DISCUSSION

## I.    Securities Act

Section 11 of the Securities Act imposes "strict liability on issuers and signatories, and negligence liability on underwriters" in a registered securities offering "when the registration statement . . . contains material misstatements or omissions."  *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) (citing 15 U.S.C. §§ 77k, 77l(a)(2)).  Section 12(a)(2) provides similar relief where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions.  *See* 15 U.S.C. § 77l(a)(2).  "Claims under sections 11 and 12(a)(2) are . . .  Securities Act siblings with roughly parallel elements."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).  These provisions create "three potential bases for liability . . . (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading."  *Id.* at 360.  Unlike with securities fraud cases, "plaintiffs bringing claims under [these section] need not allege scienter, reliance, or loss causation."  *Id.* at 359.

To state a claim under Section 11 or 12(a)(2) of the Securities Act, a plaintiff must allege that: "(1) [he] purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  *Id.* at 358–59 (internal quotations

omitted).  Where, like here, a plaintiff alleges a Securities Act claim, "based on omissions, [they] must demonstrate that the 'allegedly omitted facts both existed, and were known or knowable, at the time of the offering.'"  *Gutman v. Lizhi Inc.*, 633 F. Supp. 3d 681, 688 (E.D.N.Y. 2022) (quoting *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008)). Defendants argue that Plaintiff's Securities Act claims under Sections 11 and 12(a)(2) fail because the Amended Complaint does not plausibly allege any material misstatement or omission that both existed and was known or knowable, at the time of the offering.  (Mem. of L. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mem.") at 8–15, ECF No. 47-1.)  The Court agrees.

Although the Amended Complaint spans nearly 200 pages and includes 477 allegations, Plaintiff's Securities Act claim distills to five allegations.  In sum, Plaintiff alleges that BHG's Offering Documents were false and misleading because they failed to disclose that, at the time of the IPO: (1) BHG's "medical provider directories were not accurate or up to date in both its new and existing markets" which caused claims to be either "improperly denied" or otherwise "backlogged[] in being processed and paid"; (2) BHG did not have "enough staff and resources to handle the claims in a timely manner"; (3) due to this alleged backlog of claims, BHG "owed millions of dollars to healthcare providers for overdue claims"; (4) due to these alleged claims-processing and directory issues, BHG "was unable accurately perform risk adjustments" and therefore "understated its costs and the health risk of its members, which in turn, caused [BHG] to similarly overstate its MCR"; and (5) both the COVID-19 pandemic and BHG's pre-IPO growth exacerbated each of these alleged operational issues.  (Am. Compl. ¶¶ 177, 192, 276, 291, 310, 331, 354, 363, 394.)

Plaintiff acknowledges that BHG's Registration Statement included disclosures warning investors of various risks, including risks related to the states about which Plaintiff complains.

Indeed, the Amended Complaint includes allegations that BHG disclosed risks associated with BHG's ability to set appropriate premiums, manage its costs and growth, evaluate the business, and predict future prospects. (Am. Compl. ¶¶ 169–77.) The Amended Complaint attributes these risks to BHG's limited operating history, the COVID-19 pandemic, the accuracy of BHG's data, the management of risk adjustment programs, and the performance of third-party vendors. (*Id.*) And, the Second Circuit has long made clear that a defendant's inclusion of detailed risk factor disclosures in its offering documents can undermine allegations that the defendant materially misled investors. *See Panther Partners*, 538 F. Supp. 2d at 672 ("An accurate statement coupled with the precise disclosure of a risk later realized cannot adequately form the basis for a securities claim"); *In re Micro Focus Int'l Plc Sec. Litig.*, No. 1:18-CV-06763, 2020 WL 5817275, at *6 (S.D.N.Y. Sept. 29, 2020) ("Nor does Plaintiff plead why [forward-looking] statements are misleading in the context of detailed statements of risk."). Even still, Plaintiff alleges that Defendant's risk warnings were insufficient and indeed misleading because they described such risks only as "potential" when BHG was aware that the risks had already materialized or predictably would do so. (Am. Compl. ¶¶ 169–77.) It is true as a matter of law that "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004). The question here, however, is whether Plaintiff's factual allegations support an inference that the risks Defendants warned of in the Registration Statement had manifested prior to the IPO.

In support of his claim that many of what the Registration Statement described as "risks" had already manifested, Plaintiff principally relies on statements from former employees attesting to BHG's poor operational state prior to the IPO and post-IPO corrective disclosures allegedly admitting to these problems. (Pl.'s Opp'n to Defs.' Mot. ("Pl.'s Opp'n") at 4, ECF No.

49.)  In particular, the Amended Complaint offers up allegations by three former BHG employees—FE-1, FE-2, FE-3—alleging that BHG had been experiencing a backlog of claims due to a company-wide failure to maintain accurate provider directories prior to the IPO in June 2021.  (*See* Am. Compl. ¶¶ 116, 118–20, 127, 144, 150–53.)  These allegations, however, are insufficient to support even an inference that any of these employees occupied a position to possess the information alleged.  *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460–61 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011) (declining to credit confidential sources because they did not interact with the defendants and "had no access to aggregated data").  That is, according to the Amended Complaint, FE-1 was responsible only for the insurance product segment of BHG's business in Arizona from December 2019 to July 2021.  (Am. Compl. ¶ 114.)  As Defendants argue, a former employee responsible for just one of BHG's many insurance segments in just one or two of the fourteen states in which BHG operated "simply was not in a position from which to opine on the overall condition of BHG's overall business."  (Defs.' Mem. at 12.)  FE-2 and FE-3 worked at BHG for six and five months, respectively, and oversaw limited aspects of BHG's operations.  (Am. Compl. ¶¶ 141–42 (alleging that FE-2 "oversaw a team of nurses and social workers who performed case management services" for BHG members), *id.* ¶¶ 148–49 (alleging that FE-3 "functioned as a liaison" between BHG's members and BHG's providers.)  It is therefore implausible that FE-2 and FE-3 could have first-hand knowledge of BHG's alleged failings.  *Cf.*, *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 196 (S.D.N.Y. 2010) (crediting confidential witnesses who had "first-hand interactions with the Defendants concerning the matters alleged in the Complaint."), *aff'd*, 430 F. App'x 63 (2d Cir. 2011).

Plaintiff nevertheless relies on *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp. PLC* for the proposition that "the allegations of former regional employees are sufficient in supporting falsity where the complaint pleads, as it does here, "company-wide practices." (Pl.'s Opp'n at 12 (citing 709 F.3d 109, 123–24 (2d Cir. 2013).) In *New Jersey Carpenters*, the plaintiff alleged that the defendant engaged in a widespread practice of ignoring its own underwriting guidelines and "describe[ed] its sources as employees who would have participated in different aspects of [the defendant's] [underwriting] process during part or all of the relevant time period." 709 F. 3d at 124. The Second Circuit evaluated confidential witness allegations and ultimately determined that the plaintiffs had provided an "adequate basis for believing that the defendants' statements were false." *See Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). In particular, the Second Circuit found that allegations from "eight unnamed prior employees" of the defendant that had held various positions, including former quality control auditors and account managers, and had direct knowledge of a widespread practice of ignoring underwriting guidelines, supported the inference that the defendant misled investors by failing to disclose that fact. *Id.* at 118, 121.[6] By contrast, Plaintiff does not offer up any allegations that the confidential sources in the Amended Complaint had direct knowledge of BHG's company-wide practices. In the absence of allegations of direct knowledge, the Amended Complaint fails to support Plaintiff's claim.

---

[6] The other cases Plaintiff cites are similarly inapposite because in those cases, the confidential sources alleged that they were in a position with direct knowledge that operations on the ground directly contradicted representations made by the defendants. *See In re Nio Sec. Litig.*, No. 19-CV-1424, 2021 WL 3566300, at *4, 7 (purchasing manager responsible for "installation of new factories" where alleged that construction on factory never began); *In re Blue Apron Holdings, Inc. Sec. Litig.*, No. 17-CV-4846, 2020 WL 1950783, at *7 (E.D.N.Y. Apr. 22, 2020) (quality associate at Liden facility where alleged that Liden facility far behind schedule).

Even if the Court assumed for the sake of argument that these confidential witnesses were well-positioned to have information concerning BHG's operations, the allegations attributable to these witnesses do not support an inference that the wide-spread operational issues alleged in the Amended Complaint existed at the time of the IPO in June 2021. Plaintiff alleges through FE-1 and FE-3 that claims-processing backlogs stemming from BHG's failure to maintain its company-wide provider directories led to the routine denial of valid claims and to inaccurate risk adjustments and the ability to project MCR. (*Id.* ¶¶ 116–20, 127–28, 150, 153). Moreover, Plaintiff alleges that FE-2 "observed an increase in the volume of complaints" about BHG's payment backlog "in approximately May or June 2021 through the end of his employment." (*Id.* ¶ 144.) The allegations of FE-2 and FE-3 are based solely on those former employees' anecdotal experiences. (*See, e.g.*, *id.* (basing FE-2's knowledge of provider payment backlogs on the work he did with teams responsible for treatment coverage and approvals, even though FE-2 was not personally responsible for approvals); ¶¶ 150–51 (basing FE-3's allegations on complaints he received from BHG's providers).) *See In re Lehman Bros. Sec. & Erisa Litig.*, Nos. 10 Civ. 6637, 09 MD 2017, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) (rejecting confidential witnesses who "were loan level underwriters, not managers or corporate officers who could have spoken to the company's practices broadly"). And, although FE-1 alleges that Executive Defendants addressed these operational concerns in multiple "all hands meetings" beginning in February 2021, (*id.* ¶ 121), the Amended Complaint does not provide a basis for how FE-1 would have personal knowledge of the extent of the operational issues discussed. *See In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (finding a former employee's statement that he attended meetings during which reports were circulated and questions were raised to be "so vague as to be meaningless," because it lacked, among other

14

allegations, "information regarding how extensively or in what manner the reports were discussed"). Thus, while these confidential witness allegations support an inference that BHG experienced a backlog of claims to some extent around the time of the IPO, they fall short of adequately pleading that those operational problems were "wide-spread" and "well-known" by the June 2021 IPO. *See Micro Focus Int'l*, 2020 WL 5817275, at *8 (declining to rely on allegations by a defendant's "former employees" where those allegations did not sufficiently establish that certain (and allegedly undisclosed) risks had materialized prior to the effective dates of the defendant's offering documents).

Plaintiff's reliance on Executive Defendants' statements is equally unavailing. According to the Amended Complaint, certain BHG executives, which confirmed post-IPO corrective disclosures that the purported "future conditions" warned of in the Registration Statement already existed at the time of the IPO. The first came during BHG's November 2021 earnings call, when Mikan informed investors that BHG's "ability to accurately capture the risk of [its] members and therefore, [its] estimated 2021 risk score [was] lower than [it] had originally anticipated" due to unexpected impact of the ACA's extended open enrollment growth and the COVID-19 Delta variant. (Am. Compl. ¶¶ 196, 321.) As a result, Mikan explained, there was "an increase in [BHG's] risk adjustment payable and a corresponding decrease in [its] reported premium revenue." (*Id.*) In the second disclosure in March 2021, Mikan stated that the "significant deterioration" in BHG's 2021 results "was due to specific identifiable issues, including COVID costs, catching up on claims payments, and resolving resubmitted claims" which "was compounded by [a] lack of visibility into lagging medical claims on [BHG's] legacy operational systems, which require manual processing." (*Id.* ¶¶ 34, 207, 370, 398.) Mikan explained that BHG "didn't have the data or the insights to really understand how [it] [was]

15

capturing the risk codes and what other underlying medical trends [they were] seeing." (*Id.* ¶ 376.)  Likewise, Smith attributed BHG's poor 2021 MCR to COVID-19 and "claims processing issues where [BHG's] challenges in capturing the risk of the population was in part due to the lack of timely insight into data, which drove the insufficient engagement in care management." (*Id.* ¶ 208.)

Plaintiff argues that Executive Defendants' statements that 2021 was the "peak of inefficiency" due to "identifiable issues," and that BHG "did not have the data" to accurately manage risk, support an inference that Defendants knew about those conditions at the time of the IPO.  (Pl.'s Opp'n at 11–12.)  But, Plaintiff's argument does not account for the full explanation Executive Defendants credited for BHG's struggles, namely the impact of the COVID-19 Delta variant and the extended ACA open enrollment.  *See Demaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) ("In evaluating a prospectus, we read it as a whole. . . . Our inquiry does not focus on whether particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities.").  Plaintiff has not, and cannot, plausibly allege that BHG knew exactly how a combination of the ACA extended enrollment and the COVID-19 Delta variant would impact its business.  *See Gutman*, 633 F. Supp. 3d at 689 (noting that "there is no allegation that Defendants knew that COVID-19 would have a material impact on Lizhi's operations and revenue").  Hindsight is 20/20 and "[t]he Securities Act requires candor in disclosures, not clairvoyance." *Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 411 (S.D.N.Y. 2020); *In re WEBMD Health Corp. Sec. Litig.*, No. 11 Civ. 5382, 2013 WL 64511, at *5 (S.D.N.Y. Jan. 2, 2013) (holding that, "even if [the company] underestimated the effect on their year-long

predictions and guidance, the Second Circuit does not permit pleading fraud by hindsight" (quotation marks and citation omitted)).

Moreover, BHG disclosed not only the risk that the COVID-19 pandemic might impose on its ability to catch up on payments and resolve resubmitted claims, (Am. Compl. ¶¶ 169–77), but also that its "rapid growth could outpace the capacity of [its] third-party service providers to effectively support [its] business needs," as had been the case "in the past," (Registration Statement at 24). BHG "cannot be held liable for failing to disclose something that [it] disclosed."[7] *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 180 (E.D.N.Y. 2017), *aff'd*, 731 F. App'x 35 (2d Cir. 2018); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("Even at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed.") (citations omitted)); *see also Panther Partners*, 538 F. Supp. 2d at 672 ("An accurate statement coupled with the precise disclosure of a risk later realized cannot adequately form the basis for a securities claim.").

In short, the Amended Complaint does not plausibly allege that the warnings of future risks in BHG's offering documents had already materialized, rendering those disclosures

---

[7] Plaintiff's arguments that Defendants violated Items 303 and 105 of Regulation S-K fail for the same reason. (*See* Pl.'s Opp'n at 15, n.11.) Item 303 requires that an issuer "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material . . . impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Item 105 requires the issuer to provide "under the caption 'Risk Factors' a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105. To the extent that the Amended Complaint plausibly alleges a known trend at the time of the IPO, BHG disclosed that that it had previous operational difficulties due to its rapid growth and that the COVID-19 pandemic might exacerbate those issues.

materially misleading.  Plaintiff therefore does not state a claim under the Securities Act Sections 11 and 12(a)(2).[8]

## II.    Exchange Act and SEC Rule 10b-5

"To state a claim on which relief can be granted under § 10(b) and Rule 10b-5, a plaintiff must plead, inter alia, that in connection with the purchase or sale of securities, the defendant made a false representation as to a material fact, or omitted material information, and acted with scienter." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108 (2d Cir. 2009).  A claim brought under the Exchange Act must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires pleading the element of scienter.  *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011).  Defendants contend that Plaintiff's claim should be dismissed due to Plaintiff's failure to sufficiently allege any material misstatement or omission or that Defendants acted with scienter.  (Defs.' Mem. at 16.)

The Court's conclusion that Plaintiff has not provided sufficient allegations of a material misstatement or omission by Defendants under the Securities Act applies with equal force under the Exchange Act.  *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 360 ("The definition of materiality is the same for [the Securities Act] as it is under section 10(b) of the Exchange Act. . . .").  This basis alone renders Plaintiff's Exchange Act and Rule 10b-5 claims ripe for dismissal.  *See ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase*, 553 F.3d 187, 197 (2d Cir. 2009) (observing that a complaint may be properly dismissed on the

---

[8] Plaintiff brought a control person claim under Section 15 of the Securities Act as well.  Section 15 of the Securities Act creates liability for individuals or entities that "control any person liable under Sections 11 or 12."  15 U.S.C. § 77o(a).  Because Plaintiff failed to plead a Section 11 violation, Plaintiff likewise failed to plead a violation of Section 15.  *See DeMaria v. Andersen*, 153 F. Supp. 2d 300, 314 (S.D.N.Y. 2001), *aff'd*, 318 F.3d 170 (2d Cir. 2003) ("Because plaintiffs have failed to state an underlying violation under Section 12(a)(1) and Section 11, their claim under Section 15 must fail as well and is dismissed.").

ground that the alleged misstatements or omissions are not material when they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000) (same). Even if Plaintiff had adequately pleaded materiality, the Court agrees that his Exchange Act and Rule 10b-5 claims may be dismissed on lack of scienter as well.

A plaintiff must plead scienter "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *ECA, Local*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting 15 U.S.C. § 78u–4(b)(2)). This mental state can be established by "alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 198. Scienter is alleged if after a holistic analysis of plaintiff's allegations, "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

Where, as here, a plaintiff does not allege that a defendant had motive and opportunity to defraud the public, he or she must instead plead facts that support "a stronger inference of recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001). To constitute recklessness, the conduct must be "at the least . . . highly unreasonable and . . . represent[] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *S. Cherry St., LLC*, 573 F.3d at 109. Allegations of a defendant's knowledge of or access to contradictory information typically support a reasonable inference of recklessness. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001).

To plead scienter, Plaintiff alleges that Mikan acted recklessly "by making statements with no basis to know they were true," (Pl.'s Opp'n at 21), when he stated that BHG ha[d] the data . . . [to] drive results and are moving to a more focused and disciplined growth model" (Am. Compl. ¶ 341), at the December 2021 Investor Day, which stood in stark contrast to his later statement at the March 2022 conference call that BHG "didn't have the data or the insights really understand how [BHG] w[as] capturing the risk codes and what other underlying medical trends [BHG was] seeing," (*id.* ¶ 376).  But, Mikan's November statement that BHG had data to drive results is too generic for to infer that Mikan was referring to data specifically about risk codes and underlying medical trends.  In other words, Mikan's statement was mere corporate optimism. *In re Yunji Inc., Sec. Litig.*, No. 19-cv-6403, 2021 WL 1439715, at *8 (E.D.N.Y. Mar. 31, 2021) (noting that puffery "includes statements, such as a company's generalizations regarding [its] business practices,' that are 'too general to cause a reasonable investor to rely upon them") (citing *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).

Nor do Plaintiff's confidential source allegations support a reasonable inference of scienter.  Plaintiff alleges that FE-1 discussed claims backlogs directly with Simeon Schindelman, CEO of the Bright HealthCare segment.  (Am. Comp. ¶ 131.)  Plaintiff also alleges that beginning in February 2021 there were several all-hands meetings where Mikan and Smith, along with Schindelman, discussed the claims backlogs.  (*Id.* ¶¶ 129, 401–02.)  Absent from the Amended Complaint, however, are any allegations that would provide a basis for the inference that FE-1 had first-hand knowledge of Executive Defendants' mental states.  *Campo v. Sears Holdings Corp.*, is instructive on this point.  635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009) *aff'd*, 371 F. App'x 212 (2d Cir. 2010).  There, the court found that allegations from three confidential

witnesses that the corporate defendants misrepresented the true value of certain real estate assets did not support an allegation of recklessness.  *Id.* at 335.  While each confidential witness was alleged to have some understanding of the defendants' alleged efforts to conceal the value of the real estate portfolio at issue, the court found that "none of them had any contact" with the defendants.  *Id.*  That fact proved fatal to the plaintiff's claim.  Here, too, the Amended Complaint fails to offer any allegations that FE-1 had any contact with Executive Defendants.  *Cf. Janbay v. Canadian Solar, Inc.*, No. 10 CIV. 4430, 2013 WL 1287326, at *7 (S.D.N.Y. Mar. 28, 2013) (holding that plaintiff had not alleged scienter based allegations from confidential source who was "out of the loop of management").

Plaintiff also argues that the departures of Schindelman and Sam Srivastava, CEO of the NeueHealth Segment, after the close of the Class Period "contribute to an inference of scienter." (Pl.'s Opp'n at 22.)  That is true where the allegations in the complaint somehow link the alleged departure to the alleged fraud.  *See In re BISYS Sec. Litig.,* 397 F. Supp. 2d 430, 447 (S.D.N.Y. 2005) (noting that, "absent any alleged facts linking the two resignations and the alleged fraud, the resignations of [company executives] do not support an inference of conscious misbehavior or recklessness").  The Amended Complaint fails to do so.  Indeed, on this point, Plaintiff alleges only that FE-1, who directly communicated with Schindelman prior to the Class Period regarding the claims backlog problems, stated that Schindelman had been "laid off" in March 2022 partly as a scapegoat for BHG's pre-existing operational problems. (Am. Compl. ¶¶ 131, 139.)  It is true that departures "[can] suggest[] a higher level of wrongdoing approaching recklessness or even conscious malfeasance."  *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 633 (S.D.N.Y. 2014).  However, Plaintiff's allegations provide no support for the inference that these departures were linked in any way to conscious misbehavior by Executive Defendants.

21

Next, Plaintiff argues that his allegations going to the "core operations" of BHG's

business, "permit[] an inference of scienter." (Pl.'s Opp'n at 23 (internal quotations omitted).)

Not so. The so-called "core operations theory" permits courts to "infer that a company and its

senior executives have knowledge of information concerning the core operations of a business,

such as events affecting a significant source of revenue." *In re Aegean Marine Petro. Network,*

*Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 173–74 (S.D.N.Y. 2021). That inference, however, cannot

do all the heavy lifting to plead a cogent theory of scienter. *See In re Plug Power, Inc. Sec.*

*Litig.*, No. 21 Civ. 2004, 2022 WL 4631892, *18 (S.D.N.Y. Sept. 29, 2022) ("While courts

within this Circuit have debated the viability of the doctrine, the majority approach treats it as

additional evidence of scienter but not independently sufficient to show scienter."); *In re*

*Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y.2011) (considering "'core

operations' allegations to constitute supplementary but not independently sufficient means to

plead scienter"). And, the Second Circuit has held in a similar context that allegations of

accounting irregularities and violations must be "coupled with evidence of corresponding

fraudulent intent" to be sufficient to plead scienter. *Novak*, 216 F.3d at 309. So, while the Court

may infer that Defendants knew about BHG's operational setbacks, Plaintiff has not coupled that

inference with any viable allegations that support the conclusion that Defendants acted with the

requisite recklessness.

Plaintiff's contention that the close temporal proximity between BHG's statements of

optimism and its corrective disclosures provides "strong circumstantial evidence of scienter" also

fails. (Pl.'s Opp'n at 24.) The proximity of corrective disclosures made on the heels of "firm

and rosy representations of revenue, backlog, and realization" *may* strengthen circumstantial

allegations of scienter, but it "is not sufficient by itself to constitute scienter." *In re Pareteum*

*Securities Litigation*, No. 19 Civ. 9767, 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021).

Moreover, both of the cases Plaintiff cites in support of his temporal proximity argument are

inapposite because they included a critical fact that is missing in this case: an admission by the

defendant that it had knowledge information that it failed to disclose.  *See id.* at *16 (finding

financial restatements made just seven months after more positive representations of business

health "add[ed] further strength to" evidence that the company's auditors advised the defendants

that their internal controls over financial reporting were "inadequate and ineffective" and the

company's admissions that its "financial statements were not reliable"); *In re CPI Card Grp. Inc.*

*Sec. Litig.*, No. 16-cv-4531, 2017 WL 4941597, at *3 (S.D.N.Y. Oct. 30, 2017) (scienter

supported by an admission of knowledge soon after IPO of a trend that began in the first half of

2015 and continued until the company's IPO in mid-October 2015).  As discussed, the Amended

Complaint concedes that that BHG warned investors that the COVID-19 pandemic might impose

risks on its ability to catch up on payments and claims resolution, (Am. Compl. ¶¶ 169–77), and

that its "rapid growth could outpace the capacity of [its] third-party service providers to

effectively support [its] business needs," as had been the case "in the past," (Registration

Statement at 24).

     In short, the Amended Complaint's allegations, if true, would not add up to

circumstantial evidence of conscious misbehavior or recklessness.[9]  And, because Plaintiff does

---

[9] In a last-ditch effort to plead scienter, Plaintiff argues that its allegations that Colorado regulators audited BHG prior to the IPO and issued a fine for its failure to pay provider claims bolster its pleading of scienter.  (Pl.'s Opp'n at 24.)  But, even the cases on which Plaintiff relies cast doubt on the ultimate value of government investigations in the scienter analysis, where, as here, it is unclear whether the government investigation made any determination about Defendant's conscious misbehavior or recklessness.  *See In re ITT Educ. Servs., Sec. Litig.*, 34 F. Supp. 3d 298, 309 (S.D.N.Y. 2014) (opining (Continued)

not adequately plead a material misrepresentation or omission nor scienter, Plaintiff's Exchange Act and Rule 10b-5 claims fail.[10]

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's Amended Complaint are GRANTED.

SO ORDERED.

Dated: Brooklyn, New York
      November 1, 2024

/s/ LDH
LaSHANN DeARCY HALL
United States District Judge

---

that government investigations "are not categorically irrelevant" but nor are "they are not tremendously probative" because "[i]t is not clear whether, or how much, each investigation [in that case] hinged on the Defendants' states of mind"); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y.2013) (considering "a governmental investigation as one piece of the puzzle" while recognizing that "the existence of an investigation alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter"). So, while the Court has considered these allegations, they cannot save Plaintiff's otherwise defective pleading of scienter.

[10] Plaintiff also brings a claim under Section 20(a) of the Exchange Act. A control person claim under Section 20(a) requires "a primary violation by the controlled person." *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). Because Plaintiff failed to allege a primary violation of Section 10(b) of the Exchange Act or SEC Rule 10b-5. As such, Plaintiff's Section 20(a) claim fails.